# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

| | | |
|---|---|---|
| **XCENTRIC VENTURES, LLC**, an Arizona limited liability company; and **ED MAGEDSON**, an individual, | : : : : | No. 15CV4008-DEO |
| | : | **COMPLAINT** |
| Plaintiffs, | : : | **Jury Trial Demanded** |
| | : | |
| vs. | : : | |
| **BEN SMITH**, in his individual capacity as Sac County Attorney, | : : : | |
| | : | |
| Defendant. | : | |

Plaintiffs Xcentric Ventures, LLC and Ed Magedson, through undersigned counsel, allege as follows:

### Introduction

1.    "The criticism of public officials lies at the heart of speech protected by the First Amendment." *Williams v. City of Carl Junction, Missouri*, 480 F.3d 871, 874 (8th Cir. 2007).    Defendant Ben Smith ("Smith") is an elected public official; Sac County Attorney for Sac County, Iowa.    Thus, criticism of Smith goes to the heart of speech protected by the First Amendment.

2.    Smith successfully prosecuted Tracey Richter ("Richter") in 2011, accusing her of killing Dustin Wehde ("Wehde") over a decade prior.

3.    Numerous individuals criticized Smith for his handling of this controversial case.

1

4.     These individuals have a constitutional right to criticize Smith through opinions and truthful statements of fact.

5.     Much of the criticism was lodged on the website www.RipoffReport.com ("Ripoff Report"), a website dedicated to enabling consumers and other individuals to air their grievances about companies and public officials.

6.     Ripoff Report was, at the time of drafting this complaint, ranked by Alexa.com as the 2,484[th] most popular website in the United States and the 9,315[th] most popular website in the world.

7.     Ripoff Report is owned and operated by Plaintiff Xcentric Ventures, LLC, through its manager, Ed Magedson ("Magedson").

8.     In his crusade to squelch the criticism against him, Smith has:

- Threatened criminal prosecution against Magedson and Xcentric Ventures to retaliate against the political and professional criticism that has been posted on Ripoff Report;

- Unlawfully searched emails, including those containing privileged attorney-client communications;

- Disclosed attorney-client privileged communications to the public;

- Disclosed private and personal communications to the public;

- Disclosed bank account numbers and private financial records to the public in violation of law;

- Wrongfully instituted civil proceedings for the purpose of placing private records in the public records;

- Issued over 100 criminal subpoenas as part of his campaign of harassment;

- Improperly obtained and executed search warrants; and

2

- Falsely accused Magedson of criminal conduct.

9. Smith engaged in this wrongful conduct to use his awesome powers as a prosecutor to chill the free speech of Magedson and Xcentric Ventures.

**Jurisdiction and Venue**

10. This action arises under the Constitution of the United States, particularly the Fourth and Fourteenth Amendments, and under the laws of the United States, particularly the Civil Rights Act, 42 U.S.C. § 1983.

11. This Court has jurisdiction over Plaintiff's federal civil rights claim pursuant to 28 U.S.C. §§ 1331, 1343, and 144.

12. Plaintiffs also invoke the supplemental jurisdiction of this Court over their State claims against the Defendant for common law violations pursuant to 28 U.S.C. 1337, as common law claims form part of the same case or controversy.

13. The events that form the basis of Plaintiff's Complaint occurred in Sac County, State of Iowa. Smith currently resides or works, or resided or worked at relevant times, within Sac County, Iowa. Thus, venue is proper in the Northern District Court of Iowa pursuant to U.S.C. § 1391(b).

**Parties**

3

14.     Plaintiff Xcentric Ventures, LLC, is a limited liability company organized under the laws of the State of Arizona. It is the owner and operator of a website known as www.ripoffreport.com (the "Ripoff Report"), dedicated to consumer protection.

15.     Although much of the Ripoff Report is devoted to exposing fraudulent and improper conduct by businesses, the Ripoff Report also exposes perceived governmental abuses of power.

16.     Ripoff Report declares that its mantra is that it "protects consumers' first amendment right to free speech."

17.     Magedson is an unmarried individual and a resident of the State of Arizona.

18.     Magedson is the founder of Ripoff Report and the managing member of Xcentric Ventures.

19.     Smith is an individual residing, upon information and belief, in Sac County, Iowa. At all times relevant to the present complaint, he was and is the duly elected County Attorney for Sac County, Iowa. He was first elected to this office in November of 2010.

20.     Smith is named in his individual capacity as such term is used within the jurisprudence of the Civil Rights Act of 1871, 42 U.S.C. § 1983, and at all times referenced herein was acting under the color of law.


\

## Factual Allegations

### A.     Richter Kills an Intruder

4

21.     On December 13, 2001, Richter shot and killed Wehde at her home in Early, Iowa.

22.     Richter claimed that she shot in self-defense, and, after her divorce from Michael Roberts ("Roberts"), claimed that Wehde had come to her home to kill her at the request of her then husband, Roberts.

23.     As part of the homicide investigation, detectives learned that Roberts was the beneficiary of life insurance on his wife's life.

24.     On February 13, 2002, the investigators had Roberts take a polygraph examination.

25.     As part this examination, the polygraph operator asked Roberts:

- "Did you arrange for DUSTIN to be in your house last December 13th?";

- "Did you plan in advance for DUSTIN to be in your home last December 13th?"; and;

- "Do you know the name of the second intruder in your home last December 13th?"

26.     To each of the above questions, Roberts answered: "No."

27.     The lie-detector result indicated that Roberts was 99% deceptive. The diagnostic evaluation read: "After careful analysis of the Roberts' polygraphs, and based on the case facts available, it is the examiner's opinion that Roberts' truthfulness could not be verified and he could not be cleared in this matter."

**B.     The "Ripoff Report"**

5

28. "Ripoff Report" is "an online forum where users can read and post messages about businesses that purportedly have 'ripped off' consumers in some manner."

29. Xcentric Ventures, L.L.C. operates Ripoff Report.

30. Ripoff Report is a forum primarily for consumers to post about their personal experiences with businesses, but also acts as a forum for citizens to post about public officials and abuse of power.

31. Registering for, and posting to the Ripoff Report website, is free. A post on Ripoff Report is called a "report."

32. These reports are authored and published by third-party readers and users of the Ripoff Report website, not by people employed by Xcentric Ventures.

33. The website has grown to become one of the most popular consumer reporting websites: containing almost two million reports, giving consumers a voice; saving countless consumers from scams; positively impacting the business practices of legitimate businesses; and assisting government agencies and law enforcement personnel across the United States, including the FBI, FTC, SEC, Homeland Security, U.S. Postal Inspectors, U.S. Customs and Border Patrol, and federal and local prosecutors to identify scams and find witnesses to stop frauds.

**C. Roberts**

34. Roberts has a career in the reputation management industry, meaning that he is paid by companies to hide negative information about their business practices.

35. He continues to advertise those services to this day through his various online companies, including "Rexxfield" and Page1Me. See, e.g., www.rexxfield.com.

6

36.     Roberts has an extensive history of conflict and hostility towards Ripoff Report and Magedson.

37.     Xcentric Ventures hired Roberts in 2009 to assist in obtaining information about a website called www.complaintsboard.com.   ComplaintsBoard was a direct competitor of the Ripoff Report, getting its start by copying tens of thousands of pages of content from Ripoff Report.  As such, Xcentric Ventures brought a copyright infringement lawsuit against ComplaintsBoard. *See Xcentric Ventures v. Elizabeth Arden*, United States District Court for the District of Arizona, Case No. CV2008-2299.

38.     An attorney introduced Xcentric Ventures to Roberts, who had extensive knowledge about ComplaintsBoard, and Xcentric Ventures hired Roberts to provide information about the ownership of the ComplaintsBoard website.

**D.     Roberts' Attempts to Extort The Ripoff Report**

39.     In March of 2011, Roberts contacted Xcentric Ventures' attorney, at first anonymously, and then openly.

40.     Roberts informed the attorney that someone had injected code into the Ripoff Report website that caused reports to disappear or lose rankings in search engine results (the "Ripoff Report Hack").

41.     Roberts offered information about countermeasures and about persons who had installed the code in exchange for €105,000 (approximately $150,000 U.S.), and requested that Xcentric Ventures grant immunity to the code writer and to Roberts himself.

42.     Roberts followed up with an email stating that if Xcentric Ventures signed a draft agreement that he attached, "We'll get this hole plugged before sun up tomorrow."

7

43.     The draft agreement, authored by Roberts, stated that Roberts knew how to make this malicious code "100% ineffective"; that he knew who the creator was; and that he knew who was exploiting the method to charge individuals and businesses money to have their respective Ripoff Report complaints "buried" in Google search engine results.

44.     Xcentric Ventures rejected the proposal.  Instead, it independently located and removed the malicious code from its website, and publicized Roberts' failed attempt at extortion.

45.     Subsequently, other negative reports about Roberts were posted to the Ripoff Report website.

### E.     Darren Meade

46.     Darren Meade ("Meade") previously worked with Roberts.

47.     Mr. Roberts' had earned money by charging companies thousands of dollars to hide negative information about that company on the internet and using the Ripoff Report Hack to cause search engines to not show results about their customers.

48.     Meade and Mr. Roberts parted ways and became adverse to one another.

49.     In mid-to-late 2011, Meade contacted Magedson and provided him with information about the Ripoff Report Hack.

### F.     Smith Befriends Roberts

50.     At trial, Richter asserted as a defense that Wehde had come to her home at the request of her husband, Roberts.

8

51.     Nonetheless, Smith befriended Roberts rather than remain impartial and objective as a prosecutor should.

52.     Smith accepted Roberts' claim that he (Roberts) was an innocent "victim" of Richter, despite polygraph evidence to the contrary.

53.     Smith's relationship with Roberts extended far beyond the professional relationship one might expect as a result of Smith's office. For example, Smith testified on behalf of Roberts during a custody proceeding with Richter in 2012.

54.     Smith also submitted an affidavit in support of Roberts gaining custody of Richter's children, attesting to reviewing the documents from the Roberts' "knotted custodial matters."

55.     Smith stated that Roberts is "completely and unabashedly honest," and that his mother-in-law would poison his children against him with her obsessive efforts to publically blame and demonize Roberts for the murder of Wehde.

56.     Smith also wrote to the Australian Consulate requesting "emergency action" to allow Roberts' children to leave the United States with Roberts, claiming that their lives were in danger from their mother, as well as his own life:

> Despite Richter's incarceration, it is my strong belief that, so long as she draws breath, Richter poses a danger to the lives of her ex-husband, Michael Roberts, and their children, [Redacted] and [Redacted] Roberts, as well as many others, including myself and others responsible for her life imprisonment [ . . .]

## H.     John Brewington History

57.     John Brewington ("Brewington") is an Arizona private investigator, and convicted criminal.

9

58.   Brewington also has a long history of animosity toward the Ripoff Report website.

59.   In March 2006, Brewington anonymously posted a physical threat on the Ripoff Report website against the principal of a company by the name of Federated Financial. He made this posting to fuel the public controversy between Ripoff Report and Federated Financial, which was suing Xcentric Ventures at that time.

60.   Later in 2006, Brewington and Magedson clashed when Brewington attempted to obtain information from Magedson for one of Brewington's private investigations.

61.   During this matter, Brewington said or implied that he was a law enforcement officer and Magedson accused Brewington of lying. That began Mr. Brewington's nine-year long obsession to put Xcentric Ventures and the Ripoff Report website out of business.

62.   Brewington has a personal blog which he has devoted to negative criticism about the Ripoff Report.

63.   Using his blog, emails and social media, Brewington has made many public statements menacing or harassing Xcentric Ventures's employees, attorneys, agents and service providers, including but not limited to the following:

June 27, 2011: "Recipe for catching a shark. Study and profile the Shark. Throw insurance chum into the water. When the Shark comes in to feed, throw in dynamite. The Shark being a Shark will come back to feed on insurance chum. Throw in more dynamite."

August 26, 2011: Mr. Brewington posted that he was filing a bar complaint against Ripoff Report lawyers. The post has a bizarre photograph of the bar complaint, a painting, and a feather duster. The painting

10297-10297-00101\MCS\MCS\1583045.1

includes a private investigator, a chalk outline of a dead body, and a blood stained document.

64. In addition to personally menacing Xcentric Ventures, Brewington regularly incites others to harm Xcentric Ventures by litigation and other methods. He offers those litigants and misfeasors information, documents and assistance.

65. As only one of dozens of examples, in 2013, the Arizona Court of Appeals found that there was evidence that Brewington had assisted notorious spammer William Stanley (who has since been indicted by a federal grand jury for transmitting threats and extortion) in a campaign to harass the service providers of Xcentric Ventures and threaten those companies in an effort to induce them to discontinue providing services to the Ripoff Report website. *Xcentric Ventures, LLC, et al. v. John F. Brewingon, et al.,* Arizona Court of Appeals, No. 1 CA-CV 11-0042, Memorandum Decision dated December 22, 2011.

66. Brewington's website front page boasted that he is "arguably the foremost expert on the Ripoff Report and its owner Magedson. So much so that a rip the lid off book 'Social Waterboarding' is in the works. Do you think you have a lawsuit against Ripoff Report.... before you pay an attorney a great deal of money to lose a case for you, I'm the guy you need to speak to."

### I. Meade Posts Information About the Richter Case On Ripoff Report

67. Meade believes that Richter is innocent of the murder charges against her. Accordingly, he posted his opinions and information about the case on Ripoff Report (as any member of the public can do).

11

68.     Meade posted that Richter was an innocent mother, set up by Roberts, and the victim of prosecutorial misconduct.

69.     For example, the title of one of the reports on Ripoff report was:

Ben Smith Sac County Iowa Attorney prosecutorial misconduct, improper relationship with star witnesses, allowing witnesses to knowingly lie, seeking fame not justice, Sac county Iowa corruption. Tracey Richter falsely convicted evidence leads to overwhelming evidence to estranged husband Michael Roberts, Rexxfield failed polygraph, witness intimidation, evidence tampering, Prosecutors improper relationship with witnesses & Michael Roberts. Roberts witness protection sham. Exaggerated, misleading information to Dateline NBC. Sac City, Iowa

70.     The reports on Ripoff Report included allegations and documents supporting those allegations that witnesses in the Richter trial committed perjury.  The reports on Ripoff Report also included Michael Robert's actual polygraph results.

71.     While Ripoff Report does not control the content of people posting on the website, Magedson believes that allegations of prosecutorial misconduct are a matter of public concern, and might raise awareness for the plight of an innocent woman.

72.     Apart from what Meade told Magedson about Roberts, Richter and Smith, Magedson had no independent knowledge of the relationship between those three.

73.     Meade posted the reports on Ripoff Report about Smith and Roberts and matters related to the Richter investigation and trial; at no time did Mr. Magedson write any such reports or posts nor did he direct Meade to do so.

**J.     Smith Retaliates Against Ripoff Report and Magedson**

74.     Smith's conviction against Richter in November of 2011, was affirmed by the Iowa Court of Appeals on January 9, 2013. *See State v. Richter*, 828 N.W.2d 326 (Iowa App. 2013) (table, unpublished decision).

12

75. Nonetheless, Smith decided to pursue those who exercised their First Amendment right to criticize Smith for that prosecution.

76. By Smith's own admission, after the conviction, he spent more than 1,500 hours investigating Richter, Richter's mother, Meade, and others for posting criticisms about the Richter investigation and trial.

77. Smith issued "over 100 Rule 2.5(6) County Attorney Investigatory Subpoenas Duces Tecum," reviewing "thousands of documents" and listening to "hundreds of hours of recorded phone conversations." Here are his exact words:

> During this investigation, your applicant listened to hundreds of hours of recorded phone conversations between TRACEY RICHTER and her friends and family, which made from either the Sac County Jail in Sac City, Iowa, or the Iowa Women's Prison in Mitchellville, Iowa, as well as audio recordings of conversations between TRACEY RICHTER and her family and friends during their prison visits. Additionally, your applicant has issued over 100 Rule 2.5(6) County Attorney Investigatory Subpoenas Duces Tecum in furtherance of this investigation and has obtained and reviewed thousands of documents, and has spoken with numerous witnesses. In total, your applicant has spent well over 1,500 hours investigating / working on this case.

78. Using in part information provided to him by Brewington and Roberts, Smith participated in and adopted a 119-page Search Warrant Affidavit, alleging there was probable cause to believe that Magedson and Xcentric Ventures are involved in a conspiracy with Meade to engage in witness tampering and other related crimes specified therein.

79. Smith then made the Search Warrant Affidavit public, which is abnormal and extremely rare during an "ongoing investigation." As a direct result, Smith's unsubstantiated allegations were widely circulated on the internet by Roberts, Brewington, and their known associates.

13

80. Smith made media appearances touting his "ongoing investigation" calculated to cast suspicion and public condemnation on his critics, such as his interview on 60 Minutes Australia in November 2011.

81. Smith aggressively promoted the Search Warrant Affidavit as a public news release, including his appearance on a radio show/podcast in which he encouraged listeners to read the Search Warrant Affidavit for details.

82. This information has also been widely publicized and reported by widely followed organizations such as the Huffington Post.

83. The Search Warrant Affidavit includes an admission by Smith on its very first page that the document could contain "factual inaccuracies," and contains extensive assertions of "fact," of which Smith could not possibly have had any personal knowledge, including the childishly disparaging assertion that Meade is Magedson's "BFF."

84. Indeed, the Search Warrant Affidavit appears to have been written at least in part by or with the assistance of Roberts.

85. For example, the Search Warrant Affidavit refers to details about the Ripoff Report Hack that closely tracks the story that Roberts told Xcentric Ventures and others. However, the Search Warrant Affidavit fails to disclose that Roberts was involved in the Ripoff Report Hack himself, and that he attempted to sell information about it to Xcentric Ventures.

86. On June 8, 2014, a full month before Smith executed the search warrant, Brewington posted on his anti-Ripoff Report blog, "Pay attention to the date here. You will see I know what I am talking about."

14

87.   On June 26, 2014, Brewington posted, "I have said it before. If you are standing under the Magedson/Ripoff Report tree, you will be struck by lightning. The storm is coming."

88.   On July 8, 2014 (one day before Smith executed the search warrant), Brewington wrote, "Gentle reader, I now present you with just a very small portion of what I know and what is going to come. Keep in mind the evidence hasn't been made public yet, but I have permission to release this." That statement was followed by information contained in the Search Warrant Affidavit.

89.   On July 9, 2014, Smith executed the search warrant. Smith strategically released the Search Warrant Affidavit to the media and to people, including Brewington, who would help him use it to disparage Xcentric Ventures.

90.   On July 10, 2014, Brewington tweeted, "The storm is here."

91.   Smith has been releasing information from inside his "investigation" so that Mr. Brewington and others can use the information to bring suspicion and public condemnation on Xcentric Ventures and Magedson.

92.   The Search Warrant Affidavit contains numerous references to the banking records of Xcentric Ventures, and to Magedson's personal and business email correspondence, including his emails to and from his attorneys. Smith apparently obtained these records through search warrants, then intentionally made information public by releasing the Search Warrant Affidavit.

93. Smith also released Xcentric Ventures' banking records and private emails directly to Brewington, including emails clearly protected by attorney client privilege, knowing that information would be disseminated.

94. Brewington posted comments on social media about payments made by Xcentric Ventures; information that he only could only have obtained from having access to that actual checks that were written as obtained by Smith with the search warrants.

95. Smith also improperly read attorney client privilege communications and then shared them with Brewington and others who used them against Xcentric Ventures.

96. Smith read and disseminated personal emails that had nothing to do with his investigation and, in some cases, predated the events being investigated.

97. On August 11, 2014, Smith filed a response to Anna Richter's Motion to Expunge Warrant, which was the warrant that relied on the Warrant Affidavit.

98. In that opposition pleading, Smith said that Xcentric Ventures internally referred to a post about Brewington as a "hit piece."

99. A thorough search of the records of Xcentric Ventures revealed that its attorney had, indeed, referred to the post as a "hit piece," and that reference only exists in a highly confidential electronic communication between counsel for Xcentric Ventures and Magedson.

100. That privileged email was the sole reference to the Brewington post as being a hit piece.

101. Smith also sent approximately fifteen highly confidential and privileged emails between Xcentric Ventures and its attorneys to the Arizona State Bar Association as part of a frivolous and unfounded bar complaint against counsel for Xcentric Ventures.

102. Smith ignored his own ethical duty under Rule 4.4(a) of the Iowa Rules of Professional Conduct to refrain from using methods of obtaining evidence that violates the legal rights of others, which includes prohibiting "unwarranted intrusions into privileged relationships, such as the client-lawyer relationship."

103. Additionally, in the course of his personal vendetta and under pretext of a legitimate investigation, Smith used warrants to obtain personal email correspondence between Magedson and friends, and Magedson and personal business associates.

104. Smith's actions in obtaining, reading, and disseminating confidential and personal information from personal correspondence constitutes an illegal invasion of Magedson's privacy, and an act of oppression and intimidation to chill rights to free speech.

105. Smith also publicly alleged that Magedson committed the following crimes:

- Ongoing Criminal Conduct, a Class "B" Felony

- Conspiracy, a Class "D" Felony

- Solicitation, a Class "D" Felony

- Extortion, a Class "D" Felony

- Witness Tampering, an Aggravated Misdemeanor

- Facilitation of A Criminal Network By Attempting To Induce A Witness," a Class "B" Felony

17

106. Smith also filed a civil lawsuit, specifically an Application for a Civil Injunction to Restrain Harassment or Intimidation of Victims or Witnesses under Iowa Code § 915.22 (a "915 application").

107. He listed the plaintiff in the action as the State of Iowa. In the 915 application, Smith sought removal of the names of the witnesses from the reports on Ripoff Report.

108. Xcentric Ventures filed a motion to disqualify Smith because, as the subject of the reports at issue, he had a very serious conflict of interest.

109. In response to the motion to disqualify, Smith filed documents with the Court containing Xcentric's private records, such as banking records and private emails with the court, making them public records.

110. In doing so, Smith ignored the mandatory redaction rules required for e-filing and left bank account numbers on the documents.

111. Smith then filed a sur-reply at 9:00 pm the night before the morning hearing, knowing that neither the judge nor Plaintiffs' counsel would see it and he never mentioned it at the hearing. It was not filed to persuade the Judge, it was filed to make public additional documents before he voluntarily dismissed the case.

112. At oral argument on Friday, October 10, 2014, Smith admitted that he felt personally attacked and that "this is something if I had to, you know, wish out of my life, I would" and that his concern was "just getting [the posts on Ripoff Report] removed and getting it down."

18

113. Apparently recognizing that he was about to be found in violation of the Iowa ethics rules and disqualified from the matter, Smith voluntarily withdrew the 915 application on Sunday, October 12, 2014 – less than one court day after the hearing but before a ruling could be issued.

114. However, he thereafter sent an email indicating his intention to continue his crusade and obtain "more meaningful, permanent relief."

115. Smith's conduct has caused consider damage and harm to Plaintiffs.

116. Among other things, Plaintiffs have incurred considerable attorney's fees in connection with the criminal accusations and the 915 Action. Plaintiffs' reputation, both professionally and personally, has been significantly impugned. Magedson has experienced considerable and intense emotional distress and psychological trauma as a result of Smith's vendetta.

### Claims For Relief

### Count One
### 42 U.S.C. § 1983

117. All allegations in this Complaint are incorporated as if fully set forth herein.

118. Criticizing our public officials for perceived governmental misconduct is one of the hallmarks of our constitutional democracy and is therefore speech that is protected by the First Amendment to the United States Constitution.

119. The First Amendment also protects the right to speak, post or host these criticisms without fear of reprisal by governmental officials.

19

120.    The threats of prosecution, dissemination of private and/or false information, and the institution of unethical and harassing civil proceedings by the very prosecutor Xcentric Ventures and Magedson criticized or allowed to be criticized constitutes unlawful retaliation by Smith since the activities of Xcentric Ventures and Magedson are fully protected by the First Amendment.

121.    Smith also violated Xcentric Ventures and Magedson's clearly established rights under the Fourth and Fourteenth Amendments to the United States Constitution to be free from the unreasonable searches and seizures of his property when Smith unlawfully searched and then publically disseminated highly confidential and private information, including attorney-client emails and bank account numbers and information without probable cause or reasonable basis to believe that Xcentric Ventures or Magedson had done anything other than exercise their First Amendment rights to publically criticize or to host public criticisms of his performance as a prosecutor.

122.    Further, by obtaining and reviewing confidential and protected communications by and between Plaintiffs' counsel, Smith further violated Plaintiffs' rights under the Sixth Amendment to the United States Constitution.

123.    As a direct and proximate result of Smith's wrongful conduct as set forth herein, Plaintiffs sustained serious and significant damage.

**Count Two**
**42 U.S.C. § 1983**
**Abuse of Process**

124.    All allegations in this Complaint are incorporated as if fully set forth herein.

20

125. Smith instituted legal process by, among other things, issuing County Attorney Subpoenas Duces Tecum, applying for search warrants, and instituting the "915 application" civil lawsuit.

126. Smith instituted these legal processes without probable cause and for improper purposes, including the effort to obtain confidential records to which he would otherwise not have access, to make private records public, to suppress speech critical of his actions, and to continue and further his campaign of retaliation against Plaintiff.

127. As a direct and proximate result of Smith's wrongful conduct as set forth herein, Plaintiffs sustained serious and significant damage.

## Count Three
## Abuse of Process

128. All allegations in this Complaint are incorporated as if fully set forth herein.

129. Smith instituted legal process by, among other things, issuing County Attorney Subpoenas Duces Tecum, applying for search warrants, and instituting the "915 application" civil lawsuit.

130. Smith instituted these legal processes without probable cause  and for improper purposes, including the effort to obtain confidential records to which he would otherwise not have access, to make private records public, to suppress speech critical of his actions, and to continue and further his campaign of retaliation against Plaintiff.

131. As a direct and proximate result of Smith's wrongful conduct as set forth herein, Plaintiffs sustained serious and significant damage.

21

## Count Four
## Malicious Prosecution/Wrongful Institution of Civil Proceedings

132. The foregoing allegations are incorporated as if fully set forth herein.

133. Smith instituted legal proceedings including the 915 application, which terminated as a result of Defendant's voluntary dismissal upon realization of an impending unfavorable ruling.

134. Smith lacked probable cause or other good faith basis to bringing this lawsuit. He did so for the improper purpose of obtaining improper discovery and containing his campaign of retaliation against Plaintiffs.

135. As a direct and proximate result of Smith's wrongful conduct as set forth herein, Plaintiffs sustained serious and significant damage

## Count Five
## Invasion of Privacy

136. The foregoing allegations are incorporated as if fully set forth herein.

137. Defendant Smith placed Plaintiffs in a false light before the public.

138. In addition, Defendant Smith wrongfully intruded upon Plaintiffs' private affairs, including obtaining and publicizing Plaintiffs' private financial records and correspondence.

139. As a direct and proximate result of Smith's wrongful conduct as set forth herein, Plaintiffs sustained serious and significant damage.

## Prayer For Relief

WHEREFORE, Plaintiffs pray for judgment as follows:

10297-10297-00101\MCS\MCS\1583045.1

A.    For a declaration that Smith's conduct violated the First, Fourth, Sixth, and Fourteenth Amendments to the United States Constitution and, further, that Defendant Smith has a conflict of interest in continuing any further investigation or prosecution of Plaintiffs;

B.    For an order enjoining Smith from continuing his campaign of retaliation against Plaintiffs, including an injunction precluding further investigation and/or prosecution of Plaintiffs by Smith;

C.    For compensatory damages, including lost income and business opportunities, attorney's fees and expenses incurred as a result of Smith's conduct, other economic losses, emotional distress and other psychological damages; and general pain and suffering;

D.    For exemplary and punitive damages to the extent permitted by law;

E.    For pre- and post-judgment interest to the extent permitted by law;

F.    For attorney's fees and expenses pursuant to 42 U.S.C. § 1988;

G.    For taxable costs; and

H.    For such other relief as the Court deems just and appropriate.


Respectfully submitted,

BERGER LAW FIRM, P.C.

/s/ Peter W. Berger

_____
By: Peter W. Berger, AT0000826
7109 Hickman Road
Urbandale, Iowa 50322

23

Telephone: (515) 288-8888
Facsimile: (515) 288-8182
pbergerlaw@mediacombb.net
www.peterbergerlaw.com

Local Counsel for Plaintiffs

CERTIFICATE OF SERVICE

I hereby certify that on January 30, 2015, I electronically
filed this document with the Clerk of Court using the ECF
system.

/s/ Peter W. Berger

Signature _____

24