IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION


XCENTRIC VENTURES, LLC, an
Arizona Limited Liability Company;
and ED MAGEDSON, an individual,

       Plaintiffs,

    vs.                               No. C15-4008-DEO


BEN SMITH, in his individual
capacity as Sac County Attorney,      TRANSCRIPT OF
                                   PRELIMINARY INJUNCTION
       Defendant.          HEARING
_____/


       The Hearing held before the Honorable Leonard T.
Strand, Magistrate Judge of the United States District Court for
the Northern District of Iowa, at the Federal Courthouse, 320
Sixth Street, Sioux City, Iowa, May 1, 2015, commencing at 9:02
a.m.

APPEARANCES

For the Plaintiffs:          JOEL B. ROBBINS, ESQ.
                             Robbins & Curtin
                             Suite #B-100
                             301 East Bethany Home
                             Phoenix, AZ 85012

                             MARIA CRIMI SPETH, ESQ.
                             Jaburg & Wilk
                             Suite 2000
                             3200 North Central Avenue
                             Phoenix, AZ 85012

                             ANGELA LYNNETTE CAMPBELL, ESQ.
                             Dickey & Campbell Law Firm
                             Suite 1
                             301 East Walnut Street
                             Des Moines, IA 50309

For the Defendant:           Kristopher K. Madsen, Esq.
                             Robert M. Livingston, Esq.
                             Stuart, Tinley, Peters, Thorn,
                               Hughes, Faust & Madsen
                             2nd Floor
                             310 W Kanesville Boulevard
                             Council Bluffs, IA 51502-0398

Also present:                Adam Kunz

Reported by:                 Shelly Semmler, RMR, CRR
                             320 Sixth Street
                             Sioux City, IA  51101
                             (712) 233-3846

```
 1                THE COURT:  Please be seated.  All right.  Good
 2     morning, everyone.
 3                MR. MADSEN:  Morning.
 4                MR. ROBBINS:  Morning, Your Honor.
 5                THE COURT:  This is Xcentric Ventures, LLC, and Ed
 6     Magedson versus Ben Smith.  It's Number 15CV4008.  We are here
 7     today for a hearing on the plaintiffs' motion for preliminary
 8     injunction.  Would counsel please enter their appearances and
 9     introduce who they have with them.
10                MS. CAMPBELL:  Your Honor, Angela Campbell for the
11     plaintiff.  I'm local counsel.
12                THE COURT:  Okay.
13                MS. CAMPBELL:  I have Joel Robbins, lead counsel;
14     Maria Speth, associated counsel; Adam Kunz who's a
15     representative from Xcentric Ventures.
16                THE COURT:  Great.  All right.  Thank you.  Good
17     morning.
18                MR. MADSEN:  Your Honor, I'm Kris Madsen for the
19     defendant, Ben Smith, who is to my left, and my co-counsel from
20     my firm is Robert Livingston.
21                THE COURT:  Great.  Thank you.  Good morning.  All
22     right.  We had exchanged a few e-mails over the last few days
23     about a couple procedural issues.  I had proposed because the
24     motion has been fully briefed and very thoroughly briefed by the
25     parties coming into the hearing today that we skip opening
```

```
 1    statements and move right into the evidence, and I believe
 2    counsel indicated that was acceptable and something they thought
 3    was also a good idea.  Is that correct from the plaintiffs?
 4              MR. ROBBINS:  Yes, Your Honor.
 5              THE COURT:  And defense?
 6              MR. MADSEN:  Yes, Your Honor.
 7              THE COURT:  Good.  All right.  Then we will start with
 8    the plaintiffs, and I guess before we go into that, I am
 9    relatively informal about the way I conduct hearings.  I think
10    it's more important that the parties and the attorneys be
11    comfortable.  So if you like standing at the podium, please do
12    so.  If you'd rather sit at the table, you don't have to stand
13    up each time you're addressing the Court.  I don't get too hung
14    up on that kind of thing.  So whatever makes all of you most
15    comfortable, obviously we're going to be here a while today, so
16    whatever works best.
17              But with that, does the plaintiff -- well, one more
18    thing.  Sorry.  Before the hearing, I -- yesterday I think I
19    received a binder of the plaintiffs' exhibits.  It looks like
20    it's Exhibits 1 through 40 that the plaintiff planned on
21    offering today.  Does the defense have objections to any of
22    those exhibits?
23              MR. MADSEN:  There are no objections from the
24    standpoint of an authentication, identification.  We might have
25    some objections, Your Honor, on a relevancy basis.
```

1    THE COURT:  Okay.  So shall we just take them as we go

2    then during the hearing today?  What I was going to do is see if

3    we could just admit all of the exhibits today at the beginning,

4    but if you think you have objections and you want to preserve

5    your record, that's fine.  I just -- if there were going to be

6    no objections, I was just going to say they're all admitted now.

7    But we can just take them as we go.  Is that what you'd rather

8    do?

9         MR. MADSEN:  We'd stipulate to their admissibility as

10   it relates to the issues of, you know, authentication,

11   identification.  Our concern is there might be some that might

12   not have any relevance to the issues in this case.

13        THE COURT:  Sure.  Well, let's just -- instead of

14   admitting them all, we'll indicate -- the record will indicate

15   that you're not arguing about authenticity or foundational-type

16   issues, but you may raise relevance objections as we go through

17   the exhibits.  So with that, let's go ahead with the testimony

18   then.  Does the plaintiff have a witness to call?

19        MR. ROBBINS:  Yes, Your Honor.  Our first witness is

20   Ben Smith.

21        THE COURT:  Okay.  Great.  Mr. Smith, please come

22   forward.  I'll have you stop right here, and I'll swear you in.

23   Would you raise your right hand.

24        BENJAMIN SMITH, PLAINTIFFS' WITNESS, SWORN

25        THE COURT:  Okay.  Please have a seat.  Adjust the

1   microphone, both the microphones really if you need to.  And

2   then for the record, would you tell us your full name, please,

3   sir.

4               THE WITNESS:  Yes, sir.  Benjamin John Smith.

5               THE COURT:  Okay.  Thank you.

6               And with that, you may proceed with the questioning.

7               MR. ROBBINS:  Thank you, Your Honor.

8                         DIRECT EXAMINATION

9   BY MR. ROBBINS:

10  Q.   Mr. Smith, you are the county attorney for Sac County?

11  A.   I am, sir.

12  Q.   When did you graduate from law school?

13  A.   2006, sir.

14  Q.   And when you passed the bar, you began working for the

15  Attorney General's Office for the state of Iowa?

16  A.   Yes, sir.

17  Q.   And you were assigned to child support -- the child support

18  unit of the Iowa State Attorney General's.

19  A.   Yes, Your Honor -- or yes, sir.

20  Q.   Don't waste a "Your Honor" on me.

21  A.   No, it's just -- yeah, I'm not used to addressing other

22  attorneys on the witness stand so . . .

23  Q.   Okay.  Later you ran for and won the job of county attorney

24  for Sac County; correct?

25  A.   Yes, sir.

1  Q.   When did you first meet Michael Roberts?

2  A.   I first met him, it was either February or March, I

3  believe, of 2011.

4  Q.   And Michael Roberts was the ex-husband of Tracey Richter

5  who you prosecuted for murder; correct?

6  A.   That's correct, sir.

7  Q.   And Michael Roberts told you that his wife, Tracey Richter,

8  the woman -- or strike that, told you that his ex-wife, Tracey

9  Richter, was a sociopath and that she had arranged for the

10 murder of Dustin Wehde; correct?

11 A.   I don't know about whether -- whether he said that -- I

12 don't know whether Michael Roberts ever told me that it was his

13 theory that Tracey had arranged it.  I'm sure he called her a

14 sociopath.  He may have said that, sir.  I'm . . .

15 Q.   Is it fair to say that you and Michael Roberts talked at

16 length about Tracey Richter?

17 A.   Yeah.

18 Q.   How much time would you estimate that you spent with

19 Michael Roberts?

20 A.   I've met Michael Roberts maybe twice.

21 Q.   Have you ever e-mailed him?

22 A.   Yes, we exchanged e-mails.

23 Q.   How often do you exchange e-mails?

24 A.   Back in 2011 when I was investigating the murder, it was

25 frequent.  And then it trailed off, you know, after that.  As

1   far as a number, you know, anywhere from, you know, five times a

2   day to five times a month, you know, to not at all.

3   Q.   Okay.  And is it fair to say that you also spoke to him

4   over the telephone?

5   A.   That's correct, sir.

6   Q.   How often would you estimate during the 2011 period prior

7   to the homicide trial for Tracey Richter would you estimate that

8   you were speaking to Mr. Roberts over the telephone?

9   A.   I'm not quite for sure.  It's -- I mean, it's been a while,

10  but if I had to guess, again, probably in the same level of

11  frequency as the e-mails.  It ranged whether it was, you know,

12  two or three, four, five times a day to, you know, I wouldn't

13  speak with him for weeks, maybe months.

14  Q.   After you became Sac County prosecutor, you decided to

15  prosecute Mr. Roberts' ex-wife, Tracey Richter; correct?

16  A.   That's correct.

17  Q.   And did Roberts perform any work on the underlying case

18  against his ex-wife, Tracey Richter?

19  A.   Could you be more specific with work?

20  Q.   Yes.  By -- when I say work, did he provide you with

21  information, e-mails, telephone information that assisted you in

22  your prosecution of his ex-wife?

23  A.   Yes, that'd be fair.

24  Q.   And eventually -- or strike that.

25         Who was the lead counsel in that case?

A.   The lead counsel in that case was Assistant Attorney
General Doug Hammerand.

Q.   And following the tr -- you did obtain a conviction;
correct?

A.   Yes, sir.

Q.   And following the trial, you had national attention;
correct?

A.   Yes, sir.

Q.   There was a Dateline episode on the Tracey Richter murder
conviction?

A.   Yes, sir.

Q.   There were newspaper stories nationally and in Iowa.

A.   Yes, sir.

Q.   And you were the one that appeared in the Dateline episode;
correct?

A.   I did appear, yes.

Q.   You've appeared in Australian tel -- on Australian
television on their version of 60 Minutes; correct?

A.   I believe so.  I was interviewed.  I don't know whether it
aired or not, sir.

Q.   Okay.  Have you ever seen on YouTube the episode involving
the Tracey Richter murder trial?

A.   Which one?

Q.   The one from 60 Minutes.

A.   I don't know --

1  Q.   Australian --

2  A.   I don't know whether or not I have.  Maybe.  I don't know

3  for sure.

4  Q.   But it is fair to say that you were in the spotlight;

5  correct?

6  A.   That's fair.

7  Q.   And it's fair to say that you were proud of the murder

8  conviction that you obtained.

9  A.   Absolutely.

10  Q.   And after the conviction, you began to listen to phone

11  calls from Tracey Richter to her mother and other phone calls

12  that Tracey Richter made; correct?

13  A.   I began listening to Tracey's phone calls, Miss Richter's

14  phone calls, in December of 2013 was the first time after her

15  conviction.

16  Q.   Okay.  And you listened to the phone calls she had while

17  she was being held prior to trial in Omaha; correct?

18  A.   She was held in Omaha, sir, for I think a couple of days

19  before extradition.  There were audio recordings done at the

20  Omaha -- or the Douglas County Jail there.  That would have been

21  in July of '11.  And then when she was transported, extradited,

22  to Sac County which would have been from July '11 through -- up

23  and through -- to the trial, October of '11, yes, I -- she did

24  make phone calls, and I did listen to those.

25  Q.   Okay.  And I was first going to clarify that you had

1    listened to the phone calls in Omaha.  You also listened to the

2    phone calls in Sac County; correct?

3    A.    Yes, sir.

4    Q.    Okay.  And you understand that Tracey continued and

5    continues to contend that she was innocent, though a jury found

6    her guilty; correct?

7    A.    Yes, sir.

8    Q.    And that case has subsequently been up to the Court of

9    Appeals and has been affirmed by both the lower court and the

10   Supreme Court of the state of Iowa; correct?

11   A.    Yes, sir.

12   Q.    Do you have before you the exhibits?

13   A.    I do not, sir.

14   Q.    I will -- do I -- oh.  Thank you.  This is a long walk.

15   A.    I know.  It's a little bit nicer than Sac County.

16   Q.    I don't mean to turn my back.  It's just kind of a long

17   walk.  Exhibit 1's the affidavit that you submitted on July --

18   was it July 6 or July 7?  Go ahead and look at the back.

19   A.    I'm looking at Exhibit 1, the first page of Exhibit 1, and

20   it is the search warrant application.  It was made on July 7.

21   And when I say made, it was presented to the magistrate, and the

22   magistrate signed it on July 7 of 2014.

23   Q.    Let me direct your --

24          MR. ROBBINS:  Move for admission of Exhibit Number 1.

25                         *   *   *   *

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:15-cv-04008-LTS   Document 48   Filed 05/12/16   Page 11 of 252

```
1              (Exhibit 1 was offered.)

2                          *   *   *   *

3              MR. MADSEN:  No objection.

4              THE COURT:  All right.  Exhibit 1 is received.

5                          *   *   *   *

6              (Exhibit 1 was admitted.)

7                          *   *   *   *

8    BY MR. ROBBINS:

9    Q.   And let me direct your attention to the second -- second to

10   the last paragraph on page number 13.  And that is a discussion

11   of the trial itself, and I think I can project it.  If you want

12   to, you can look at the screen, or you can look at the exhibit

13   before you.  But that is your description of the trial of this

14   case; correct?

15   A.   Yeah, that would be correct.

16   Q.   Okay.  And the assistant attorney general, that would be

17   Doug Hammerand?

18   A.   Yes, sir.

19   Q.   Okay.  And go ahead and go to page 2 of Exhibit Number 1.

20   And on page number 2, you describe how much work you had done in

21   this particular case; correct?

22   A.   Yes, sir.

23   Q.   And I will blow up the portion of page number 2 where you

24   discuss that.  As of July 7 of 2013 -- 2014, you had submitted a

25   hundred -- over a hundred subpoenas duces tecum; correct?
```

1   A.   Yes, sir.   They are actually county attorney investigatory

2   subpoenas duces tecum, not to, you know, nitpick, but there's a

3   difference between the two of them.

4   Q.   Well, I don't mean to nitpick either, but the words you

5   used were subpoena duces tecum, and I apologize for my ignorance

6   of Iowa law, but that was what you wrote is that you had had 100

7   county attorney investigative subpoenas duces tecum in

8   furtherance of this investigation.   Those were your words.

9   A.   Yes, sir.

10   Q.   And did you continue to do additional subpoenas following

11   the July 7, 2014, subpoena?

12   A.   No, sir.

13   Q.   That was the last one.

14   A.   Well, this is actually a search warrant on July 7.   I have

15   issued county attorney investigatory subpoenas since this time,

16   and I went back and looked.   And I can't -- I don't recall

17   seeing any that followed this.   If there were, they weren't

18   remarkable in any way.

19   Q.   Okay.   So it's fair to say this is the culmination of your

20   investigation of Ed Magedson and Xcentric Ventures since this is

21   the final affidavit you submitted in support --

22   A.   Oh, I take -- I'm sorry.   I take that back.   This search

23   warrant was issued July 7, and there was a subsequent search

24   warrant I think on the 20th, around the 20th of July.

25   Q.   Do you recall what, if any, differences there were 13 days

1   later when you submitted the final affidavit supporting a search

2   warrant?

3   A.   I don't recall, sir.

4   Q.   Okay.  Is it fair to say that the Exhibit 1 fairly

5   summarizes the investigation that you performed?

6   A.   Yes, sir.

7   Q.   And according to page number 2 of Exhibit Number 1, you had

8   spent over 1,500 hours -- and that's three-quarter --

9   three-quarters of a year, full-time work -- working on this

10  investigation which you were wrapping up as of July 7 of 2014.

11  A.   Could you clarify three-quarters of a year?

12  Q.   Well, it's a person working full time 40 hours a week, 50

13  weeks in a year, 2,000 hours.  You had worked 1,500 of that on

14  this case, although you may work harder.  I mean, I saw

15  somewhere where you had said you worked 20 hours a day in

16  preparation for the trial.  But you spent 1,500 hours on this

17  case alone as summarized in this affidavit.

18  A.   I did.  This case -- I guess the investigation on this case

19  began in my mind and as it relates to the subject matter

20  contained in the search warrant shortly after Tracey Richter's

21  conviction.

22  Q.   And the culmination from the time of the conviction up

23  until the time of this warrant was 1,500 hours; correct?

24  A.   Around that.  If -- when I did the math, that's -- yeah, at

25  least.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:15-cv-04008-LTS Document 42 Filed 05/12/16 Page 14 of 252

```
 1   Q.   Did you prepare all of Exhibit Number 1?
 2   A.   I mean, I prepared it, yes.
 3   Q.   When I say prepare, did you write it all?
 4   A.   I wrote -- as far as like the final edit, yeah.
 5   Q.   Okay.  And I don't mean edit.  Did you write or did you
 6   receive assistance in preparing Exhibit 1?
 7   A.   I did receive assistance, yes.
 8   Q.   Okay.  And, in fact, when you discuss the work that you
 9   did, you said -- and I quote -- the facts and information
10   contained in this affidavit come from your affiant's personal
11   observations, training, experience, and research as well as the
12   same from other law enforcement officials, investigators, and
13   licensed private investigators.  Did I read that correctly?
14   A.   You did, sir.
15   Q.   What were the portions of this which you were solely
16   responsible for as opposed to the parts where you received
17   assistance from pri -- licensed private investigators?
18   A.   Well, sir, it's -- I mean, the search warrant's almost --
19   well, it is over a hundred pages.
20   Q.   I count 119 pages of substantive affidavit.  And what I am
21   concerned with, sir, is the participation of the licensed
22   private investigators.  So first I wanted to determine how much
23   of this document are you solely responsible for?
24   A.   Could you clarify solely responsible?
25   Q.   Yeah.  Let me -- let me do that for you, because there are
```

1   a number of subject matters, and maybe it's better if we just

2   break them down into subject matter.

3   A.   Sure.

4   Q.   Let's taken Darren Meade.  Starting at -- you discuss in

5   this document Darren Meade; correct?

6   A.   Yes, sir.

7   Q.   And you have a section which is eight pages on Darren

8   Meade; correct?

9   A.   I believe so, if you could point me to that page.

10  Q.   Well, I can point you to that page, but at least for the

11  purpose of our discussion, I'll actually get into the

12  substantive part of it.  But as to the facts concerning Darren

13  Meade, were those at your personal knowledge, or did Michael

14  Roberts assist you in the preparation of your section involving

15  Darren Meade?

16  A.   Michael Roberts, licensed investigator; Tina Church;

17  Dr. Scott Connelly out of California who had dealings with both

18  your client and Darren Meade helped prepare this section.

19  Q.   Did you -- okay.  Did you receive any assistance during the

20  preparation of the affidavit from John Brewington?

21  A.   I don't recall receiving any assistance from him in regards

22  to any of the content of the search warrant.  I might have asked

23  him certain questions about Xcentric Ventures that wound up in

24  here.  So I guess the answer, you know, could be yes.

25  Q.   Did you give John Brewington a copy of your affidavit

1  supporting the warrant prior to releasing it publicly?

2  A.   I think I may have -- I think I may have provided him a

3  rough draft, and that was, I believe, done for the purposes

4  of -- there's a lot of material in here that I was very

5  unfamiliar with when I first began looking into this.  And

6  Private Investigator Brewington had a wealth of knowledge as it

7  related to your client.  And I didn't -- I believe -- the answer

8  to your question's yes, and I believe I had provided it to him

9  so that I wasn't misstating the functions and the -- just things

10  about your client.

11  Q.   Okay.  So you don't mention his name in the affidavit, but

12  you relied at least in part on John Brewington; correct?

13  A.   Pr -- that's probably fair.

14  Q.   And you relied in part upon information provided to you by

15  Michael Roberts.

16  A.   That'd be fair.

17  Q.   And did you circulate a draft of your affidavit to Michael

18  Roberts so that he could participate in the final preparation?

19  A.   I believe I provided a copy to Michael Roberts, maybe a

20  draft, but just -- if I recall just as to the section as it

21  related to his involvement in and with Tracey Richter and her

22  family.

23  Q.   Did you provide a draft to Tina Church and to Scott

24  Connelly?

25  A.   I don't recall Tina Church.  Maybe.  Scott Connelly, yeah,

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:15-cv-04008-LTS-KEM   Document 42   Filed 05/12/16   Page 17 of 252

1    I probably did provide one to him.

2    Q.    Is Scott Connelly a licensed private investigator?

3    A.    No, he's not, sir.

4    Q.    Okay.  And Tina Church, what was her role?  You said she

5    had some.

6    A.    Well, Tina Church and Dr. Scott Connelly had communication

7    and had contacts and experience with Xcentric Ventures and

8    Darren Meade specifically.  Tina Church had recorded phone

9    conversations between Darren Meade and -- with herself and also

10   in a three-way phone conversations between Darren Meade, Ed

11   Magedson, and herself.

12   Q.    So she gave you -- and that was a recording that was made

13   with everyone's permission?

14   A.    I don't know, sir.

15   Q.    Okay.  Did you ask?

16   A.    No.

17   Q.    Okay.  You released Exhibit Number 1 publicly; correct?

18   A.    I filed it with the clerk of court.

19   Q.    And when you say filed it, you did not file it under seal;

20   right?

21   A.    No, I did not.

22   Q.    Had you filed any of the previous -- was this the first

23   affidavit that you had prepared in support of a search warrant?

24   A.    No, it was not, sir.

25   Q.    Did you release all of the previous ones or file them so

1    that they would become public record?

2    A.    I filed those under seal, sir.

3    Q.    Okay.  But you did not file this one under seal; correct?

4    A.    No, I did not.

5    Q.    And you're aware that the rules of ethics for the state of

6    Iowa limit pretrial publicity by a prosecutor in a criminal

7    case; correct?

8    A.    Yes.

9    Q.    In fact, the Iowa Rules of Professional Conduct provide

10   guidelines for prosecutors; correct?

11   A.    Could you repeat that?  I'm sorry.

12   Q.    The Rules of Professional Conduct provide guidelines for

13   prosecutors; correct?

14   A.    They do.

15   Q.    And according to 32:3.8(f), except for statements that are

16   necessary to inform the public of the nature and extent of the

17   prosecutor's actions that serve a legitimate law enforcement

18   purpose, prosecutors shall refrain from making extrajudicial

19   comments that have a substantial likelihood of heightening

20   public condemnation of the accused and shall exercise reasonable

21   care to prevent investigators, law enforcement personnel,

22   employees, or other persons assisting or associating with the

23   prosecutor in a criminal case from making an extrajudicial

24   statement that the prosecutor would be prohibited from making

25   under Rule 32:3.6 or this rule.  Did I state that fairly?

1  A.   It sounds familiar, sir.

2  Q.   Okay.  And yet did you have an understanding when you gave

3  John Brewington a copy of this of whether he would post it on

4  the Internet?

5  A.   Anything and everything I told anyone assisting me with

6  this including all the individuals that you had named and I had

7  mentioned was done with strict admonishments not to do that very

8  thing.

9  Q.   One month prior to the filing of your affidavit, were you

10  informed that Mr. Brewington announced to the world that arrests

11  would be coming for Ed Magedson and for the Ripoff Report?

12  A.   I don't recall the exact timing of that, sir, but I know

13  that he did state something to that effect.

14  Q.   You knew that he stated something during this time period

15  where he was reviewing it for the purpose of assisting you to

16  prepare a -- an affidavit which was factually accurate; is that

17  fair?

18  A.   I don't believe I knew about it, sir, at that time.  I

19  think I learned of it after if I recall.

20  Q.   Okay.  And why did you make your search warrant affidavit

21  public?

22  A.   I made the search warrant -- I did not ask the court to

23  file it under seal for a number of reasons.  One, this search

24  warrant was for items in someone's home which if that is sealed,

25  then I guess to me it just -- it smells a little bit.  If

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:15-cv-04008-LTS Document 42 Filed 05/12/16 Page 20 of 252

1    somebody has stuff taken from their home and they're told that

2    they're not able to see why, I think that that is cause for

3    concern.  And also there was -- there was some strategic value

4    in having it released.

5    Q.    I'll deal with the strategic value second, but I want to

6    talk with you for a second about your discussion about fairness

7    because this affidavit supported the warrant for Tracey

8    Richter's mother Anna to grab her computer; correct?

9    A.    Yes, sir.

10   Q.    And this -- you had had telephone intercepts of her -- of

11   Anna's conversation, Anna Richter's conversation, with her

12   daughter Tracey Richter.  You had had those, and you put those

13   into these search warrants; correct?

14   A.    They weren't intercepts, sir.  They were recordings done at

15   the prison and that the prison -- the prison had provided them

16   to me at my request.  And the -- there were conversations that

17   were summarized that were contained in that.

18   Q.    Okay.  Because the reason that you were taking it was that

19   she had allegedly tried to tamper with witnesses including Mary

20   Higgins; correct?

21   A.    Yes, sir.

22   Q.    Okay.  Mary Higgins is your mother-in-law; correct?

23   A.    She is, sir.

24   Q.    You are the son-in-law of one of the primary witnesses in

25   the Tracey Richter case; correct?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:15-cv-04008-LTS Document 42 Filed 05/12/16 Page 21 of 252

1   A.   That is correct.

2   Q.   Okay.  That's only recent, though.  When did you first

3   meet?

4   A.   I first met my wife Abby or Mary Higgins?

5   Q.   No, Abby, not Mary.

6   A.   Okay.  I first met Abby -- I believe it was the summer or

7   maybe late spring of 2011.

8   Q.   Okay.  So prior to the trial you met Abby, but I'm certain

9   that you didn't date her before the trial; correct?

10  A.   That's correct.

11  Q.   How soon after the trial did you begin dating prior to

12  being married in the last year?

13  A.   I think it was -- I don't know -- a couple weeks, a month.

14  Q.   Now, there is some portion of the affidavit that deals with

15  Tracey Richter and Anna Richter.  You didn't just put that

16  portion in and say, Anna, this is why I'm taking your computer.

17  You put discussion about Darren Meade.  You put discussion about

18  Xcentric Ventures.  You put discussion about Ed Magedson within

19  this affidavit as well as the discussion about Anna Richter;

20  right?

21  A.   That's correct, sir.

22  Q.   You talked about a strategic reason, and I want to hear

23  what your strategic reason was for releasing this 119-page

24  affidavit by filing it so that it became a public record.

25  A.   I wanted to obtain and I did obtain a search warrant

1  following this for the e-mail communications for your -- for

2  your client's personal e-mail communications.  I wanted to catch

3  the reactions in those.

4  Q.   So you publicly released these so you could see what Ed

5  Magedson wrote following his learning that there was an

6  affidavit that you had mentioned him in.

7  A.   Yes, sir.

8  Q.   Okay.  And this is the -- or I want to go back and get one

9  little issue.  Did Michael Roberts actually write portions of

10 Exhibit Number 1?

11 A.   I don't know whether he wrote it or not or he suggested

12 certain things.  He suggested a lot of things.  I don't -- I

13 don't know whether he wrote or whether I adopted some of the

14 things that he had written.

15 Q.   And maybe I can make it simpler because it would be hard to

16 remember.  Did you cut and paste out of e-mails that he sent, or

17 did he send you Word documents?

18 A.   I don't recall exactly, but I do -- my concern, my main

19 concern, with getting the information, the draft of Michael's,

20 there's a lot of times and dates in there as they relate to

21 matters dealing with his dealings with the Richter family.

22 Michael Roberts -- the information that's contained in here is

23 not -- very little of it I would say is provided by Michael

24 Roberts.

25 Q.   Okay.  Let me go back.  And how much of this -- did you

prepare any of the words that were written by John Brew -- or

Brewington provided advice and reviewed your materials and added

parts involving computers; correct?

A.    Involving computers?

Q.    Yeah, computers, hacking codes, SQL insertions.

A.    Did he provide me with --

Q.    Okay.  Let me go back and ask you now, you said that with

Brewington and with Roberts that you admonished them that they

should not release publicly the information that you were

circulating to them; correct?

A.    I admonished them not to discuss or not to reveal any

information that I had shared with them.  What limited

information I did share with them I asked them not to discuss.

Q.    And when you -- you say you don't recall whether or not

Brewington started posting that.  Do you remember the posts that

he put up that said the storm is coming?

A.    You know, sir, I remember that.  I don't know when it was.

I don't -- I never involve myself with the social media aspect

of all this.  There's Twitter.  I don't even have a Twitter

account.  Someone's pretending to be me on Twitter.  But I

didn't ever get involved with that aspect of this.  I know

there's a whole separate world going on with people tweeting at

each other and, you know, feuding online.  I just . . .

Q.    Let me just -- the question was actually more simpler than

I think --

1  A.   Okay.

2  Q.   -- than I think we made it.  The question was you had

3  mentioned earlier that at some point you became aware that John

4  Brewington was putting stuff out on to the Internet about this

5  affidavit prior to it being public.  Do you recall that

6  testimony?

7  A.   Yes, sir.

8  Q.   When did you -- you said you didn't recall when you found

9  out that he was -- you considered that to be a violation of the

10  admonishment you had given him; correct?

11  A.   The information about -- which tweet are you talking about?

12  Q.   Okay.  Well, let's go ahead and look at Exhibit Number 24.

13        MR. ROBBINS:  Move for admission of Exhibit Number 24.

14                    *   *   *   *

15        (Exhibit 24 was offered.)

16                    *   *   *   *

17        THE COURT:  Any objection?

18        MR. MADSEN:  No objection, Your Honor.

19        THE COURT:  All right.  Exhibit 24 is received.

20                    *   *   *   *

21        (Exhibit 24 was admitted.)

22                    *   *   *   *

23  BY MR. ROBBINS:

24  Q.   And let me blow it up for you, Mr. Smith, because I find it

25  to be so tiny that I can barely read it.  Your eyes might be

1   better.  You're a younger fella than I.  This is on a board that

2   Mr. Brewington uses, and this is dated June 8 of 2014,

3   approximately one month less a day prior to the day that you

4   made the affidavit that we discussed as Exhibit 1 public.  Do

5   you see that up on the upper right-hand corner, the red part?

6   A.   I'm color-blind with red.  You'll have to excuse me.

7   Q.   Oh, sorry.  Maybe that would help.

8   A.   Oh.  I see it on here.  Upper left?

9   Q.   Yes.

10  A.   2014, June 8.

11  Q.   Yes.  So one month less one day because it's the 8th to the

12  7th of July is when he posts this, and he is talking about the

13  Ripoff Report; correct?

14  A.   I don't know, sir.  I've never seen this before.

15  Q.   Well, let me just pull that out.  Do you see where it says

16  Ripoff Report Social Waterboarding Chapter 10, the Justice

17  Files?  Do you see that?

18  A.   I do see that.

19  Q.   Okay.  And it says -- it is talking about the indictments

20  and arrests; correct?

21  A.   If you could, sir, can you -- I'm not even quite for sure

22  what I'm looking at, what this is.

23  Q.   Well, it is -- it is John Brewington's board or website

24  where he discusses the Ripoff Report.  The subject of our

25  questioning was the fact that you knew that John Brewington had

1    jumped the gun on releasing information from the affidavit that

2    you helped -- or that he helped you to prepare, and this is

3    evidence that, in fact, he was putting it up on the Internet

4    that there would be arrests and indictments.  And he says, The

5    date is June 8.  Pay attention to the date here.  You will see I

6    know what I am talking about soon.  On July 8 of 19 -- of 2014,

7    and he begins to talk about the indictment.  But the post was

8    dated before -- was dated --

9            MR. MADSEN:  Your Honor --

10   Q.   -- was dated before the affidavit.

11           MR. MADSEN:  Your Honor, I would object to the form of

12   the question.  I think counsel is testifying.  I don't know if

13   there was a question there.

14           MR. ROBBINS:  Withdraw the question.

15   BY MR. ROBBINS:

16   Q.   In any event, you knew that Brewington was talking on the

17   Internet about the indictment and the arrests before you filed

18   your affidavit publicly; correct?

19   A.   I don't know if that's the case or not.  I knew that I had

20   found out that he was discussing it or talking about it.  I

21   don't know why he would put this up there.  In all the

22   conversations that I had with John Brewington, I don't think I

23   ever discussed anything having to do with arresting Ed Magedson.

24   That just doesn't sound right.  That was never, ever my

25   intention in doing this.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:15-cv-04008-LTS Document 42 Filed 05/12/16 Page 28 of 252

1   Q.   And the reason that I ask that question is because as a

2   prosecutor if you have given someone the admonishment that, in

3   fact, they are not to discuss this stuff out on the Internet and

4   they violate it, as a prosecutor I'm going to be angry, and I'm

5   going to talk to them.  Do you remember having a talk with

6   Brewington when you found out that he was releasing information

7   that you were giving him?

8   A.   When I found that out which -- and I don't recall exactly

9   when that was -- I did discuss with him, I -- and he apologized.

10  Q.   And in terms of the apology, do you remember whether it

11  occurred before or after you released the affidavit publicly?

12  A.   I believe it was well after, sir.

13  Q.   And in -- Brewington says in his post that he had

14  permission to do so.  And what I understand from you is he did

15  not have permission to release information before it became

16  public.

17  A.   Absolutely did not.

18  Q.   Okay.  Do you recall where you received the information

19  that Brewington was releasing information to the public prior to

20  you releasing the affidavit?

21  A.   No, I don't.

22  Q.   When you mention -- or strike that.

23          There was one other person.  Did Lisa Borodkin help

24  draft the affidavit?

25  A.   No, she did not.

1 Q. Has she helped you to draft any pleadings?

2 A. No. She -- we've been in discussions to help me draft

3 something, but she hasn't come through yet I guess.

4 Q. Was one of the reasons that you released the affidavit to

5 the public to get it out before Roberts and Brewington released

6 it?

7 A. That's not accurate, no.

8 Q. Okay. Let's talk a moment about Mr. Roberts. You are

9 aware that he was married to Tracey Richter; correct?

10 A. Yes, sir.

11 Q. And you are aware -- when you decided to take on the Tracey

12 Richter murder case, you did a lot of research; correct?

13 A. Yes, sir.

14 Q. You went through the file.

15 A. Yes, sir.

16 Q. You went through the entire file.

17 A. Oh, yes.

18 Q. You knew that Roberts was given a polygraph in the

19 investigation following the death of Dustin Wehde; correct?

20 A. Yes, sir.

21 Q. And Mr. Wehde is the man that was killed while he was over

22 at Tracey Richter's house, and he was killed by Tracey Richter;

23 correct?

24 A. I'm sorry. Could you rephrase that -- or not rephrase

25 that. Could you just say it again? I . . .

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:15-cv-04008-LRR Document 42 Filed 05/12/16 Page 29 of 252

1    Q.    I just wanted to give a context to who Dustin Wehde is.

2    He's the man who Tracey Richter killed.

3    A.    Yes, sir.

4    Q.    And you reviewed the polygraph of Michael Roberts as part

5    of your investigation before you ever prosecuted his wife,

6    correct, or his ex-wife?

7    A.    Yes, sir.

8    Q.    Do you recognize Exhibit Number 17?

9    A.    Yes, sir, it looks familiar.

10    Q.    And --

11    A.    Although I don't recall sticky note -- notations.

12    Q.    And I apologize. If we -- if we are able or if we have to

13    go to do discovery, you'll get cleaner exhibits.

14    A.    Sure.

15    Q.    I apologize for what we have. But without any kind of

16    sticky note notations or yellow marks on it, do you recognize

17    what that is?

18    A.    Yes, I do, sir.

19    Q.    It is the polygraph for Michael Roberts; correct?

20    A.    One second.

21    Q.    If you look at the bottom of page 1, it says subjects, and

22    it says Michael Ross Roberts, page 1.

23    A.    And this is Exhibit 17; correct?

24    Q.    Correct.

25    A.    I believe up until page 193 through 198 would be the

```
 1  polygraph examination.

 2          MR. ROBBINS:  And move for admission of Exhibit Number

 3  17.

 4                          *   *   *   *

 5          (Exhibit 17 was offered.)

 6                          *   *   *   *

 7          MR. MADSEN:  No objection.

 8          THE COURT:  All right.  Exhibit 17 is received.

 9                          *   *   *   *

10          (Exhibit 17 was admitted.)

11                          *   *   *   *

12  BY MR. ROBBINS:

13  Q.   And let's go to page number 5.  And again, apologies for

14  the -- I know it wasn't your yellow marks that appear on that

15  exhibit.  But I'm going to draw your attention to the center of

16  the page where it discussed the questions which were relevant to

17  the investigation of the death of Dustin Wehde.  The polygrapher

18  asked three questions.  He said, "Did you arrange for Dustin to

19  be in your house last December 13?"  And the answer was no.  He

20  said he asked, "Did you plan --" and these are not sequential.

21  This is questions 5, 7, and 10.  He asked on question 7, "Did

22  you plan in advance for Dustin to be in your home last December

23  13?"  His answer was no.  He was also finally asked in this

24  sequence, "Do you know the name of the second intruder in your

25  home last December 13?"  Did I read those correctly?
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:15-cv-04008-LTS Document 42 Filed 05/12/16 Page 31 of 252

1  A.   I believe so, sir.

2  Q.   And you had reviewed those; correct?

3  A.   Yes, sir.

4  Q.   Okay.  And on the following page, page number 6, the

5  polygrapher discusses his conclusions, and again this must be an

6  annotated pdf because I see the little box that has a note

7  usually.  The note isn't there, but it's not yours.  The

8  evaluation was that after careful analysis of Michael Roberts'

9  polygraph and based on the case facts available, it is the

10 examiner's opinions that Roberts' truthfulness could not be

11 verified and he could not be cleared in this matter the death of

12 Dustin Wehde; correct?

13 A.   Yes, sir.

14 Q.   And, in fact, he -- the polygrapher brought him back to ask

15 him some additional questions, and he was asked the question on

16 the following page which is page number 7.  He said Michael

17 Roberts was asked if he could offer any explanation why the

18 polygraph examination that he had just completed taking

19 indicated that he was 99 percent deceptive on the relevant

20 questions.  Do you see that?

21 A.   I do see that.  That is -- this is an interview not by the

22 polygrapher but by then Special Agent Dan -- I think it's Dan

23 Moser.

24 Q.   And when the polygrapher is talking about deceptiveness, he

25 is referring to those three questions that we covered; correct?

1 A.   I believe so, yes.

2 Q.   And you knew that -- and this Michael Roberts is the same

3 Michael Roberts who you were communicating five times a day on

4 occasions and speaking to up to five times a day prior to the

5 prosecution of his ex-wife; correct?

6 A.   Yes, sir.

7 Q.   Okay.  And do you believe -- or strike that.

8      You didn't even call him as a witness; correct?

9 A.   No, we did not, sir.

10 Q.   Did you plan at some point on calling him as a witness and

11 then later decide because of the polygraph and because of other

12 issues that he would not be a witness?

13 A.   I named Michael witness (sic) as a witness in the minutes

14 of testimony that were attached to the trial information.  It

15 was ultimately Assistant Attorney General Doug Hammerand's call

16 not to call him as a witness.

17 Q.   Do you see why some people might be critical of relying in

18 any way on a witness like Michael Roberts?

19 A.   I can see why some would, yes.

20 Q.   And they have a First Amendment right to go out and

21 complain about things that they don't think are right about

22 their government; is that correct?

23 A.   Absolutely.

24 Q.   Okay.  In fact, that's even in the Constitution, that

25 people under the First Amendment have a right to petition their

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
Case 5:15-cv-04008-LTS Document 48 Filed 05/12/16 Page 33 of 252
To purchase a complete copy of the transcript

1 government for redress.

2 A.   Absolutely.

3 Q.   That means you.

4 A.   Absolutely.

5 Q.   And if they want to insult you, they are free to do so.

6 A.   Certainly.

7 Q.   Okay.  And in the 119-page affidavit that we've been

8 talking about which is Exhibit Number 1, did you ever mention

9 Roberts' polygraph results?

10 A.   I did not, sir.

11 Q.   I said I would talk about Darren Meade's -- about your

12 discussion about Darren Meade.  Now's the time.  Go to page

13 number 15 of your Exhibit Number 1 which is the affidavit that

14 supported your warrant.  Oh, I'm going to say 15.  I'm sorry.

15 A.   Did you say 15, sir?

16 Q.   15, yes.

17 A.   Okay.

18 Q.   And that is the section where you mention Darren Meade;

19 correct?

20 A.   It's the section where I address Darren Meade.  I think I

21 talk about him before that, but yes.

22 Q.   This is the section -- I mean, you divided it -- the first

23 section was on Tracey Richter, and then the next section is on

24 Darren Meade.

25 A.   Yes, sir.

1   Q.   And you spend eight pages with what you refer to as a

2   criminal enterprise to put SQL injection scripts into complaint

3   sites such as the Ripoff Report.  Do you recall that?

4   A.   Yes, sir.

5   Q.   Okay.  You had no -- you had not done an investigation of

6   Michael Roberts' claims other than to speak to people about what

7   they contended happened between Michael Roberts and Darren

8   Meade; correct?

9   A.   I apologize.  Could you rephrase that?

10   Q.   Yeah, I'm sorry.  It's a rather complicated question, so

11   let me break it down into smaller component pieces.  First of

12   all, did you subpoena Michael Roberts' e-mails during this

13   period of time to determine what Michael Roberts was doing with

14   the enterprise which was taking SQL injection scripts and

15   putting them on complaint sites such as the Ripoff Report?

16   A.   No.

17   Q.   Okay.  So you mentioned -- and I'm going to go to -- I said

18   that it was 8 pages, so let's go to page 23, and let's look at

19   your discussion about Michael Roberts.  It looks in this section

20   on Darren Meade -- and what you're talking about is an

21   enterprise which consisted, according to you, of Darren Meade, a

22   guy named Zimmerman, and these guys were bad guys just to be

23   simple; fair?

24   A.   That's fair.

25   Q.   Okay.  And what you do not mention until page number 23 is

1  Michael Roberts' association with this enterprise.  Did you --

2  were you aware of his association with this enterprise?

3  A.    Yes.

4  Q.    Okay.  Because on page number 23 there are 2 paragraphs

5  which discuss Roberts, and I'm going to, if my finger is

6  accurate enough, blow those up.  In the first paragraph you

7  state on October 25 of 2011 in an e-mail to Michael Roberts,

8  Darren Meade thanked Michael Roberts for providing him updates

9  on Tracey Richter's murder trial and told Michael Roberts that

10  he was praying for him.  And that's what you wrote, or at least

11  someone wrote that for you, and you signed it.

12  A.    I wrote that.

13  Q.    Okay.  And you obtained that information from Michael

14  Roberts; correct?

15  A.    Yes, and he -- well, let me think for a second, sir.  I

16  believe so, yeah.

17  Q.    Well, we know that you didn't subpoena the e-mails from

18  Xcentric until a month later.  Did you -- had you already

19  subpoenaed Darren Meade's e-mails?

20  A.    No.

21  Q.    Okay.  So this had to come from Michael Roberts.

22  A.    Yes, I believe this came from Michael Roberts in response

23  to -- what had happened was after Tracey Richter was

24  convicted -- it was April of 2012 -- I -- my office started

25  getting con -- phone calls from Darren Meade and e-mails from

1  him.  In those e-mails Darren Meade stated that Michael Roberts

2  was responsible for the murder, that he had information that

3  proved Michael Roberts was responsible for the murder and not

4  Tracey.  Darren Meade also stated that I needed to change my

5  testimony in Roberts' upcoming custody proceedings to provide

6  favorable testimony to Tracey's mother.  And it was in response

7  to receiving those e-mails from Darren Meade that I contacted

8  Michael Roberts because those e-mails referred to Michael

9  Roberts, and I said, who is this guy; what is going on with

10  this?  Michael Roberts in response had sent me e-mails that

11  rebutted everything that Darren Meade had been telling me.

12  Q.  And I apologize.  I know that I promised that I would

13  finish this in a relatively compact period of time.

14  A.  It's complicated.

15  Q.  My question -- my question was more limited than that.

16  This information came from Michael Roberts, correct, the

17  e-mails?

18  A.  Which one, sir?

19  Q.  The one that says October 25 in an e-mail to Michael

20  Roberts, that was an e-mail that was received from Michael

21  Roberts; correct?

22  A.  I think it may have been -- it was either Michael Roberts

23  or Dr. Scott Connelly.

24  Q.  Okay.

25  A.  Because I believe that Dr. Scott Connelly was also cc'd in

1    on that e-mail.  I can't say for sure which one had sent it,

2    though.

3    Q.    So they both participated as kind of a team.  One would get

4    cc'd on the stuff that was sent to you.  You just don't remember

5    which it was that had sent it?

6    A.    No.  What I'm saying is that in Darren Meade's e-mails to

7    Michael Roberts, the reason why I have that in the search

8    warrant affidavit is because October 25 was halfway through the

9    murder trial.  And during the murder trial, Darren Meade and

10   Michael Roberts had some amicable relationship.  I don't know

11   whether it was fiduciary in nature.  But as you can see in the

12   search warrant, just a couple days following the exchange where

13   Darren says he's praying for Michael, he then -- he then becomes

14   upset because Michael won't give him money.  And I'm wondering

15   why somebody is reporting their friend for -- you know, for

16   having been involved in a murder when on October 25 he's saying

17   he's praying for him.

18   Q.    Mr. Smith, I apologize because I am trying to ask tight

19   questions.  My question was simply that you said you had stated

20   you didn't remember whether it was Roberts or Connelly that sent

21   it to you and the other one that was cc'd on it, so I was just

22   confirming that when one would send you an e-mail they would cc

23   the other.  I was trying to restate you so I could make sure

24   that I understood it.

25   A.    I forgot where you were going with that.  What I was trying

1  to say is that the e-mail exchanges between Roberts and Darren

2  Meade, the ones that you see up there, those were cc'd to Scott

3  Connelly, not their -- not sending them to me they were cc'd in

4  on.

5  Q.   So you just don't know who you got them from.

6  A.   Exactly.

7  Q.   Okay.  Perfect.  Because at least according to you -- and

8  this is your best information or close to the best information

9  that you had -- as of the trial, the trial began the day before,

10  and Michael Roberts and Darren Meade are on good terms.  One's

11  praying for the other.

12  A.   Yes.

13  Q.   Right?

14  A.   Yes, sir.

15  Q.   And then a couple days later -- and that's one of the

16  things that we need to talk about just a second because none of

17  the allegations against Xcentric and none of the allegations

18  against Ed Magedson have anything to do with people putting out

19  misinformation before the trial to get witnesses not to testify.

20  The information that comes from the Ripoff Reports is after the

21  trial is over; correct?

22  A.   Can you break that up into --

23  Q.   Yeah.

24  A.   Okay.

25  Q.   I can do that.  The trial occurred before Darren Meade ever

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:15-cv-04008-LTS Document 42 Filed 05/12/16 Page 39 of 252

1  got mad at Roberts; right?

2  A.   No, that's not true.

3  Q.   Okay.  There was one post that Roberts -- or that Meade

4  made, and it was to a newspaper story where he made a bad

5  comment about Roberts, correct, before the trial was over?

6  A.   I have no knowledge of that, sir, I don't believe.

7  Q.   Okay.  Well, you wrote about it in your affidavit.

8  A.   Okay.

9  Q.   So we'll get there.

10 A.   A post?

11 Q.   It was a response to a article in the newspaper, and he

12 wrote a response to that.

13 A.   That occurred before the trial was over?

14 Q.   Yes.

15 A.   Okay.  Well . . .

16 Q.   Okay.  But in any event, the trial has started.  They're on

17 good terms.  Three days later on October 28, the trial's not

18 over, but they have a dispute; correct?

19 A.   Yes, sir.

20 Q.   And that's summarized when you say on October 28, 2011,

21 Darren Meade began making extortive demands of the state witness

22 Michael Roberts for financial payments.  That's where the

23 blow-up occurs; correct?

24 A.   Yes, sir.

25 Q.   In fact, the trial is over on November 7 of 2011; correct?

1  A.   Yes, sir.

2  Q.   And as of 2011, it will be a month until Darren Meade ever

3  goes to Ed Magedson and Xcentric and meets them for the first

4  time; correct?

5  A.   Yes, sir.  I believe actually to restate that, I do believe

6  that Darren Meade had contacted Xcentric Ventures a number of

7  months before the murder trial started.

8  Q.   And did you see -- ever see a response to that?

9  A.   I don't believe so, no.

10  Q.   Do you know how many e-mails Xcentric gets?

11  A.   I have no idea.  I could only imagine.  It's probably --

12  probably quite a few.

13  Q.   Okay.  Now, you -- did you ever come to the understanding

14  that Michael Roberts attempted to blackmail the Ripoff Report to

15  the tune of $105,000 euros to give them the code that he had

16  been involved in creating and inserting into their site?

17  A.   I believe I had seen allegations of that.  I don't know --

18  I mean, I know that Xcentric Ventures was alleging that, and I

19  may have seen communications between Michael Roberts and

20  Xcentric Ventures that I'm guessing Xcentric Ventures

21  interpreted as being extortive in nature.

22  Q.   Did you see the contract that Michael Roberts -- go ahead

23  and look at Exhibit Number 28.

24         THE WITNESS:  Your Honor, is it possible to get a

25  drink of water or -- I'm sorry.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:15-cv-04008-LTS   Document 42   Filed 05/12/16   Page 41 of 252

```
 1              THE COURT:  Yeah.
 2              THE WITNESS:  Mouth is stuck.
 3   Q.   Mine gets --
 4   A.   A little lubrication might help this.
 5   Q.   Not a problem.
 6              THE WITNESS:  Thank you, Your Honor.
 7   A.   And I'm going to have to ask you to repeat that.  I'm
 8   sorry.
 9   Q.   Not a problem.  We had talked about whether or not Michael
10   Roberts had contacted the Ripoff Report, and you had said you
11   remember some allegations, and so I wanted to quickly show you
12   Exhibit 28 which is an e-mail from Roberts to Maria Speth, the
13   woman that is seated to my right.  Do you see that?
14   A.   One second, sir.  Yes, sir.
15              MR. ROBBINS:  Move for admission of Exhibit Number 28.
16                        *   *   *   *
17              (Exhibit 28 was offered.)
18                        *   *   *   *
19              MR. MADSEN:  No objection.
20              THE COURT:  All right.  Exhibit 28 is received.
21                        *   *   *   *
22              (Exhibit 28 was admitted.)
23                        *   *   *   *
24   BY MR. ROBBINS:
25   Q.   Okay.  And on page number 2 of Exhibit Number 28 is the
```

1   agreement that Michael Roberts drafted and sent to Maria Speth

2   about the hack to the Ripoff Report.  Do you see page number 2

3   of Exhibit Number 28?

4   A.   Yes, and that would be page 244 and 245.

5   Q.   Yes.

6   A.   Would that be fair?  Yes.

7   Q.   And the buyer which is -- and this is on the following

8   page.  The buyer which is Xcentric Ventures will transfer the

9   full purchase price of 105,000 euros converted to U.S. dollars

10  per the published rate on wwxe (sic) -- dot xe.com at the time

11  of execution to Lawrence Semenza who was the attorney for

12  Michael Roberts.  Were you ever shown that by Michael Roberts?

13  A.   I don't believe so.  I think I'm seeing this for the first

14  time.

15  Q.   And in terms -- you had said that you found that the sub --

16  or that there were unsubstantiated allegations.  But did you

17  ever review or were you provided this information that, in fact,

18  he had asked for a hundred -- Michael Roberts had asked for

19  115,000 euro to basically pay him for the Ripoff hack?

20  A.   I think I knew about it.  It wasn't the e-mail -- it wasn't

21  Exhibit 28.  But I think I had heard about it from somewhere.

22  Q.   Do you know what a SQL insertion code is?  Yes or no.

23  A.   I think so, yeah.

24  Q.   Okay.  And you don't mention Roberts being a part of this

25  criminal enterprise in the Darren Meade section; correct?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:15-cv-04008-LTS Document 412 Filed 05/12/18 Page 43 of 252

1    A.    No.

2    Q.    Okay.  And, in fact, according to your affidavit, Meade,

3    Darren Meade, talks to Tracey Richter for the first time on

4    November 27 or about within a month of her being convicted by

5    phone.  Go ahead and turn to page 24 of Exhibit 1.

6    A.    What was the date?  27th?

7    Q.    It was November 27, and I'll call out the specific portion.

8    A.    And you said Tracey Richter?

9    Q.    I said that Meade talked to -- oh, Anna Richter for seven

10   minutes.  Okay.  I misstated that.  I apologize.

11   A.    To my knowledge Darren Meade has never spoken directly with

12   Tracey Richter.

13   Q.    Okay.  But he has spoken to her mother on 3 occasions for a

14   period of time of 7 minutes, 83 minutes, and 50 minutes;

15   correct?

16   A.    At that time, yes.

17   Q.    And he had talked to Tracey Richter's fiancé for 87

18   minutes; correct?

19   A.    At that -- sorry.  At that time, yes.

20   Q.    And we know that he and Roberts have had their falling out

21   before this and that he is now talking with them; correct?

22   A.    Could you re -- could you restate that, please?

23   Q.    Darren Meade has had his falling out with Roberts because

24   that occurred the month before in October on the 28th.  Now he's

25   talking with this family.  Do you know what the conversations

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:15-cv-04008-LTS-KEM   Document 442   Filed 05/12/16   Page 44 of 252

1   involve?

2   A.    Between Darren and the Richter family?

3   Q.    Yes.

4   A.    At this time I'm not -- I don't believe that I know.

5   Q.    Okay.

6   A.    Exactly.

7   Q.    You don't know whether they're saying my daughter's

8   innocent.  You know that that's what Anna Richter --

9   A.    I'm sure --

10  Q.    -- felt; right?

11  A.    I'm sure that that's what Anna Richter's position was.

12  Q.    Okay.  And so -- and these were not recorded; correct?

13  A.    No.

14  Q.    So you know the length of the calls, but you do not know

15  their content.

16  A.    That's all I know, sir, yes.

17  Q.    Okay.  And at the time that you contacted Richter --

18  Roberts for the first time, did he tell you how much child

19  support he owed?

20  A.    Maybe.  I don't know for sure.

21  Q.    You arrested Roberts' wife on July 27 of 2011 or about 5

22  months before the trial; correct?

23  A.    Yeah, yes, sir.

24  Q.    Okay.  And immediately after the arrest, Roberts who you

25  did know that he owed child support; correct?

1  A.   I think I did.  I can't recall, but I think that I did.

2  Q.   Okay.  But immediately after the arrest, Roberts who owed

3  child support -- and the custody was with his wife Tracey;

4  correct?

5  A.   Yes.  You mean the actual physical care?

6  Q.   Physical care, yes.

7  A.   Yes, Tracey Richter had physical custody of the children at

8  the time she was arrested.

9  Q.   But immediately after the arrest, Roberts takes his

10  children and goes to California and enrolls in the California

11  Victim Protection Program; correct?

12  A.   That's correct.

13  Q.   Did you help him to get the California Victim Protection

14  Program benefits?

15  A.   No.

16  Q.   Okay.  You did, though, testify on his behalf at the

17  custody hearing for the children.

18  A.   Yes, pursuant to a subpoena.

19  Q.   Okay.  And this is the same Roberts that you were relying

20  on for information about Tracey Richter; correct?

21  A.   Yes.

22  Q.   Okay.  You accused her father -- he's a police officer;

23  correct?

24  A.   He -- he's now deceased, but he was a detective with the

25  Chicago PD.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
Case 5:15-cv-04008-LTS Document 42 Filed 05/12/16 Page 46 of 252
To purchase a complete copy of the transcript

1  Q.   And you accused -- or strike that.

2         Did you find Michael Roberts to be credible at all

3  times?

4  A.   With the dealings that I had with him, yes.

5  Q.   Subsequently having found out information, were you aware

6  at the time that you were dealing with him that he was

7  attempting to extort money from Xcentric Ventures to buy the

8  hack -- the SQL insertion hack?

9  A.   I was not aware of the goings on between Michael Roberts,

10  Xcentric Ventures, Darren Meade, Ed Magedson.  I didn't --

11  those -- the information I got from Michael, the information I

12  got from everybody was way more than I ever wanted or needed for

13  the purposes of which I was asking it.

14  Q.   And let me -- let me focus you a little bit because you

15  accused Tracey Richter's father -- brother, his brother's a

16  detective; correct?

17  A.   I believe he was.

18  Q.   Okay.  And you accused him of fabricating a death threat

19  based solely on Mr. Roberts' word; correct?

20  A.   Not based solely on that, no.

21  Q.   What in addition to Roberts' words did you use to arrive at

22  the conclusion that Tracey Richter's brother who is a detective

23  made a d -- or fabricated a death threat?

24  A.   The information I used was information obtained pursuant

25  to -- I don't know whether it was a subpoena or search warrant.

1  There was communications before -- during the murder trial when

2  I guess maybe he saw the writing on the wall and that being John

3  Richter, the brother, maybe saw the writing on the wall where it

4  just so happened -- it was a circumstantial evidence I guess.  I

5  didn't have any direct knowledge.  You know, did Michael Roberts

6  call up his brother, his ex-brother-in-law, Chicago detective,

7  at his place of business in the Chicago Police Department after

8  not talking to him for two or three years and threaten his life?

9  I just found it highly suspect, especially the timing of the

10  report, when the Richter family was trying to find the location

11  of the Richter children.

12  Q.   And so just so I understand, the timing was suspicious to

13  you.  Did you say when you were talking about the allegation

14  that there was a fabricated threat, that your -- that you did

15  not know whether or not he was fabricating this story or not but

16  that the circumstances looked suspicious?

17        MR. MADSEN:  Your Honor, I'm objecting to this entire

18  line of questioning.  I'm trying to give counsel some leeway

19  here, but I'm having a real difficult time understanding how

20  these questions in this area of testimony has any relevance

21  whatsoever to the issues before the Court in the motion that has

22  been filed by counsel.  I think we're just getting outside of

23  anything that even resembles relevance to the issues before the

24  Court.

25        THE COURT:  Sure.  Mr. Robbins?

1      MR. ROBBINS:  The -- what we're demonstrating through

2  a course of carefully trying to build up the evidence that we

3  have or marshal the evidence is that time and time again

4  Prosecutor Smith has jumped to conclusions and done things which

5  are improper which is why we're suing and why we're asking for

6  an injunction where we are asking that this man not be permitted

7  to continue on this investigation.  So we're using circumstances

8  and anecdotal evidence to show a pattern which repeats itself

9  where because of the tie-ins to the various witnesses, because

10  of the emotions and the hurt that Mr. Smith feels where he's

11  done inappropriate things time and time again that we're asking

12  for relief from this Court.

13      THE COURT:  All right.  I'm going to overrule the

14  objection at this point.  I'm not sure yet I know enough, and

15  I'm going to need to hear more evidence before I can decide

16  myself what's relevant and what's not, so I'll overrule the

17  objection and allow the line of questioning to continue.

18  BY MR. ROBBINS:

19  Q.   Let me show you Exhibit Number 3.

20      MR. ROBBINS:  Move for admission of Exhibit Number 3.

21                  *   *   *   *

22      (Exhibit 3 was offered.)

23                  *   *   *   *

24      THE COURT:  Before we do that, was there ever an

25  answer to the question that was objected to?  I think you asked

1   a question, and then counsel objected.  I overruled it, but I

2   don't -- if Mr. Smith answered it, I guess I didn't hear it.

3              MR. ROBBINS:  Let me reask it then.

4              THE COURT:  Sure.

5   BY MR. ROBBINS:

6   Q.   Just to restate, you had no direct evidence that a police

7   officer in Chicago had fabricated something other than

8   circumstantial evidence.

9   A.   No direct evidence, sir.

10  Q.   Okay.  Other than Michael Roberts saying that it was a

11  fabrication.

12  A.   No, it wasn't just Mike Roberts.  It was the information I

13  obtained from the Chicago Police Department subsequent to

14  learning that that allegation had been made, information I

15  obtained through communications that were from John Richter to

16  his son Noah.  It wasn't just Michael Roberts' word.

17  Q.   Right.  There was circumstantial evidence plus Michael

18  Roberts' word.  That's all I was trying to say.

19  A.   I mean, not -- I mean, his word that he didn't call up a

20  Chicago police officer at the place of the Chicago police

21  officer's employment and threaten his life and as well as a

22  screen shot I believe of a Facebook message sent from Detective

23  John Richter to Michael Roberts' son saying that they were going

24  to find him, something to that effect.

25  Q.   So the circumstantial evidence plus Michael Roberts'

1  testimony; correct?

2  A.    Michael Roberts never testified, sir.

3  Q.    Okay.  He told you.

4  A.    Yes, sir.

5  Q.    Okay.  And you knew that Meade -- oh, strike that.  I had

6  moved for admission of Exhibit Number 3.

7              THE COURT:  Any objection?

8              MR. MADSEN:  No objection.

9              THE COURT:  All right.  Exhibit 3 is received.

10                       *   *   *   *

11             (Exhibit 3 was admitted.)

12                       *   *   *   *

13  BY MR. ROBBINS:

14  Q.    And you obtained this through a search warrant of e-mails

15  to Ed Magedson?

16  A.    Is it the one with the exhibit sticker 24 at the bottom?

17  Q.    Yes.

18  A.    Yes.

19  Q.    Well, no -- it does have Exhibit 24, but it's Exhibit 3 in

20  the book.

21  A.    Yeah, I understand.  I just wanted to make sure we're

22  looking at the same thing.  Yes.

23  Q.    Okay.  So you received that from one of the warrants.

24  A.    Yes, sir.

25  Q.    And you could tell from that that Meade -- Roberts didn't

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:15-cv-04008-LTS   Document 442   Filed 05/12/18   Page 51 of 252

1  like Meade, and you knew that because he had told you that.

2  Meade didn't like Roberts either.  They didn't like each other;

3  correct?

4  A.   I think that's fair.  At one point they were good friends,

5  I believe, and depending upon the point in time I guess, sir.

6  Q.   And -- now I'm going -- actually crossing off some

7  questions that I've already asked because I tend to follow the

8  dog where it goes so . . .

9  A.   I do the same thing.

10  Q.   Is Darren Meade -- there is a post-conviction relief motion

11  of some sort that you're a witness in for Tracey Richter?

12  A.   I'm -- I don't know if I'm a witness yet.  I know that

13  Tracey Richter wants to depose me in the post-conviction relief

14  case that she's filed.

15  Q.   And Darren Meade is a witness in that post-conviction

16  relief motion?

17  A.   I -- if he is, I don't know.  I know that he's been

18  providing evidence to Tracey Richter's post-conviction relief

19  attorney as well as Darren Meade's attorney --

20  Q.   And --

21  A.   -- or -- as well as Xcentric in this case.

22  Q.   And if Darren Meade is a witness in that case, you are

23  prosecuting him right now; correct?

24  A.   Yes, sir.

25  Q.   Tracey Richter has a son who testified at trial; correct?

1   A.   Yes, sir.

2   Q.   And you've publicly stated that you want to prosecute that

3   trial witness for perjury; correct?

4   A.   I wanted to at the time after the hearing.  Statute of

5   limitations has long since run out on that, and it wasn't in --

6   it was actually -- because the trial was in Webster County -- it

7   didn't happen in Sac County -- his statement, which was -- I

8   believed to be perjurious in nature, there's nothing I could

9   have done about it.

10  Q.   Just so I understand, you did say publicly, knowing that

11  this was in a different county, that you were going to prosecute

12  a witness in the trial of Tracey Richter for perjury.

13  A.   I had communications with the then county attorney, Webster

14  County, Ricki Osborn, about coming over special prosecutor to

15  prosecute the case.

16  Q.   Okay.  And did you feel that was harassment?

17  A.   No, I did not.

18  Q.   Okay.  There's a woman who -- well, we've talked about Mary

19  Higgins, so I'm not going to repeat that.  After you unsealed

20  and released your affidavit to the public, you sued the Ripoff

21  Report in a civil action; correct?

22  A.   I filed an action for injunctive relief under Iowa Code

23  section 915.22.

24  Q.   Yes.  You filed a civil action under 915.55 -- or .22?

25  A.   I believe it's .22.

1  Q.   Okay.  And that was to remove posts on the Ripoff Report;

2  correct?

3  A.   No, that's incorrect.

4  Q.   What was the purpose of the injunction?

5  A.   I believe the prayed-for relief and the affirmance

6  contained in that injunction were to remove the names and images

7  of the witnesses from the Ripoff Report complaints that appeared

8  on two million web pages.

9  Q.   You said two million web pages.  Your picture appeared on

10 two million web pages; correct?

11 A.   Yes, it did, sir.  It does to this day.

12 Q.   Was there a picture of Michael Roberts on two million

13 websites?  Yes or no.

14 A.   I can't recall.  I really don't know how the website

15 functions.  I think that when you log into the home page of the

16 website -- no, I don't think that there was one of Michael

17 Roberts on two million.

18 Q.   And was there a picture of any of the other witnesses?

19 These were attacks on you; right?

20 A.   What were?

21 Q.   That -- you say these pictures, that your picture, was all

22 over the Ripoff Reports, your picture on every page; right?

23 A.   Well, I --

24 Q.   Was -- strike that.  You had just said that the witnesses

25 or that -- I believe your testimony was that the witnesses had

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:15-cv-04008-LTS-KEM   Document 44   Filed 05/12/16   Page 54 of 252

1    their information on two million pages.  That was an incorrect

2    statement.  The witnesses aren't on two million pages in the

3    Ripoff Report; correct?

4    A.   The story --

5             MR. MADSEN:  Your Honor, I think that misstates his

6    answer.  And I'd refer -- I object to the form of the question.

7             MR. ROBBINS:  I'll ask it in a more open --

8             MR. MADSEN:  Okay.

9             MR. ROBBINS:  -- in a more open fashion.

10   BY MR. ROBBINS:

11   Q.   You are not saying that pictures of the individual

12   witnesses are on two million pages; correct?

13   A.   Correct.

14   Q.   Okay.  And your picture appears on two million pages in the

15   Ripoff Report; correct?

16   A.   It does.

17   Q.   And you have talked about how that is hard on you; correct?

18   A.   I never said it was hard on me.  I think I maybe said it

19   irritated me and that, you know, at first it irritated me and

20   actually -- I know you're referring to one of the exhibits that

21   you have.  It's that two-minute clip of the 60 Minutes.  I

22   believe that interview was given two or three days after Darren

23   Meade and Ed Magedson published that complaint on all two

24   million pages.  I don't even think I had seen it or even read it

25   all, but I know that in that -- during that interview, I didn't

1  even really know what Ripoff Report was or didn't -- obviously

2  didn't know Ed Magedson.  There was a whole host of things that

3  had been published about me and my family by others on other

4  social media before that.

5  Q.   Okay.

6  A.   So . . .

7  Q.   And I apologize because I mean to make the questions

8  precise.  You had said that you were irritated, and that answers

9  the question so far as I need it; okay?

10  A.   Okay.

11  Q.   Fair to say you were irritated.

12  A.   At first.  As far as the Ripoff Report stuff?

13  Q.   Yeah.

14  A.   I mean, at first blush, yeah.

15  Q.   Okay.  And you filed the 915 action to remove the name so

16  you couldn't identify who was being talked about when people

17  were trying to criticize witnesses in the Tracey Richter case.

18  A.   No, that's not accurate.

19  Q.   Okay.  If their identities are removed, then how would one

20  be able to know who was being talked about?

21  A.   If their identities are removed, then their names and

22  images don't appear on the first page of Google.  It's that

23  simple.

24  Q.   You asked that the names be redacted.

25  A.   Yes, sir.

1    Q.    So when you go to the page, if you were somehow able to

2    find it, it would have black spots where the names were instead

3    of having people's names.

4    A.    That's something that your client does on a routine basis

5    for money as well as recently.

6    Q.    Sir, I apologize so much. I really want to move through

7    this, and I promised the judge that I would be done in an hour

8    and a half, and at this rate we will never finish. If you

9    remove the names of the people and you put a black space where

10    their names were, even if you get to that website, you can't

11    tell who they're talking about.

12    A.    No.

13    Q.    Correct?

14    A.    Yeah. Obviously, yeah.

15    Q.    Okay. And you were -- there was a motion to disqualify you

16    from the 915 hearing; correct?

17    A.    There was, sir.

18    Q.    And, in fact, you withdrew before the hearing on that

19    motion, correct, timingwise?

20    A.    I withdrew after the hearing, sir.

21    Q.    Okay. But before the ruling.

22    A.    Before the ruling, yes.

23    Q.    Okay.

24    A.    I think it was a couple days after the hearing.

25    Q.    And Xcentric was represented by Peter Berger; correct?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:15-cv-04008-LTS Document 48 Filed 05/12/16 Page 57 of 252

1  A.  That's correct.

2  Q.  And he contacted you and indicated that he would offer at

3  no cost to take any false claims off of the Ripoff Report;

4  correct?

5  A.  I had a number of conversations -- and I don't want to get

6  away from your question here, but I had a number of

7  conversations with Peter.  The first conversation I had with

8  Peter was, I believe, August 1, August 2 Peter contacted me,

9  said he represented Ed Magedson in any possible criminal action

10  that may be taken against him.  And during that conversation, he

11  more or less asked me, you know, how can we make this right, or

12  what can we do?  And I -- I had told him that I consider what

13  had been put on the Internet -- I told him a lot of things but

14  what had been put on the Internet about the state's witnesses

15  was ongoing witness harassment and retaliation for their

16  testimony.

17      And we got to the point during the conversation, he

18  said something about -- or I said or we discussed redacting the

19  names or what would it take for this to -- you know, for -- to

20  make this right.  And I said removing the witnesses' names from,

21  you know, the content of these would be a good start.  And he

22  said, well, let me see what I can do.

23      Called me back like five minutes later.  He said, Ben,

24  you'll never -- you'll never believe this.  We have -- Xcentric

25  Ventures has this great program.  All the witnesses have to do

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:15-cv-04008-LTS Document 42 Filed 05/12/16 Page 58 of 252

1  is enroll in this program and provide proof that they didn't,

2  you know, commit, you know, acts of moral turpitude, child

3  molestation, things of that nature, and then it would come off.

4  And I asked him did it come with a cost?  I mean, I was

5  flabbergasted that he offered that to me in the first place

6  because at the time I told him in no uncertain terms I was

7  positive I could prove that Darren Meade and your client, Ed

8  Magedson, had hired Darren Meade, had paid Darren Meade, had

9  been working with Darren Meade to put these stories up on the

10  Ripoff Report.  So when Peter Berger offered these services to

11  remove stuff that, you know, was illegal, I was -- I was just

12  flabbergasted.

13  Q.   Okay.  So the question was very simple.  It was did Peter

14  Berger contact you and inform you that the Ripoff Report would

15  at no cost take any false claims off of the Ripoff Report?

16  A.   The first time I talked with Peter, I asked him if there

17  was a cost associated, and he said, "I will find out."  Peter

18  got back to me -- never got back to me as to whether or not

19  there was a cost within the next couple of days, and it was

20  between that time -- I believe the time that he told me that it

21  would be with no cost that I filed for the injunction.  I

22  believe that's how it happened.

23  Q.   Okay.  So the answer ultimately to that question is yes,

24  Peter -- Peter Berger did offer to at no cost take any false

25  claims off of the Ripoff Report; correct?  It may have occurred

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:15-cv-04008-LTS Document 44 Filed 05/12/16 Page 59 of 252

1    over two conversations, but eventually you came to understand
2    that at no cost to the people that they could participate in a
3    program to remove any false claims from the Ripoff Report.
4    A.   At some point in time.  I can't recall exactly for sure
5    when he said it was for free.  I just know the first
6    conversation I had with him he said he had to check whether or
7    not it was for free.  He was --
8    Q.   And when he checked and when he came back to you, he said
9    it's free.
10   A.   Yes, when --
11   Q.   Okay.
12   A.   Yeah, I believe so.  There's an e-mail I think where he
13   said at no cost.
14   Q.   And after you dismissed the civil claim, you told Peter
15   Berger that you would pursue more effective means.  Do you
16   remember telling him that?
17   A.   Yes, I do.
18   Q.   And what did you mean by that?
19   A.   At that time I -- in my head I was envisioning a civil
20   racketeering action brought under Iowa Code section 706A which
21   more effective in the limited amount of relief I could obtain
22   and wasn't going to obtain obviously in the 915 action.
23   Q.   Well, let me ask you this.  Did you ever provide -- you
24   were asked -- were you angry?
25   A.   Was I what?

1   Q.   Were you angry?

2   A.   When?

3   Q.   At the point that you were making these decisions.

4   A.   Was I angry?

5   Q.   Yeah.  Were you mad at the Ripoff Report because of the

6   fact that your name appeared all over it?

7   A.   I've never been upset with Ripoff Report, with -- I mean,

8   irritated?  Sure.  That kind of goes along with the territory.

9   I mean, have I been upset by, you know, the way that they have

10  reacted to -- to -- you know, to the witnesses in this case and

11  as it relates to the continued presence of these things online

12  and their inability to accept responsibility for allowing Darren

13  Meade to run roughshod over them?  Yes.

14  Q.   Is the answer to your question irritated, yes; angry, no?

15  Would that be a summary of what the long answer you just gave me

16  was?

17  A.   Yeah.

18  Q.   Okay.  And after you withdrew or -- withdrew from that

19  case, you offered to make a deal with the author of all of those

20  posts, Darren Meade; correct?

21  A.   Say that again.

22  Q.   After you spoke with Peter Berger, after that time period,

23  you offered to make a deal with Darren Meade; correct?

24  A.   Offered him a deal -- yeah, I offered him immunity to

25  testify against Ripoff Report.

1  Q.   Okay.  And did you help Michael Roberts to leave the

2  country and to protect him against his ex-wife?

3  A.   I didn't help him leave the country.  I helped him try to

4  leave the country.

5  Q.   Okay.  You wrote a letter to the Australian embassy saying

6  that you found him to be a truthful man?

7  A.   I think I wrote that in all the matters and dealings that I

8  had with him I found him to be truthful.

9  Q.   Okay.  In the affidavit that you -- or strike that.

10        In other public pleadings that you have filed, is it

11  true, sir, that you have put in copies of checks with the

12  account number for the Ripoff Reports in them?  Yes or no.

13  A.   I -- yes.

14  Q.   Is it true, sir, yes or no, that you have received and put

15  into public pleadings e-mail communications between the Ripoff

16  Report, Ed Magedson, and his lawyers?  Yes or no.

17  A.   You said communications between the two of them?

18  Q.   Yes, e-mails.

19  A.   I don't believe there were any e-mails in the public.  I

20  think that I filed those under seal.

21  Q.   Do you remember filing the state's response to defendant's

22  motion to disqualify county attorney on October 1 of 2014?

23  A.   Yes, sir.

24  Q.   I mean, this is -- I'm not going to put it into evidence

25  because I didn't want to kill a tree copying it four times, but

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:15-cv-04008-LTS Document 42 Filed 05/12/16 Page 62 of 252

1  that's a pretty thick motion; isn't that right?

2  A.    Yes.

3  Q.    And in that motion -- that was not under seal; correct,

4  sir?

5  A.    Part of it was.

6  Q.    Was the part that you claim to be under seal the part that

7  contained attorney-client information from Ed Magedson to his

8  lawyer, Maria Speth?

9  A.    Yes, I believe all the communications between Ed Magedson

10 and anyone that was either acting as an attorney or COO or

11 whatever, I believe -- I believe were all under seal, yeah.

12 Q.    Okay.  And are you sure about that?

13 A.    I thought I was pretty sure about that.  I could be -- I

14 could be wrong.

15 Q.    Okay.  But when you received attorney-client -- or

16 attorney-client communications, did you immediately call either

17 Ed Magedson, Magedson, or Maria Speth and say, "I have received

18 attorney-client e-mails"?  Yes or no.

19 A.    No.

20 Q.    Did you -- when you received attorney-client privileged

21 information, did you actually read the e-mails and interpret for

22 yourself that he was writing letters or e-mails, sorry, to his

23 lawyers?  Did you see that, and did you recognize it?

24 A.    I saw that, and I recognized it.

25 Q.    At the point that you had recognized that you had

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:15-cv-04008-LTS-DJH  Document 44  Filed 05/12/16  Page 63 of 252

1  intercepted attorney-client information, did you establish a

2  taint review for someone to look at it to see whether or not

3  there were attorney-client privileged information, or did you

4  review it yourself?

5  A.   I reviewed it myself.

6  Q.   And did you use that information without returning it to

7  the lawyer or to the person who was consulting with their

8  attorney?  Did you return it to them?

9  A.   No, I didn't return it to them.

10  Q.   In fact, you used it; correct?

11  A.   I --

12  Q.   You used it in motions; correct?

13  A.   I -- yes.

14  Q.   And you actually submitted a bar complaint against Maria

15  Speth; correct?

16  A.   I did.

17  Q.   And, in fact, sir, you were at some point offered a -- you

18  were given an offer to try to resolve this matter, and you

19  stated that you were receiving a bribe; correct?  Yes?

20  A.   I did.

21  Q.   Yes.

22  A.   Yes.

23  Q.   Okay.  And, of course, if it wasn't you and the prosecutor

24  receiving the same offer, they would be able to say, oh, this

25  isn't a bribe, but we're not going to take that deal because the

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:15-cv-04008-LRR Document 42 Filed 05/12/16 Page 64 of 252

1   offer wouldn't be to the person with all of their interest tied

2   into this case like you; correct?

3   A.   That's not accurate.

4   Q.   Okay.  And let's talk a little bit about the people that

5   were state's witnesses.

6         THE COURT:  Counsel, can we take a -- is it a good

7   time to stop?

8         MR. ROBBINS:  Yes.  Thank you, Your Honor.  Sure.

9         THE COURT:  It's just a little after 10:30.  We can

10  all use a break.  Let's come back at 10:50 and resume

11  questioning.  So we'll be in recess.

12        MR. ROBBINS:  Thank you.

13        (Recess at 10:33 a.m.)

14        THE COURT:  Please be seated.  All right.  We are back

15  in session in Xcentric Ventures, et al., versus Ben Smith.

16  Mr. Smith is back on the stand, sir.  Do you understand you are

17  still under oath?

18        THE WITNESS:  I do, sir.

19        THE COURT:  Okay.  Great.  Thank you.

20        Mr. Robbins, are you ready to proceed?

21        MR. ROBBINS:  Thank you, Your Honor.  Yes.

22  BY MR. ROBBINS:

23  Q.   I want to go back and ask you something about

24  Mr. Brewington.  You had talked about learning at some point

25  that Brewington had put up information from the affidavit that

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:15-cv-04008-LTS Document 48 Filed 05/12/16 Page 65 of 252

1  you had said for him to keep out of the public's eye that he had

2  started posting on it; correct?

3  A.   I don't recall whether I was speaking specifically about

4  the affidavit.  I just knew that there was some information that

5  had gone up.  I can't remember -- I can't recall exactly what it

6  was.

7  Q.   Do you remember whether it was information revealing such

8  things as arrests and indictments?

9  A.   There was never any information given to him about arrests

10  or indictments.

11  Q.   Do you know whether or not that would have been close in

12  time to the time of the affidavit?  I know you don't know

13  whether it was immediately before or immediately after.  But was

14  it within a few weeks of the affidavit going public?

15  A.   You're talking about tweets and stuff on social media that

16  Brewington posted about imminent arrests?

17  Q.   Yes.

18  A.   I don't believe I saw that until long after.  I -- yeah, it

19  just -- I think Peter Berger's the one that pointed it out to me

20  if I recall, but I don't recall exactly.

21  Q.   I'd like you to look at Exhibit Number 2.  Oh, you know

22  what?  Before we go there, can I have the cover pages for --

23  okay.

24        I'm going to hand you the cover page for state's

25  response to defendant's motion to disqualify county attorney,

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:15-cv-04008-LTS Document 42 Filed 05/12/16 Page 66 of 252

1    and then I'm going to hand you attachments -- the cover pages

2    for attachments A, B, and C to that motion.

3    A.    Uh-huh.

4    Q.    Do you see anywhere on any of those where it says under

5    seal?

6    A.    These were not under seal, sir, no.

7    Q.    Okay.  And this is the 900 pages that we showed in that

8    box, the 30 --

9    A.    I can't speak as to what's in the box.  I know that there

10   was a lot of pages.  There's a lot of transcripts and things of

11   that nature.  I don't know what's actually in the box there, but

12   there was a separate filing along with this done at the same

13   time that contained a -- I believe they're actually referenced

14   in this document, a separate document that was filed under seal,

15   where I referenced certain items like see item 1, and that was

16   filed under seal.  That was filed contemporaneously with this.

17   Q.    Okay.  That's not referenced on the cover pages of any of

18   the things you filed that it was filed under seal.

19   A.    Not in these, no, huh-uh.

20   Q.    Okay.  Thank you.

21   A.    No.  Yeah.

22   Q.    Let's go back to the Brewington question.  Did you provide

23   him attorney-client e-mails from the Ripoff Report?

24   A.    I don't believe so.

25   Q.    Okay.  Then I am going to have you look at Exhibit Number 2

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:15-cv-04008-LTS    Document 42    Filed 05/12/16    Page 67 of 252

1  which was --

2         MR. ROBBINS:  Move for admission of Exhibit Number 2.

3                      *   *   *   *

4         (Exhibit 2 was offered.)

5                      *   *   *   *

6         MR. MADSEN:  No objection.

7         THE COURT:  All right.  Exhibit 2 is received.

8                      *   *   *   *

9         (Exhibit 2 was admitted.)

10                     *   *   *   *

11 BY MR. ROBBINS:

12 Q.    Now, the redactions there and the privileged and the --

13 those are done by counsel for Xcentric Ventures.  And let me

14 just call out the part where you would have read that this is a

15 continuation of an e-mail I sent to Ripoff Report servers and

16 e-mail.  I am using these e-mails to preserve confidentiality.

17 Would that have been something that you read before you

18 submitted it and used it as an exhibit?

19 A.    Certainly.

20 Q.    Okay.  And did you return this to either the Ripoff Report,

21 Ed Magedson, or Maria Speth or Xcentric Ventures?

22 A.    No.

23 Q.    And in that e-mail, there is a discussion, and I'm just

24 going to ask you to read it yourself if you would.  It talks

25 about a hit piece.  Do you see that?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:15-cv-04008-LTS-KEM  Document 48  Filed 05/12/16  Page 69 of 252

1  A.   Yes, I do, the only part that's not redacted.

2  Q.   And then on Exhibit Number -- I'll have you look at Exhibit

3  Number 13.

4  A.   Okay.

5  Q.   Exhibit Number 13 is a response to motion for protective

6  order and request for in-chamber review of evidence and response

7  to motion to expunge search warrant.  Do you recognize that?

8  A.   Yes, I do.

9  Q.   Is it, in fact, a pleading that you filed?

10 A.   It appears to be.

11 Q.   And I will ask you to look on page number 6 of that.  Oh,

12 I'm sorry.

13          MR. ROBBINS:  Before I project it, move for admission

14 of Exhibit Number 13.

15                          *  *  *  *

16          (Exhibit 13 was offered.)

17                          *  *  *  *

18          MR. MADSEN:  No objection.

19          THE COURT:  All right.  Exhibit 13 is received.

20                          *  *  *  *

21          (Exhibit 13 was admitted.)

22                          *  *  *  *

23 BY MR. ROBBINS:

24 Q.   And in Exhibit Number 13 which you wrote -- and let me see

25 if I can blow that up -- it says most troubling in all of this

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:15-cv-04008-LTS Document 42 Filed 05/12/16 Page 69 of 252

1    is that after the undersigned recently disclosed to

2    representatives of Ripoff Report that John Brewington, a

3    licensed private investigatory in the state of Arizona, provided

4    law enforcement here in the state of Iowa with information

5    concerning the Ripoff Report, a Ripoff Report complaint about

6    the private investigator John Brewington which Ripoff Report has

7    described as a hit piece was made a featured report on 1.6

8    million web pages.  Did I read that correctly?

9    A.    1.8 million.  You said 1.6 but --

10   Q.    Oh, I'm sorry.  That's my glasses.

11   A.    Yeah.

12   Q.    My eyes suck.  Getting old sucks.  It will come some day

13   for you too, but it sucks.  Let me give you a preview.  It

14   sucks.  Apologize for the sideline.

15            THE COURT:  It does beat the alternative, though.

16            MR. ROBBINS:  At least I can see something.  It's too

17   dark the other place.

18   Q.    But in any event, did you talk to Mr. Brewington and

19   provide him with that e-mail that you describe as a hit piece?

20   A.    I don't think I provided it to him.  I think I may have

21   told him about it.

22   Q.    So you discussed the attorney-client information with this

23   investigator.  Did you know his relationship with the Ripoff

24   Report?

25   A.    His being John Brewington?

1  Q.   Yes.

2  A.   I know more about it now than I did when I first came to

3  know of John Brewington.

4  Q.   Did you ever get the feeling that he was amicable or at

5  least neutral concerning his feelings about the Ripoff Report?

6  A.   No.

7  Q.   And you were sharing with him attorney-client privilege

8  from this person or this company that he had at least from your

9  understanding an animus relationship.

10 A.   That's not -- that not accurate.

11 Q.   Okay.  So you were discussing with him this e-mail which is

12 marked attorney-client privilege with a man who at least

13 according to your perceptions was no friend of the Ripoff

14 Report.  Did I accurately state that?

15 A.   No, you did not.

16 Q.   Okay.  Let's break it down then.  You said that you had

17 discussed the contents of this e-mail with John Brewington.

18 A.   Yes.

19 Q.   Was that a correct statement?

20 A.   I believe that's correct.

21 Q.   Okay.  Did you discuss with him the contents of that

22 e-mail?

23 A.   I believe so, yes.

24 Q.   Okay.  That e-mail was labeled attorney-client privilege,

25 or it said it was a confidential communication; correct?

1  A.    I believe it said it was confidential.  I don't know

2  whether it said it was attorney-client privileged.

3  Q.    What other confidences do you believe applied under the

4  circumstances of a conversation between the lawyer for -- and

5  one of the executives of Xcentric?

6  A.    This communication was between Chief Operating Officer Adam

7  Kunz who's here today.  It was marked privileged.  It was a

8  discussion between COO Kunz and Ed Magedson about writing hit

9  pieces.  It was written from Adam Kunz's Gmail account or his

10  nonwork account to Ed Magedson's personal account.  Marked

11  confidential, it doesn't mean that it's privileged.  And writing

12  hit pieces is not privileged communications between attorney and

13  client.  That is . . .

14  Q.    You're aware that Adam Kunz is the in-house counsel for the

15  Ripoff Report; correct?

16  A.    I am.

17  Q.    Okay.  And this is a conversation between the chief counsel

18  and the CE -- or whatever you call Ed Magedson.  That's a

19  communication between them; correct?

20  A.    Yes.

21  Q.    Okay.

22  A.    Not all communi --

23  Q.    And you are sh -- and it even says confidential

24  communications.  Is there another confidential communication

25  category that would apply to communication between the in-house

1  counsel and the chief executive for lack of a better word?

2  A.   There's -- I don't believe that there's a privilege between

3  executives and the clients, no, to answer your question.

4  Q.   Okay.  So you felt that it was appropriate to share

5  information from this e-mail with Mr. Brewington.

6  A.   I wanted -- I was -- if I believe correctly, I was asking

7  for context as to why a hit piece would be published against

8  him.  I didn't fully understand the nature of the relationship

9  between these two.  That e-mail's clearly not a privileged

10  communication.  It might be a communication between an attorney

11  and a client, but writing -- offering editorial advice as to hit

12  pieces is not a communication done in furtherance of providing

13  legal advice.

14  Q.   As a lawyer, have you ever provided advice to your clients

15  about what they should or shouldn't do?  Have you ever done

16  that?

17  A.   I've only ever represented the state so . . .

18  Q.   Have you ever had the state do something that you said

19  that's not a good idea?  Do you become an attorney when it's a

20  good idea but you aren't an attorney when it's a bad idea and

21  you're trying to say that might not be something we want to do?

22  A.   I don't recall ever sending any of -- I just don't have

23  clients I guess.

24  Q.   Okay.  But you do understand that some of us out there do

25  have clients.

1  A.   I do.  I understand that.

2  Q.   Okay.

3  A.   But to provide context I guess is --

4  Q.   If there's context, I'm trying to finish in a half hour.

5  I'm going to make it.

6          MR. ROBBINS:  Go ahead.

7          MR. MADSEN:  I understand, but I think if he asks a

8  question, he's gotta give the witness an opportunity to fully

9  answer it, and I think there he cut him off, and he was trying

10  to respond.

11          MR. ROBBINS:  It probably was a curt answer.  The

12  question I believe was you acknowledge that some of us out there

13  do have clients, and then he tried to answer the question.  I

14  would withdraw the question because it was probably not asked --

15  it was probably a little bit rhetori -- a rhetorical question

16  and argumentative.

17          THE COURT:  All right.  The question is withdrawn, and

18  the answer will be disregarded.

19  BY MR. ROBBINS:

20  Q.   How did you screen e-mails to determine which

21  communications were privileged and which were not?

22  A.   I did not.

23  Q.   Did you ask for any advice from any other counsel in order

24  to assist you in determining when you were invading the

25  attorney-client privilege?

A.   I've never invaded the attorney-client privilege, sir.  I
obtained a search warrant for the personal communications of Ed
Magedson.  I followed the Department of Justice's DOJ manual,
and I believe only once in that 300-page document is there a
reference to a taint officer.  It was never done in conjunction
with a search warrant for -- for e-mail communications.  In
fact, the technical language of the search warrant is almost a
carbon copy of the one that's in the DOJ United States
Department of Justice manual.

Q.   Do you know what the Department of Justice does when they
run into an attorney-client privilege e-mail?  Have you ever
heard of a taint officer?

A.   A taint officer, my understanding -- I have heard of that,
yes.  My understanding is a taint officer is assigned before a
search warrant comes back in -- according to the DOJ manual, as
I remember reading through it, it was -- you do that in
instances, and the example that they gave in the manual was if
you obtain a search warrant for computers belonging to attorneys
or when it's reasonably likely to assume that there's going to
be attorney-client communications.

Q.   How about when you start running into communications that
are labelled with confidential and they're between an in-house
counsel and the, for lack of a better term, chief executive?

A.   I don't understand the question.  What about --

Q.   If you run into something that -- let's even propose --

1  let's take a hypothetical for just a moment.  You run into an

2  e-mail that says "attorney-client privilege" in red, and it

3  says, I as your attorney am advising you, blah, blah, blah,

4  blah, blah.  Don't care what blah, blah, blah is, but it's

5  labeled attorney-client privilege.  When do you have to stop

6  reading and say, wait a second, I need to have someone who

7  doesn't have a dog in this fight to determine whether or not I

8  can read this right away or whether, as the Iowa Rules of

9  Professional Conduct would suggest, that I send that back to the

10  attorney?  When is that moment?

11  A.  First off, the Iowa Rules of Professional Conduct -- in the

12  bar complaint filed by your client against me, the Iowa

13  disciplinary committee found -- they dismissed the complaint,

14  and I know that was one of your client's key gripes against me.

15  Q.  If I asked that question, I really apologize because my

16  question to you was on the hypothetical of an e-mail which says

17  attorney-client privilege in red across that says, I as your

18  attorney, blah, blah, blah, blah, blah, do you acknowledge that

19  at that point that you probably need to put that aside and have

20  someone who is not -- doesn't have a dog in the fight to look

21  and determine whether it's attorney-client privileged

22  communications?

23      MR. MADSEN:  Your Honor, again, I object.  Counsel has

24  again interrupted Mr. Smith when he's giving an answer.  And I

25  think the witness should be allowed to give the answer.  It

1    might not be the answer that counsel wants, but I think he still

2    should give -- be allowed to give the answer, and I think it was

3    responsive to the area that the questioning was in.

4            THE COURT:  I disagree.  The witness went off on a

5    complete tangent about a bar complaint and whatever happened to

6    it.  The question had nothing to do with that, so he was not

7    being responsive, and it was appropriate for counsel to try to

8    redirect him to the question.  So the objection -- excuse me,

9    the objection's overruled.

10   BY MR. ROBBINS:

11   Q.   How many of these e-mails, privileged e-mails, between

12   attorney and client did you send to the Arizona State Bar in a

13   bar complaint just approximately?

14   A.   I don't know.  Including the ones that were threaded, maybe

15   ten.

16   Q.   Okay.  And we were talking about John Brewington.  Did you

17   perform any investigation to vet Mr. Brewington during the 1,500

18   hours of investigation you performed?

19   A.   I came to learn that he was a licensed private

20   investigator.  I don't know how or where.  But I knew that he

21   was licensed, I think bonded also if I recall.

22   Q.   Did you know about or try to get any information about what

23   his relationship was with the Ripoff Report?

24   A.   No.

25   Q.   You didn't know, for instance, that he had been involved in

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:15-cv-04008-LTS    Document 42    Filed 05/12/16    Page 77 of 252

1  multiple lawsuits with the Ripoff Report?

2  A.    No.

3  Q.    You didn't know -- he didn't tell you that he was writing a

4  book about the Ripoff Report?

5  A.    I think that he mentioned that, you know, long after the

6  fact.

7  Q.    Okay.  So you never asked him.  You didn't say, hey, you

8  know, why are you coming to me and giving me this information;

9  what's in it for you?  You never asked that?

10  A.    No.

11  Q.    Okay.  Do you remember at page 52 talking about the fact

12  that Darren Meade told your investigator, Tina Church, that

13  Darren Meade did all the writing and that Mr. Magedson just

14  provided the platform for people to write?

15  A.    I do recall something to that effect, yeah.  I'll look

16  here.

17  Q.    If you remember it in general, that's probably good enough

18  and saves us a little bit of time.

19  A.    Okay.

20  Q.    It's already in evidence.  You state in your affidavit that

21  Darren manipulated Ed Magedson in order to try to get a job.  Do

22  you remember that?

23  A.    I think I recall something like that.

24  Q.    And it was in November at the trial -- this is in November,

25  so the trial ends in October; correct?

1  A.   November actually.  November 7.

2  Q.   Okay.  November 7 the trial ends.  It is not until December

3  that Meade meets with Ed Magedson for the first time; correct?

4  A.   That's my understanding, yes.

5  Q.   Okay.  And you state -- or strike that.  That's in the

6  evidence, so I'm not going to refer to it.

7        Okay.  Let's look at Exhibit Number 8.  Do you see

8  Exhibit Number 8?

9  A.   Yes.

10  Q.   Do you recognize that to be an e-mail which was put into

11  evidence in your section 915 action?

12  A.   I don't know if I filed -- yeah, that's why the -- that's

13  my exhibit sticker, so yeah.  Yeah, that appears to be correct.

14  Q.   Okay.  And that is one of the things that you made of

15  public record?

16  A.   Yes.

17  Q.   And it is an e-mail from Maria Crimi Speth -- did I say

18  Crimi wrong?  Crimi?  Crimi -- Maria Crimi Speth to Ed Magedson

19  who is referred to as editor of Ripoff Report.  You recognized

20  at the time that you put this into a public record that it was

21  an attorney-client e-mail; correct?

22  A.   I believe that there were individuals, not attorneys, that

23  were copied in on the e-mail that --

24  Q.   Okay.  Let's go and look at each of them because I do see

25  that -- okay.

```
 1          MR. ROBBINS:  Oh, Your Honor, move for admission of

 2   Exhibit Number 8.

 3                        *   *   *   *

 4          (Exhibit 8 was offered.)

 5                        *   *   *   *

 6          MR. MADSEN:  No objection.

 7          THE COURT:  All right.  Exhibit 8 is received.

 8                        *   *   *   *

 9          (Exhibit 8 was admitted.)

10                        *   *   *   *

11   BY MR. ROBBINS:

12   Q.    And let's just go through each of them because did you, for

13   instance, know that westerned@aol.com is Ed Magedson?

14   A.    I did.

15   Q.    Okay.  And Ripoff Report, EDitor@ripoffreport, is Ed

16   Magedson.

17   A.    Yes.

18   Q.    And david@ripoffreport you probably assumed would be an

19   employee of the Ripoff Report; correct?

20   A.    Certainly.

21   Q.    And Anette, also a employee of the Ripoff Report, and

22   justin@ripoffreport was also a member of the Ripoff Report;

23   correct?

24   A.    Yeah.  That's what I understood.

25   Q.    Okay.  So you had an understanding that this was a
```

Case 5:15-cv-04008-LTS Document 42 Filed 05/12/16 Page 80 of 252

```
 1   privileged -- attorney-client privileged information which you
 2   put into the public record; correct?
 3   A.   I put it in the public record.  I guess I don't recognize
 4   it as being privileged.
 5   Q.   Okay.  So was this -- without going into it in too much,
 6   it's not an invitation to a volleyball game or anything like
 7   that.  You acknowledge that it is related to Ms. Speth's -- or
 8   Miss Speth's -- is it Miss, Ms.? -- Miss Speth's communications
 9   with her client; correct?
10   A.   Yes.
11   Q.   Okay.  I'd like to have you look at Exhibit Number 4.  Do
12   you recognize that?
13   A.   Yes.  No.  Exhibit 4 you said?
14   Q.   Yes, Exhibit 4.
15   A.   Hold on a second.  My binder's kind of exploded on me.
16   Q.   Uh-oh.
17           MR. ROBBINS:  May I approach the witness, Your Honor?
18           THE COURT:  Yes, please.
19   BY MR. ROBBINS:
20   Q.   Okay.  You're at Exhibit Number 4?
21   A.   Yes.
22   Q.   Do you recognize Exhibit Number 4?
23   A.   I don't actually.
24   Q.   You don't recall reviewing that in the subpoena that you
25   served or not -- you didn't serve a subpoena -- on the warrant
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:15-cv-04008-LTS Document 42 Filed 05/12/16 Page 81 of 252

1  that you had issued for Ed Magedson's e-mail?

2  A.    I don't believe so, no.

3  Q.    Okay.

4  A.    If I see here -- I didn't have Ed Magedson's

5  ripoffreport.com e-mail address.

6  Q.    So you had the Western Ed?

7  A.    Yes, sir.

8  Q.    Okay.  And go ahead and take a look at Exhibit Number 5.

9  Do you recognize this e-mail?

10  A.    Yes, I do.

11  Q.    And that is a -- an e-mail that was written to you by

12  Darren Meade in 2012?

13  A.    That's correct, sir.

14          MR. ROBBINS:  Move for admission of Exhibit Number 5.

15                      *   *   *   *

16          (Exhibit 5 was offered.)

17                      *   *   *   *

18          MR. MADSEN:  No objection.

19          THE COURT:  Exhibit 5 is received.

20                      *   *   *   *

21          (Exhibit 5 was admitted.)

22                      *   *   *   *

23  BY MR. ROBBINS:

24  Q.    And he told you in that e-mail that Michael Roberts had

25  threatened his life?

1  A.   And you're still referring to Exhibit 6 now; right?

2  Q.   No.  Exhibit 5.  I'm sorry.  You might be at the wrong --

3  A.   No.  I'm back.  Okay.

4  Q.   He told you that Mr. Roberts had threatened his life?

5  A.   Yes, he did.

6  Q.   And he gave you an audio recording of that; correct?

7  A.   Yes, he did.

8  Q.   And you listened to the audio recording; correct?

9  A.   I don't recall -- I don't believe that I did at that time,

10  no.

11  Q.   Do you recall there was discussion -- have you ever

12  listened to that audio tape?

13  A.   I think so.  I'm not quite for sure.  There was a lot of

14  audio recordings, a lot, that were sent by Darren Meade and also

15  Michael Roberts.  I didn't listen to them all.

16  Q.   Okay.  Do you remember hearing a discussion about a hollow

17  point bullet that Mr. Roberts was participating in?

18  A.   I remember there being a discussion about a hollow point

19  bullet, but I don't recall exactly who was saying it or was

20  participating in it.

21  Q.   Did you ever talk to Michael Roberts about that when you

22  were attempting to verify whether or not he was a credible

23  witness who you should rely on in the preparation of your

24  affidavit?

25  A.   I don't recall, no.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*

Case 5:15-cv-04008-LTS   Document 42   Filed 05/12/16   Page 83 of 252

1  Q.   Okay.  Do you remember that Mr. Meade told you in that

2  e-mail that Mr. Roberts had attempted to extort the victim of a

3  hacking scheme?

4  A.   If you could point me to the page, maybe I could -- not

5  right off the top of my head I do not recall that but . . .

6  Q.   You know, it's in evidence.  We can refer to it.  But you

7  do recall that he gave you access to his Dropbox; correct?

8  A.   That Darren Meade did, yes.

9  Q.   Did you access his Dropbox?

10 A.   No, I did not.

11 Q.   Did you ever see the information that was there in the

12 Dropbox that he tried to give you?

13 A.   No.

14 Q.   Go ahead and look at Exhibit Number 7.

15 A.   Okay.

16 Q.   And Exhibit Number 7 is an e-mail from you to Darren Meade;

17 correct?

18 A.   It is.

19 Q.   And was that in response to Exhibit Number 5?

20 A.   May 9 was Exhibit 7.  I don't know if it was -- it was a

21 response to communications I had had with Darren or e-mails that

22 Mr. Meade had sent to me.  I don't recall if it's an immediate

23 reply to the one that's Exhibit 5.

24 Q.   And in response did you tell him that before moving forward

25 with the case against Michael Roberts that you needed his sworn

1  grand jury testimony?

2  A.    Yes, I remember this e-mail, yes.

3  Q.    Did you tell him that you required his sworn grand jury

4  testimony before you could move forward?

5  A.    Yes, I wrote this in an e-mail to him.

6  Q.    Have you ever done a grand jury?  Have you ever convened a

7  grand jury in Sac County, Iowa?

8  A.    I haven't convened a grand jury, but I have convened Rule

9  256 investigations which are akin to grand jury proceedings.

10  Q.    You did not require a grand jury testimony to move forward

11  against Mr. Meade; correct?

12  A.    No.

13  Q.    Or Mr. Magedson -- Magedson.

14  A.    That's not accurate.  I haven't moved on Mr. Magedson.

15  Q.    Okay.  And indeed, sir, you had no intention as of the time

16  that that e-mail was written of moving against Michael Roberts;

17  correct?

18  A.    At the time that Darren Meade wrote this e-mail to me?

19  Q.    The time that you wrote the one back to him.

20  A.    Oh, I'm sorry.  No, huh-uh.

21        MR. ROBBINS:  Okay.  Move for admission of Exhibit

22  Number 7.

23                          *   *   *   *

24        (Exhibit 7 was offered.)

25                          *   *   *   *

```
1              MR. MADSEN:  No objection.

2              THE COURT:  Exhibit 7 is received.

3                           *   *   *   *

4              (Exhibit 7 was admitted.)

5                           *   *   *   *

6   BY MR. ROBBINS:

7   Q.   Please turn to Exhibit Number 9.  Do you recognize Exhibit

8   Number 9?

9   A.   Yes, I do, sir.

10  Q.   And I will move for -- what is Exhibit Number 9?

11  A.   Exhibit Number 9 is an e-mail from Darren Meade to Matt

12  Breen, KTIV news reporter.

13  Q.   And in that -- and who is it from?

14  A.   It's from Darren Meade to the newsperson.

15  Q.   Okay.

16             MR. ROBBINS:  And move for admission of Exhibit Number

17  9.

18                          *   *   *   *

19             (Exhibit 9 was offered.)

20                          *   *   *   *

21             MR. MADSEN:  No objection.

22             THE COURT:  All right.  Exhibit 9 is received.

23                          *   *   *   *

24             (Exhibit 9 was admitted.)

25                          *   *   *   *
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
Case 5:15-cv-04008-LTS Document 42 Filed 05/12/16 Page 86 of 252
*To purchase a complete copy of the transcript*

1   BY MR. ROBBINS:

2   Q.   And in the e-mail there is a statement where -- did you

3   immediately share the information that was provided to you by

4   Darren Meade to Michael Roberts?

5   A.   I mean, it was within a couple days.  I think I -- I don't

6   exactly recall what I said to Mr. Roberts or what information I

7   gave him.  But, I mean, after I got that e-mail, that was one of

8   the first things I did was contact Michael Roberts and tell him

9   what -- you know, what had been sent to me.

10  Q.   Take a look at Exhibit Number 10.

11  A.   Sure.

12  Q.   Exhibit Number 10 is a compilation of articles, websites,

13  and blogs that deal with the story of you going against the

14  Ripoff Report.  You are aware that you once again have national

15  publicity, that, in fact, your case against Xcentric Ventures

16  and Ed Magedson has given you back the national spotlight.

17  A.   It hasn't -- I mean, I suppose there's national attention

18  to this.  No, I didn't . . .

19  Q.   You've been in the Huffington Report; correct?

20  A.   The Huffington Post, I believe.

21  Q.   Huffington Post, sorry.

22  A.   I believe that there was an article written there.

23  Q.   Sorry.

24       MR. ROBBINS:  Move for admission of Exhibit Number 10.

25                    *   *   *   *

**Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov**
To purchase a complete copy of the transcript
Case 5:15-cv-04008-LTS   Document 42   Filed 05/12/16   Page 87 of 252

```
1              (Exhibit 10 was offered.)

2                          *   *   *   *

3         MR. MADSEN:  No objection.

4         THE COURT:  Exhibit 10 is received.

5                          *   *   *   *

6              (Exhibit 10 was admitted.)

7                          *   *   *   *

8    BY MR. ROBBINS:

9    Q.   Go ahead and look at Exhibit Number 11.

10   A.   Okay.

11   Q.   Exhibit Number 11 is a letter from Peter Berger to you

12   putting you on notice of what he referenced as serious ethical

13   implications concerning your involvement in this case.  Is that

14   correct?

15   A.   Yes, sir.

16        MR. ROBBINS:  And move for admission of Exhibit Number

17   11.

18                          *   *   *   *

19             (Exhibit 11 was offered.)

20                          *   *   *   *

21        MR. MADSEN:  No objection.

22        THE COURT:  Exhibit 11 is received.

23                          *   *   *   *

24             (Exhibit 11 was admitted.)

25                          *   *   *   *
```

1  BY MR. ROBBINS:

2  Q.   And there is attached to Exhibit Number 11 a number of

3  e-mails, but at 1:55 I believe that there is an e-mail from you

4  to Peter Berger.

5  A.   Yes, sir.

6  Q.   And is that your response to Peter Berger?

7  A.   Yes, it is, sir.

8  Q.   And you in that state that you will ask the court to issue

9  county attorney subpoenas to Ed Magedson and Adam Kunz, Justin

10  Crossman, Anette Beebe.  That is you writing that; correct?

11  A.   That is, yes.

12  Q.   Go ahead and go to Exhibit Number 14.  Have you ever seen

13  that?

14  A.   This affidavit of Earl Hardisty?

15  Q.   Yes.

16  A.   Yes, I have.

17  Q.   Did you, in fact, tell Earl -- Earl Hardisty was the Sac

18  County prosecutor prior to you?

19  A.   Yes, he was.

20  Q.   And -- and he had -- or strike that.

21       He had provided information to the defense attorney

22  for Tracey Richter; correct?

23  A.   That's correct.

24  Q.   And you protested to him for providing information or

25  working with them; correct?

A.   I didn't protest.  This affidavit's not -- is not accurate.

I never told him to quit talking to Tracey Richter's criminal

defense attorneys.  I told him that if he was going to provide

them with information that the information he was providing them

was false.  It had to do with the existence of certain things

that never existed.  I would then get e-mails from Tracey

Richter's criminal defense attorney saying where is this

information.

          Finally I learned the source of it was my predecessor,

Earl Hardisty, and I called him and I asked him, you know -- I

was upset with him because I had beat Earl, and he was the

incumbent, and I had beat him in the election.  Despite that, I

had a number of discussions with him concerning the Tracey

Richter case providing him my mental impressions and my theories

of the case.  And I was -- I was disappointed that he was

speaking with the defense counsel and not, I guess, adhering to

his ethical obligation to keep that information to himself.

They subpoenaed him after they had spoken with him.

          So he had told them a bunch of information, and

then -- then they subpoenaed him to -- for a deposition.  And we

moved to quash the deposition.  And this issue was raised by

Tracey Richter's attorney.  In fact, this affidavit was attached

to a motion to have me disqualified in the Richter prosecution.

And the judge considered the evidence, and there's a court order

where the judge that presided over the case, Judge Wilke, had

```
 1   indicated that it was -- that I never threatened Earl Hardisty.

 2              MR. ROBBINS:  Your Honor, move to strike as

 3   nonresponsive to the question.

 4              THE COURT:  I'm going to overrule that.  It was a

 5   relatively open-ended question.

 6              MR. ROBBINS:  Fair enough, Your Honor.  Thank you.

 7              Move for admission of Exhibit Number 14.

 8                         *   *   *   *

 9              (Exhibit 14 was offered.)

10                         *   *   *   *

11              MR. MADSEN:  No objection.

12              THE COURT:  All right.  Exhibit 14 is received.

13                         *   *   *   *

14              (Exhibit 14 was admitted.)

15                         *   *   *   *

16   BY MR. ROBBINS:

17   Q.   And please take a look at Exhibit Number 15.

18   A.   I'm there, sir.

19   Q.   Are you there?

20   A.   Yeah.

21   Q.   Okay.  This is an affidavit you signed?

22   A.   Yes.

23              MR. ROBBINS:  Move for admission of Exhibit Number 15.

24                         *   *   *   *

25              (Exhibit 15 was offered.)
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:15-cv-04008-LRR Document 42 Filed 05/12/16 Page 91 of 252

```
1                          *    *    *    *

2              MR. MADSEN:  No objection.

3              THE COURT:  Exhibit 15 is received.

4                          *    *    *    *

5              (Exhibit 15 was admitted.)

6                          *    *    *    *

7   BY MR. ROBBINS:

8   Q.    This is an affidavit that you provided Mr. Roberts in his

9   child custody proceeding?

10  A.    It is.

11  Q.    You also spoke at the child custody proceeding?

12  A.    I testified, yes.  Both of these provided pursuant to

13  subpoenas.

14  Q.    And at paragraph number 12 you acknowledge that you had

15  numerous dealings with him in the legal investigatory matters

16  related to the Richter case; correct?

17  A.    I did.

18  Q.    At paragraph number 13, you had said before -- and I'd like

19  to just make that a little bit bigger so -- let me see if I can

20  call it out.  Here you say that you believe Michael Roberts to

21  be completely and unabashedly honest in the aforementioned

22  dealings, slash, matters.  Did I read that correctly?

23  A.    You did.

24  Q.    You were aware at the time that you wrote this about his

25  polygraph examination; yes or no?
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript*
Case 5:15-cv-04008-LRR Document 44 Filed 05/12/16 Page 92 of 252

1    A.    Yes.

2    Q.    Okay.  And you were aware that the Iowa Department of Human

3    Services had determined the child abuse allegations against

4    Mr. Roberts were founded; correct?

5    A.    I don't know if that was -- I didn't know that I guess.  If

6    that's the case, I didn't know that.

7    Q.    Okay.

8    A.    I don't believe so.

9    Q.    We've talked about the polygraph.

10          MR. ROBBINS:  Your Honor, may I take a half a minute?

11          THE COURT:  Sure.

12          MR. ROBBINS:  I think I can cross a couple of these

13   off.

14          THE COURT:  Absolutely.

15          MR. ROBBINS:  Your Honor, move for admission of

16   Exhibit 18.

17                        *   *   *   *

18          (Exhibit 18 was offered.)

19                        *   *   *   *

20          MR. MADSEN:  No objection.

21          MR. ROBBINS:  Okay.  And --

22          THE COURT:  Hold on.  Did you say no objection?

23          MR. MADSEN:  I did.  No objection, Your Honor.

24          THE COURT:  All right.  Thank you.  Exhibit 18 is

25   received.

```
 1                        *   *   *   *

 2            (Exhibit 18 was admitted.)

 3                           *   *   *   *

 4    BY MR. ROBBINS:

 5    Q.   Go ahead and go to Exhibit 29 if you would.

 6    A.   Okay.  I'm there, sir.

 7    Q.   And let me blow that up.  In fact, I think I can do

 8    something a little tricky here.  I'm going to take -- oh.

 9            MR. ROBBINS:  Exhibit 29 and 30, move for admission of

10    those two.

11                           *   *   *   *

12            (Exhibits 29 and 30 were offered.)

13                           *   *   *   *

14            MR. MADSEN:  Your Honor, I fail to see the relevance

15    in these exhibits.  And since there hasn't been questions asked

16    about them, maybe he can establish some relevance, but I'm not

17    sure what they are, frankly.

18            MR. ROBBINS:  Okay.  Let me --

19            THE COURT:  I'll go ahead and rule.  I'm still at the

20    point where I'm not sure I know what's relevant and what's not

21    relevant, and we don't have a jury here, so I'm going to go

22    ahead and receive the evidence, Exhibits 29 and 30.  I'll

23    receive both exhibits.  Obviously as I'm ruling on the case,

24    I'll decide whether I consider them to be relevant or not, but I

25    will receive them as substantive evidence for purposes of the
```

1   hearing today.  So you may proceed.

2              MR. MADSEN:  Your Honor, if I may just to maybe speed

3   things up with counsel, I know I had indicated at one point that

4   I didn't have any identification, authentication objections,

5   that it would just be relevance objections.

6              THE COURT:  Sure.

7              MR. MADSEN:  I'm going to withdraw the relevance

8   objections to all of them with the exception of the exhibit

9   which is the 60 Minutes snippet, and my only problem with that

10  is if we're going to put -- I would prefer not to just have a

11  two-and-a-half-minute snippet put in.  If they're going to put

12  it in, I think Your Honor should see the entire video which I

13  think we have available for you.

14             THE COURT:  It'd be more of a completeness objection?

15             MR. MADSEN:  It would, Your Honor, more of a

16  completeness.

17             THE COURT:  Okay.  So first we'll indicate then the

18  defendant has withdrawn any objections to Exhibits 1 through 39

19  which means all should just be considered admitted into evidence

20  at this point.  Is that correct?

21             MR. MADSEN:  That is correct, Your Honor.

22             THE COURT:  And then Exhibit 40 which is the -- it's a

23  DVD, apparently contains part of an interview.  Mr. Robbins,

24  what's your thought on Exhibit 40 as far as the interview?

25             MR. ROBBINS:  I think that's fine.  I just -- my only

1    concern was that I didn't want it to be the news show.  I wanted

2    it to be his interview, but it is.  I've been assured that by

3    counsel, and it's long, but, you know, that's fine.

4            MR. MADSEN:  Well, let me make sure that that is, in

5    fact, correct, because I think Mr. Smith has created -- I don't

6    know if it was a DVD of the entire interview, and I guess my --

7    I don't know if it's the entire 60 Minutes show or the entire

8    interview.

9            THE COURT:  Why don't you go ahead and ask a few

10   questions about Exhibit 40 so we can figure out what it is and

11   what we should do about it.

12   BY MR. ROBBINS:

13   Q.   Mr. Smith, let me just ask you a couple questions.  Exhibit

14   40, it won't be in that book, but it's the DVD that you made.

15   A.   Exhibit 40, I'm not quite for sure.  Was that the clip that

16   you made?

17   Q.   Oh.  That was stuff we made.  But apparently there was a

18   DVD that you had?

19   A.   I have the file on my computer and a blank DVD to put it

20   on.  It's the entire uncut interview with 60 Minutes.  I

21   believe -- and I don't want to speculate, but just by seeing

22   that clip that was up on the screen earlier, I believe that

23   that's just the cut and paste like two and a half minutes.  Does

24   that sound about right?

25   Q.   That was the -- yeah, it was off -- it was off of a YouTube

```
1    thing, so I took the whole thing, but there was two and a half
2    minutes.  You're saying you have the whole interview?
3    A.   The whole interview from beginning to end.
4    Q.   But not -- but not the journalists putting in their input
5    and not --
6    A.   Yeah, yeah.  It's just me and the guy asking the questions.
7              MR. ROBBINS:  No objections, Your Honor, to that.
8              THE COURT:  Okay.  So let me make sure I'm clear then.
9    Exhibit 40 we would substitute -- because I think the one I
10   have, is that the short version?
11             MR. ROBBINS:  Yeah, that's the short version.
12             THE COURT:  And the parties will substitute a longer
13   version.  And you want to just work together and make sure you
14   agree on what it is and get it to the Court?
15             MR. MADSEN:  Sure.
16             MR. ROBBINS:  That sounds fine.
17             MR. MADSEN:  Thank you.  Thank you, Your Honor.
18             THE COURT:  Great.  Let's do that.  And with that
19   understanding then, Exhibit 40, there will be no objection as
20   long as it's the entire interview; is that correct?
21             MR. MADSEN:  That is correct, Your Honor.
22             MR. ROBBINS:  Yes.
23             THE COURT:  Okay.
24             MR. ROBBINS:  Oh.  The only -- if during counsel's
25   closing she wants to refer to the -- you know, she'll be using
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
To purchase a complete copy of the transcript
Case 5:15-cv-04008-LTS Document 42 Filed 05/12/16 Page 97 of 252

1  our 40, but it's just part of the bigger so --

2          THE COURT:  Sure.  As long as it's part of what's

3  going to be included on the ultimate exhibit, I don't have any

4  problem with that.  And again, just for the record then, 1

5  through 39 are admitted.  40 -- I guess we'll admit this for

6  today but with the understanding that the longer version will be

7  substituted later.  Does that make sense?

8                          *   *   *   *

9          (Exhibits 1 through 40 were admitted.)

10                         *   *   *   *

11         MR. ROBBINS:  Yes.

12         MR. MADSEN:  I think if Mr. Smith has it with him, we

13  can probably do that today.

14         THE WITNESS:  Your Honor, it would just take a minute

15  or two to burn it on to the DVD.

16         THE COURT:  Okay.  If that's something that can be

17  accomplished today, great.  If not --

18         MR. ROBBINS:  If not, we'll see that the Court gets

19  the substituted.

20         THE COURT:  Very good.  Thank you, everyone.

21  BY MR. ROBBINS:

22  Q.  We were talking about Exhibits Number 29 and 30, and they

23  look microscopically small, so let's hope that I can make them

24  so that they will be a little bit more recognizable by blowing

25  them up.  Go ahead and look at the screen if you would.  I think

1  that that's -- I can probably actually get it a little bit

2  better than that.  Do you recognize that Michael -- or did you

3  know that Michael Roberts is -- uses a Twitter feed called

4  Ripoff Report Victims?

5  A.   I'm not aware of that.  I don't -- I think I made a Twitter

6  account two or three years ago.  I don't really understand how

7  it works.

8  Q.   Okay.  Well, so were you aware that Mr. Roberts posts --

9  often posts on the Internet with materials that are considered

10  to be adverse to the Ripoff Report?

11  A.   Yes.  Mr. Roberts uses social media to publish things about

12  Ripoff Report.

13  Q.   And I'm going to show you Number 30 which is some artwork

14  that he had done.  Do you recognize -- let's see, get it up

15  there.  It says, "Don't let them get away with it."  Do you

16  recognize who the cartoon of the little guy down on the ground

17  with --

18  A.   Yeah.  My understanding is that's supposed to be Ed

19  Magedson.

20  Q.   Okay.  Ed Magedson is the person who he has the flagpole

21  planted in and is stepping on.

22  A.   That's my understanding, yeah.

23  Q.   And you have an understanding that Mr. Roberts has a

24  single-minded focus to shut down the Ripoff Report and to gag Ed

25  Magedson; correct?

```
1   A.   I guess --
2            MR. MADSEN:  Object to foundation, Your Honor.
3            MR. ROBBINS:  I asked his understanding.
4            THE COURT:  He can answer.  It's overruled.
5   A.   I'm sorry.  Could you ask that again, sir?
6   Q.   Yeah.  You have an understanding that Michael Roberts has a
7   single-minded focus to try to shut down the Ripoff Report and to
8   gag Ed Magedson.
9   A.   I know that's his -- that's his deep motivations, yes.
10  Q.   Okay.  And did it ever occur to you that you were serving
11  in your capacity as a prosecutor as a tool for him to help
12  accomplish this goal?
13  A.   Not one time.
14  Q.   Okay.  I'll have you refer to Exhibit Number 39.  And do
15  you recognize what Exhibit Number 39 is?
16  A.   Don't have a clue.
17  Q.   Okay.  Do you recognize the e-mail address that it comes
18  from?
19  A.   Yeah, looks like Michael Roberts' e-mail address.
20  Q.   And what is the date on that e-mail address?
21  A.   June 2, 2014.
22  Q.   And that is before your search warrant has become public;
23  correct?
24  A.   It is, sir.
25  Q.   And in that e-mail he says, "I am hopeful that I will have
```

1    serious prosecutors taking up the cause pretty soon."  Do you

2    see that?

3    A.    Which line is it, sir?

4    Q.    Well, let's read it together.

5    A.    No, I'll read it.  I just -- if you tell me what line it

6    is.

7    Q.    I have -- I have smarter people handing me things and

8    telling me to ask questions, so let's read it together.  Let me

9    get it up there.  Does that make it readable?

10   A.    Yeah, I see now.  It's on kind of the first paragraph, last

11   sentence.

12   Q.    Okay.  And go ahead and read it if you would.

13   A.    Says, "I'm also hopeful that I will have serious

14   prosecutors taking up the cause pretty soon as I build the crime

15   books for the different cases."

16   Q.    Are you that serious prosecutor that he is talking about?

17   A.    I can't say that for sure.

18   Q.    Did you, in fact, take up the cause to shut down the Ripoff

19   Report and gag Mr. Magedson?

20   A.    No, I did not, sir.

21   Q.    Let's talk about your duties under the Iowa ethical

22   opinions.  Were you aware that the Iowa Bar has an ethics

23   committee?

24   A.    I am.

25   Q.    Have you reviewed or been shown Iowa Ethics Opinion 15-02,

1   a 2015 bar ethics opinion on intercepted e-mails?

2   A.   I am.

3   Q.   And were you aware that where counsel obtains -- that the

4   Iowa Ethics Board wrote where counsel obtains confidential or

5   attorney-client privileged communication between a client and

6   lawyer inadvertently disclosed or obtained under some cover of

7   right, counsel should stop reading or otherwise using the

8   documents or information, immediately notify the lawyers whose

9   communications have been intercepted, and either return the

10  documents to the lawyer or follow the lawyer's directions

11  regarding the same or apply to the court for directions on the

12  continued possession and use of documents and information?  Were

13  you aware of that?

14  A.   I believe -- excuse me.  I believe that that was in the

15  Iowa Lawyers' Association magazine published, yeah.  I don't

16  remember it verbatim, excuse me, but I do remember that I

17  thought it was awfully coincidental that that had appeared in

18  that magazine.

19  Q.   And did you read Rule -- you've read Rule 321.7 of the Iowa

20  Rules of Professional Conduct about conflicts of interest?

21  A.   Yes, I have, sir.

22  Q.   And you were aware that courts have held where prosecutors

23  consider themselves as victims that they should not continue

24  prosecuting cases; correct?

25  A.   I am not aware of any cases.  That makes -- that only makes

1  sense really.

2  Q.   Let me ask you what your understanding of the rule

3  regarding conflicts of interest as it applies to prosecutors is.

4  A.   My understanding of that rule is -- and I've looked, you

5  know, through that rule and through the comments, and there's

6  nothing that specifically addresses the -- you know, the special

7  role that prosecutor plays.

8         My understanding of that rule is that when you have

9  duties to clients and former clients and that if you have

10 interests that are adverse, then you can't represent one or the

11 other.  And you have to excuse me because I don't do a lot -- I

12 don't do any civil work.  But that's my understanding of it.  I

13 have -- you know, this isn't about me.  It's not about me at

14 all.  I'm -- it's -- you know, and the prosecution in -- or

15 excuse me, the defense in Darren Meade's case had filed a motion

16 to have me disqualified, and that was rejected and the same on

17 the basis for the post-conviction relief also offering that same

18 statute.

19 Q.   You agree with the statement that it should not be about

20 you, but you say it is not about you.

21 A.   Could you repeat that?

22 Q.   You agree with me that it should not be about you.

23 A.   It's been made about me, but it's not -- I mean, it should

24 not --

25 Q.   And you should not let your emotions get the better of you

1   as a prosecutor; correct?

2   A.   Correct.

3   Q.   Because you have in the past -- I mean, you -- the Tracey

4   Richter trial was a feather in your cap; correct?

5   A.   It -- I mean, it was -- it's something that I'm proud of

6   not because of the result but of the -- you know, the hard work,

7   and it was a long road.  And it's something I wish now that it,

8   you know, didn't even exist, to be quite honest.

9   Q.   In the 119 pages -- we referred early on to the reference

10  to the trial and the affidavit, the fact that the other lawyer

11  who actually tried it wasn't mentioned in that paragraph.  Do

12  you ever mention the other person that actually tried the case

13  in your affidavit?

14  A.   Douglas Hammerand?  No.

15  Q.   Okay.  Because -- and the focus has always been in the news

16  on you; right?

17  A.   I didn't include Mr. Hammerand's name in that because I

18  didn't want Ripoff Report to target him online, quite frankly,

19  is the reason why I didn't put his name there.

20  Q.   Okay.  When was the last time that you communicated in any

21  way with Michael Roberts?

22  A.   I communicated with him yesterday.

23  Q.   Did you talk to him about his deposition?

24  A.   He told me about his deposition.

25  Q.   How long did the conversation last?

1   A.    Three minutes.

2   Q.    Did he tell you that he refused to answer the question

3   about whether or not he had prepared parts of that affidavit

4   because he felt it would jeopardize the prosecution?

5   A.    I think that he just said that he didn't say anything based

6   upon his obligations as a PI.  I don't exactly recall what he

7   said.  The purpose of my -- the main purpose of my communication

8   with him was to obtain the full s -- the entire 60 Minute video

9   because I knew that he had had that so . . .

10   Q.    Were you aware -- or strike that.

11             Were you aware that Ripoff Report checks have been

12   posted on the Internet with the account showing?

13   A.    I --

14   Q.    With the account number on their checks showing.

15   A.    Excuse me.  I'm not aware of that, sir.

16   Q.    Were you aware that attorney-client privileged information

17   has been posted on the Internet from other sources?

18   A.    If it's there, I'm not aware of that.

19   Q.    Did you provide financial information or financials to

20   Mr. Brewington?

21   A.    I allowed Mr. Brewington to review the bank records,

22   Xcentric Ventures' bank records.

23   Q.    And you do know -- and I think -- I know we've established

24   for Roberts, but you know that Brewington is also a person who

25   is trying to, if he can, injure if not fatally injure the Ripoff

1  Report; correct?

2  A.    I didn't know and still, I guess, don't know the extent of

3  Brewington's, you know, motivations.  I know he does not -- does

4  not like Xcentric Ventures and he has a longstanding feud with

5  them.  But he's a licensed private investigator with a wealth of

6  knowledge of all things having to do with Ripoff Report.  In

7  fact, it was Investigator Brewington who told me where I could

8  locate the Xcentric Ventures bank account records because I

9  didn't even know where they were.

10 Q.    And so you let him look at those bank records.

11 A.    I did.

12 Q.    Did he look at them physically, or did you e-mail them to

13 him?

14 A.    I e-mailed them to him with the admonishment that he was

15 not to -- in fact, I think I even maybe set up a Dropbox that he

16 could only view -- whatever it was, how ever I did it, it was

17 done with a strict admonishment that they didn't -- that once he

18 was done explaining certain things to me about them that they

19 didn't exist.

20 Q.    So there is a method within Dropbox where you can give it

21 to them but they cannot download it is what you're saying?

22 A.    I think that's what I tried to do.  I thought that there

23 was a way that you could do it without them having the ability

24 to download.  I may not have done that in this case.  In fact,

25 now that I think about it, I tried to do it, and it wasn't

1 working.

2 Q.   So you gave him the ability to download the Ripoff Report's

3 financial reports without vetting him but just because he is a

4 bonded licensed private investigator.

5 A.   He is -- yes, he has a -- his expertise and he advertises

6 is with Ripoff Report, and it wasn't all the bank records.  It

7 wasn't all of them.

8 Q.   When you say his expertise is with Ripoff Report, it's not

9 as an admiration club; right?

10 A.   Is not what?

11 Q.   He advertises himself as an investigator who goes after the

12 Ripoff Report; correct?

13 A.   He advertises himself as an investigator that specializes

14 in helping attorneys with Ripoff Report cases.

15 Q.   So anyone who has a case against the Ripoff Report, he's

16 willing to help them, and you got in line, and you gave him

17 their financial records in a way that he could download;

18 correct?

19 A.   Yeah.  It was done with, like I said, a strict

20 admonishment.

21 Q.   Did it include bank statements?

22 A.   I believe it was bank statements and then the physical

23 images of the checks.

24 Q.   So the physical images of the checks which were unredacted

25 as to the account numbers were given to this man who provides

1  information to any attorney that asks him to help them against

2  the Ripoff Report.

3  A.    It was done -- it was done with the admonishment that he

4  could not use those in any way, shape, or form.  They did not

5  exist from the point after he was, you know, providing the

6  information about them forward.

7  Q.    What was the question that you asked him that required him

8  to look at an image of any type?  Why couldn't you have asked

9  him, hey, I'm sitting here with these records, what's this

10  company, what's that company?  Why would you provide anyone who

11  says that what they do as a living or one of their jobs is to

12  help people who sue the Ripoff Report, why would you ever

13  provide that man with checks and bank statements and things that

14  could be misused?  Was it all based on his promise of the --

15  after you were done with your admonishment?

16  A.    I -- can you break that question up?  I'm sorry.

17  Q.    Yeah, it's two questions really.  Why did you do that?

18  A.    Because it was easier than sitting on the phone with him.

19  It was easier for him to go through them and then report back to

20  me.

21  Q.    And can you show or I guess maybe if we go over the lunch

22  hour, can you provide the Court with the written ad -- or the

23  written document that Mr. Brewington signed in terms of your

24  admonishment to make certain that maybe we could consider like a

25  protective order where he would have to sign it?  Can you

1    provide that signed document perhaps?

2    A.   I can't provide a signed document.  What I can provide, I

3    think there should be an e-mail communication where I

4    acknowledge that, where I tell him that.

5    Q.   Do you have a signed returned e-mail where he says, "Yes, I

6    will do that"?

7    A.   Maybe.  I don't know for sure.

8    Q.   You provided the financials to Michael Roberts?

9    A.   I don't believe so.

10   Q.   Did you provide attorney-client privileged communications

11   to Brewington?

12   A.   I don't believe so, no.

13   Q.   Did you tell the judge when you were applying for the

14   subpoena that you intended to review attorney-client privileged

15   information if those were returned?

16   A.   It was a judge that was -- it actually was a search

17   warrant.  You can't get e-mails with a subpoena.  I never -- it

18   never really crossed my mind, to be honest, that I would find

19   any attorney-client communications in that.  The way that that

20   works -- and if you want me to explain later, I can.

21   Q.   I think your attorney may ask you that question.

22   A.   Okay.

23   Q.   Let me -- I'm going to wrap it up here.  I've got maybe

24   three minutes.  I don't even know why I said that because now

25   I'm going to go four.  But in any event, in the hundreds of

1  subpoenas that you've served and the many thousands of hours

2  that you have spent, has Ed Magedson ever said smear this

3  person, smear that person?

4  A.   Yes.

5  Q.   Okay.  And, sir, a person can believe that someone is

6  innocent; correct?

7  A.   Can you speak into the mike?

8  Q.   A person can believe that someone is innocent.

9  A.   Absolutely.

10 Q.   Correct?

11 A.   Yep.

12 Q.   And they can feel that people are lying; correct?

13 A.   Absolutely.

14 Q.   And they can express that; correct?

15 A.   Yes.

16 Q.   Let me take one second.

17        MR. MADSEN:  Can I get him some water, Your Honor?

18        THE COURT:  Sure.

19 BY MR. ROBBINS:

20 Q.   Let me just ask you this question, sir.  You were asked to

21 identify what statements were false about the witnesses by

22 Mr. Berger?

23 A.   Yes, I was asked that.

24 Q.   Did you respond to that in writing?

25 A.   No, I did not.

1  Q.   Did you respond to it over the telephone and say here's

2  what --

3  A.   No.

4  Q.   Here's what I --

5         MR. ROBBINS:  That's all the questions I have, Your

6  Honor.

7         THE COURT:  All right.  Let's talk about the rest of

8  the day for a bit.  It's just about noon, so when we finish our

9  little discussion here, we'll take about an hour for lunch, come

10 back at one o'clock.

11        Mr. Robbins, how long -- obviously you don't know how

12 long the questioning's going to be from the defense.  But as far

13 as putting on the rest of your case, how much time do you think

14 you need today?  Or go ahead, Miss Speth.

15        MS. SPETH:  Yes, Your Honor.  I believe that I will

16 probably have Mr. Kunz on the stand for an hour and a half, and

17 I have about 15 minutes with Mr. Magedson.

18        THE COURT:  Okay.  Thank you.  And then Mr. Madsen,

19 between your questioning of Mr. Smith -- and again, I know it's

20 hard to predict.  I'm just looking for ballpark.  How much time

21 do you think you need today?

22        MR. MADSEN:  Under an hour.

23        THE COURT:  Under an hour?  Okay.  Here's the issue.

24 I have a hearing scheduled at four o'clock, and I could probably

25 move it a bit but not by a lot.  People start needing to leave

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*To purchase a complete copy of the transcript.*
Case 5:15-cv-04008-LTS Document 42 Filed 05/12/15 Page 1 of 252

1   by about 4:30 here, so I want to make sure we have time.

2          One thing to think about at lunch, I know there's some

3   reference to the closing arguments.  If we run into a time

4   problem, would you prefer to do those in writing or come back

5   another time or try to do them quickly?  We'll just kind of see

6   where we're at at the end of the evidence.  I don't want to cut

7   anybody or make -- you know, not give them the opportunity to

8   make an argument.  But to me the most important thing is I want

9   to get the evidence in today.  We'll see where we're at at the

10  end of that, and hopefully we'll have time.  If the parties want

11  to argue today, we can do that.

12         But in any event, let's take a recess now.  We'll come

13  back at one o'clock for the defense examination of Mr. Smith.

14  We will be in recess.

15         (Lunch recess at 11:55 a.m.)

16         THE COURT:  Please be seated.  All right.  We are back

17  in session in Xcentric Ventures, et al., versus Ben Smith.

18  We've taken a lunch recess.  Mr. Smith is back on the stand.

19  And, sir, you are still under oath.

20         THE WITNESS:  Yes, sir.

21         THE COURT:  And I believe we're at the point for

22  questioning by defense counsel.  Who's going to handle the

23  questioning?

24         MR. MADSEN:  I am, Your Honor.  You had indicated it

25  was okay if we stayed seated.

```
 1              THE COURT:  Absolutely.

 2              MR. MADSEN:  And if so, I would prefer to do that.

 3              THE COURT:  Yep.  Whatever you're most comfortable

 4      with is fine.

 5              MR. MADSEN:  Well, I have Livingston to my right, and

 6      when I ask a silly question, he can tell me how to ask it

 7      correctly, and it's a little easier here.

 8              THE COURT:  Never hurts to have help.

 9              MR. MADSEN:  Thanks.

10              THE COURT:  All right.  Go ahead.

11                            CROSS-EXAMINATION

12      BY MR. MADSEN:

13      Q.   Ben, tell me again when you were elected county attorney.

14      A.   I was elected November -- it would have been the November

15      election in 2010, took office that January, following January,

16      2011.

17      Q.   And prior to that you'd worked for the attorney -- Iowa

18      Attorney General's Office; is that correct?

19      A.   I did, sir, the child support recovery unit.  I was

20      assigned in Council Bluffs to represent the -- that agency.

21      Q.   So the Court knows, when you were elected Sac County

22      attorney, you were coming home, so to speak, were you not?

23      A.   Yes, I was.

24      Q.   Is that where you were raised?

25      A.   I was born and mostly raised in Sac County in a town --
```

1  Lake View is my current -- current residence.

2  Q.   Okay.  And upon being elected to the position of Sac County

3  attorney, how long after that was it that the Tracey Richter

4  case came across your plate, so to speak?

5  A.   The case was first presented to me, it was within days or

6  weeks of me being in office.  There was a special agent who had

7  stopped by to introduce himself, and towards the end of the

8  conversation, he had mentioned the suspicious death or the

9  homicide investigation I believe as they were calling it into

10 the 2001 death of Dustin Wehde.

11 Q.   So in effect was that a -- what I would call a cold case?

12 A.   Yeah, I guess you'd call it a cold case.  Some people do.

13 I -- yeah, I mean, I -- it was characterized as a cold case,

14 yeah.

15 Q.   And upon being elected Sac County attorney, did you then

16 take steps to look into the circumstances surrounding the death

17 of Dustin Wehde?

18 A.   I did.  It was a slow progression.  I had a lot on my plate

19 when I was first elected.  I, you know, quite frankly, didn't

20 really even know how to prosecute traffic citations.  So when

21 the agent brought it to my attention, it just -- it didn't

22 really seem like anything that would be viable, especially

23 considering how old it was.  You know, in the back of my mind,

24 it seemed that there's probably something wrong with the case;

25 otherwise it wouldn't be here, you know, ten years later.

1    Q.   And upon looking into the circumstances surrounding the

2    death of Mr. Wehde, what'd you find out?   I mean, did anything

3    jump out at you?

4    A.    Yeah.   What jumped out at me, I guess -- you know, two

5    things mostly were the number of shots that were fired into the

6    young man's body.   There was 11 shots fired total in an alleged

7    home invasion where Miss Richter purportedly defended herself,

8    11 shots fired total.   Nine of those eleven hit Mr. Wehde's

9    body.   Three of those nine were in the back of Mr. Wehde's head,

10    and two of those three that were in the back of his head were

11    done using different weapons.   That was the first thing that

12    jumped out at me.

13        The second thing was her version of how -- when I say

14    her, I'm talking about Miss Richter -- the version of her

15    statements considering how the shooting had gone down.

16    Q.   And what was it that bothered you about her version?

17    A.    Well, her version, I mean, it was -- she had given

18    different versions but is that it was physically impossible for

19    the shots to have occurred the way that she said they did in

20    relation to like a -- how do I say this?   The geometry didn't

21    match up.   In other words, the trajectories were in a downward

22    fashion.

23        First of all, 9 out of 11's incredible.   You know, it

24    was done supposedly in the dark with her eyes closed.   You know,

25    one of the nine shots that connected with her body -- with

1    Mr. Wehde's body was supposedly over her right-hand shoulder.

2    Her hands were supposedly tied.  And the geometry just didn't

3    match up.  And I guess that always, always bothered me.

4    Q.   Okay.  And ultimately you made the decision along with the

5    Iowa Attorney General's Office to bring charges.

6    A.   Actually I didn't -- I didn't -- I didn't make that

7    decision with them.  That's a decision that I made.  I had

8    provided the attorney general's office with numerous documents,

9    items, PowerPoint presentations.  I met with them a couple

10   times.  And it was clear that I was being kind of put off, so to

11   speak.  And, you know, we developed the investigation further

12   and came to some additional information.

13           Another important aspect of the case was there was a

14   pink spiral notebook left in the vehicle following the murder.

15   It was very suspect.  The contents purported to be Dustin

16   Wehde's, the decedent's, journal where he was hired to -- he was

17   hired by Dr. John Pitman who was Tracey Richter's first husband

18   and ex-husband at the time of the murder to attack Tracey and

19   her son or their son, Bert Pitman.  And Dustin Wehde's a special

20   ed kid, and he just by all accounts had no business journalling

21   about that so . . .

22   Q.   Ultimately, though, you filed charges, and the attorney

23   general's office came in and along with you tried the case and

24   obtained a conviction.

25   A.   Yes, sir.

```
1    Q.   And that conviction's been appealed, has it not, and --
2    A.   It was -- sorry.  It was appealed, went through the
3    process, direct appeal to the appellate court in the state of
4    Iowa, then to the Supreme Court, upheld at both levels.
5    Currently I believe a year or so ago Miss Richter filed for a
6    post-conviction relief, and there's a current post-conviction
7    relief action pending.
8    Q.   Okay.  That case generated much publicity we've heard?
9    A.   It did, sir.
10   Q.   You received criticism relative to that case, did you not?
11   A.   Yes.
12   Q.   And now you've been a prosecutor for some five years now.
13   Am I correct that you've received criticism on other cases?
14   A.   I receive criticism on a lot of cases.
15   Q.   That comes with the territory I'm assuming.
16   A.   Absolutely.
17   Q.   And you understand that people have certain rights to make
18   those criticisms.
19   A.   It's their constitutional right, and I -- you're not going
20   to find anybody that is -- you find few more supportive of our
21   Bill of Rights than myself, and I know that people will
22   disagree, but that's our -- that's our country.  That makes our
23   country great.
24   Q.   You understand we're here today in part because Ed Magedson
25   and Xcentric are claiming that you are curtailing their First
```

Amendment rights relative to the criticisms that have been warranted against you or lodged against you. You understand that, don't you?
A. Yes, I do.
Q. Before we start talking about what your investigation -- what you've done in the prosecution and investigation, I just want a couple things clarified for the Court's benefit. You still have currently pending a prosecution against a man by the name of Darren Meade, do you not?
A. I do.
Q. And do you have some concerns relative to this process today that could in effect impact your ability to continue prosecuting him?
A. The answer's yes. There are, you know, certain -- there's information that -- obtained pursuant to investigation. The prosecution of Darren Meade, the current one, is -- it's tied in with, you know, the subject matter of why we're here on this. And they're intertwined. It's my fear that by, you know, disclosing certain information that it would obstruct the state's case.
Q. Okay. Now, Darren Meade's lawyer is here today, isn't he?
A. Yes, he is.
Q. Can you point him out to the Court?
A. Yes. He's the man, individual, sitting in the back left with the blue shirt, Glen. Hi, Glen.

1  Q.   Okay.  Explain for our benefit what the charges are that

2  are currently pending against Mr. Meade.

3  A.   The charges pending against him are a v -- it's a class B

4  felony in the state of Iowa.  It's violation of Iowa Code

5  section 706A, and that would be the ongoing criminal conduct

6  statute which in laymen's terms I guess has been described as

7  Iowa's version of RICO.  It's ongoing criminal conduct which is

8  described as indictable offenses committed on an ongoing basis

9  for financial gain.

10  Q.   Okay.  We've talked a little bit about some of the

11  criticisms that have been lodged against you.  And were there --

12  counsel for Mr. Magedson at one point I think characterized some

13  of the criticisms of the witnesses in the Tracey Richter case as

14  being attack -- as being attacks on their credibility.  How

15  would you characterize them?

16  A.   I think that there are -- I don't think.  I know that there

17  are Ripoff Report complaints or reports lodged online whether or

18  not on Ripoff Report that do deal with or discuss the subject

19  matter -- or excuse me, the credibility of the witnesses.

20       My concern in this investigation wasn't that -- the

21  veracity of the testimony given by the witnesses in the case.

22  It was the manner in which they were being published online and,

23  to be more specific, the search engine optimization techniques

24  used by Ripoff Report to couple wholly irrelevant and salacious,

25  harassing subject matter with the witnesses' names.

1    For example, you have a story about Michael Roberts.

2    Another state witness, Ray Friedman, and his wife Marie Friedman

3    pop up on the Ripoff Report in stories next to -- their names

4    have child molester or something having to do with molesting

5    children or pipe bombs or terrorism.

6    And why that's significant is when somebody goes to

7    search Marie Friedman or Ray Friedman or one of the state's

8    witnesses, because of the logarithms used, the technical stuff

9    that's kind of well beyond my expertise, that the first page of

10   Google, one of the first two or three search results would show

11   witness and then child molester or pipe bomb or things of that

12   nature.

13   Q.   And these are characterizations that are being made about

14   witnesses from the Tracey Richter criminal case.

15   A.   That's correct.

16   Q.   When did you or how did you first learn about this?

17   A.   I first learned about Ripoff Report through Darren Meade.

18   That was in April of 2012.  About -- well, it was about four or

19   five months after Tracey Richter was convicted.

20   And just to back up one more step, Miss Richter was

21   convicted in November, sentenced early December.  Short -- in

22   that month between her conviction and sentence, she had tried to

23   solicit a prisoner in Wisconsin to come forward with fraudulent

24   testimony and --

25   Q.   And how did you learn that?

1  A.   I learned that because the jail staff down in the Sac

2  County Jail had discovered it in items that Tracey Richter's

3  mother was trying to -- I was told to sneak out of the jail.

4  Q.   And I'm sorry to interrupt.  You were talking about Darren

5  Meade, I believe.

6  A.   Yeah.  Okay.  So where I'm going with that was, okay, so

7  I -- Miss Richter had been convicted of -- before her murder

8  conviction had convictions for, I believe, perjury or fraud.

9  And I guess when Darren Meade contacted me four months after the

10 conviction saying he had all this evidence that proved, you

11 know, that the state was wrong, that Tracey was -- Miss Richter

12 was wrongly incarcerated, I knew right away just -- it smacked

13 of what Tracey Richter's family had done up and to that point.

14        And, in fact, Mr. Meade had referenced Tracey

15 Richter's family in these communications to me in April of 2012.

16 And one of the allegations he made was that -- and Darren Meade

17 made was that Darren Meade had contacted law enforcement a year

18 or two years before the state began its prosecution to provide

19 us with this evidence but that we never contacted him, we never

20 followed through with the information that he had provided.

21        So after I got that e-mail communication from

22 Mr. Meade, I issued a county attorney subpoena which in Iowa the

23 Rules of Criminal Procedure require prosecutors to present an

24 application to the district court judge and the district court

25 judge then, if he approves it, will order the clerk to issue the

1    subpoena.  I issued a handful of those for Darren Meade's phone

2    records.

3              And what I got back in May of 2012 was that Mr. Meade

4    had extensive communication with Tracey Richter's family around

5    the time that he -- you know, shortly after the conviction and

6    up until, you know, he had contacted my office.  He had

7    contacted numerous media outlets, so on and so forth.  And I

8    knew that he -- that information -- it was just too similar to

9    the other information of somebody coming forward.  For me it was

10   if I don't follow up on this, if I don't look into this -- which

11   I did; I contacted the sheriff's office.  I contacted the local

12   PD, anybody who would have been responsible for receiving a call

13   of that nature.  And there was no -- nobody had any information

14   as to that.

15   Q.   Nobody had any information to verify what Darren Meade had

16   said he'd done relative to contacting law enforcement officials

17   you mean?

18   A.   Exactly.

19   Q.   So at what point did you learn that there were postings

20   being made on the Ripoff Report regarding state witnesses?

21   A.   There was a Ripoff Report publication made in September of

22   2012 which would have been approximately four months after

23   Darren Meade's -- my first communication with him in April of

24   2012.  And it's important to note that, you know, I had done my

25   background research and investigating what -- the things that

1　Darren Meade had told me in 2012, found them all to be proven,

2　not just through Michael Roberts but proven through other

3　sources to be patently false, just on their face false.  So I

4　told him, Darren Meade, toward the end of this e-mail

5　conversation that, you know, I know what you're doing, basically

6　just knock it off.  You know, I knew that he was involved with

7　them.

8　Q.　He wanted to free Tracey Richter.

9　A.　Yeah, and he was providing -- he provided me with false

10　information.  It's that simple.  And so I -- I let him know that

11　I was going to refer this to other law enforcement agencies.

12　　　　　　September 2012 comes around, and a Ripoff Report

13　complaint goes up online, and it's got my picture on it.  It's

14　on -- that picture I guess appears in a link to the article,

15　appears on at that time I think it was like 1.6 million or 1.7

16　million of its web pages.  But it contained a lengthy -- I don't

17　know what you want to call it -- a -- well, just Mr. Meade's

18　take of how he believed certain witnesses -- you know, how he

19　believed Tracey Richter was wrongfully convicted.

20　Q.　And this was critical of you?

21　A.　Yes, it was.

22　Q.　What types of stuff was in it?

23　A.　That report, I mean, that report said that I knowingly put

24　witnesses on the stand, I suborned perjury, that I had done a

25　number of other things related to, you know, my job as a

prosecutor, that complaint as it evolved online because there's

room for comments below.  I mean, it -- I mean, it came anything

from, you know, I had sexual relationships with, you know, some

of the male witnesses, that was on there, that I abused

methamphetamine.  I mean, those are some of the things that

appeared in the rebuttal comments after.

Q.    As ridiculous as that may be, though --

A.    Yes.

Q.    -- you understand that he has a First Amendment right to do

that?

A.    Absolutely.  Well, I mean --

Q.    Well, but I guess what I'm saying is is that why -- did

that have anything to do with your eventually bringing charges

against him?

A.    Had absolutely nothing to do with it.

Q.    So what occurs then later that causes you to believe that

charges need to be brought against Darren Meade?

A.    Between September 2012 when that report first went up and

the following months, maybe even years, the -- some of the state

witnesses, specifically Dr. John Pitman and Raymond Friedman,

had contacted me, and they were concerned with the things that

had gone up about them.  The -- and they weren't concerned with

the underlying -- you know, the substantive content of the

article about, you know, their, you know, committing perjury.

It was their names associated with child molesting, pipe bombs,

1  prostitutes, et cetera, and how those would appear on the first

2  page of Google when you type in -- Dr. John Pitman, for example,

3  is a prominent plastic surgeon.  He's a colonel in the Army.

4  And his business, his surgery practice, advertised solely

5  online.  So you type in Dr. John Pitman, Virginia, and up pops

6  Dr. John Pitman, the first result of Google, Dr. John Pitman,

7  child molester, you know, baby raper, you know, things that --

8  Q.   Those are things that were on there?

9  A.   Those are things that appear in the subject heading below,

10 yeah.

11 Q.   Okay.  And Dr. Pitman was a witness in the Tracey Richter

12 case.

13 A.   Yes, he was.

14 Q.   And you also said a Raymond Friedman.  What was -- what was

15 posted about him?

16 A.   Raymond Friedman was Michael Roberts' alibi.  You know, the

17 stuff that was posted about Raymond Friedman, there was some

18 association with him and I believe it was domestic terrorism and

19 child molesting or child pornography or something to that

20 effect.

21 Q.   Did you make a determination as to who was posting these?

22 A.   I -- I didn't make a determination.  I had my suspicions,

23 and my suspicions just because I had -- you know, I had

24 extensive dealings and unfortunately had, you know, a year's

25 worth of Tracey Richter's family under my belt, you know, at

1  this time.  And the things that were going up there just kind of

2  smacked of them, to be perfectly honest.

3        And so what I did from there is I contacted the

4  Department of Corrections where Tracey Richter was currently

5  incarcerated, Mitchellville, and was able to obtain from them

6  Tracey Richter's -- all the recordings of her prison phone

7  calls.  And I didn't do that until December of '13 I think is

8  when I had asked.

9        What prompted that was not only the complaints about

10  Dr. Pitman and Raymond Friedman and Marie Friedman, it was

11  Dr. Pitman was contacted by a representative of Ripoff Report,

12  and that representative by the name Sam Eubanks who I now know

13  to be Siamack Yaghobi, spelled S-i-a-m-a-c-k Y-a-g-h-o-b-i, had

14  contacted Dr. Pitman's practice and offered to remove the stuff

15  about Dr. Pitman for -- I think it was 10,000 or $15,000 up

16  front and then a monthly maintenance fee thereafter.

17  Q.   So --

18  A.   So it was becoming more concerning.  I mean, we're not

19  talking about criticisms of the witnesses and their testimony

20  but, you know, trying to -- and I need to add not just

21  characterizations of conduct that's, you know, immoral and

22  illegal.  It was also always associated -- their names were

23  always associated with their business.  So if you're typing in

24  witness's business and witness's name, it would pop up on the

25  Internet in conjunction with that also.

1   Q.   Okay.

2   A.   So I go -- and that's what drove me to go to the Department

3   of Correction.  The last thing I wanted to do was have to listen

4   to Tracey Richter's phone calls because it is -- it was just

5   difficult.  It consumed the better part of my life a year

6   before.  It wasn't healthy for me, you know, emotionally just

7   draining.  But I knew it had to be done because my -- my belief

8   was that Tracey Richter and her family were behind the postings

9   along with Darren Meade.

10   Q.   What evidence were you able to develop that linked Darren

11   Meade to these postings then?

12   A.   The jail communications that I listened to, every once in a

13   while -- I mean, they'd range from -- you know, they're

14   20-minute phone conversations is all the prisoners must be

15   allowed at a time.  And they ranged from, you know, talking

16   about their daily activities to talking about Dr. Pitman and

17   providing documents to Darren Meade and the -- and references to

18   Dr. Pitman and what's going up online about him.  And it all

19   occurred right around the same time that the stuff would go up.

20        So I'd hear about it during the phone recordings.  I'd

21   hear about them providing documents to Darren Meade and about

22   being upset with Dr. Pitman and them saying stuff's going to go

23   up about Dr. Pitman and the subject matter that they're

24   discussing in the phone conversations, and the next thing you

25   know, it goes up online.

1  Q.   So in -- and I don't want to mischaracterize your

2  testimony, Ben, but ultimately you learned information that

3  Darren Meade through the Richter family was posting content

4  relative to the state's witness -- witnesses in an effort to

5  assist Tracey Richter?

6  A.   That's what the evidence said to me, demonstrated to me.  I

7  took the phone recordings, and I took the information that I

8  gathered by listening to them sp -- as they related to the

9  witnesses in the case, and I had a meeting with the -- down in

10 Des Moines with the Department of Corrections security person, a

11 representative from the attorney general's office, and then a

12 representative from the Division of Criminal Investigation.  And

13 I had asked for them to put a wire into Tracey Richter's

14 visitation room.  And I did that because during all the phone

15 conversations that I'd hear, Tracey and her mother would -- when

16 they weren't talking in code, they would start discussing stuff

17 about Ripoff Report and about documents and getting documents to

18 somebody.  And then one or the other would admonish one of the

19 other and say, "We'll talk about it in person."  Many

20 conversations started like that and stopped with, "Wait a

21 second; we'll talk about it in person."  So that's why I asked

22 for that to be put in her -- the visitation room.

23 Q.   Through your investigation, did you learn that Darren Meade

24 was the one posting these items on Ripoff Report about the

25 state's witnesses?

1    A.    That's what the evidence shows I believe.

2    Q.    Okay.  And was it after that that you filed the charges

3    against Darren Meade?

4    A.    It wasn't -- no, it was not directly after that.  What had

5    happened was is after they put the wire or the recording device

6    into her room or the visitation room, I think that they recorded

7    maybe 15, 20 visits at 3 hours each.  And from that they were

8    more candid.  Obviously they didn't know they were being

9    recorded.  And their discussions related not just to Darren

10   Meade but to Ed Magedson.  And Tracey Richter's mother discussed

11   in detail her conversations with Ed Magedson, that Ed Magedson

12   wants me to get these documents, that Ed Magedson wants Bert

13   Pitman who'd be Tracey's son to get him documents.  There was

14   conversations between Tracey and Anna on these visits where Anna

15   would tell Tracey, well, Ed Magedson wants your attorney,

16   Tracey's attorney, to obtain civil discovery through the civil

17   discovery process so that Dr. Pit -- or excuse me, Ed Magedson

18   could use it for his own.

19         MR. ROBBINS:  Your Honor, could we ask the witness to

20   avoid the narrative of questions on the table because he starts

21   out and then starts going into hearsay.  And if we can have it

22   broken up into question/answer, I think I can object better.

23         THE COURT:  Sure.

24         MR. ROBBINS:  Thank you, Your Honor.

25         THE COURT:  Just try to respond only to the question

1  and then move on to the next question.

2          THE WITNESS:  Yes, sir.

3  BY MR. MADSEN:

4  Q.   In the information that you developed surrounding Darren

5  Meade, you found a link to Ed Magedson; is that what you're

6  telling us?

7  A.   That's what I'm telling you, yes.

8  Q.   Tell us what evidence you found that linked Ed Magedson to

9  Darren Meade.

10 A.   There were references in these prison recordings of Darren

11 Meade and Ed Magedson working together for Tracey's benefit.

12 One in particular was Anna Richter had told -- Anna Richter had

13 told Tracey Richter that Darren Meade was going to publish a

14 complaint online about the attorneys that represented Tracey in

15 her criminal case.

16         MR. ROBBINS:  Your Honor, objection to the hearsay.

17 We keep talking about these conversations, but we don't have the

18 recordings or the transcripts.

19         THE COURT:  All right.  Mr. Smith, did you actually

20 hear these recordings?

21         THE WITNESS:  I did, Your Honor.

22         THE COURT:  All right.  And my understanding, this

23 isn't offered to prove the truth.

24         MR. MADSEN:  It is not, Your Honor.

25         THE COURT:  All right.  I'm going to overrule the

1  hearsay objection and allow the witness to testify specifically

2  about what he heard on the recordings.  I'm certainly not going

3  to consider the conversations to be for the truth because that

4  clearly would be hearsay.  But I will allow the testimony.

5          THE WITNESS:  Thank you.

6          MR. MADSEN:  Thank you.

7  A.    There was a conversation where Anna Richter told Tracey

8  Richter that Darren Meade was going to publish something online,

9  on Ripoff Report, about Tracey Richter's criminal defense

10  attorneys, specifically that those criminal defense attorneys

11  were going to admit in her post-conviction relief action that

12  they were ineffective.  And Anna told Tracey that she admonished

13  Darren and said no, you don't, we need them.  And then Anna went

14  on to say and Ed also -- Ed, referring to Ed Magedson, and Ed

15  also told Darren not to -- to wait, not to publish anything

16  about the -- Tracey Richter's criminal defense attorneys because

17  it would affect her post-conviction relief action.  So that was

18  the evidence I had that demonstrated to me that Ed Magedson, you

19  know, he wasn't just, you know, the owner or operator of the

20  website but, you know, that he was working with Darren.

21  Q.    You've done enough research into Ripoff Reports, have you

22  not, to understand that Ripoff Reports can publish certain

23  content that might be defamatory and still avoid any liability

24  relative to that?

25  A.    That's true.

1  Q.   But are you telling us that this was different, that --

2  A.   What was different about this and in that 1,500 hours, you

3  know, that was referenced in the search warrant, there was a lot

4  of that time that was spent just trying to understand the

5  Communications and Decency Act, specifically the criminal or

6  civil liability for a website.  And my understanding is that,

7  you know, for example, like Facebook, if I post something about

8  you on Facebook, I could be held liable civilly, but the owner

9  of Facebook couldn't be.  The same thing, you know, holds true

10 for Ripoff Report.  They enjoy the same immunity.

11       What made it different is that the evidence that I

12 have demonstrates that Ed Magedson was directing Darren Meade,

13 paying Darren Meade, to put stuff up online concerning the

14 Tracey Richter case and the state's witnesses.

15 Q.   And in effect that's why you're prosecuting Darren Meade

16 and looking into the prosecution of Ed Magedson, isn't it?

17 A.   That's correct.

18 Q.   And are you telling the judge that you have developed

19 evidence that links Ed Magedson to Darren Meade?

20 A.   I have.

21 Q.   And you've developed evidence that indicates that Ed

22 Magedson helped create or directed Darren Meade to create

23 content relative to the witnesses in the Tracey Richter case?

24 A.   That's accurate.

25 Q.   Have you also developed evidence that indicates that Ed

1   Magedson and/or Ripoff Reports was paying Darren Meade?

2   A.    I did.

3   Q.    Tell us in what form of evidence you developed.

4   A.    In May of 2013, I obtained a subpoena for Xcentric

5   Ventures' bank records, and that subpoena had come back because

6   prior to that I had obtained Darren Meade's.  I had obtained

7   Darren Meade's bank records.  So there was a progression.  I

8   just didn't jump to Ripoff Report.

9         The -- when I got Darren Meade's bank records back, I

10  saw images of checks written to him by Xcentric Ventures.  And

11  just -- I mean, they were a smattering of them.  There was -- I

12  don't know -- three or four maybe in that account.  I used that

13  information to apply for a subpoena for Xcentric Ventures' bank

14  records because the position of Ripoff Report was that they had

15  nothing to do -- Darren Meade was not associated with them in

16  any way, they had nothing to do with him, he was not an

17  employee.  And so I obtained the subpoena for the bank records

18  for Xcentric Ventures.  And that was in May.  I got those back,

19  and I saw that there were approximately I think 31 some odd

20  checks that were either written directly to Darren Meade or

21  Darren Meade's landlord totaling, I mean, anywhere between --

22  well, probably right around $7,000 a month in total.

23  Q.    Okay.  And that had gone on for how long a period of time?

24  A.    That was from December 2011 through -- and I think the

25  records I got stopped in -- well, would have been when I got the

1   subpoena, so in May of 2013.  I didn't obtain any bank record

2   subpoenas after that one.  I obtained -- I had previously also

3   obtained Darren Meade's phone records, and I'd ind -- and I had

4   learned that Darren Meade and Ed Magedson talked on the phone

5   for hours a day.  And sometimes -- and I had this jotted down,

6   some notes, and not just Darren -- not just Ed Magedson but

7   Darren Meade had extensive communication with Ripoff Report's

8   counsel in December of 2011 when he started to get paid.  So, I

9   mean, on average anywhere between 25 to 30 hours a month Darren

10  Meade and Ed Magedson were communicating over the phone.

11  Q.   And you believe that at least some of these communications

12  had to do with Tracey Richter and the Richter witnesses.

13  A.   Yes, some.

14  Q.   You're not claiming that that's all they talked about?

15  A.   No.  I'm sure that they were friends and that they -- you

16  know, they talked about other things I'm sure.

17  Q.   Ultimately you filed charges against Darren Meade?

18  A.   I did.

19  Q.   And you filed it under what code section?

20  A.   It -- it's Iowa Code section 706A, I think sub 2 or sub 4,

21  maybe sub 3, but it's the ongoing criminal conduct statute.  And

22  then there are a number of predicate offenses including witness

23  tampering that are -- that fall beneath that.

24  Q.   And you believe that the conduct of Darren Meade is such

25  that he violated that criminal statute.

1    A.    Yes, sir.

2    Q.    And prior to filing charges -- I don't do criminal work,

3    but I hear of something called probable cause.  What is that?

4    A.    Probable cause is a fluid concept.  It's below a

5    preponderance.  It's, you know, having probable cause to -- I

6    guess I don't really know how to articulate it, but the trial

7    information that was filed as against Darren Meade was approved

8    by a district court judge.  And for there to be approval by the

9    district court judge, it has to -- I believe the Rules of

10   Criminal Procedure in Iowa indicate that there needs to be on

11   its case the evidence contained in the trial information and the

12   attached minutes of testimony if unrebutted would warrant a

13   conviction by a jury.

14   Q.    And am I correct that your investigation is continuing into

15   Ed Magedson and Ripoff Reports and their involvement relative to

16   these witnesses?

17   A.    That's correct.

18   Q.    And if the evidence that you develop indicates that

19   Magedson was involved in creating the content or directing Meade

20   to post content that is harassment or intimidation against these

21   witnesses, is it your intent to file such charges against

22   Magedson and Ripoff Reports if necessary?

23   A.    It's my intent to do that.  It's my duty.  These witnesses,

24   I put them on the witness stand.  They didn't have a say in

25   this.  They were asked to testify in a murder case, and now

1    they're paying the consequences for doing that.  Dr. Pitman has

2    all but lost his surgery practice because of this.

3    Q.   Now, they want to characterize your activities as being in

4    retaliation for postings that have been made about you.  How

5    would you address that?

6    A.   I would address that by stating the criticisms of me went

7    up -- began September 2012.  And the first subpoena or criminal

8    discovery device, subpoena or search warrant, that was -- as to

9    Xcentric Ventures or Ed Magedson was March, April, or May of

10   2013.  It wasn't something where I jumped the gun and said that

11   these guys are -- you know, they're in cahoots with them.  It

12   wasn't till after I heard those audio recordings.  I was not

13   expecting, you know, to hear what I did.

14         Now, I obtained the search warrants following that.

15   It was in July, right around the time we obtained the material

16   for the search warrant for Anna Richter's home, the one you see

17   as -- I think it's Exhibit 1 is -- I obtained the e-mail

18   communications, Ed Magedson's personal e-mail communications,

19   from his personal e-mail account and also Darren Meade's from

20   Darren Meade's e-mail account.  I was also -- any, you know,

21   doubts that I had about Ed Magedson's involvement in this were,

22   you know, quashed when I got those e-mail communications.

23   Q.   Those revealed to you that Magedson was involved in the

24   creation of the content posted by Meade?

25   A.   At least some of the content as it related to the state's

1  witnesses.

2  Q.   And those -- that evidence revealed that Magedson knew that

3  this information was false.

4  A.   That -- say that again.

5  Q.   Magedson knew that the information being posted by Meade

6  surrounding these witnesses were false.

7              MR. ROBBINS:  Object to foundation, lack thereof.

8              THE COURT:  That does seem to call for speculation.

9              MR. MADSEN:  Let me withdraw it, Your Honor.

10             THE COURT:  I'll sustain that.

11             MR. MADSEN:  Thank you, Ben.  That's all the questions

12  I have.

13             THE COURT:  All right.  Mr. Robbins?

14             MR. ROBBINS:  Thank you, Your Honor.

15                     REDIRECT EXAMINATION

16  BY MR. ROBBINS:

17  Q.   Ben, go ahead and -- sorry.  Mr. Smith, go ahead and pull

18  out Exhibit Number 1.  Do you have it before you?

19  A.   I do.

20  Q.   I'd like you to go to page 67 because you said -- and I

21  want to ask you because you were talking about some evidence

22  collected, and I wanted to talk to you about the last paragraph

23  on that page.  And I will blow it up for you.  Oh.  Let me put

24  it on present.

25             And were you aware -- or you were presenting in the

1  affidavit that you submitted something where people were sending

2  e-mails with nonindexed links.  Do you know what a nonindexed

3  link is?

4  A.   I think so.

5  Q.   Okay.  And do you know that that is a method of tracking

6  where that e-mail -- what the person who receives an e-mail does

7  with it?

8  A.   My understanding is it just -- it shows where it's opened.

9  You can tell what -- the IP address, if you don't have a filter

10  or some other way to obfuscate the system.

11  Q.   Who was it that was sending e-mails to Ed Magedson?

12  A.   Dr. Scott Connelly.

13  Q.   Okay.  And then when they were opened, if you hit the link,

14  then they would be able to tell whether you, in fact, opened the

15  link; right?

16  A.   Opened the link, and then if the link then was opened in

17  another location, then you could also tell, you know, who opened

18  that -- who was also a recipient of that, who got the message

19  forwarded to them.

20  Q.   So if I get an e-mail and I don't know that it's a

21  nonindexed link but I click it, then you can figure, oh, Joel

22  got the e-mail.  And if I send it over to Maria and she clicks

23  it, then you can say, oh, Maria opened that e-mail, and she

24  sends it over to Adam, and you can see where the thing goes.

25  A.   You can --

1  Q.  By seeing who it is that clicks on the link that's been put

2  in this e-mail; correct?

3  A.  You can't see who opens it.  You can just tell where it's

4  opened.

5  Q.  Okay.  So then you can take the IP address and then link it

6  to Joel, Maria, and Adam.

7  A.  Yes.

8  Q.  Okay.  Did you approve of that?

9  A.  I don't recall.  Maybe -- I never t -- directed Dr. Scott

10  Connelly to do that, no.  Maybe -- maybe one towards the end.

11  Q.  But you did use it in your affidavit; correct?

12  A.  I did.

13  Q.  Okay.  And we were talking about Dr. Pitman.  Were you

14  aware that Dr. -- Dr. Pitman told you that he contacted the

15  Ripoff Report first; correct?

16  A.  I don't know whether or not he told me that.

17  Q.  Okay.  Were you aware that there was actually a recording

18  of Dr. Pitman calling the Ripoff Report to ask what he can do

19  before -- his name is Siamack Yaghobi called him back?

20  A.  If -- I don't know if I knew that or not, no.

21  Q.  You were aware, though, that the Ripoff Report does offer

22  people the ability to respond to complaints that are against

23  them; correct?

24  A.  Yes.

25  Q.  Okay.  And that Siamack is one of the people that contacts

1    people about what to do when you have information that you want

2    to respond to; correct?

3    A.   Can you be a little more definite with -- I don't know what

4    you're saying.

5    Q.   Do you know that the person who called Dr. Pitman was

6    associated with the people that try to say if you've got a

7    complaint or if you want to respond, this is how you do it?

8    Were you aware of that?

9    A.   Yeah, I think I'm kind of aware of that process, yeah.

10   Q.   Okay.  One of the things that you charged Darren Meade with

11   was extorting -- extorting the Ripoff Report; correct?

12   A.   I did.

13   Q.   Okay.  You know that before Darren Meade had ever met with

14   anyone at the Ripoff Report that he had spoken with Tracey

15   Richter's family; correct?

16   A.   Yes.

17   Q.   And, first of all --

18   A.   I'm sorry.  Could you say that again?

19   Q.   Yeah.  I said before Darren Meade had ever met with anyone

20   at the Ripoff Report because that was December, he had spoken at

21   length with Tracey Richter's family.

22   A.   I don't think that that's accurate.  I don't think that

23   Darren Meade spoke with Tracey Richter's family until December.

24   I could be -- I could be mistaken, but regardless, it wasn't at

25   length.

1   Q.   Well, it was 7 minutes to the mother, and then it was 50

2   minutes to the mother; then it was 80 minutes to the mother, and

3   then it was 87 minutes with the fiancé; correct?

4   A.   That was in December; right?

5   Q.   No.  Let's go look at your -- at page number -- let's see.

6   We had gone through this.  I want to say it was right at the end

7   of the Darren Meade, so it's going to be around in the 20s.

8   Here we go.  November 22 Anna Richter called Darren Meade, one

9   minute.  The 23rd, Tracey Ri -- let's see, Darren Meade called

10   Anna Richter, and the two spoke for 7 minutes on the 27th.

11   28th, Darren Meade spoke to Anna Richter for 83 minutes.

12   November 29, Anna spoke to Darren for 50 minutes.  And on

13   December 1 -- and I cut it off, but you can actually read it

14   yourself -- Darren Meade and Tracey Richter's fiancé -- I'll

15   just blow it up so we can look at it -- spoke on the phone for

16   87 minutes.  Did I read that correctly?

17   A.   You did, sir.

18   Q.   And you know that it was December 10 before Darren Meade

19   flew and met with people at the Ripoff Report.

20   A.   I know that there's a check written to Darren Meade

21   December 3, 2011, and I don't know exactly how that came about.

22   I just know that there was a check written to Darren Meade or

23   his landlord on December 3.

24   Q.   Okay.  But I'm not asking for when times, you know,

25   coincide with other times.  I'm actually asking for just

1    confirmation that Darren Meade spoke to this family; correct?

2    A.    He did, yes.

3    Q.    Did the Richters ever pay Darren Meade anything?

4    A.    Yes, they did.

5    Q.    Okay.  So they pay him money, and then at least in your

6    investigation he begins to try to -- I don't know what you'd

7    call it -- get her off of her crime.

8    A.    I don't think that that was the case.  You know, the --

9    there was a four-month or maybe closer to five between December

10   of 2011 and April when Darren Meade contacted me.  There was --

11   December '11, April, four months, four and a half months where

12   Darren Meade and Ed Magedson had entered into or at least seemed

13   to enter into a contract where Darren would work on Ed's behalf

14   to do certain things not related to the Tracey Richter case.  In

15   fact, the e-mail communications that I have from December 2011

16   through April 2012 doesn't even mention Tracey Richter or

17   anything having to do with her being wrongfully convicted.

18   Q.    Exactly.  Because when Darren goes to meet with the Richter

19   family and starts getting paid, then he begins to put stuff out

20   into the -- into the world and starts talking to witnesses and

21   collecting things and doing things for them to try to get, at

22   least in your mind, Tracey Richter off of the murder of Dustin

23   Wehde; correct?

24   A.    Yeah, yeah, I guess you could say that.

25   Q.    I did say that.  Do you agree with it?

1  A.   Yes, I agree with it.

2  Q.   Okay.  And you said that there were posts on the Ripoff

3  Report calling Dr. Pitman a child rapist?  That was your

4  testimony?

5  A.   I think it was baby raper.

6  Q.   Okay.  You've not offered the actual post into evidence;

7  correct?

8  A.   No, but I have it.

9  Q.   Okay.  Perfect.  Can we mark it as an exhibit?

10  A.   Give me a second, and I'll find it.

11          MR. ROBBINS:  May I approach the witness, Your Honor?

12          THE COURT:  You may.

13  BY MR. ROBBINS:

14  Q.   To save you a little bit of time, do you have the actual

15  post versus a excess -- or an -- you have an Excel spreadsheet?

16  A.   Yes, I have the actual post in my bag.

17  Q.   Perfect.  Perfect.

18  A.   Would have been in January 2013.  It was actually May 7,

19  2013.

20          THE WITNESS:  May I retrieve that, Your Honor?  Is

21  that --

22          THE COURT:  Any objection to the witness -- from

23  either counsel any objection to the witness finding that

24  document?

25          MR. ROBBINS:  No, of course not.

         1          MR. LIVINGSTON:  Is it something I could find?

         2          THE WITNESS:  Yeah, it'd be number 132.

         3          MR. LIVINGSTON:  Would you like me to bring it up to

         4    him, Your Honor?

         5          THE COURT:  Yeah, please do.  Or counsel --

         6          MR. ROBBINS:  Can I see it real quick?

         7          THE COURT:  Mr. Robbins, do you want to see it?

         8          MR. ROBBINS:  Yeah, just -- I just need to make sure

         9    that I've got the same thing.

        10          MR. LIVINGSTON:  Sure.

        11          MR. ROBBINS:  Yes.

        12          THE WITNESS:  Thank you.

        13          MR. MADSEN:  I'm sorry.  Had that been marked as an

        14    exhibit?

        15          MR. ROBBINS:  We need to mark it as an exhibit.  It

        16    wasn't marked by us.

        17          THE COURT:  Let's -- why don't you go ahead and ask

        18    him a few questions about it first just to make sure everybody's

        19    on the same page.  Then we'll decide whether we're going to mark

        20    it.

        21          MR. ROBBINS:  Okay.

        22    BY MR. ROBBINS:

        23    Q.   That's the post that you're relying on in terms of using --

        24    you said -- I used child rapist; you used baby rapist.  In fact,

        25    this says both of them.  If you look at the second page of that,

1    it -- under the title Kiddie Crap --

2    A.   Yes, sir.

3    Q.   -- it says if journalists were not like presstitutes, which

4    I don't know what he means -- but I think I have an idea -- they

5    would mock Smith for claiming that top secret evidence existed

6    that was not public knowledge.  They would describe him as

7    deranged for his willingness to prosecute his friend's ex-wife

8    for murder claiming he had evidence Tracey Richter -- she had

9    accused her first husband of being a baby raper and later

10   accused Michael Roberts of child abuse, yet it was Smith's

11   friend Michael Roberts whom when he -- when an investigation

12   into John Pitman was about to be dismissed, Roberts proffered

13   new allegations accusing Pitman of raping his son.  Did I read

14   that correctly?

15   A.   You did, sir.

16   Q.   Okay.

17   A.   The point I guess being --

18            THE COURT:  Wait a minute.  There's not a question.

19            THE WITNESS:  Oh, I'm sorry.

20            THE COURT:  Do you want to mark that as an exhibit?

21            MR. ROBBINS:  Yes, yes, Your Honor.

22            THE COURT:  Any objection to marking it as an exhibit?

23            MR. MADSEN:  None.

24            THE COURT:  Okay.  Let's go ahead.  We have some

25   exhibit stickers here.  Let's go ahead and do that now.

1           MR. ROBBINS:  Okay.  Thank you.

2           THE COURT:  And would you like to offer it then?

3           MR. ROBBINS:  Yes.

4           THE COURT:  Shall we -- what will it be?  41?

5           MR. ROBBINS:  I believe that's right.

6           THE COURT:  All right.  We will -- and for the record,

7    let me just ask Mr. Smith to confirm this just so we have a

8    record of it.  This is a document that you brought and was in

9    your bag when you got to court today; is that right?

10          THE WITNESS:  It was, Your Honor.

11          THE COURT:  Okay.  And now you've had it retrieved,

12   and we're going to mark it as Exhibit 41.  Is that right?

13          THE WITNESS:  That's my understanding, Your Honor.

14          THE COURT:  Okay.  Great.  Thank you.  Any objection

15   from the defense?  Mr. Madsen, any objection to having Exhibit

16   41 received?

17          MR. MADSEN:  None, Your Honor.

18          THE COURT:  Okay.  Exhibit 41 will be received.

19                        *   *   *   *

20          (Exhibit 41 was admitted.)

21                        *   *   *   *

22   BY MR. ROBBINS:

23   Q.   Now, you listened to tapes of discussions between Tracey

24   Richter and her mother it sounded like hundreds and hundreds of

25   hours.

1   A.   It was a lot, yeah.  Well, and I listened to them more than

2   one time unfortunately.

3   Q.   Did you have an investigator do that, or did you do that

4   yourself?

5   A.   I started with an investigator, and the investigator didn't

6   do a lot with them, and he had other things that he had to do.

7   And I did them after that.

8   Q.   Now, you know that Meade -- at least it's your belief that

9   Mr. Meade met with Tracey Richter's family and then was paid by

10  them and began to put out publicity.

11  A.   I don't know whether Mr. Meade was paid by -- or excuse me,

12  had ever met Tracey's attorney -- or excuse me, Tracey's family.

13  The only payment I could determine that came from the Richters

14  to Darren was a $400 Western Union MoneyGram.

15  Q.   So $400.  Do you -- is that your -- is that your concept of

16  what motivated Darren Meade for -- to start publishing this

17  stuff about Tracey Richter's --

18  A.   Not at all.

19  Q.   Okay.  And in terms of your understanding -- oh.  You

20  offered.  But Meade has been the one who has been putting out

21  this information according to your investigation; correct?

22  A.   Yes, sir.

23  Q.   Okay.  And yet when you were -- or Mr. Meade's counsel --

24  you've told Mr. Meade's counsel that you would give him immunity

25  if he testified against Ed Magedson; correct?

1   A.   That's correct.

2   Q.   Okay.  And you have turned down multiple proposals to

3   identify and remove false statements of fact about the

4   testifying witnesses; correct?

5   A.   That's correct.

6   Q.   And, in fact, when you were given one offer, you said that

7   you were somehow being offered a bribe; correct?

8   A.   I -- yes.

9   Q.   You reported Ms. Speth to the Arizona Bar because you said

10  she was trying to bribe you; correct?

11  A.   That was one of the things, yes.

12  Q.   Okay.  Why don't you explain to me what the bribe was.

13  A.   The bribe was as follows:  After I had communicated with

14  Mr. Downey, Darren Meade's attorney, and offered Mr. Meade

15  immunity to testify against Xcentric Ventures and Ed Magedson

16  before the grand jury, the -- where was I going with that?

17  Sorry.

18          THE COURT:  What was the bribe?

19          THE WITNESS:  Oh.  What was the bribe?  I'm sorry.

20  A.   The bribe was that they offered to remove stuff -- not

21  remove but basically make the stuff up there about me, myself,

22  invisible on the Internet whereas before they had, you know,

23  wanted me to give them information that would demonstrate the

24  stuff that's up there about the witnesses was inaccurate.

25          After -- after I filed the -- or after I had, I

1   believe, filed an application in district court to have -- it's

2   called a Watson hearing to determine whether or not there's

3   issues with Mr. Meade's right to effective assistance of

4   counsel, two days after that -- I think the timing -- I'm not

5   quite for sure, but I had received a communication from Ripoff

6   Report's attorneys that they would take down stuff, all the

7   reports that Darren Meade had put up there, and that they would

8   basically, you know, not populate them or popularize them.  And

9   by code, by definition of the Iowa Code, that's bribery.  You're

10  offering to do something for a public official in order to sway

11  that person's decision-making authority.

12  Q.    Sir, in fact, the offer never mentioned you at all by name,

13  did it?

14  A.    It didn't mention me by name, but it mentioned to remove or

15  hide all the reports including the ones about me, whereas before

16  all the other offers only ever related to removing the stuff

17  about the state's witnesses.

18  Q.    Okay.  So they said we'll remove more than that.  They

19  volunteered to do that.  Did you go -- now, this isn't about

20  you; right?  This is about you protecting these witnesses.

21  A.    That's absolutely right.

22  Q.    And which -- let me see.  Did you go to Michael Roberts and

23  tell him this is the offer that we've got?

24  A.    No.

25  Q.    What about your mother -- your mother-in-law?  When you

1 were sitting at the table, did you say, because this isn't about

2 you, this is about them and protecting their rights, so did you

3 go to her and say this is the offer we got from Xcentric?

4 A.   No.  I don't discuss that with my mother-in-law.

5 Q.   Did you go to any of the witnesses and tell them about the

6 offers?

7 A.   I don't believe so.  They weren't -- I mean, the offers

8 weren't offers.  They were -- Xcentric Ventures was offering to

9 remove posts that I had proof they put up there if the witnesses

10 enrolled in some program and provided affirmative documentation

11 that they were, in fact, not everything that they said they

12 were.

13 Q.   So they said they'd do it for free.  You didn't contact any

14 of these witnesses; correct?

15 A.   I can't recall whether or not I did.  I mean, I guess --

16 well, I answered the question.

17 Q.   You said one thing that I have a question about.  By

18 disclosing certain things, you might jeopardize another criminal

19 case.  Do you guys have -- now, I'm from Arizona.  Do you have

20 disclosure rules here where they say put your evidence up on the

21 table and let the other side know about it because it's not a

22 sneaky way of convicting people of crimes?  You put the evidence

23 and then let them test it.  Is that the way it works in Iowa?

24 A.   Not -- not totally, no.

25 Q.   Okay.  So what is this evidence that you feel so necessary

1  to hide from the defense in another criminal case?

2  A.    I guess it's not evidence that I'm looking to hide, I guess

3  per se hide.  It's just discussing my strategy, discussing, you

4  know, my mental impressions and things of that nature.

5  Q.    Okay.  The thing that you had said was -- and -- was that

6  this is not about you; it's about witness protection.  I'm going

7  to ask you to go to Exhibit 38.  Do you recognize Exhibit Number

8  38?  I believe it's in evidence because I think all of the

9  objections have been removed.  Do you recognize Exhibit Number

10  38?

11  A.    38?  Yeah, that's a picture of a website that I -- I have.

12  Q.    That's your website; correct?

13  A.    Yes, it is.

14  Q.    And like the Tracey Richter case, you are proud of your

15  record at Buena Vista University in terms of your weight-lifting

16  accomplishments?

17  A.    I think there's some things up there, yeah.

18  Q.    Okay.  And it says that your weight -- you had a lot of

19  records within the football team for your weight-lifting

20  prowess; correct?

21  A.    I think something to that effect, yeah.

22  Q.    And then it said that the new BVU's strength and

23  conditioning coach decided to lower the bar and erase history by

24  getting rid of your records.

25  A.    I put that in there.  It was kind of tongue in cheek.

1  Q.   And that was important enough for you to put on your

2  website.

3  A.   That was something I had put on my website just to kind of

4  be lighthearted.  I mean, I think there's other references in

5  there to me playing video games with my foster brother.

6  Q.   Well, it actually says you played video games and when you

7  lose you accuse people of cheating.  I'll take that one as

8  tongue in cheek.  But you focused -- when you became the Sac

9  County prosecutor or the Sac County criminal prosecutor,

10 criminal attorney for the whole county, you're focused on

11 whether or not your records stay up because it was important to

12 you.

13 A.   It was.

14 Q.   And you'd like to see the Tracey Richter result stay up;

15 correct?  You wouldn't like to see history erased.

16 A.   I -- I think that her conviction was just, and I think that

17 it will stand.  Does that answer your question, sir?

18        MR. ROBBINS:  No further questions, Your Honor.

19        THE COURT:  All right.  Any -- any additional

20 questions from the defense?

21        MR. MADSEN:  Nothing.  Thank you.

22        THE COURT:  All right.  Mr. Smith, you are excused,

23 and you may step down.  Thank you, sir.

24        THE WITNESS:  Thank you.

25        THE COURT:  Mr. Robbins or anybody else from the

1   plaintiff, ready to call the next witness?

2          MS. SPETH:  Yes, Your Honor.  Plaintiff calls Adam

3   Kunz.

4          THE COURT:  Okay, sir.  Please come forward.  Sir, if

5   you'll stop right about here, and I'll swear you in, and then

6   I'll have you have a seat.  Please raise your right hand.

7              ADAM KUNZ, PLAINTIFFS' WITNESS, SWORN

8          THE COURT:  Okay.  Please have a seat.  Adjust the

9   microphones so they're right in front of you.

10         MR. ROBBINS:  We're having a little technical

11  difficulty.  It says "searching" up there.

12         THE WITNESS:  Is that good?

13         MR. ROBBINS:  I don't think so.  Hopefully we're

14  finding, not searching.

15         MS. SPETH:  We can get started.  I don't have an

16  exhibit right off the bat.  This way we can kind of multi-task.

17         THE COURT:  Okay.  Just a minute.  Let me -- first of

18  all, Sabrina, would you see if Amanda can help us out so we can

19  get started?  But we'll get our IT person in here.

20         MS. SPETH:  Thank you, Your Honor.

21         THE COURT:  And then, sir, would you go ahead and tell

22  us your full name and spell your last name, please.

23         THE WITNESS:  My name is Adam Seymour Kunz, spelled

24  K-u-n-z.

25         THE COURT:  Okay.  Thank you.

```
 1                 Miss Speth, you may proceed.

 2                 MS. SPETH:  Thank you, Your Honor.

 3                          DIRECT EXAMINATION

 4     BY MS. SPETH:

 5     Q.   Could you please state your position with Xcentric

 6     Ventures?

 7     A.   I am in-house counsel with Xcentric Ventures, a full-time

 8     employee.

 9     Q.   For how long have you held that position?

10     A.   About two years.

11     Q.   What was your previous employment?

12     A.   I worked for the law firm of Jaburg and Wilk in Phoenix,

13     Arizona.

14     Q.   And is that my law firm?

15     A.   Yes, I worked for your firm.

16     Q.   And while at my firm, did you also provide legal services

17     on an outside counsel basis to Xcentric Ventures?

18     A.   Yes, I did that for many years.

19     Q.   What is Xcentric Ventures, LLC?

20     A.   It's an Arizona limited liability company that operates the

21     ripoffreport.com website.

22     Q.   And where is that company organized?

23     A.   It's organized in the state of Arizona.

24     Q.   Now, you mentioned the Ripoff Report website, and we've

25     heard quite a bit about the Ripoff Report website.  What is the
```

1   philosophy of your company, of Ripoff Report?

2   A.   Well, the philosophy of the company and the purpose of the

3   website is to give a voice to the regular person that a regular

4   person could never have before the Internet.  Prior to the

5   public use of the Internet and the creation of the website, if a

6   person had a consumer problem with a business, their complaint

7   would be heard about as far as you can get with word of mouth.

8   The Ripoff Report website allows a regular person to post a

9   complaint about their dealings with a business in a way that

10  other consumers who are looking for information about that

11  business can find it.  And so it gives a voice to the common

12  consumer and allows them to make a statement about their

13  problems they've had with a business.

14  Q.   Are they --

15             THE COURT:  I'm going to stop you just for a second.

16             MS. SPETH:  Sure.

17             THE COURT:  We have our IT specialist here.  Are we

18  working now?

19             MS. SPETH:  I think we're -- yeah, I think we're all

20  connected.

21             THE COURT:  Good.  Thanks, Amanda.  Sorry about that.

22  Go ahead.

23             MS. SPETH:  Thank you, Your Honor.

24  BY MS. SPETH:

25  Q.   Are the posts categorized, the posts on Ripoff Report?

1  A.   Yes.  When a person comes to the web page to post a report,

2  they go through a series of prompts and menus, and some of those

3  prompts require them to choose categories for their reports.

4  Q.   Are some of those categories -- well, give me an example of

5  a category just so that we understand what we mean by

6  categories.

7  A.   There might -- there's a category about restaurants.

8  There's a category about insurance business I think.  There's --

9  so it's designed to give a menu of choices so that -- so that a

10 person making a posting can accurately categorize or describe

11 the type of business they're complaining about.

12 Q.   Are there categories on Ripoff Report related to public

13 entities?

14 A.   Yes.

15 Q.   And what are those?

16 A.   I'm aware that there's a category called criminal justice

17 system.  There's a category called -- I think it's corrupt

18 government entities or public corruption, something like that.

19 Q.   Or government corruption?

20 A.   Government corruption I think is exactly one of the

21 categories.

22 Q.   For how long has Ripoff Report been on the Internet?

23 A.   Since 1997.

24 Q.   And how much content is on Ripoff Report?

25 A.   There are in the neighborhood of two million discrete

1    reports, whether they're -- well, reports or rebuttals or

2    comments or updates.  There's two million items approximately.

3    Q.    And where does that content come from?

4    A.    In the -- in the web page industry, social media industry,

5    it's known as user-generated content.  It's the same kind of

6    content that Facebook has where the users of the web page

7    develop or provide the substantive content of the web page.  So

8    the users write the reports just as the users come and read

9    reports.

10   Q.    Do Xcentric's agents post complaints about third parties?

11   A.    Generally, no.  I should probably elaborate.

12   Q.    Go ahead.

13   A.    It's against -- it's against the policy of the company for

14   the company to post reports.

15   Q.    You don't pay people to post complaints on Ripoff Report?

16   A.    No.

17   Q.    Do you charge the users, the individuals, the consumers, to

18   post on Ripoff Report?

19   A.    No.  When a user, when a consumer, comes to the web page to

20   post a report or an update or a comment, there is no charge

21   whatsoever.

22   Q.    Do you charge the companies or the subjects of the reports

23   to file their own responses?

24   A.    No.  A company who's reported about on the Ripoff Report is

25   always free to come and rebut the complaint or make comments or

descriptions or propose resolutions.  We call that a rebuttal,

and there's no charge at all for a company to do that.

Q.   What are Ripoff Report's policies about what content the

users can publish?

A.   The first important policy is that Ripoff Report is a site

for complaints.  And so the first rule is that the content has

to be a complaint about something, like a consumer interaction

or something that's important.  And then there are other rules

about what can be posted and what can't be posted as well.

Q.   Such as?

A.   Well, a user's not allowed to post certain kinds of private

information on the -- as part of a report or comment.  So, for

instance, a Social Security Number or bank account number would

not be allowed in order to protect privacy.

        We don't -- we don't allow profanity.  And when it's

posted, it's redacted in a certain way.  We don't allow

obscenity, so we wouldn't -- we wouldn't accept or allow

pornographic images in a post.  If there was an attempt to post

something like child pornography, we would contact the FBI

immediately if someone tried to submit that.

Q.   And how does Ripoff Report monitor that?

A.   Ripoff Report has a -- has employees that we call monitors

or moderators.  And when a user of the website generates some

content, creates a report or rebuttal, it's held in a queue, and

one of the moderators has to look at it and scan it to see if

1   there's any material that is not in compliance with those

2   policies.  In some cases there would be redactions such as bank

3   account number, Social Security Number, or the profanity.  In

4   other cases a report simply wouldn't be allowed at all.

5   Q.    Is Ed Magedson one of those moderators?

6   A.    No, he is not.  He does not interact with incoming reports

7   at that level at all.

8   Q.    What are Ripoff Report's policies about what gets taken

9   down once it's posted?

10  A.    Well, the first and most important policy is that things

11  don't get taken down once they're posted.  There's a couple of

12  important reasons for that.  The philosophy is that it's

13  important -- that the information that's valuable to consumers

14  and the public is information about how complaints and problems

15  are resolved.  And we don't feel that complaints or problems are

16  resolved by hiding them or masking them.  And so reports remain

17  posted no matter what in order to allow businesses to respond

18  and show the public how they handle complaints.

19          Another important reason for that policy is that there

20  would be a tendency for a business to go after an author of a

21  complaint to try to intimidate them to agree to remove or recant

22  their report.  So, for instance, a business who felt disparaged

23  or defamed might threaten to sue a consumer who made a Ripoff

24  Report.  With that policy we're able to tell the business

25  there's no use beating that person up.  It won't matter.

1  Q.   But what if there's a false statement in a report?

2  A.   We have avenues of policy that allow -- we don't -- we

3  don't want false statements on the Ripoff Report.  And so we

4  have procedures or policies designed to address them and allow

5  them to be discredited or removed from postings on the Ripoff

6  Report.

7  Q.   Is one of those programs called a VIP arbitration or an

8  arbitration process?

9  A.   Yes.

10  Q.   Does Ripoff Report normally charge for that process?

11  A.   Yes.

12  Q.   How much?

13  A.   There's a $2,000 fee to arbitrate a complaint or a report

14  in the VIP arbitration process.

15  Q.   And where does that money go?

16  A.   We have professional arbitrators.  There's a retired state

17  of -- appeals court judge and a 20 -- person who has 25 years of

18  AAA arbitration experience.  So they're paid $1,000 for each

19  arbitration that they conduct.

20  Q.   And is the arbitration actually on the merits?  Are they

21  actually looking at evidence?

22  A.   Yes, there's a streamlined procedure so that the person who

23  wants to challenge the veracity of a statement on -- in a report

24  can submit evidence that the statement is -- that there's a

25  false statement and a streamlined process for the person who

1  made the statement to defend it.  And so evidence -- the

2  arbitrators actually weigh evidence.

3  Q.  Has Xcentric Ventures ever offered that program to or

4  through Ben Smith to the witnesses or the people who were posted

5  about in connection with the Tracey Richter trial?

6  A.  Yes.  That's exactly the process that was offered to County

7  Attorney Smith so that false statements could be addressed at no

8  charge to the people who were offended by them.

9  Q.  And I want to be clear because you did say this, but I want

10 to make sure that we're clear.  Was it your intention to make it

11 very clear to Mr. Smith and to whoever he was representing or

12 the witnesses that there was no charge involved in that, that

13 this was the normal program that you charge $2,000 for but that

14 you were offering it for free?

15 A.  Yes.  The company intended to extend a solution to the

16 problem that Mr. Smith was identifying.  There were false

17 statements about people.  We offered to use that process at our

18 own expense so that those statements could be identified and

19 removed.

20 Q.  I want to go back to the general process, not this

21 particular case.  But in general what if a court of law

22 determines that a statement on Ripoff Report is false?

23 A.  Well, we have a policy that would address the standard case

24 where that would occur.  The standard thing would be that an

25 offended person would sue for defamation in a court of law, that

1    the court would make findings that specific statements were

2    false and defamatory.  And in a case where a court issues that

3    kind of an order, we would use that order to discredit the false

4    statements, and in some cases we might even feature that very

5    prominently.  And in some cases we might even remove the

6    defamatory statements from the report.

7    Q.    Now, this court case that you've described -- and I take it

8    you've seen this situation many, many times.

9    A.    It happens not infrequently.

10   Q.    And in those court cases, is the defamation claim typically

11   against Xcentric, or is it typically against the author?

12   A.    In the case I'm describing, that would be a proper

13   defamation case where the offended party, the defamed party if

14   they're, in fact, defamed sues the person who created the

15   content, who actually defamed them, the author.

16   Q.    And is there ever situations where there might be a lawsuit

17   against Xcentric for defamation, or have you had situations

18   where there have been lawsuits against Xcentric for defamation

19   that was written by a third party?

20   A.    There have been many of those lawsuits.  They are -- they

21   have become rare over time or less frequent.

22   Q.    And why is that?

23   A.    There's a federal statute, section 230 of the

24   Communications Decency Act, that gives a web page like Ripoff

25   Report immunity, publisher's immunity, so they cannot be

considered the publisher of content that was created by a third

party. And so it's literally -- it's not proper to try and hold

Ripoff Report or Xcentric Ventures responsible for something

somebody else wrote and put on the website.

Q. Does Ripoff Report also have a copyright infringement

policy or a DMCA policy?

A. Yes, of course, they ha -- we have a standard policy that

when a copyright violation is pointed out to us and there's a

specific safe harbor mechanism for a person to make that claim

and tell it -- tell us about it, we remove the content that

violates copyright law.

Q. Does Xcentric Ventures frequently work with law enforcement

agencies?

A. Yes, and it's -- that's one of the -- one of the highest

purposes of the website. Because of the nature of the website,

it's as if consumers report problems with frauds and crimes

directly to the website, and so it becomes a pool of evidence.

And it's very common for law enforcement agencies to reach out

to the Ripoff Report and request information to help them

identify witnesses or victims of fraud schemes and scams or to

request other kinds of information. And it's our specific

policy to cooperate, make it very easy for them to help protect

consumers and the public.

Q. Are you familiar with someone named John Brewington?

A. I am.

1  Q.   Can you explain John Brewington's history with Ripoff

2  Report very briefly?

3  A.   Well, he is a licensed private investigator in Phoenix.  He

4  participated in a scheme to interfere with Ripoff Report's

5  business in pretty foul ways, and we sued him for it.  He had to

6  settle the suit.  He sued us to demand the content about him be

7  removed.  He lost.  He has published things on Twitter and

8  Facebook on a very regular basis criticizing, attacking,

9  disparaging the company, the web page, people who work for it.

10  He -- et cetera.

11  Q.   For how long has this, I would say, bad blood between John

12  Brewington and Ripoff Report been going on approximately?

13  A.   Well, it's been going on for years.  And I want to say that

14  certainly 2007, maybe earlier.

15  Q.   And has it been a private battle or a very public battle?

16  A.   He makes it very public.

17  Q.   Has Xcentric Ventures filed complaints against --

18  complaints with the Department of Transportation -- I'm sorry,

19  whatever the department is that regulates Mr. Brewington's

20  private investigator license?

21  A.    It's the Department of Public Safety.

22  Q.    Thank you.  DPS.

23  A.    Yes, and at least two complaints and I think three

24  complaints have been filed against his license by us, by

25  Xcentric Ventures.

1  Q.   Has John Brewington filed bar complaints against Xcentric

2  Ventures' lawyers?

3  A.   Against me and against you, yes.

4  Q.   Take a look at Exhibit 21.  Do you have the exhibits in

5  front of you, Mr. Kunz?

6  A.   No, I don't.

7  Q.   Let me get you a set.  And then -- do you have a screen in

8  front of you?

9  A.   There's a screen here.

10 Q.   I think we'll just do that.

11 A.   But it's not on.  I can see that.

12       THE COURT:  Sabrina, can you help him get that?  I was

13 wondering that when Mr. Smith was testifying earlier.  I don't

14 think that screen was on.

15 A.   I can see the screen.

16 Q.   All right.  Do you recognize Exhibit 21?

17 A.   I do.

18 Q.   And what is that?

19 A.   This is a picture that John Brewington posted on his own

20 web page as part of the -- he will sometimes publish chapters in

21 the book that he's writing, the scandal book that he's writing,

22 about Xcentric and Ripoff Report and Ed Magedson.  And as part

23 of his web page, he published this picture in association with

24 bragging claims that he was filing a bar complaint against the

25 Jaburg and Wilk lawyers that work for the Ripoff Report.

1  Q.   And was this picture on his website before Mr. Smith shared

2  with Mr. Brewington your financial information?

3  A.   Yes, it was.

4  Q.   And was it on the Paladin PI website before Mr. Smith

5  shared with Mr. Brewington attorney-client privileged e-mails?

6  A.   Yes, it was.

7  Q.   By the way, how did that bar complaint turn out?

8  A.   The bar contacted me and said that a complaint had been

9  filed but not to worry about responding, and then it was

10  dismissed pretty quickly.

11  Q.   How does Mr. Brewington position himself on his website

12  with respect to Ripoff Report?

13  A.   When you say his website, I understand that you mean

14  paladinpi.com.

15  Q.   Yes.

16  A.   And he holds himself as -- I think it's the world's

17  foremost expert or the foremost expert on all matters relating

18  to the Ripoff Report and Ed Magedson.

19  Q.   Does he -- does he ask the rhetorical question do you think

20  you have a lawsuit against Ripoff Report?

21  A.   He does, as reflected in the image that you have on the

22  screen right now.

23  Q.   And does he say that before you pay an attorney a great

24  deal of money to lose a case for you, I'm the guy you need to

25  speak to; I'll level the playing field?

1  A.   That's the statement on his web page.

2  Q.   And is this prominently displayed on his website?

3  A.   Yes, that's -- if you go to his website and you follow his

4  links about Ripoff Report specifically, that is what you find.

5  Q.   And was that prominently displayed on his website at the

6  time that Mr. Smith provided him with your financial records and

7  attorney-client privileged e-mails?

8  A.   Yes, it's been consistently displayed for a long time,

9  number of years.

10 Q.   And does it also mention on there that he's writing a book

11 about Ripoff Report?

12 A.   He describes that book which he -- which he calls social

13 waterboarding.

14 Q.   Did he ever discuss that book with you personally?

15 A.   He did.

16 Q.   And what did he -- what was that discussion?

17 A.   Well, it was during the -- it was while we were winding up

18 the lawsuit against -- his lawsuit against us where he asked us

19 to remove reports.  His attorney arranged for he and I to meet

20 together over a meal.  He said -- and I believe him -- that his

21 hope was that we could resolve differences and John Brewington

22 could move on from his obsession going after the Ripoff Report.

23 But, in fact, Mr. Brewington told me that he intended to publish

24 that book, that he had scandalous material that hadn't been

25 released yet, and that he was going to press forward to continue

1 to dig for information and publish information unless we wanted

2 to pay him a hundred thousand dollars for the rights to

3 everything he's written and ever would write about Ripoff

4 Report, and then he would be silent.

5 Q. Now, Mr. Brewington makes it sound like there are many

6 people that have interest in filing lawsuits against Ripoff

7 Report.  Is that accurate?

8 A. I think -- I think it is accurate, that there are --

9 there's a lot of companies or people out there that aren't happy

10 that they have Ripoff Reports and would like to suppress them or

11 take them away.

12 Q. Let's take a look at Exhibit 23.  Do you recognize Exhibit

13 23?

14 A. I do.

15 Q. What is that?

16 A. That is a -- thank you for enlarging that.  That's a

17 Facebook page that John Brewington started and runs called

18 Jaburg and Wilk Boycott.

19 Q. So John Brewington not only publicly disparages Ripoff

20 Report, but he publicly disparages and, quote, boycotts its

21 attorneys.

22 A. Yes.  That Facebook page is specifically designed and it's

23 consistently put up content that is disparaging or insulting or

24 derogatory towards the law firm of Jaburg and Wilk and the

25 attorneys who work for it, specifically the ones that represent

1    Ripoff Report.

2    Q.   And doesn't he also talk on that particular page about

3    attorneys who don't work for Jaburg and Wilk but have

4    represented Ripoff Report?

5    A.   There's an example of that in this image.

6    Q.   Now, Victoria Ames doesn't currently work for Jaburg and

7    Wilk; correct?

8    A.   That's correct.  This is actually accurate in describing

9    that she's now faculty for Arizona State University.

10   Q.   So in this particular post on Mr. Brewington's Facebook

11   page, his Jaburg and Wilk boycott page, he is slamming Arizona

12   State University for hiring a woman who used to work at Jaburg

13   and Wilk; right?

14   A.   Yes, and left-handedly accusing the law firm of Jaburg and

15   Wilk of trying to hide its involvement by using someone who's

16   not working for the firm, just negative in tone.

17   Q.   And who's Michael Crow?

18   A.   He is the -- he is the dean of Arizona State University.

19   Well, actually I think his title is president.  He's in charge

20   there and well known for it.

21   Q.   And what was the date -- let's take a look back at Exhibit

22   1 just for a minute unless you remember.  What was the date of

23   Ben Smith's warrant affidavit that was filed in Sac County?  On

24   what date was it filed is what I'm asking?

25   A.   I wouldn't mind looking at it.  I think the date stamp says

1  July 9, 2014.

2  Q.    Yeah, I think that's what it says as well.  So let's take a

3  look at Exhibit 24, please.  And what is Exhibit 24?

4  A.    Exhibit 24 is a representation of one of John Brewington's

5  social waterboarding chapters or posts on his website to be

6  derogatory towards the Ripoff Report and people who work with

7  it.

8  Q.    And what was the original date of that post according to

9  what you saw on the Internet?

10  A.    It's as it's represented in this image.  It was the 8th of

11  June, 2014.

12  Q.    Approximately one month before the search warrant became

13  public?

14  A.    Yes.

15  Q.    And what does Mr. Brewington say about -- what's the title

16  of this post?

17  A.    The title is The Indictments and Arrests, They're Coming to

18  Take Me Away.

19  Q.    And what did Mr. Brewington post on June 8, 2014, one month

20  before the warrant became public?

21  A.    He posted, "The date is June 8.  Pay attention to the date

22  here.  You will see I know what I am talking about soon."

23  Q.    And did he also update this post on July 8 according to the

24  post?

25  A.    Yes, he did.

1   Q.   And what did he say about his access to the warrant

2   information on June 8 -- excuse me, on July 8?

3   A.   He said he knows what is going to come.  The evidence

4   hasn't been made public yet, but I have permission to release

5   this.

6   Q.   So Mr. Brewington announced to the world the day before the

7   public -- the warrant became public that he not only had the

8   warrant but that he had permission to talk about it.

9   A.   That's what it says right in his social waterboarding

10  chapter.

11  Q.   He doesn't say he was admonished to keep it quiet.

12  A.   He doesn't, and he doesn't apologize.

13  Q.   And he doesn't seem to be hiding from anyone who can see

14  his web post that he has done that; right?

15  A.   That's -- that's correct.  In fact, far from hiding, he

16  publicizes.  When he writes something like this, he tweets about

17  it or puts it on Facebook, links to it.

18  Q.   It'd be pretty brazen for a licensed private investigator

19  to announce that he had permission to do something that he had

20  been admonished not to do and to announce that publicly,

21  wouldn't it?

22  A.   I would think he would be inviting condemnation from the

23  person who admonished him.

24          THE COURT:  Before we move on, it's just after 2:30.

25  Let's take a short recess, come back at 2:45.  We'll be in

1    recess.

2              (Recess at 2:33 p.m.)

3              THE COURT:  Please be seated.  We're back in session

4    for Xcentric Ventures versus Ben Smith.  Mr. Kunz is still on

5    the stand for direct examination.

6              Counsel, are you ready to proceed?

7              MS. SPETH:  Yes, Your Honor.  Thank you.

8              THE COURT:  All right.  Please go ahead.

9    BY MS. SPETH:

10   Q.   Mr. Kunz, has John Brewington posted and tweeted private

11   financial information about Xcentric on social media?

12   A.   Yes, he has.

13   Q.   Let's take a look at Exhibit 25.  Do you recognize -- do

14   you recognize that page?

15   A.   I do.  This is a -- this is an image of John Brewington's

16   Twitter feed.  It shows what he tweets and forwards.

17   Q.   Okay.  And is one of those tweets about -- does one of

18   those tweets indicate that Mr. Brewington had access to Xcentric

19   Ventures' banking records?

20   A.   Yes, yes, there is an indication of that.

21   Q.   Which tweets reveal that he had that access?

22   A.   Well, it was the one that was just enlarged, and I can't

23   read it without the enlargement.  The July 27 tweet that we're

24   looking at right now that says, More Maria Crimi Speth online

25   with the URL there.  Her daughter Nichole works for Ripoff

1  Report.

2  Q.   And how is Nichole spelled?

3  A.   Nichole is spelled N-i-c-h-o-l-e.

4  Q.   Is that a correct spelling of her name?

5  A.   Your daughter spells her name N-i-c-o-l-e.

6  Q.   Let's switch over to -- I'm going to go a little bit out of

7  order, and let's switch over to -- no -- yeah, Exhibit 26.  And

8  did my daughter do some summer work for Ripoff Report?

9  A.   Yes, she did.

10 Q.   And is this a check that your company wrote to her?

11 A.   Yes, Xcentric Ventures wrote this check to Nicole, one of

12 the checks that paid her.

13 Q.   And how is her first name spelled?

14 A.   On the check it's spelled N-i-c-h-o-l-e.

15 Q.   Spelled incorrect just like Mr. Brewington spells it

16 incorrectly; right?

17 A.   Exactly the same.

18 Q.   Let's take a look back at Exhibit 25.  Is there another

19 post that indicates that Mr. Brewington had access to Xcentric's

20 private financial records?

21 A.   Yes, there was another tweet about S and G Investigations.

22       MS. SPETH:  Are you able to maximize that part?

23 Q.   It's why would Mr. Magedson -- Ed Magedson hire S and G

24 Investigations?  I believe it's 3.  Sorry.  Why would Ed

25 Magedson hire S and G Investigations to put GPS trackers on my

1  car?  Is that what that says?

2  A.    Yes.  He tweeted that on July 19.

3  Q.    Let's take a look at Exhibit 27.  And is that a check that

4  was in Xcentric's financial records?

5  A.    Yes, Xcentric Ventures wrote this check to S and G

6  Investigations.

7  Q.    And what does the memo portion say?

8  A.    It says GPS trackers, forward slash, J, appears to be FB.

9  Q.    Do you know who Michael Roberts is?

10 A.    I do know who Michael Roberts is.

11 Q.    You know what?  I'm sorry.  Before we move to Mr. Roberts,

12 let me back up for a minute.

13        The two checks that we just saw, what was the dates of

14 those -- I'm sorry, the tweets about those checks, what were the

15 dates of those tweets?  Did you notice, or do we need to go

16 back?

17 A.    They were -- I think they were both in July of 2014.

18 Q.    25?  So Exhibit 25 indicates that those two tweets were

19 July 20 --

20 A.    July 19 regarding S and G Investigations and I think a

21 little later regarding Nicole Speth.

22 Q.    Okay.  So some time a little later in July.

23 A.    Yes.

24 Q.    That was approximately two weeks after the search warrant

25 became public.

1  A.   The July 20 one was.  This July 27 was a little more than

2  that.

3  Q.   Thank you.

4  A.   So the Nicole Speth tweet was dated July 27.

5  Q.   All right.  Let's talk about Mr. Roberts.  Do you know who

6  Michael Roberts is?

7  A.   Yes, I do know who Michael Roberts is.

8  Q.   Are you -- is your company involved in a lawsuit with

9  Mr. Roberts right now?

10  A.   Yes.

11  Q.   And was his deposition recently taken?

12  A.   It was taken last Tuesday, the 28th of last month, of

13  April.

14  Q.   Okay.  I'm sorry.  When you say last Tuesday, do you mean

15  just this past Tuesday or the one before?

16  A.   Just three days ago.

17  Q.   Three days ago, okay.  And you heard the testimony that

18  between the time he was deposed and today he spoke with

19  Mr. Smith?

20  A.   I did hear that testimony, yes.

21  Q.   How did you first become aware of Michael Roberts?

22  A.   Xcentric Ventures -- I was working at Jaburg and Wilk as an

23  attorney, and there was a case where Xcentric Ventures was suing

24  a competing website for stealing content from the Ripoff Report

25  to get itself started.

1  Q.   How much content?

2  A.   Tens of thousands of copyrighted reports.

3  Q.   Okay.  And what did Mr. Roberts have to do with that?

4  A.   He was referred as someone who had information about

5  that -- the website that had been stealing content.  I think he

6  had identified the owners and some of the other operations or

7  practices of that other complaints website.

8  Q.   Okay.  When was the next time you had any contact with

9  Michael Roberts?

10 A.   When he contacted Jaburg and Wilk demanding $105,000 euros

11 to -- in relation to the hack of the ripoffreport.com website.

12 Q.   Now, I'm going to ask Miss Campbell to pull up Exhibit 28.

13 But while I'm doing that, did you have any conversations with

14 Mr. Roberts about that proposal?

15 A.   I spoke to him on the phone about it.

16 Q.   And in that conversation, did he tell you he wanted

17 immunity for himself as part of that deal?

18 A.   Yes, as well as the person who wrote the code, the SQL

19 injection code.

20 Q.   So let me see if I understand this.  Was Ripoff Report --

21 the Ripoff Report website hacked?

22 A.   It was.

23 Q.   And after -- and how did Ripoff Report learn about the

24 hack?

25 A.   Well, I think we learned about it through Michael Roberts'

1  contact with the -- because he reached out and said you've been

2  hacked.

3  Q.   Okay.  And is Exhibit 28 an e-mail that he sent to our law

4  firm?

5  A.   Yes, that's an e-mail that he sent to Jaburg and Wilk.

6  Q.   And how did this hack work?  What did you understand about

7  this hack?  Did you look into it, and do you have familiarity

8  with it?

9  A.   Yes.  In fact, we reported it to the FBI, and I worked with

10  the FBI to -- to investigate if you -- they investigated.  I

11  helped provide them information as they investigated the hack.

12  It was -- it was code inserted into the website that wasn't

13  supposed to be there, and it did two things that aren't supposed

14  to happen on the website.  It forced the website to not display

15  the report where the code was inserted, and it also told the

16  search engines not to index that report anymore.

17  Q.   Okay.

18  A.   So it effectively removed a report from the website or at

19  least the ability of the public to see it both on the website

20  and through search engine results.

21  Q.   And how was that hack commercialized?

22  A.   The group that was doing the hacking would approach people

23  who had complaints about the website, people who were reported

24  on the website, and request money in order to hack down a

25  report.

```
1   Q.    And you said you worked with the FBI with respect to that
2   hack?
3   A.    Yes.
4   Q.    And did Darren Meade help provide information to the FBI
5   about that hack?
6   A.    He certainly did.  He met with FBI agents and told them
7   what he knew.
8   Q.    And when he came to Phoenix, Arizona, in December of
9   2011 -- tell me if I've got the wrong year.
10  A.    No, that's the right year.
11  Q.    -- was that related to giving information about the hack?
12  A.    Yes, he came and specifically met with FBI agents in
13  Phoenix.
14  Q.    And were you there as well?
15  A.    I wasn't there when the agents interviewed him.  I was
16  there -- so I wasn't in the interview room, but I was outside
17  the conference room where he was meeting with the FBI agents.
18  Q.    Do you have any understanding whether part of the reason
19  that Xcentric paid Darren money in December of 2011 was related
20  in any way to the information he provided with respect to the
21  hack?
22  A.    Well, not directly.  So Xcentric has paid Darren Meade
23  money.  And some of it -- and Ed Magedson made the decisions
24  about paying him.  And some of it was out of gratitude because
25  Darren Meade approached us, helped to expose information about
```

1  the hack and aid in the criminal investigation about that crime.

2  Q.   Now, did Xcentric Ventures pay any of the money that

3  Michael Roberts requested, the 105,000 euros?

4  A.   No, Xcentric did not pay Michael Roberts for that.

5  Q.   Are you aware of Michael Roberts making the public

6  statement that he has, quote, a single-minded focus on shutting

7  down Ripoff Report and gagging its owner, Ed Magedson?

8  A.   I've seen that he's posted that on the Internet for

9  everyone to see.

10 Q.   Can we look at Exhibit 29?  This is the tiny one.  And has

11 that been publicly available on the Internet for quite some

12 time?

13 A.   Yes.  This is a Facebook posting that Michael Roberts made.

14 He runs Ripoff Report Vic on Twitter, and those are his

15 cartoons.

16 Q.   Let's look at Exhibit 30.  What is your understanding of

17 who the person is holding the flag in that cartoon?

18 A.   That is a caricature of Michael Roberts himself depicted as

19 the biblical hero David who slew the giant Goliath.

20 Q.   And the cartoon depicts Ed Magedson bound and gagged.

21 A.   Yes, it does.  He's bound hand and foot, and he has tape

22 gagging his mouth.

23 Q.   Let's take a look at Exhibit 31.  And do you recognize that

24 picture?

25 A.   Yes, I do.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
Case 5:15-cv-04008-LTS  Document 62  Filed 05/11/15  Page 179 of 252
To purchase a complete copy of the transcript

1    Q.   Is that a picture that's been available on the Internet?

2    A.   Yes, I've seen that on -- for example, on Michael Roberts'

3    rexxfield.com web page.

4    Q.   And what does that depict?

5    A.   That is Michael Roberts himself in a -- sort of a

6    victorious pose with a thought bubble and the cartoon of Ed

7    Magedson bound and gagged.

8    Q.   And if Mr. Smith was looking into Mr. Roberts, he would

9    have found -- easily found this on the Internet; correct?

10   A.   Yes.

11        MR. MADSEN:   Object, foundation.

12        THE COURT:   That's sustained.

13   BY MS. SPETH:

14   Q.   Does Michael Roberts purport to lead a boycott or what he

15   calls a boycott campaign against Ripoff Report?

16   A.   He does purport to do that.

17   Q.   And can you describe what Mr. Roberts does that he calls

18   the boycott?

19   A.   He is threatening to embarrass and disparage anyone who

20   works with the Ripoff Report including the corporate advocacy

21   program customers or any companies or individuals who provide

22   support services to the Ripoff Report.  He has at least one web

23   page where he -- where he identifies those people, suggests that

24   they have evil motives and, in fact, that they support terrorism

25   or emotional terrorism by associating with the Ripoff Report.

1  Q.   Has he also attacked Ripoff Report's advertisers?

2  A.   Yes.  Those -- they've been included in the group that is

3  disparaged that way.

4  Q.   And has he specifically directly communicated to your

5  customers?

6  A.   Yes, he has.

7  Q.   Let's take a look at Exhibit 32.  Can you please describe

8  Exhibit 32 for us?

9  A.   Exhibit 32 is an e-mail that Michael Roberts sent to one of

10  Ripoff Report's corporate advocacy program members.

11  Q.   So one of Ripoff Report's customers.

12  A.   Yes.

13  Q.   And does he mention prosecutors?

14  A.   He does.

15  Q.   Can you read just that sentence to us, please?

16  A.   He tells that customer, "I am also hopeful that I will have

17  serious prosecutors taking up the cause pretty soon as I build

18  the crime books for the different cases."

19  Q.   And what is the date of that e-mail?

20  A.   June 4, 2014.

21  Q.   One month before the subpoena was made public.

22  A.   Before the warrant affidavit was made public, yes.

23  Q.   I apologize.  Thank you.  Does Mr. Roberts' e-mail explain

24  to your customer why he's reaching out to him?

25  A.   Yes, it does.

1    Q.    What does he say?

2    A.    He's asking for money.  He says -- essentially he says if

3    I'm able to accomplish those things including getting

4    prosecutors to go after the Ripoff Report, will you give me a

5    financial reward?

6    Q.    When did you first become aware of the search warrant

7    affidavit, Exhibit 1?

8    A.    Either on July 9 or perhaps the next day.

9    Q.    And how did you become aware of it?

10    A.    The media reached out to the company to -- for comment

11    about the news and social media that was going on surrounding

12    the fact that Anna Richter's computer had been seized under the

13    warrant.

14    Q.    And shortly after Anna Richter's computers were seized, did

15    you look to determine whether or not the search warrant was

16    available on public websites?

17    A.    The warrant application became available on multiple public

18    websites almost immediately after it was filed.

19    Q.    And did Mr. Brewington and Mr. Roberts capitalize on the

20    warrant in social media?

21    A.    They both posted about it on web pages and in social media

22    with links, with links, so that people could go and download

23    copies of it.

24    Q.    Take a look at Exhibit 33.  Do you recognize that document?

25    A.    I think I do, but this screen is blurry, and I can't read

1   this document on this screen.

2           MS. SPETH:  May I approach the witness, Your Honor?

3           THE COURT:  You may.

4           MS. SPETH:  I'll give him a printed version as well.

5   It is a long walk.

6   BY MS. SPETH:

7   Q.   Is that an e-mail that Mr. Roberts sent to Ed Magedson and

8   Ripoff Report?

9   A.   Yes, that's an e-mail that came from one of Mr. Roberts'

10  business e-mails to one of the company's e-mail addresses.

11  Q.   Does it appear to be a mass e-mail based upon the way

12  it's -- the way the salutation reads?

13  A.   Yes, and based on the way that it's written, it seems to

14  have gone out to a lot of people.  It says, "Dear Ripoff Report

15  Victims Support Group."

16  Q.   And did Mr. Roberts testify that this went out to

17  approximately two to three hundred people?

18  A.   I'm not aware of that.

19  Q.   Okay.  I'm sorry.  Where does the link, the first link, in

20  Exhibit 33 go?

21  A.   That link goes to the Google search engine and

22  automatically performs a search on the terms criminal warrant

23  Ripoff Report.

24  Q.   And the terms -- and that shows up what?

25  A.   Well, then Google returns a list of places -- frankly,

1    places where you can download that criminal warrant.

2    Q.    And were there multiple places?

3    A.    There were multiple places, and there have consistently

4    been multiple places even today.

5    Q.    How about Mr. Smith himself?  Did he publicize the search

6    warrant?

7    A.    He did.

8    Q.    Let's take a look at what we previously marked as Exhibit

9    10.  And there's -- a few pages into Exhibit 10 there's a

10   reference to a podcast.  What do you know about that podcast?

11   A.    There's a lawyer in California named Bennet Kelley who my

12   understanding is he does a radio broadcast which he also

13   records, makes available on the Internet which is called a

14   podcast.  And these pages represent a printout of the Internet

15   page where he makes his interview with Ben Smith available as a

16   podcast to the public and has a little article about it.

17   Q.    And was Mr. Smith a guest on that podcast?

18   A.    Yes, he was.

19   Q.    And did you listen to the audio of that podcast?

20   A.    Yes, I did.

21   Q.    Does Ben Smith refer to the search warrant in that podcast?

22   A.    Yes, he does.

23   Q.    Tell me about that.

24   A.    He makes comments to the effect of that there's an ongoing

25   investigation that he shouldn't talk about a lot but if you want

1  the details you can look at the search warrant application

2  affidavit.

3  Q.   Now, is that -- you're saying plural.  Does he say that

4  once or more than once?

5  A.   I think he said that three times.

6  Q.   And does this story and podcast by Bennet Kelley depict

7  Mr. Smith in any particular role?

8  A.   It depicts him as the hero of the Gunfight at the O.K.

9  Corral, the little -- the prosecutor from the little rural

10 county taking on the big corporate Ripoff Report.

11 Q.   Does it also talk at all about David and Goliath?

12 A.   I don't remember that.

13 Q.   Does -- that's okay.

14 A.   I'm looking at that article now, and it does say, "To say

15 that this is a David versus Goliath battle is an

16 understatement."

17 Q.   Now, has Ben Smith put your e-mails with your attorneys and

18 your client's e-mails -- I don't know if I consider him your

19 client when you're in-house counsel but e-mails between

20 yourself, Mr. Magedson, and outside counsel, has Ben Smith put

21 those into public records?

22 A.   He has put them into public records, and Ripoff Report is

23 my client.

24 Q.   And --

25 A.   Well, Xcentric Ventures is my client.

1    Q.    And Mr. Smith said he thought some of that was sealed.  Do

2    you know if there were -- if he actually placed in the public

3    record without sealing them attorney-client privileged e-mails?

4    A.    He definitely did do that.

5    Q.    Let's take a look at Exhibit 8.  Was Exhibit 8 -- and I

6    know we talked about this exhibit extensively with Mr. Smith.

7    Exhibit 8 was between yourself; is that correct?  Actually can

8    you just tell us who the participants in this conversation are

9    on this e-mail?

10   A.    Yes, it's from you.  It is to EDitor@ripoffreport.com.

11   That's Ed Magedson who is the manager of Xcentric Ventures, LLC.

12   Western Ed is also an e-mail address he used.

13   david@ripoffreport.com was an attorney for Ripoff Report who I

14   think -- I think in June of 2012 he was outside.  I can't

15   remember if he was an employee or not, but he's never been

16   anything but an attorney for Ripoff Report.

17   Q.    But he's an attorney.

18   A.    Yeah.  anette@ripoffreport.com is in-house counsel at

19   Xcentric Ventures, and justin@ripoffreport.com is the -- was the

20   chief technical officer.

21   Q.    And the e-mail is -- was the e-mail for the purpose of

22   providing legal advice?

23   A.    Of course, it was.  Ed Magedson reached out to you

24   specifically as well as other members of the legal team and the

25   chief technical officer seeking advice about taking some action,

1  and the string gives advice.

2  Q.   And it was about taking action against Michael Roberts for

3  getting the Google ads cut off, isn't that correct, or against

4  whoever got the Google ads cut off; correct?

5  A.   Both are correct.  The assumption was it was about Michael

6  Roberts.  It was about the Google ads that were cut off.

7  Q.   Did you ever waive privilege with respect to this e-mail?

8  A.   No.

9  Q.   Did you ever give anyone permission to use this e-mail?

10  A.   I did not, and the company did not.

11  Q.   Now, there are allegations in the search warrant about

12  Xcentric Ventures; correct?

13  A.   Yes.

14  Q.   And there's allegations in the search warrant that there

15  are false statements in reports about witnesses in the Richter

16  trial on Ripoff Report.  That's one of the allegations in the

17  warrant; correct?

18  A.   Yes.

19  Q.   Have you read through the entire affidavit of Ben Smith in

20  support of the search warrant, Exhibit 1?

21  A.   I have.

22  Q.   And at some -- what did you determine to do when you first

23  became aware of the search warrant?  What was your decision with

24  respect to that?

25  A.   Well, I'm not sure it's accurate to say it was my decision.

1    I read it, and the company decided to investigate those

2    particular allegations and solve the problem by removing false

3    statements of fact from the accused reports.

4    Q.   And I apologize.  When I said yours, I meant the company's.

5    And did you -- and did you, the company, announce that intention

6    on the Internet?

7    A.   The company did announce that intention on the Internet.

8    Q.   Let's take a look at Exhibit 35.  And on what date did you

9    announce that intention?

10   A.   It was very shortly after the release of the warrant, we

11   became aware of the warrant.  I would have to look at the date

12   of the actual announcement to be sure.  And it was not September

13   of 2012.  What's the exhibit number?

14   Q.   Oh, I'm sorry.  It is Exhibit 35.

15   A.   It was in -- it was in July of 2014.  I'll have to look to

16   see the exact date.

17   Q.   So in the same month as the warrant became public?

18   A.   Yes.

19   Q.   Actually if you take a minute -- I know we're kind of in a

20   hurry, but take a minute to find that date, please.

21   A.   July 13, 2014.

22   Q.   So approximately a week after the warrant became -- after

23   you became aware of the warrant, you made a public statement

24   that you would investigate the allegations and remove the false

25   statements.

1    A.    Within -- within four days, maybe shorter of learning about

2    the warrant, being able to read it, the company decided to

3    investigate it and announce publicly that we would investigate

4    and redact false statements of fact.

5    Q.    What about opinions or what about true statements of fact

6    in the post that might be critical or disparaging of people who

7    testified in the Richter trial?

8    A.    It was decided that those would not be removed.

9    Q.    Why?

10   A.    Because -- because there is -- because it's important

11   public information, and there's a constitutional right to

12   express opinions publicly and to make true statements about

13   matters of public concern publicly.  And so -- but there

14   isn't -- there is not a constitutional right to make false

15   statements.  And we wanted to remove false statements if there

16   were indeed false statements.

17   Q.    But what if a true statement or an opinion was harassing or

18   retaliatory towards a witness that testified in the Richter

19   trial?

20   A.    I don't think a true statement can be harassing against a

21   witness in that situation.  And I don't -- and I don't --

22   because it can't be harassing, I don't think it can be

23   retaliatory.

24   Q.    And did you indeed do the investigation that you say in

25   Exhibit 35 that you were going to do?

1  A.  Yes, I did the investigation, and the investigation is

2  ongoing.

3  Q.  You're still doing it.

4  A.  Yes.

5  Q.  Did you personally head up that investigation?

6  A.  I personally head up that investigation, yes.

7  Q.  And how have you done that?  How has that looked?

8  A.  Well, we've attempted to investigate in a lot of different

9  ways.  Reading -- we tried to read the warrant, the affidavit,

10  and determine what statements were accused as being false.  And

11  we tried to determine which reports were accused of having false

12  statements and which witnesses were accused of having false

13  statements made about them.  And that was not very fruitful.

14  It's very difficult to understand specifics like that from the

15  warrant affidavit.

16       We reached out to Ben Smith to ask him to identify

17  what statements were false that could be investigated and

18  redacted.  We looked to things that he had written and filed to

19  try and identify exactly what statements would be accused as

20  false.  That includes pleadings in the civil action.  I think it

21  was called the 915 action that he filed against us as well the

22  pleadings from the criminal case he's filed against Darren

23  Meade.  We've identified some things which have clearly been

24  accused as false and further investigated them by doing Internet

25  searches and seeking public records that could either verify

1  or -- or prove false things that have been alleged.

2  Q.   Now, have you posted any updates about the investigation?

3  A.   Yes, we've posted several updates about the investigation.

4  Q.   So if we look at Exhibit 35, we'll see a January of 2015

5  date.  Is that one of the updates?

6  A.   Yes, it is.

7  Q.   Did you reda -- I'm sorry.  Did you say you redacted some

8  statements as a result or --

9  A.   We have -- we have redacted some things from the report on

10  the website because of the investigation, yes.

11  Q.   Let's take a look at Exhibit 36.  Does that reflect one of

12  the redactions that you made?

13  A.   I believe we did make redactions from the report that's

14  displayed in Exhibit 36.  I'm actually looking through the

15  exhibit to try and find the redactions.  They would be clearly

16  identified with multiple parentheses and redacted and I believe

17  in all capital letters.

18  Q.   Okay.  Do you see that or not -- not right now?

19  A.   Well, I'm not seeing it very clearly.  I'm not finding it

20  easily.

21  Q.   Okay.  Let me ask you this.

22          THE COURT:  Let me interrupt.

23  Q.   Why did you --

24          THE COURT:  Look at the bottom -- close to the bottom

25  of the page that's 263.  I see what I think you're talking

1  about, but I want to make sure.  About three-fourths of the way

2  down.

3          THE WITNESS:  Yes, Your Honor.  That is exactly the

4  symbol we use when we redact things from a report.

5          THE COURT:  Okay.  Thank you.  Just wanted to make

6  sure.  That's what I thought it was.

7          MS. SPETH:  Thank you.

8  BY MS. SPETH:

9  Q.   Why did you make a determination to redact whatever

10  reference was there about John Pitman?

11  A.   In this case we became aware really through items from the

12  Darren Meade criminal case that one of the things that Mr. Smith

13  claimed was false was the allegation that John Pitman hired

14  prostitutes and I believe the allegation that he'd been arrested

15  for soliciting prostitutes in Florida.  And so we investigated

16  that.

17  Q.   And what did you learn?

18  A.   We learned that there was a fellow named John Pitman who

19  had been arrested in Florida for soliciting prostitutes, but his

20  picture didn't look very much like other pictures of Dr. Pitman

21  that we had, and his name was spelled differently when we

22  compared it with other public records I think from the medical

23  board about Dr. Pitman.  So it appeared that information that

24  had been provided to support the allegation that Pitman hired

25  prostitutes did not actually support that allegation.

1  Q.   Now, you heard Mr. Smith testify earlier that one of the

2  posts accused Dr. Pitman of being a baby raper.  Did you hear

3  that testimony?

4  A.   I did hear that testimony.

5  Q.   Is that what that post actually says?

6  A.   No, that is not what the post actually says, and it's not

7  what the title actually says.

8  Q.   What does it actually say?

9  A.   I don't know that I remember the exact words, but what it

10  says is that essentially that Michael Roberts accused Dr. Pitman

11  of being a child molester or a baby raper.

12  Q.   And does it also say that then Mr. Smith accused Tracey

13  Richter of being the one who made that accusation?

14  A.   I don't know.  I would have to read it to answer that

15  question.

16  Q.   Let's take a look at Exhibit 37.  Did you make any other

17  redactions as a result of your investigation other than the

18  Pitman redaction that we just talked about?

19  A.   We did.

20  Q.   And what was that?

21  A.   In Exhibit 37 you can see that that is an image of the

22  title to a report that was posted on the web page by Darren from

23  Laguna Beach, California.  The title of that report formerly did

24  include the names of Raymond and Marie Friedman.

25  Q.   And you redacted them?

1    A.    Yes, we did.

2    Q.    You didn't redact Michael Roberts' name?

3    A.    No, we did not.

4    Q.    Why not?

5    A.    Well, when -- the investigation on this was pretty simple.

6    We read the report, and the report describes the fact that the

7    company called Mile 2 had been sued at some point in time and

8    that the accusations in the lawsuit included that the company

9    planted graphic depictions of child molestation and torture,

10   liquid explosives, pipe bomb recipes, et cetera.  So that was

11   what the report was about.

12           The report didn't even describe the fact that Marie

13   and Ray Friedman were owners of Mile 2 at the time of the

14   lawsuit, although I think the report does say that Michael

15   Roberts was.

16           And we basically looked at that and said it's too

17   close to a representation that they're doing personal things

18   that's not supported in the report, so we redacted it as

19   unsupported or what appeared to be a false implication.

20   Q.    Do you think you were being conservative in doing that

21   redaction?

22   A.    I think we were doing everything we could to get to -- yes.

23   Q.    Have you --

24   A.    You know, I'm not sure what you mean by conservative.  The

25   fact of the matter is we were trying to remove the false

1    implication.

2    Q.    Okay.  And have you had any roadblocks in your

3    investigation?

4    A.    Yes.

5    Q.    And what is the roadblock, or what are the roadblocks?

6    A.    Well, the major roadblock is we've asked Mr. Smith to

7    identify what statements are false so that we can investigate

8    them and, if they're false, redact them.  And he won't respond.

9    He has not responded.

10   Q.    Have you thought about reaching out to the subjects of the

11   reports directly?

12   A.    I've thought about that.

13   Q.    Have you done it?

14   A.    I'm -- I would be scared to death to do that.

15   Q.    Why?

16   A.    Well, I would be afraid of being accused of harassing them

17   in retaliation for their testimony and having a grand jury

18   convene to get an arrest warrant against me or something like

19   that.  We're afraid of the consequences if we were to reach out

20   and contact them directly.  That's why we tried to approach

21   through Mr. Smith.

22   Q.    Have there been situations -- did you find anything in your

23   investigation that indicated that the accusations in the warrant

24   didn't even line up with the statements on Ripoff Report?

25   That's poorly worded.  Do you know what I'm getting at?

1  A.   I understand what you're getting at.

2  Q.   Help me out.

3  A.   Well, one of the early things that we thought we could pull

4  out of the warrant affidavit was the accusation that certain

5  witnesses committed perjury on the stand at trial by

6  contradicting deposition testimony that they had given before

7  trial.  I believe that that is specific -- that's spelled out as

8  an accusation of falsehood in the -- it's one of the few

9  specific allegations that we could pull out of the search

10  warrant affidavit.  And I can't find that in any reports on the

11  web page.  And I'm not the only one who've looked.  We haven't

12  been able to find that specific accusation.

13  Q.   Has Xcentric Ventures made any attempts to address

14  Mr. Smith's concerns about the posts on Ripoff Report other than

15  just the investigation?

16  A.   Yes.

17  Q.   And what have those been?

18  A.   Well, for starters, we offered the arbitration program at

19  no charge so that false statements could be identified and

20  redacted.

21  Q.   Anything else?

22  A.   Yes.  More recently we offered to -- we offered to use

23  no-follow codes in all of the reports about the Tracey Richter

24  trial.  Can I elaborate about that?

25  Q.   You want to tell us what a no-follow code is?

1    A.    Among other things, yeah.

2    Q.    Okay.  Go ahead.

3    A.    We learned -- what I heard Mr. Smith say on the stand

4    today, we heard that his concern was the way the titles made

5    these reports show up in the search engine listings.  And in an

6    attempt to address that directly, we said, all right, let's

7    offer to make them not show up in the search engine listings at

8    all.  That's what a no-follow code does.  At least a no-follow

9    code is a request to the search engines for them not to index

10   those pages.  We really don't control what the search engines

11   do, so we can't force it to happen.  But that's what a no-follow

12   code does.

13   Q.    What was Mr. Smith's response to that offer?

14   A.    I think he accused you of trying to bribe him.

15   Q.    Now, did Mr. Smith accurately describe that offer on the

16   stand earlier?

17   A.    No.

18   Q.    Why not?  What was wrong with his description of it?

19   A.    Let me remember how he described it.

20   Q.    Well, let me ask it this way.  Did that proposal ever

21   mention Mr. Smith?

22   A.    No.

23   Q.    Have Mr. Smith's actions that we've talked about over the

24   course of today chilled free speech?

25   A.    It certainly has chilled our free speech and free speech in

1    general.

2    Q.    Tell me some of the ways that that has happened.

3    A.    Well, it's -- first of all, it's made us afraid of criminal

4    sanctions and of the disparagement of the purpose of the report

5    and the business model of the report.  It's made us afraid to

6    the point that we won't allow Darren Meade to post anything on

7    the website.  It's made us afraid to post things on the website.

8    It caused us to offer to do things that is against --

9    essentially against our policy to do.  Xcentric Ventures does

10   not have the resources to do investigations for everything

11   that's posted on the Ripoff Report.  There's -- we don't have

12   those resources, and so we don't offer -- we haven't offered to

13   do investigations for content that we are not responsible for

14   under federal statutes.

15   Q.    In this case how much time, how much resources did you

16   devote to your investigation?

17   A.    I think we have in the neighborhood of 200 man hours

18   directly in an attempt to address the investigation the way I've

19   described.

20   Q.    I interrupted you.  I'm sorry.  Any other ways that it's

21   chilled free speech?

22   A.    Yes.  I mean, we've offered to remove things.  We've

23   offered to put no-follow codes to suppress these reports so that

24   the public can't find them on the search engines.  We've offered

25   a lot of things to try and avoid the criminal prosecution and

the fall-out from the investigation and the prosecution.  And

all of those things are about taking information away from the

public.

Q.   Do some of these posts that we've been talking about over

the course of today include video -- videos with evidence that

supports the statements that are made?

A.   Yes, that's an additional area.  Some of the postings about

the trial and the witnesses were supported by things that were

posted on other websites.  So, for instance, if a document was

represent -- was referred to in one of the postings on the

ripoffreport.com that -- there might be a link to that document

hosted on a third-party website that we don't -- that we don't

have anything to do with, or likewise a video.  Meade produced

some videos that showed supporting information for the

allegations that he wrote in some of his reports and hosted

those videos on a website called screencast.com I think.  And

those -- many of those things have been taken down by the

companies who were hosting them under threat.

          MS. SPETH:  I have no further questions, Your Honor.

          THE COURT:  All right.  Cross-examination?

          MR. MADSEN:  Thank you, Your Honor.

                    CROSS-EXAMINATION

BY MR. MADSEN:

Q.   Mr. Kunz, you're a lawyer?

A.   Yes.

1  Q.   When did you become licensed to practice law?

2  A.   In 1997 or 8, '98 I think.

3  Q.   And tell me again when you began working for Ripoff Report

4  and Xcentric Ventures.

5  A.   I did a little bit of work for Xcentric Ventures in I think

6  it was the year 2000, just a little bit.  And then after I

7  joined Jaburg and Wilk in 2005, I believe I started doing some

8  work, an increasing amount of work, for the Ripoff Report almost

9  immediately.  I couldn't -- I couldn't tell you for certain if

10 it was in 2005 or 2006 or even early 2007, but it was in that

11 neighborhood of time.

12 Q.   And tell me when you became actually employed by Xcentric

13 Ventures.

14 A.   Directly?

15 Q.   Yes.

16 A.   About two years ago in -- I think it was -- I think it was

17 October of 2013.

18 Q.   In your current --

19 A.   Maybe it was 2012.

20 Q.   I'm sorry.  And your current position is chief operating

21 officer?

22 A.   No, it isn't.

23 Q.   I'm sorry.  Tell me what your current position is.

24 A.   I'm in-house counsel.

25 Q.   In-house counsel.  And have you always held that position

1  since you've been employed by Xcentric Ventures?

2  A.   Yes, I have always been in-house counsel to Xcentric

3  Ventures while I've been employed by Xcentric Ventures.

4  Q.   Would I be correct in characterizing your practice as

5  having some expertise in Internet law?

6  A.   I don't -- I don't really feel expert in Internet law, but

7  I know --

8  Q.   Tell me what your area of practice is.

9  A.   Pardon me?

10 Q.   Tell me what your area of practice was when you were in

11 private practice.

12 A.   In private practice I did state court litigation, state

13 agency practice.  I focused on some employment-related issues.

14 I advised -- I advised corporate clients on dispute resolutions,

15 so I negotiated disputes.  And it's true that some of my

16 practice focused around Internet-related issues including issues

17 related to section 230 of the Communications Decency Act and

18 liability for things that are posted on the Internet, defending

19 against accusations of liability.

20 Q.   Have you ever done any criminal law work?

21 A.   I've -- I've -- I've been in justice court on some traffic

22 tickets.  I think many years ago I helped negotiate some kind

23 of a -- like a surrender and plea agreement for a fella who was

24 having problem with drugs and wanted to turn himself in.  But

25 I've not -- I've never been a prosecutor; I've never represented

1  myself as a criminal defense attorney.  I took the class in law

2  school, but I don't -- I haven't practiced criminal law.

3  Q.   Okay.  I want to ask you some questions.  You said you

4  have -- and you've practiced in this area involving the

5  Communications Decency Act which can I -- I'm not real familiar

6  with that, but is it okay if I refer to that as the CDA?

7  A.   I know what you mean if you say CDA.

8  Q.   Great.  Am I correct that the CDA offers an outfit like

9  Ripoff Report certain immunities as just the publisher of the

10 content that is posted?

11 A.   Let me answer this way.  The CDA means that Ripoff Report

12 or a web page like Ripoff Report that accepts user-generated

13 content is not liable for that content.

14 Q.   Okay.

15 A.   It's not liable as a publisher, so it cannot be considered

16 the publisher of that kind of content.

17 Q.   So in other words, if people or businesses post content

18 about another business or person, they can't successfully sue

19 Ripoff Reports for being the forum for that.  Is that a fair

20 characterization?

21 A.   I'd say so.  I think it depends on what their objective in

22 suing is but --

23 Q.   Sure.

24 A.   Yes.

25 Q.   And you had testified under questionings from Miss Speth

1    that Xcentric's agents -- I wrote this down here -- Xcentric's
2    agents do not post content.  Do you remember saying that?
3    A.   I remember saying that.
4    Q.   And you said that Xcentric's agents don't pay others to
5    post content.  Do you remember saying that?
6    A.   No, I don't remember saying that.  I don't think I was
7    asked that.  And I think what I said was it's against the policy
8    of the website for its agents to create -- to create the kind of
9    content that's in reports.  I mean, certainly -- certainly
10   Xcentric's agents have created the format of the website.
11   Xcentric's agents wrote the terms of service --
12   Q.   Sure.
13   A.   -- that are displayed and many articles and a lot of
14   information about how the website operates.  But the reports
15   that are about -- you know, the complaints, Xcentric Ventures
16   doesn't write those.
17   Q.   Xcentric doesn't write those, nor would Xcentric pay
18   someone else to write those.  Is that what you're telling me?
19   A.   Correct.
20   Q.   And you understand the CDA well enough to know that if, in
21   fact, Xcentric did pay someone to post that content the CDA no
22   longer immunizes that conduct, does it?
23   A.   I'm not sure that's absolutely true.  But if Ripoff
24   Report, if Xcentric Ventures created the content even through
25   its agents, then the CDA would not give the website immunity,

1   publisher immunity.  In other words, then the web -- or Xcentric

2   Ventures could be treated as the publisher.

3   Q.   Xcentric could be treated as what?

4   A.   Publisher.  Like when a newspaper publishes an article --

5   Q.   Sure.

6   A.   -- and so the newspaper is the publisher and has some

7   liability for what's written.  If Xcentric Ventures creates

8   content for the website, then it would be the publisher.

9   Q.   Exactly.  And if Xcentric paid someone to create that

10  content, they lose that protection too, don't they?

11  A.   I don't know that -- I don't know the legal conclusion that

12  you're asking for.

13  Q.   I think that's what you just told me, but I don't want to

14  mischaracterize it.

15  A.   Well, you -- again, I don't know the legal conclusion of

16  the exact question you're asking.  That's the kind of thing that

17  as in-house counsel I would go to outside counsel and ask for

18  research about before -- before I authorized us to take any

19  action if -- or before -- you know, I would advise Ed Magedson

20  not to allow any action till we had an opinion on that.  So I

21  don't . . .

22  Q.   As you sit here today -- and I understand that you've done

23  work with the CDA and you're now in-house counsel.  Do you

24  believe that Ed Magedson and Ripoff Report can avoid liability

25  if Ed Magedson and Ripoff Report some -- pays someone and

1   assists in creating the content that is ultimately posted on the

2   website?

3           MS. SPETH:  I think to the question, Your Honor, I

4   object that it's compound only because he's merging Mr. Magedson

5   and Xcentric into one.  If he splits them up, I would have no

6   objection.

7           THE COURT:  It's also compound in the sense you're

8   asking both pays someone and assists in creating --

9           MR. MADSEN:  Let me -- let me clean it up, Judge.  I'm

10  sorry.

11          THE COURT:  Yeah.

12  BY MR. MADSEN:

13  Q.   We've talked about generally the immunity offered by the

14  CDA to Ripoff Report and other Internet -- what do you call

15  them?  Publishers?

16  A.   Interactive computer services.  I think that's what the

17  statute calls them.

18  Q.   Okay.

19  A.   And that generally includes web pages, and so if you want

20  to say websites, for example, that's probably --

21  Q.   Let's call them websites.  So if I post something on Ripoff

22  Report that is defamatory about Judge Strand, the CDA offers

23  protections to Ripoff Report relative to that publication --

24  relative to that posting, does it not?

25  A.   Means the CDA -- the CDA means that the website can't be

1    treated as the publisher of what you -- of your defamation of

2    the judge.

3    Q.   Okay.  And my question then, if Ripoff Report created the

4    content and paid me to post that content, do you believe the

5    immunity still exists?

6    A.   If Xcentric --

7                MS. SPETH:  Your Honor, I object again.  He said

8    created and paid.  I don't -- I think we need to separate those

9    two things.

10                THE COURT:  I think -- I think he can ask the question

11    with the two combined.

12                MR. MADSEN:  And that's what I want to know.

13                THE COURT:  In this context he's asking if both of

14    those things happen.

15                MS. SPETH:  Oh, I see.  It's the and.

16                THE COURT:  What's the -- yeah, then what's the

17    witness's opinion?

18                MS. SPETH:  Thank you.  I'm sorry.  Okay.  Sorry.

19    A.   If Xcentric Ventures created the content and paid you to

20    post it, then Xcentric Ventures would be treated as the

21    publisher because they created it.

22    Q.   Okay.  And they wouldn't have the same protections, would

23    they?

24    A.   They would not have immunity from liability as a publisher.

25    Q.   Okay.  And you would agree, wouldn't you, Mr. Kunz, that at

1  times Ripoff Report has postings that are false?

2  A.   Well, I've given examples of posts where we've identified

3  false statements, so clearly yes, that happens.

4  Q.   And you would agree, wouldn't you, Mr. Kunz, that at times

5  Ripoff Report has postings that are defamatory in nature?

6  A.   I don't -- I don't disagree with that.

7  Q.   Then you agree.

8  A.   I agree.

9  Q.   Okay.  And I don't -- I'm just trying to set some

10  foundation here; okay?

11  A.   I think I should -- I think I should say it's against --

12  it's against our policy.  We ask people who post on the website

13  to verify that what they're posting is accurate.

14  Q.   I get that, and I understand that.

15  A.   And truthful so --

16  Q.   But you're not going to sit here today and tell -- tell the

17  judge that Ripoff Report doesn't have posts that are false

18  and/or defamatory.

19  A.   No, I couldn't say absolutely that it's perfect.  I do

20  believe that there's defamatory statements on the website.

21  Q.   But this is a forum where people can freely post.  So am I

22  correct that Ripoff Report's policy is even though that's the

23  case that might be, you don't remove those?

24  A.   No, no, that's contrary to Ripoff Report's policy.  And we

25  have mechanisms so that those things can be removed.

1  Q.    Okay.  And you're talking about the VIP arbitration?

2  A.    That is one of the avenues.

3  Q.    Where the person or business pays the $2,000 and an

4  independent investigation is done; is that what occurs?

5  A.    That's not what occurs.

6  Q.    Tell me what occurs with the VIP arbitration.  I thought

7  that's what you said.

8  A.    That's not what I said.

9  Q.    Tell me what occurs with the VIP arbitration.

10  A.    In the VIP arbitration, a person who wants to challenge a

11  statement that's posted on the website would pay the arbitration

12  fee and submit essentially a brief supported by evidence to the

13  independent arbitrator.  And then the -- then the people in our

14  company who administer the program reach out to the author of

15  the accused statements and ask for them to submit a brief with

16  evidence to defend the truthfulness of the statement.  And when

17  either the submissions are made or the time runs out, then the

18  independent arbitrator considers the evidence under a specific

19  set of rules.  And the arbitrator under the rules of the

20  arbitration program, under the private arbitration rules,

21  determines whether the accused statements are false.  And when

22  they are false, they can be disavowed or identified as false and

23  in some cases redacted.

24  Q.    Okay.  And when they're determined to be false and

25  redacted, the person who challenged it still pays the $2,000,

1    though, don't they?

2    A.    Yes.

3    Q.    You don't refund their money.

4    A.    No.

5    Q.    Now, I want to ask some questions about Darren Meade.  Do

6    you know Mr. Meade?

7    A.    I've met him.  I've had conversations with him.

8    Q.    You've talked with him?

9    A.    Yes.

10    Q.    You've e-mailed -- traded e-mails with him.

11    A.    Yes.

12    Q.    Has Darren Meade ever been employed by Ripoff Report?

13    A.    Not as an employee.  He's been contracted, and he's

14    performed services for the Ripoff Report and been paid as a

15    contractor, but he has not been an employee of Ripoff Report.

16    Q.    And the services that Mr. Meade has been paid for, was that

17    services that he conducted on behalf of Ripoff Report or Ed

18    Magedson or a combination?

19    A.    What I'm aware of -- what I'm aware of, there are services

20    performed for Xcentric Ventures.

21    Q.    And I've seen a bunch of cancelled checks.  Would you agree

22    that there's been significant money paid either to Darren Meade

23    or on Darren Meade's behalf by Xcentric Services?

24    A.    Yes.

25    Q.    Do you have any idea how much money Xcentric Services has

1   either paid to Darren Meade or made payments on his behalf?

2   A.   Xcentric Ventures, LLC, I'm not aware of the specific

3   figure.

4   Q.   But you agree it's a substantial amount.

5   A.   I agree that it is a substantial amount.

6   Q.   And do you know of Tracey Richter?

7   A.   I've heard about Tracey Richter.  I've never met Tracey

8   Richter.  I've never had any direct communication with Tracey

9   Richter.

10  Q.   Would you agree that Xcentric Ventures has been involved in

11  trying to free Tracey Richter?

12  A.   Yes.

13  Q.   How did that come about?

14  A.   My understanding about how that came about is that Darren

15  Meade convinced Ed Magedson that Tracey Richter was unjustly

16  convicted and that that cause or that problem won Ed Magedson's

17  sympathy, and he wanted to help right the wrong or raise

18  awareness about the injustice in hopes of righting that wrong.

19  Q.   So you be -- do you know if Ed Magedson has ever met Tracey

20  Richter?

21  A.   I believe that he has not.

22  Q.   Do you know whether he's ever met any of Richter's family?

23  A.   I have reason to believe that he's never met them in

24  person.

25  Q.   And Michael Roberts is Tracey Richter's ex-husband;

1  correct?

2  A.    That's my understanding, yes.

3  Q.    And we've talked a lot about the disputes that Michael

4  Roberts has had with Ed Magedson and Ripoff Reports, haven't we?

5  A.    I've heard a lot of information and testimony about it,

6  yes.

7  Q.    The motivations -- well, strike that.

8          The payments that have been made to Darren Meade by

9  Xcentric Ventures, are those strictly to free Tracey Richter?

10  A.    That's not my understanding.

11  Q.    Okay.

12  A.    Well, and, in fact, I should answer that question better.

13  No.  I know for a fact that not all of the money that's been

14  paid to Darren Meade was for efforts in that direction or

15  towards that purpose.  I know that for a fact.

16  Q.    Are you aware that Darren Meade has made postings on Ripoff

17  Report that attack the state's witnesses?

18  A.    I -- Darren Meade made postings on the Ripoff Report that

19  are critical of people who testified in the Tracey Richter

20  murder trial.  That's true.

21  Q.    And these postings do more than just attack their

22  credibility, don't they?

23  A.    Darren Meade's postings do -- they do more than just attack

24  the credibility of witnesses, yes.

25  Q.    Okay.

1    A.    I think his postings do do that, but I agree that they do

2    more than that.

3    Q.    And you've corresponded through e-mails with Mr. Meade,

4    have you not, about his efforts to free Tracey Richter?

5    A.    I'm not confident that that's an accurate characterization.

6    That was never my -- I don't remember ever communicating with

7    him in e-mail for that main purpose.  And let me add that

8    certainly may have been touched upon, but that was never my main

9    purpose in communicating with him.  Well, maybe I should ask you

10   to repeat your question.

11   Q.    Well, do you recall having any communications by e-mail

12   with Darren Meade in which his efforts to free Tracey Richter

13   were discussed?

14   A.    Yes.

15   Q.    Okay.  So now you do recall that.

16   A.    I recall that, yes.

17   Q.    And do you recall in e-mails referencing words to the

18   effect that -- and I'm quoting -- you have been taking Ed's

19   money for a long time and, by the way, not showing much in the

20   way of helping Tracey's cause, end of quotes?

21   A.    Are you asking me if I wrote that?

22   Q.    Yes.

23   A.    I'm not a hundred percent sure.

24          MR. MADSEN:  Well, if I could approach, Your Honor?

25          THE COURT:  Sure.

BY MR. MADSEN:

Q.   I'm going to show you what I think is an e-mail from you to Darren Meade.  And it looks like it's dated June 7, 2014.  And I'd like you to take a chance to just look through it and see if that helps refresh your memory at all.

A.   I agree that I wrote those words.

Q.   Does that help refresh your memory?

A.   Seeing that does help refresh my memory, yes.

Q.   And am I correct, sir, that this is an e-mail that you sent to Darren Meade in which in part you discussed your concerns about him taking Ed's money and not really showing much in the way of helping Tracey's cause?

A.   The main purpose of that e-mail was negotiating legal claims that he was threatening to bring against Xcentric Ventures, and I wrote the words that you read as part of that communication.

         MS. SPETH:  Your Honor, I would like to clarify where this e-mail comes from.  I'm not sure how we have an e-mail between Mr. Kunz and Mr. Meade or how Mr. Smith has an e-mail between Mr. Kunz and Mr. Meade.

         THE COURT:  Does that matter for purposes of admission of this testimony?

         MS. SPETH:  Well --

         MR. MADSEN:  Not in my opinion, Your Honor.

         THE COURT:  No, I'm asking her.

1    MS. SPETH:  It might, depending on the answer.  If the

2  answer is it's something he received in a criminal investigation

3  under seal, I don't know -- I'm not a criminal attorney, Your

4  Honor, but I don't know that it's okay to use something from a

5  criminal investigation under seal in a civil case.  And I would

6  defer to Miss Campbell who is a criminal attorney on this point.

7    THE COURT:  Well, first of all, the document didn't

8  come into evidence.  The testimony's already in evidence.  At

9  this point I, frankly, don't think it matters for our

10  proceedings how they got it.  If there's an ethical violation or

11  a violation of Iowa law involved in using this particular

12  e-mail, I don't think this court's going to be the forum for

13  addressing that violation, so I'm going to overrule whatever the

14  objection is.

15    And I'm also going to say we're going to take a recess

16  at this point.  I do have a 4:00 criminal hearing, and I need to

17  meet with United States Probation before that.  So also you'll

18  have to move -- either move your stuff to the side if you can or

19  put it on the chairs behind you.  It shouldn't take long.  I

20  expect to be done by 4:15.

21    And I guess the other thing we need to say -- we're

22  not going to argue this case today clearly.  And so think

23  about -- I don't really want anybody to have to come back here.

24  I know you came a long way.  I would do the arguments by

25  telephone.  I'm happy to do that.  But if you want to come back

1   and do them in person or just do them in writing, although,

2   frankly, I think I'm going to have questions, so I'd rather do

3   them orally.  But give that some thought.  We'll talk about it

4   at the end once all the evidence is in.

5           But unfortunately we're not going to be able to argue

6   this today.  But we will take a recess at this time and come

7   back at about 4:15 once we're completed with the other hearing.

8   We will be in recess.

9           (Recess at 3:51 p.m.)

10          THE COURT:  Please be seated.  All right.  I put my

11  civil robe back on so we can get rolling again in this case.

12          Mr. Kunz is again on the stand.  And, sir, you're

13  still under oath.  And I believe we still have cross-examination

14  proceeding, so go ahead, counsel.

15          MR. MADSEN:  Thank you, Your Honor.

16  BY MR. MADSEN:

17  Q.   Mr. Kunz, do you know how long Xcentric paid Darren Meade?

18  A.   I think I do.  My understanding is from about the end of

19  December in 2011, thereabouts, till the middle of 2014.

20  Q.   Okay.

21  A.   But I couldn't give you an accurate tail end on that.

22  Q.   And we've established that those payments at least in part

23  were to help free Tracey Richter.

24  A.   It's accurate to say to help -- to support his efforts in

25  freeing Tracey Richter.  That's accurate.

1  Q.   Okay.  And during this time that he was being paid by

2  Xcentric, he was also making postings on the Ripoff Report

3  regarding the Tracey Richter witnesses, wasn't he?

4  A.   He made postings during that period of time, yes.

5  Q.   Okay.  You said at one point in your testimony -- and I

6  might get this wrong, and if I do, I want you to correct me.

7  But you said that when items are posted Ripoff Report's policy

8  is you don't take them down.  Did you say something to that

9  effect?  Do you remember that?

10 A.   Generally speaking, that's correct.

11 Q.   Okay.  Now, you talked about this arbitration program in

12 which the sides submit briefs and you have an independent

13 arbitrator look into it and then come to a conclusion, and then

14 you post the arbitrator's decision; correct?

15 A.   That's -- that's correct as far as it goes.

16 Q.   But the posting stays up; is that correct?

17 A.   Yes.  The -- for ins -- in technical terms, the URL which

18 is the page on the website stays there.  And the typical case is

19 that the posting stays there.  But the false facts, assuming

20 that the arbitrator identifies false, defamatory statements,

21 they may well be redacted so they aren't on display to the

22 public anymore.

23 Q.   Okay.  But this is only -- this is only done and they'd

24 only be redacted if the complainant goes through that

25 arbitration program and the arbitrator makes that determination

```
 1   that it is, in fact, false; correct?
 2   A.   Yes.
 3   Q.   You've testified that Ripoff Report ultimately contacted
 4   Mr. Smith and was offering to take those statements down about
 5   the witnesses; correct?
 6   A.   Not exactly.
 7   Q.   Or redact the statements about the witnesses.
 8   A.   Not exactly.  So Ripoff Report reached out to Mr. Smith and
 9   offered to allow the arbitration program to be used to identify
10   false statements of fact and redact them.
11   Q.   Were you charging them?
12   A.   We offered to not charge.  We offered to bear the cost.  It
13   was offered free.
14   Q.   Okay.  Did Ripoff Report's decision to do that have
15   anything to do with the investigation and charges surrounding
16   Darren Meade?
17   A.   It had everything to do with the threatened criminal
18   investigation and charges against Xcentric Ventures and Ed
19   Magedson.
20   Q.   But that's against your policy as a general rule, though,
21   isn't it, to remove that?
22   A.   That's right.
23   Q.   So -- and you were willing to do this, and you weren't even
24   going to make them go through the arbitration program and pay
25   the fee.  It was just something you were going to do because of
```

1  the concern you had for criminal charges?  Is that what you're

2  telling us?

3  A.   No.  You misunderstand.  At the time the offer that we're

4  discussing was to use that arbitration program, to use the

5  system of submitting pleadings, submitting briefs with evidence

6  to a neutral arbitrator to identify false statements of fact.

7  So in that sense I think you were suggesting that we said, oh,

8  just skip the arbitration system; we'll just take down what you

9  tell us to take down.  No.  That was not offered.

10        At that time what was offered was to allow the

11  arbitration system to be used but not to charge for it.  So

12  Xcentric Ventures would bear the cost of using the professional

13  arbitrators, the professional neutrals, of allowing evidence to

14  be submitted to challenge and disprove false statements, of

15  allowing the author to submit evidence to defend the statements.

16  Q.   Did Xcentric Ventures know that certain of the content

17  posted by Darren Meade was false surrounding these witnesses?

18  A.   No.

19  Q.   You never knew that.

20  A.   I know now.  I've led the investigation that caused some

21  things to be redacted because I -- I mean, it wasn't me alone,

22  but the decision was made, the understanding was reached that

23  it's false.  So, for example, we understand that it's false that

24  John -- that Dr. John Pitman who was a witness at the murder

25  trial of Tracey Richter was arrested for soliciting prostitutes

1    in Florida.  That's not true.  And so we redacted -- we redacted

2    statements that implied that because it wasn't supported and

3    it's understood to be false.

4           But I think your question was when we made the offer

5    for the arbitration program, didn't we know that some statements

6    were false?  No, Xcentric Ventures doesn't have firsthand

7    knowledge about the things that were posted about the Richter

8    trial.

9    Q.   To your knowledge, did the efforts to free Tracey Richter

10   center around just the belief from Ed that she was innocent, or

11   was there a motive also to try and point at Michael Roberts as

12   committing this murder?

13   A.   To my knowledge the motivation there was to point out so

14   many problems, so many indications, direct and circumstantial,

15   about injustice that public attention would be drawn and

16   somebody who could get in and fix it would come and fix it.  And

17   I'm being imprecise about that on purpose.  As an attorney, I

18   know that's kind of a long shot.  But that was the motivation.

19          Now, if you're asking me whether the fact that Michael

20   Roberts failed the lie detector test when he was asked whether

21   he arranged Dustin Wehde to be in his home the night Dustin

22   Wehde was shot dead, that definitely makes Ed Magedson and me

23   and I think any reasonable person suspicious about Michael

24   Roberts' role in Dustin Wehde's death.

25   Q.   Have you read the transcript of that trial?

1    A.    No.

2    Q.    Do you know what witnesses testified on behalf of the state

3    against Tracey Richter?

4    A.    I certainly do not know the complete list.  I believe

5    that -- I know some of the witnesses that testified in the sense

6    that they've been discussed and it's not in dispute.

7    Q.    Okay.  You understand that a jury convicted her of the

8    crime and that two different appellate courts have sustained

9    that conviction.

10   A.    Yes.

11   Q.    Is Darren Meade still working for Xcentric Ventures in an

12   effort to free Tracey Richter?

13   A.    Darren Reade -- Darren Meade was never working for Xcentric

14   Ventures in an effort to free Tracey Richter.  Darren Meade was

15   working with Xcentric Ventures in an effort but not for.  And

16   Darren Meade is not now working for Xcentric Ventures in any

17   way.

18   Q.    Let me ask it this way then.  Is Xcentric Ventures still

19   paying Darren Meade in an effort to -- or to use your ways, in

20   the way of helping Tracey's cause?

21   A.    No, not to my -- not to my knowledge.  Now, I should say --

22           MR. MADSEN:  Thank you.  I don't have any further

23   questions.

24           MS. SPETH:  I have no redirect, Your Honor.

25           THE COURT:  All right.  Sir, you may step down.

1   You're excused.

2          MS. SPETH:  Your Honor, our next witness is our one

3   telephonic witness.

4          THE COURT:  Okay.  Do you have a number available?

5          MS. SPETH:  I do.  Your Honor, he's at my office, so

6   it's calling my office.

7          THE COURT:  Okay.

8          MS. SPETH:  And I have one of my associates there with

9   him only just, you know, in -- I'm a little worried about the

10  speakerphone, and so if there's an objection, if he can't hear

11  us or anything, do you want me to do anything like alert my

12  associate that there's an objection because sometimes with a

13  speakerphone they can't hear us?  I guess I'll wait and see --

14  we'll see what happens.

15         THE COURT:  Till I know how it's going to work.

16         (Dialing of telephone.)

17         MS. SPETH:  I apologize for the horrible hold music.

18  I know it's terrible.

19         (A discussion was held off the record.)

20         MR. MAGEDSON:  Hello.

21         MS. SPETH:  Okay.  Do you want to swear the witness?

22         THE COURT:  Yes.  All right.  Is this Mr. Magedson?

23         MR. MAGEDSON:  Yes, this is.

24         THE COURT:  Okay.  My name's Leonard Strand.  I'm a

25  judge here in Iowa.  We are ready for your testimony.  Are you

1  ready, sir?

2          MR. MAGEDSON:  Yes.

3          THE COURT:  Okay.  I'm going to go ahead and put you

4  under oath.  Would you please raise your right hand.

5          EDWARD MAGEDSON, PLAINTIFFS' WITNESS, SWORN

6          THE COURT:  Okay.  Thank you, sir.  You are under oath

7  now for the rest of our proceeding today.  For the record, would

8  you tell us your full name and spell your last name.

9          THE WITNESS:  Sure.  It's Edward Magedson,

10  M-a-g-e-d-s-o-n.  There's no middle name.

11          THE COURT:  Okay.  And thank you.  With that I'm going

12  to turn it over to Miss Speth to have some questions.  So please

13  go ahead.

14                    DIRECT EXAMINATION

15  BY MS. SPETH:

16  Q.   What is your position with Xcentric Ventures?

17  A.   Manager.

18  Q.   Did you create the Ripoff Report website?

19  A.   Yes, I did.

20  Q.   Why did you create that website?

21  A.   Public awareness.  The Internet came about, and I realized

22  that help -- my experience over the years in businesses I've

23  been in I -- I was always helpful with consumers in general.

24  And I realized that there was a way to let consumers take action

25  for themselves to avoid, you know, cost and attorney fees and be

1    able to take action for themselves.  I realize because of the

2    Internet it's no longer buyer beware.  It's more so today seller

3    beware.  Consumers haven't had a way for centuries to take

4    action for themselves.  And the Internet has changed everything

5    in our lives from selling insurance, law, and making a complaint

6    which people do all over the place.  They make complaints not

7    only on Ripoff Report.

8    Q.   Mr. Magedson, do you believe that posting something on

9    Ripoff Report can change circumstances or turn things that are

10   wrong into something that's right?

11   A.   Well, just like our evening news or the newspaper, not

12   everyone can get featured on the evening news or in newspaper,

13   and so public awareness happens, and, you know, it's like when

14   that story hits the news, somebody sees it, somebody who's in

15   power or a public official sees it, and they try to make a right

16   wro -- you know, a wrong and make it right and fix the problem.

17   So not everyone has that 15 minutes of fame what they call to

18   get on TV or written up in the newspaper.

19         So with the Internet, like I said, everything has

20   changed, and I'm in a -- I think in my opinion that's one of the

21   best things that have happened to consumers around the world

22   from stopping to get ripped off.

23   Q.   When did you start the website?

24   A.   Started in actually 1997.

25   Q.   Did you ever author anything on the Ripoff Report about

1  anyone who testified in the Tracey Richter trial?

2  A.    Never.

3  Q.    Did you ever author anything posted on Ripoff Report about

4  Dr. John Pitman?

5  A.    Absolutely not.  I didn't even know who he was.

6  Q.    Now, Mr. Smith testified earlier -- and I know you weren't

7  here, but he testified that one of your employees or somebody

8  who was working for you contacted Dr. Pitman.  Did you tell them

9  to do that?

10  A.    No.  Dr. Pitman's office, in fact -- which I didn't even

11  know who he was.  It didn't -- because I didn't know even at

12  that late date who Dr. Pitman was.  So the Dr. Pitman's office

13  called my office, not only left a message, but then they even

14  spoke with me on the phone.  I never called them.  They called

15  me.

16          And then at that time there was some guy who was

17  attempting and had done some sales on and off.  He's a student

18  in California.  He had dealt with doctors.  That was

19  basically -- he was seeing doctors in California because there

20  were other doctors that were already on my program.  He was

21  going to try and help doctors to help turn around their

22  reputation by using our service.  So I told him about this phone

23  call.  I think I even forwarded him the message, but I can't

24  remember exactly.  I'm not sure, but I remember telling him

25  about the phone call, sending him the information so he could

1   call Dr. Pitman, or it really was his secretary.  I believe it

2   was never Dr. Pitman.  I don't think I ever even spoke with

3   Dr. Pitman.  It was just a secretary.

4   Q.   Did you ever author anything on the Ripoff Report about

5   Marie Friedman?

6   A.   I don't even know who Marie Friedman is.

7   Q.   Did you ever author anything on the Ripoff Report about Ray

8   Friedman -- Friedman?

9   A.   No.  Well, I'd heard of them in recent and probably heard

10  of them through Darren Meade in conversation somewhere.  I never

11  knew anything about them.  I could not write anything about

12  them.  I never knew who these people were.

13  Q.   Did you ever ask Darren Meade to author something on Ripoff

14  Report about any of the people who testified in the Tracey

15  Richter trial?

16  A.   There was never any conversation about anyone that

17  testified where I would be able to speak because I didn't know

18  who these people are.

19  Q.   Now, Xcentric Ventures paid money to Darren Meade or on

20  Darren Meade's behalf from December of 2011 through mid 2014; is

21  that correct?

22  A.   Yes, I did.

23  Q.   When you say yes, you did, did you or did Xcentric

24  Ventures?

25  A.   Well, Xcentric Ventures did.

Q.   Explain to the Court, Mr. Magedson, why Xcentric Ventures
made these payments.
A.   Unfortunately it's not just a simple answer, but I'll be as
brief as I can because it changed over time.  There was many
different reasons.  The bottom reason was because I just wanted
to help him.  But let me explain.

Darren Meade contacted me the first time.  I actually
probably hung the phone up on him he said and never responded to
his e-mail because I thought he was a kook.  He later then got
me at a different moment, and I listened to him, and he told me
about a hack that was taking down Ripoff Reports.  I found
reports that he told me about, and he explained what the hack
was, what the code was.  And I was -- so he gave -- he had given
me the code.

But what happened just prior to that or during that
same time, Michael Roberts had sent my attorneys -- first tried
through other attorneys trying to extort 160,000 U.S. dollars, a
hundred and -- I forget what it was -- five thousand euros.  He
wanted money wired to his bank account, and he was going to
provide the hacking information to Ripoff Report, you know,
to -- to my attorneys, and he wanted immunity for himself and
the hacker --
Q.   Mr. Magedson, I'm going to stop you only because we have
all that evidence in already, and I just --
A.   Oh, okay.  I'm sorry.

1    Q.    And it's late.

2    A.    Okay.  So I -- because of that he came -- and he did that

3    for me.  He testified that they also -- during that time he came

4    to Arizona on his own will.

5    Q.    Is this Mr. Meade you're talking about now?

6    A.    Yeah, Mr. Meade came to Arizona, talked with the FBI for a

7    day.  I'm not sure how many days.  At least one day he did.  I

8    know he talked with my attorneys giving information on the

9    damage and things that Roberts -- Michael Roberts was doing over

10   the years, and I never knew Michael Roberts other than something

11   that he had helped my attorneys with allegedly to -- with some

12   information that was beneficial to him and we paid him money

13   for.

14           But anyway, getting back to Darren Meade, he -- when

15   he came here, I was appreciative.  He didn't ask me for any

16   money.  But when he went home, he faced eviction.  And I knew

17   from when he was here that he wasn't well and he had a foot --

18   his right foot, because he was in a bad accident, protruded out

19   to the right.  All right.  I won't elaborate on that.  That will

20   come up in a second.

21           So he had contacted me, and I knew about that, so I

22   offered -- he didn't ask.  I offered let me go ahead and stop

23   you from getting evicted.  I'll go ahead and send directly to

24   your landlord the m -- you know, the money for your rent.  So

25   that's where it started out.

1          Then Darren and I were talking more, and I cannot

2    remember the exact order, but then it was like -- of things, but

3    I paid him to help put back up my putt-putt video.  John

4    Brewington, a PI investigator, went to a -- to some car company

5    and got -- put them on video saying that I took d -- I offered

6    to take -- if they gave me $500, I would let them -- I would

7    remove the reports about them.  And that's when I -- after I pay

8    over $100,000 just not to remove one I'm going to offer for

9    $500.

10          But anyway, I made a video.  That video, John

11    Brewington giving wrong information to YouTube got it taken

12    down.  Darren Meade got it taken -- put back up.  Darren Meade

13    made it -- recopied it and fixed it so it could come back up

14    again and sent it out, so I paid him for PR work.

15          At this point -- now when I was talking to him, I was

16    hearing about him dying and all this other stuff.  I helped him

17    with money so actually he could get his foot straightened out.

18    He ended up going to the hospital because I helped him get --

19    paid his rent.  I didn't mind doing it.  I had the money.  I

20    didn't care because I help all kinds of people out all the time

21    with different situations.  I don't have children.  I don't

22    really have a family.  So I do those kind of things.

23    Q.    Let me stop you for a minute because you said he said

24    something about him dying.  Did Darren Meade tell you that he

25    was terminally ill and that he was dying?

1  A.  Well, he st -- he was -- had -- he said he was going for

2  dialysis and he wasn't well and he could die at any time.  There

3  was no specific time, not until later, until a year later or so

4  he was -- he had three months or two months to live they gave

5  him, but that's almost nine months ago already.

6  Q.  Okay.

7  A.  But I believe he's still alive at this point.  But anyway,

8  so I was trying to think of something I could give him to do.

9  So I gave him -- I said what about selling our corporate

10  advocacy business remediation and customer satisfaction program

11  which is our CAP program, C-A-P, corporate advocacy program,

12  where it helps businesses, you know, the business has to -- I

13  won't explain that, what the business does.  You don't need

14  to -- you don't want to know that now.

15  Q.  No, we don't need to know that.

16  A.  Okay.

17  Q.  But you pa -- did you give him some advances towards the

18  sales on that?

19  A.  I gave him probably -- I don't know -- two, three, maybe

20  four months in advances.  I tried -- but this was paying his

21  rent I knew, and I was trying to get him.  We worked on the

22  phones together, and I'm sure the other side has those e-mail

23  strings.  They could see that they get the list of customers

24  that he had called and really what -- you know, what he's

25  supposed to say, you know, what he's not supposed to say

1   basically.

2          And then after he couldn't sell CAP, the CAP program,

3   we basically developed a common cause.  After him convincing me

4   from a phenomenal video that he made -- and I didn't ask him to

5   make this first video -- he made a video that totally convinced

6   me where I saw the evidence Michael Roberts removing assets,

7   writing checks right before Tracey got arrested.  He was

8   removing assets.  This goes to the cause of why I was continuing

9   to pay him.

10          Please let me just explain just a tiny bit.  I saw all

11  this different evidence of the checks being written where

12  Roberts was removing money out of the account, the checks that

13  Michael Roberts wrote for life insurance policies when he said

14  in the media Tracey took out those policies, he never knew about

15  them, so that was a lie.

16          The biggest thing to me that I understood and felt

17  about Ben Smith along with other things, the main thing was Ben

18  Smith at the trial never told the jury about the polygraph.  The

19  only police polygraph that Michael Roberts took showed 99

20  percent deceptive, and how it didn't go further I don't even

21  know.  But my -- Ben Smith used at the trial which goes to

22  why -- in a second here he showed at trial the paid-for

23  polygraphs.

24  Q.   Mr. Magedson, I'm going to stop you only because we are

25  very pressed for time.

1   A.   All right.   Okay.   So anyway, we came a common cause.  I

2   felt and understood from my own experiences through other

3   people, not me, but through other people where there was

4   prosecutorial misconduct, you know, prosecutors getting away

5   with murder, they never get sanctioned, they don't get this or

6   that, and they just keep on going because they think they know

7   they can get away with it like some of the horrendous things he

8   did to me.

9           So I decided I wanted to start -- and I'm sure they

10   have those in their e-mails that they see those e-mails where I

11   was going to start a project like the Innocence Project but help

12   with people and raise money for people who were sitting on death

13   row.

14   Q.   So is it --

15   A.   Not death row but, excuse me, they have like long-term

16   prison sentences.

17   Q.   So is it fair to say that one of the reasons you continued

18   to support Darren Meade and pay his rent was because you had

19   this common cause of --

20   A.   I found myself sorry for him, so I tried to send him things

21   to do.  So one thing I'm also forgetting, like I would send him

22   sometimes -- I get Google alerts about websites attacking me

23   and/or my stuff being taken down or just -- or different

24   websites that are using my logos or -- and other trademark

25   stuff.  I send that information to Darren, and I say, Darren,

1   could you please find out the history, who owns this, where it's

2   being hosted, you know, yeah, this started out in Russia, this

3   and that and all these other things with these website scraping

4   and stealing my content. So I would try to give him things to

5   like investigate for me.

6   Q.   Were any of the payments that you ever made or that

7   Xcentric Ventures ever made to Darren Meade or on Darren Meade's

8   behalf for the purpose of writing reports to be posted on Ripoff

9   Report?

10  A.   Absolutely not. And, in fact, there are times when Darren

11  would warn me, say, hey, I just did something, I know you told

12  me, you know, to lay off Roberts and just concentrate on Tracey,

13  you know, finding evidence to exonerate Tracey because this has

14  always been my conversation with him and not to bother with

15  Roberts because he's just -- you're just giving him more

16  attention. I explained to him why just bother with him, just

17  leave him alone so --

18  Q.   Mr. Magedson --

19  A.   So the answer to your question is no.

20  Q.   -- did you ever intend to intimidate, annoy, or alarm any

21  of the people who testified in the Richter trial?

22  A.   I didn't know of them to even do such a thing. I didn't

23  know who they were.

24          MS. SPETH: I have no further questions, Your Honor.

25          THE COURT: All right. Cross-examination?

1    CROSS-EXAMINATION

2  BY MR. MADSEN:

3  Q.   Good afternoon, Mr. Magedson.  I'm Kris Madsen.  I'm one of

4  the lawyers representing Ben Smith.  I have a few questions for

5  you this afternoon.

6  A.   Sure.

7  Q.   I guess my first question, can you tell me why you weren't

8  able to join us here today?

9  A.   I haven't flown since 1999.  I have high blood pressure.  I

10  can't take blood pressure medicine.  I -- I go up in a plane, I

11  don't know if I would -- they would have to have paddles, and

12  I'd have to probably tr -- I'd want to travel with a doctor.  I

13  don't like flying.  Since 1999 I haven't flown on a plane.  I've

14  had too many bad experiences.

15  Q.   Okay.  Thank you.  You've characterized your relationship

16  with Darren Meade to a certain degree.  The testimony that's

17  come in is I think that you began paying him in approximately

18  December of 2011.  Does that sound correct?

19  A.   Yes, it does.

20  Q.   Did you know him before you started paying him?

21  A.   Well, just that three or four weeks because he came to

22  Arizona to notify us about the hack that Michael Roberts was

23  injecting into our reports.

24  Q.   Was he ever employed by Xcentric Ventures?

25  A.   No, he was never employed by Xcentric Ventures.

1  Q.   So you paid him more as a consultant, independent

2  contractor?  Would that be a fair characterization?

3  A.   Yes, it would.

4  Q.   And can you tell me how much money you paid him

5  approximately from December 2011 until you quit paying him in

6  mid 2014?

7  A.   I can only go by what I heard through what your side is

8  claiming, and I was told it's over a hundred thousand dollars.

9  So I know it is over a hundred thousand dollars.  But I don't

10 know how much.  And that's over three years I guess.

11 Q.   And you agree, don't you, sir, that part of at least the

12 purpose in paying him was to assist in freeing Tracey Richter?

13 A.   That would be correct.

14 Q.   And have you ever met Miss Richter?

15 A.   No, I have not.

16 Q.   Have you ever met any of her family members?

17 A.   No.  By phone Tracey's mother.

18 Q.   Okay.  And have you come to a conclusion yourself as to

19 whether she committed this crime or not?

20 A.   Well, I'm no -- I'm not a lawyer, and I'm not an expert,

21 but I watch enough TV shows.  No, I -- that was a joke.  Sorry.

22      I -- the evidence that I see, you know, I've been

23 around the block a number of times, and I just can't understand

24 if all the evidence was really looked at like they looked at ten

25 years prior which is the reason why they didn't want to

1  prosecute Tracey, this was a -- you know, in my opinion which

2  I'm entitled to, I don't think that Tracey -- I bet my website

3  on it that Tracey Richter is not guilty.

4  Q.   Okay.  And many things have been posted on your website to

5  that effect, have there not?

6  A.   I'm not sure.  Be specific.  I'm not sure what you mean.

7  Q.   Well, have there been postings on your website about Tracey

8  Richter's innocence?

9  A.   Oh.  Absolutely, yes, of course.

10 Q.   And you had -- there have been postings on your website as

11 well about Michael Roberts, have there not?

12 A.   Yes, I am aware of that.

13 Q.   You had said earlier I believe that you were upset with

14 Prosecutor Smith for never talking about the polygraph test that

15 Michael Roberts apparently failed.  Do you recall saying that?

16 A.   Yes, I do.  That's the failed polygraph at the trial.

17 Q.   Okay.  You believe that the jury somehow should have had

18 that evidence in front of them.

19 A.   Yes.

20 Q.   And you paid Darren Meade to in effect do everything he

21 could to free Tracey Richter, did you not?

22 A.   To take the evidence that Tracey Richter's mother was

23 sending him.  She was sending him packages weekly of documents

24 and to take those documents that he finds that either weren't

25 used or should have been used and stuff that Ben Smith might

1   have had that he didn't show that would be fair to exonerate

2   Tracey Richter.

3   Q.   Earlier Mr. Kunz testified that he was aware that Darren

4   Meade was making postings on Ripoff Report surrounding witnesses

5   from the Tracey Richter trial.  Were you aware of that as well?

6   A.   No, I -- not specifically.  I didn't pay attention to it.

7   Q.   Let me make sure I understand what you're telling me,

8   Mr. Magedson.  Are you telling me that at no point you were ever

9   aware that Darren Meade had made postings on Ripoff Report

10  surrounding the state's witnesses?

11  A.   Not until -- not till I'm going to say more recently, not

12  the first year or the second year.

13  Q.   Well, you know he -- when did you learn that he made

14  postings surrounding Michael Roberts?

15  A.   Well, I knew when that was happening but --

16  Q.   Okay.  How about the Friedmans?  When did you know about

17  the posting surrounding those?  Did you know about those when

18  they were happening as well?

19  A.   I don't re -- you know, I don't remember seeing anything

20  about Friedmans until re -- until in recent months.  And I'm

21  going to say maybe six or eight months already now.  None of

22  that came to light to me to know or to even think about it until

23  all this started to happen when we realized that there was a

24  warrant for Tracey's mother and that warrant was used to get

25  my -- all my phone records and bank records.

1  Q.   Are you telling the judge that you and Darren Meade didn't

2  ever discuss the postings that he was making on Ripoff Report

3  surrounding the state's witnesses?

4  A.   I -- there's no way I could remember specifically what

5  Darren and I -- we had, you know, I mean, hundreds of phone

6  calls.  We were like personally just friends.  And we just --

7  you know, I work 17, 20 hours a day if not more.  I deal with

8  thousands of e-mails a week.  And, you know, I really don't have

9  much time for too many people.  But Darren was somebody that

10 would call me or I would call him back most of the time.

11 Q.   And it sounds like you're a busy man, sir, and you've

12 testified that you had hundreds of phone conversations with

13 Darren, and I just want to make sure I understand your

14 testimony.  You're not telling the Court, are you, that in those

15 conversations you never discussed the state's witnesses and what

16 Darren Meade was posting on Ripoff Report?

17 A.   Well, if it was discussed, it was a one-way conversation.

18 I don't know who they are.  There would be no way for me to know

19 who they are.

20 Q.   Well, you know who Michael Roberts is, don't you?

21 A.   Right.

22 Q.   And you've had a dispute with him for a number of years,

23 haven't you?

24 A.   Okay.

25 Q.   And you do know that Michael Roberts is the ex-husband of

1  Tracey Richter.

2  A.   Right.

3  Q.   And even prior to this, you had -- even prior to this crime

4  occurring, you and Michael Roberts had a relationship, did you

5  not?

6  A.   I don't know what -- what crime are you talking about?

7  Q.   Well, the crime that Tracey Richter committed.

8  A.   Okay.  All right.  Okay.  Uh-huh.  So I don't see what

9  Michael Roberts has to do with the witness thing.

10  Q.   Well, I guess my question is you're not telling us, are

11  you, that you did not know that postings had been made by Darren

12  Meade surrounding Michael Roberts?

13  A.   Well, Michael Roberts was at the center of it all.  Of

14  course, I knew Michael -- Michael Roberts was being written

15  about.

16  Q.   Okay.  How about Dr. John Pitman?  Did you that he --

17  A.   I didn't know who Dr. John Pitman was.

18  Q.   Sir, if I could finish my question, and I know it's

19  difficult.

20  A.   Sorry about that.

21  Q.   And I understand you might not have known Dr. John Pitman,

22  but did you know Darren Meade -- had Darren Meade ever told you

23  that he made postings about Dr. John Pitman?

24  A.   I'm sure in his conversations with me.

25  Q.   Okay.

1  A.   He could have mentioned that, but I could never remember

2  anything what it was.  Again, it would be a one-way

3  conversation.  I have no information to offer about any of these

4  people.  I don't know who they are.

5  Q.   You understand, do you not, sir, that Mr. Meade has made

6  postings on your company's website, Ripoff Report, that are not

7  just critical of state's witnesses but accuse state's witnesses

8  of other illegal activities?

9  A.   I have -- I'm aware of it now but -- just up until recently

10  but was totally unaware of it.

11  Q.   So you're telling us that during the time that you were

12  paying Darren Meade to make efforts to free Tracey Richter you

13  never knew he was making any of these postings.

14  A.   I knew he was making postings.  In fact, I had told Darren

15  numerous times when -- after he would tell me he did this or he

16  did that, and I did not go and read the postings.  I don't have

17  time to read postings.

18  Q.   Okay.  And while you may not have read them, you at least

19  discussed with him what was going to be posted.

20  A.   He -- we discussed everything from life in general,

21  politics to you name it.

22  Q.   Did you ever tell him, Darren, don't post that?

23  A.   I probably did if he was -- I don't know what I could have

24  said, you know, because we talk most of the time after 10, 11,

25  12:00 at night, and so he actually heard me snoring on the

1  phone.

2  Q.   Okay.  So at times you're saying after working 20 hours and

3  talking to him at midnight you might not recall exactly what was

4  said; is that what you're telling us, sir?

5  A.   Yeah, but what is this -- just happened?  I'm not sure.

6  What is the question?  I want to make sure I know what I'm . . .

7  Q.   Well, I'm just -- you've testified that you and Mr. Meade

8  had a number of conversations.  I think you described them as

9  hundreds.  And I think you've also conceded that you talked

10  about Tracey Richter and the state's witnesses.

11  A.   No, no, I don't know that I talked -- no, you're putting

12  words in my mouth I think.  I didn't -- I didn't say that we

13  discussed state witnesses.  I don't know -- I'm sure he must

14  have told me things that he found out.  Tracey Richter's mother

15  sent him this or that.  He found something else where Michael

16  Roberts had it taken down off Scribe because that's what they

17  did every place.  They had stuff taken down.  Darren would tell

18  me about things that were -- that he would find on Wayback

19  Machine that they didn't get taken down, you know, evidence that

20  they didn't want to be seen that would help Tracey be free kind

21  of stuff.  So he told me all different kinds of things.  It

22  really was a one-way conversation.  You know, I didn't sit there

23  and instigate -- instigate him.  Darren didn't need any

24  instigating.  Darren -- Darren was doing this with them before

25  Darren knew me.  Darren and Michael Roberts were going at it on

1    Ripoff Report before they knew me.

2    Q.    So just so I'm clear, it's your testimony, sir, that you

3    paid Darren Meade; correct?

4    A.    Yes.

5    Q.    You paid Darren Meade to try to develop evidence to free

6    Tracey Richter.

7    A.    Develop evidence?  I don't know if I like that word.

8    Q.    Okay.  Well, tell me what you did to try and free Tracey

9    Richter.

10   A.    I'm not a lawyer.  I'm not sure the way you're saying this.

11   But yeah, we had a common cause.  Go ahead -- I mean, he wasn't

12   only posting on Ripoff Report.  He posted on thousands of other

13   websites literally.  He was posting -- he would send something

14   out on a thing called PRWeb and all these different competitors

15   to PRWeb.  He would get stuff put out, and he'd just put it all

16   over the place, and he'd put the same thing on Ripoff Report.

17   Q.    Sir, did you ever trade e-mails with Darren Meade in which

18   you discussed posting materials about state's witnesses in the

19   Tracey Richter case?

20   A.    I'm sure there are thousands of e-mails and somewhere he

21   could have told me about something, but anyone who knows who

22   e-mails with me if there's more than the first two sentences in

23   an e-mail, I don't know if I'm reading that much further and I

24   move on.

25          So there are things he could have said.  There could

1  have been an e-mail where he said it.  I can't remember e-mails

2  from last week let alone over the last three or four years now.

3  I'm not sure it's four years already but somewhere thereabouts.

4        MR. MADSEN:  Fair enough.  Thank you, sir, for your

5  time this afternoon.  I don't have any more questions.

6        THE COURT:  All right.  Any redirect?

7        MS. SPETH:  Just hopefully two.

8                  REDIRECT EXAMINATION

9  BY MS. SPETH:

10 Q.   Mr. Magedson, are you afraid to come to Iowa?

11 A.   Oh, if I came to Iowa, I don't -- there's no way I would

12 leave alive.  The things that have been told, the lies that have

13 been told by Mr. -- by Mr. Smith not only to my attorneys, to --

14 other things that he has done, and there's no way I know that I

15 would never leave alive from there.  He would get me in a jail,

16 and there is just no way I would leave alive.  I just -- no way.

17 Q.   Now, Mr. Magedson, Mr. Madsen asked you some questions

18 about the state's witnesses.  Do you -- in your definition of

19 the state's witnesses, do you include Michael Roberts in that?

20 A.   Michael Roberts never testified.  In fact, from what I

21 understand -- I don't know if it's true or not -- Ben Smith had

22 Michael Roberts in protective custody being p -- I don't know if

23 this is true because this would be hearsay but -- and Michael

24 Roberts was paid through some fund through the county, through

25 Sac County, was paid to stay somewhere.  He was paid money to

1   stay somewhere but didn't have him there because Michael Roberts
2   was afraid of the 70-year-old grandmother.
3   Q.  Let me stop you.  Let me stop you.  My only question is if
4   Darren Meade was talking to you about posting about Michael
5   Roberts, did you think he was talking to you about posting about
6   a witness in the trial, or did you understand that Michael was
7   never a witness in the trial?
8   A.  I never understood that Michael was a witness at the trial
9   because I knew Michael never testified at the trial.
10          MS. SPETH:  I have no further questions.
11          THE COURT:  Anything further?
12          MR. MADSEN:  Just quickly.
13                     RECROSS-EXAMINATION
14  BY MR. MADSEN:
15  Q.  Are you telling the Court that you didn't come to Iowa
16  because you think Ben Smith would kill you?
17  A.  Listen, Ben S -- I've known prosecutors around the country
18  to do that and/or worse.  And Ben Smith is a liar, and I know
19  he's a liar because he lied to my first attorney in Iowa about a
20  number of things, and he's lied about other things.  He's just
21  not a truthful -- what he did -- look what he did to me.  I
22  should trust this man?  He knew very well what he was doing.
23  I'm destroyed.  I don't know when any of those checks and people
24  who are going to be harassed or have already been harassed that
25  Mr. Smith knowingly gave to.  But Mr. Smith knew to redact your

```
 1   name on a recent paperwork.  You're aware of that when that was
 2   done.  He knew how to redact your name.  That was okay.  He knew
 3   that.  But he didn't know to do that.  My signature is
 4   everywhere on checks out on the Internet.  My account numbers
 5   are there, the same account numbers I've had for years.  I have
 6   to change everything.  I have no idea.  They totally screwed me
 7   up.
 8           THE COURT:  Mr. Magedson, I'm going to cut you off.
 9   This is the judge.  You've answered the question.
10           Any further questions?
11           THE WITNESS:  Yes.  Sorry for getting excited.
12           MR. MADSEN:  There are not.  Thank you, Judge.
13           THE COURT:  Anything else from the plaintiff?
14           MS. SPETH:  No, Your Honor.
15           THE COURT:  All right.  Mr. Magedson, you are excused,
16   and you can disconnect at this time, and we're going to hang up.
17   Thank you, sir.
18           THE WITNESS:  Thank you.
19           THE COURT:  All right.  Any further evidence from the
20   plaintiff?
21           MS. SPETH:  No, Your Honor.  We do have a housekeeping
22   issue about Exhibit 40, but maybe this is not the time for that.
23           THE COURT:  Let's save that till the end.
24           MS. SPETH:  Okay.
25           THE COURT:  Any other evidence at this point?
```

1          MS. SPETH:  No, Your Honor.

2          THE COURT:  Any evidence from the defense?

3          MR. MADSEN:  No, Your Honor.

4          THE COURT:  Okay.  All of the evidence has been

5   submitted, and I do want -- there are a few of those issues that

6   I want to talk about.  Go ahead, and what do you want to tell me

7   about Exhibit 40?

8          MS. SPETH:  Yeah.  I know earlier, Your Honor, we said

9   it would be okay to substitute one for the other.  But we also

10  realize that we've never seen or heard what that is.

11         THE COURT:  Sure.

12         MS. SPETH:  And Mr. Smith said he got it from

13  Mr. Roberts.

14         THE COURT:  Sure.

15         MS. SPETH:  So to be honest, we would like to listen

16  to it before we say we agree.  If it is what it was purported to

17  be, we will be fine with it, but we would like to hear it first.

18         THE COURT:  Sure.  That seems reasonable.  Let's just

19  do this.  Since we're not officially finishing today anyway,

20  have you received a copy now of the disc that's been burned, or

21  is that going to happen?

22         MS. SPETH:  We have not.

23         MR. MADSEN:  That has not, but we can do it and get it

24  to them if not today, depending on what your flight schedule is,

25  we can get it to you Monday.

1          MS. SPETH:  Yeah.  We fly out, but that will be fine.

2          MR. MADSEN:  Yeah, yeah.

3          THE COURT:  Let's do that.  Let's get -- as soon as

4    you can, get plaintiffs' counsel a copy of what you're proposing

5    to be substituted Exhibit 40.  You guys take a look at it.  Once

6    there's an agreement, just send a copy to me.  If there's not an

7    agreement, you know, we can get together by phone and figure out

8    what we're going to do next.  Let's do that for Exhibit 40.

9          Exhibit 41 is the new one we marked, and I think when

10   Mr. Smith left the witness chair he might have taken it, or I

11   just want to know where that is now.  It was -- we marked -- it

12   was a document we took out of his bag.

13         MR. MADSEN:  Oh.

14         THE COURT:  And I want to make sure it gets made part

15   of the record.  And I think what we would do is we would just

16   electronically file it, and that way everybody can get copies,

17   and we can get the original back if we need to.  I just want to

18   make sure before we all leave today that that doesn't end up

19   somewhere.

20         MR. MADSEN:  You sure you don't have it, Joel?

21         MR. ROBBINS:  I usually end up with everything.

22         THE COURT:  Yeah, go ahead and give that to Sabrina.

23   We will electronically file it, so that way it will be on the

24   docket, and it will be a part of the record.  We can get it back

25   to counsel at some point then, the original.

1          Let's see.  Let's talk about argument.  Does anybody

2   want to do written arguments at this point?  Plaintiffs?

3          MS. SPETH:  I'm undecided to be honest, Your Honor --

4          THE COURT:  Sure.

5          MS. SPETH:  -- about how we should do this.

6          THE COURT:  Okay.

7          MS. SPETH:  My concern more than anything else is

8   timing.

9          THE COURT:  Yeah.

10         MS. SPETH:  Because we do think this is an urgent

11  situation.

12         THE COURT:  Right.

13         MS. SPETH:  If the defendants would agree to a status

14  quo until we can get a decision, then that timing pressure would

15  be off.  If they won't, then I'm going to ask for a very

16  expedited -- I mean, I'm willing to get closings to you as fast

17  as you need them.

18         THE COURT:  Sure.  Well, let's talk about it because I

19  saw a reference somewhere to the fact that there'd been some

20  sort of informal agreement prior to the hearing today.

21         MS. SPETH:  Yes.

22         THE COURT:  I don't even know if I need to know what

23  that is, but is that something the defense is willing --

24         MR. MADSEN:  We're willing to extend that and keep it

25  status quo.  I guess I'll defer to what you want obviously, Your

1 Honor.

2 THE COURT: Sure.

3 MR. MADSEN: We're fine with just submitting written

4 briefs and arguments.

5 THE COURT: Okay.

6 MR. MADSEN: And if you believe that you have

7 questions or there's things that you need and want to set down a

8 hearing, that is fine.

9 THE COURT: Sure.

10 MR. MADSEN: But we're completely comfortable just

11 submitting, you know, with written arguments.

12 MS. SPETH: I feel the same way, Your Honor.

13 Whatever's better for you.

14 THE COURT: Do you want to do written arguments, or

15 would you rather just skip -- I don't want to make everybody

16 write new briefs if you don't want to. I think they'd be

17 helpful, frankly, but at the same time, you've all put a lot of

18 time and money into this already. Now that we've heard all the

19 evidence, I think briefing's a good idea but if you --

20 MR. MADSEN: I do too.

21 MS. SPETH: I do think it's a good idea, Your Honor,

22 because we can tie it all together -- help you, you know, by

23 tying it all together.

24 THE COURT: Sure. I think that would help because

25 obviously I know a lot more now than I did -- even though I've

1  read everything, some of it didn't make a lot of sense until

2  I've heard the evidence today.

3          What kind of timing do you think?  We'd probably

4  stagger it, have plaintiffs go first since it's your motion.

5  How long do you think you need?  As long as there's a status quo

6  in place, I don't want to rush you and say Monday morning or

7  something, so, you know, even Tuesday would be -- I'm just

8  kidding.

9          MS. SPETH:  I would -- you know, I would love 14 days.

10          THE COURT:  Sure.

11          MS. SPETH:  If that's okay with the other side and

12  with the Court.

13          THE COURT:  Yeah.  Shall we do 14 and 14 and then if

14  you want to do a reply a week?  And that way we get it in in

15  just roughly a month.  And once I start reading the briefs, I'll

16  decide -- if I had to tell you today, I think I would like to

17  hear arguments at least by telephone because I think I'm going

18  to have some questions.  But as I start reading the briefs, that

19  could change.  You might answer all my questions.

20          So for now we'll just set a briefing schedule two

21  weeks from today for plaintiffs' brief, two weeks after that for

22  the defense brief, and then a week later for any reply brief.

23  And then it will be fully submitted on the papers anyway.  And

24  then if in the meantime I decide I want to hear argument, we'll

25  do that.  We'll wait to hear from you about Exhibit 40.  That

1  takes some of the time pressure off on Exhibit 40.

2        So just get back to me even by e-mail.  And if there's

3  a dispute of what we're going to do about Exhibit 40, just let

4  me know, and we can get a status conference on that and sort

5  that out.

6        And then, of course -- I probably should have

7  mentioned this.  Everybody knows I'm doing this on a report and

8  recommendation basis which is probably another reason why it's a

9  good idea that we're doing the status quo agreement because no

10  matter what I decide to do, it's Judge O'Brien's case.  He has

11  the ultimate say.  One side or both can file objections to

12  whatever I come up with, and then Judge O'Brien will decide what

13  to do next.

14        So bottom line is this, even as a preliminary

15  injunction issue, isn't going to be resolved immediately by any

16  means.  I'll do my R and R, and then everybody can go to Judge

17  O'Brien with it from there.  And then, of course, that doesn't

18  address the ultimate merits.  Obviously the case is relatively

19  new as a civil lawsuit, and we'll just have to go from there one

20  step at a time.

21        Anything else at this point from the plaintiffs?

22        MS. SPETH:  No, Your Honor.

23        THE COURT:  Okay.  From the defense?

24        MR. MADSEN:  Nothing, Your Honor.

25        THE COURT:  All right.  Well, thanks everybody.  This

```
1   I know is a long day, but I appreciate all the effort.

2            MR. MADSEN:  Thank you.

3            MS. SPETH:  Yes, thank you.

4            THE COURT:  And have a good weekend, and safe travels

5   back, and take care.  We'll be in recess.

6            (The foregoing hearing was

7            adjourned at 5:07 p.m.)
```

```
20                      CERTIFICATE

21        I certify that the foregoing is a correct transcript

22   from the record of proceedings in the above-entitled matter.
```

```
25    S/Shelly Semmler                    5-3-15
      Shelly Semmler, RMR, CRR             Date
```

**<u>INDEX</u>**

<u>**WITNESS:**</u>                                                                    <u>**PAGE:**</u>

  BENJAMIN SMITH
            MR. ROBBINS                                          6
            MR. MADSEN                                         113
            MR. ROBBINS                                        137

  ADAM KUNZ
            MS. SPETH                                          154
            MR. MADSEN                                         199

  EDWARD MAGEDSON
            MS. SPETH                                          222
            MR. MADSEN                                         233
            MS. SPETH                                          242
            MR. MADSEN                                         243

                          * * * * *

<u>**EXHIBITS:**</u>

  1                                                              12
  24                                                             25
  17                                                             31
  28                                                             42
  3                                                              51
  2                                                              68
  13                                                             69
  8                                                              80
  5                                                              82
  7                                                              86
  9                                                              86
  10                                                             88
  11                                                             88
  14                                                             91
  15                                                             92
  18                                                             94
  1 through 40                                                   98
  41                                                            146

                          * * * * *