# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

XCENTRIC VENTURES, L.L.C., an
Arizona limited liability company; and
ED MAGEDSON, an individual,

Plaintiffs,

vs.

BEN SMITH, in his individual capacity
as Sac County Attorney,

Defendant.

No. C15-4008-MWB

**REPORT AND
RECOMMENDATION ON
MOTION FOR PRELIMINARY
INJUNCTION**

---

## TABLE OF CONTENTS

I.   *INTRODUCTION* ................................................................ 2

II.   *PROCEDURAL HISTORY* ................................................ 3

III.   *STATE OF IOWA v. TRACEY RICHTER* ........................... 5

IV.   *FINDINGS OF FACT* ...................................................... 8

  A.  *The Ripoff Report* ..................................................... 8

  B.  *Events Pre-Dating the Wehde Shooting* .......................... 9

  C.  *The Shooting and its Aftermath* .................................... 9

  D.  *Smith Charges Richter* ............................................... 11

  E.  *Ripoff Report Postings* ............................................... 11

  F.  *Smith's Investigation* ................................................. 14

  G.  *Smith Charges Meade (and Later Un-Charges Him)* .......... 17

  H.  *The Connection Between Magedson and Meade* ............... 17

V.   *APPLICABLE LEGAL STANDARDS* ............................... 19

  A.  *Preliminary Injunctions* .............................................. 19

  B.  *The Communications Decency Act of 1996* ...................... 20

  C.  *Iowa Code Section 720.4* ............................................. 31

VI.   *ANALYSIS* ................................................................ 32

    A. *Likelihood of Success on the Merits* ..................................................... 33

      1. *First Amendment* ....................................................................... 33

        a. *CDA Immunity* ..................................................................... 33

        b. *Retaliatory Motive* .............................................................. 35

          ii. *Adverse Action* ................................................................ 37

          iii. *Motivation* ...................................................................... 38

      2. *Fourth Amendment* ..................................................................... 41

      3. *Sixth Amendment* ....................................................................... 42

    B. *The Other Dataphase Factors* ........................................................... 43

      1. *Irreparable Harm* ....................................................................... 43

      2. *Balance of Harms* ....................................................................... 44

      3. *The Public Interest* ..................................................................... 44

    C. *The Recommended Injunction* ......................................................... 47

    D. *Bond* ............................................................................................. 50

VII. *CONCLUSION* ............................................................................... 50

## I.    INTRODUCTION

This case is before me on plaintiffs' motion (Doc. No. 7) for preliminary injunction. The motion has been referred to me pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 72 for the issuance of a report and recommended disposition. *See* Doc. No. 8. I conducted an evidentiary hearing on May 1, 2015. Attorneys Joel Robbins, Maria Speth and Angela Campbell appeared for plaintiffs. Attorneys Kristopher Madsen and Robert Livingston appeared for defendant. Plaintiffs called three witnesses: Benjamin Smith, Adam Kunz and Edward Magedson. In addition, plaintiffs offered Exhibits 1 through 41,[1] all of which were ultimately received

---

[1] Exhibit 40 is a DVD containing a short clip of a television interview. During the hearing, defendant requested that the entire interview be received into evidence. Plaintiffs agreed and counsel for defendant indicated that a DVD marked as Exhibit 40A, which would contain the entire interview, would be submitted after the hearing. However, counsel later advised the court

without objection.[2]   Defendant called no additional witnesses and offered no exhibits. After the hearing, plaintiff submitted two additional exhibits – Exhibits 42 and 43. Defendant does not object to either exhibit.   As such, both are received into evidence for purposes of plaintiffs' motion.

The parties submitted pre-hearing briefs.   *See* Doc. Nos. 7-1, 16 and 20.   At the conclusion of the hearing, the parties agreed to present their closing arguments in writing. All of those arguments have now been filed.   *See* Doc. Nos. 44, 45 and 49.   The motion is now fully submitted and ready for decision.[3]

## II.   PROCEDURAL HISTORY

Plaintiffs Xcentric Ventures, LLC (Xcentric), and Ed Magedson (Magedson) commenced this action on January 30, 2015, by filing a complaint and jury demand (Doc. No. 2).   The only named defendant is Ben Smith (Smith), in his individual capacity as the County Attorney of Sac County, Iowa.   *Id.*   In general terms, the complaint alleges that Smith has violated plaintiffs' constitutional rights by misusing his powers as a prosecutor to punish them for speech that is critical of him.   More specifically, plaintiffs contend that Magedson is the managing member of Xcentric and that Xcentric owns and operates a website called the "Ripoff Report."   Doc. No. 2 at ¶¶ 14, 18.   They state that the Ripoff Report provides a forum on which individuals may post complaints about businesses and government officials.   *Id.* at ¶ 15.   They allege that various users of the

---

that defendant no longer sought to introduce the entire interview.   As such, the offer of Exhibit 40A has been withdrawn.

[2] Defendant initially asserted relevancy objections to certain exhibits, which I overruled.   Later in the hearing, defendant withdrew all of his objections.

[3] Counsel stated during the hearing that the parties have agreed to maintain the status quo while the motion for preliminary injunction is pending.

Ripoff Report have posted comments critical of Smith and that Smith has retaliated against Xcentric and Magedson in various ways, including the issuance of subpoenas, the use of search warrants, the public disclosure of confidential and/or privileged information and the threat of criminal prosecution. *Id.* at ¶¶ 2-3, 5, 7. The complaint includes the following counts:

1. Violation of constitutional rights (brought under 42 U.S.C. § 1983)
2. Abuse of process (brought under 42 U.S.C. § 1983)
3. Abuse of process (Iowa law)
4. Malicious prosecution/wrongful institutional of civil proceedings (Iowa law)
5. Invasion of privacy (Iowa law)

*Id.* at pp. 19-22. Plaintiffs request declaratory and injunctive relief, compensatory damages, punitive damages, interest, attorney fees and costs. *Id.* at pp. 22-23.

On February 16, 2015, plaintiffs' filed their motion (Doc. No. 7) for preliminary injunction. The motion seeks an injunction that would bar Smith from:

A. bringing criminal charges against Xcentric or Magedson related to any postings related to criticisms of the State or its evidence presented in State v. Richter (as threatened);

B. continuing the investigation of Xcentric and Magedson such as sending search warrants or subpoenas to their banks, email providers and other service providers;

C. reading Xcentric's privileged attorney-client communications;

D. disclosing Xcentric's attorney-client privileged communications to others;

E. disclosing Xcentric's financial and banking records to others;

F. disclosing Magedson's personal and private communications to others;

G.    disclosing any communications or information obtained through investigation of Xcentric or Magedson;

H.    wrongfully instituting civil proceedings on behalf of the State; and

I.    threatening, intimidating, accusing or otherwise stating that Plaintiffs' lawyers are violating any laws in representing Plaintiffs.

Doc. No. 7 at 2.   Smith resists.

## III.    STATE OF IOWA v. TRACEY RICHTER

Any attempt to understand this case requires some knowledge of a criminal case that Smith prosecuted against Tracey Richter (Richter) in 2011.   The Iowa Court of Appeals described the facts of that case as follows:

> On December 13, 2001, Richter shot and killed Dustin Wehde in her home in Early, Iowa. A trial information was filed against her in Sac County almost ten years later on August 5, 2011, charging her with murder in the first degree. Richter pleaded not guilty and filed a notice of an affirmative defense of justification. Trial was moved to Webster County.

> There was no question Richter shot and killed Wehde. Richter used two different guns, and the autopsy showed Wehde had been shot nine times. Three shots were to the back of his head and neck; the trajectory of some of those wounds indicated the shots came from above Wehde. At least one shot occurred after blood had started to congeal. The crucial question at trial was whether Richter was justified in shooting Wehde.

> The jury heard two very different stories. Each party has laboriously set out in their briefs the evidence supporting their version of events. The State emphasizes evidence showing Richter intentionally, deliberately, and premeditatedly killed Dustin Wehde to frame her ex-husband. For example, the State's crime scene reconstructionist, Rodney Englert, testified that the trajectories of the bullets and the wounds to Wehde indicated the initial shots could have been fired from an area in the southeast corner of the master bedroom near the gun safe and that the shots could have been fired

5

as Tracey was crouched or kneeling. Englert stated later shots to Wehde's head would have been fired from above Wehde and that there was congealed blood on Wehde's face indicating a shot was fired into his head after he was dead.

Mary Higgins had been a good friend of Richter's in Early. She told the jury that shortly after the shooting, Richter and her family went on a several-week trip to Australia. When Richter returned in February, Richter told Higgins about the shooting "[l]ike she was telling me her grocery list. She basically had no emotion to it." Richter told Higgins that she "unloaded" the gun as she was being pulled at by the two intruders; she then got up and stepped over what she thought was dirty clothes to check on her children. Richter told Higgins,

> She took the two—well, the three children down the hall. And as they were going down the hall, there was a body there and she told me that the body was moving and she stood over him and said, "Stop moving" or either it was, "I'll blow your fucking brains out" or "I'll blow your head off."

> And she told me he continued to move and she stood over him and she fired the gun until he quit moving. Then they proceeded down the stairs.

Higgins further testified that Richter's son, Bert, came into the room while Richter was relaying the story and became "extremely agitated," began banging his head against the table, and stated "Why did you go up there? Why did you go back up there? You didn't have to shoot him. You didn't have to kill him."

Higgins further testified that Richter told her that the police found an older model computer and a pink notebook in the car left in her driveway the night of the purported home invasion. Richter described to Higgins details of the contents of that pink notebook, which included contact information for her first husband, Dr. John Pitman, with whom Richter was involved in a custody dispute. Richter told Higgins the notebook would prove her ex-husband was involved.

There was evidence that the contents of the notebook had been kept from the public by law enforcement, and Richter should not have known what was written in it. Higgins recounted an incident in 2004 when Richter pointed at Higgins face and told her "to forget about the pink notebook." The State argued that the contents of the notebook, referring to Richter's ex-husband and his detailed plans to have Richter and Bert killed, came from Richter herself in an attempt to win the custody dispute over Bert.

As for the defense, Richter points out testimony supporting her claim that she acted in self-defense during a home invasion. Richter claimed she acted in self-defense, giving several statements to police that two (or three) men broke into her home and accosted her, choking her with a pair of panty hose until she was unconscious. She was able to get to a gun safe in the master bedroom and, shooting blindly over her shoulder, shot one of the intruders and the other (or others) ran away.

Richter's son, Bert, who was eleven years old at the time of the shooting, testified that while watching TV in his room, he heard Richter yelling for help from down the hall. After Richter was pulled away from the door to Bert's room, Bert heard banging around in the hallway. Bert reported hearing Richter making a "very awful choking sound" for a few minutes. Then Wehde—whom Bert knew from previous interactions—came to the bedroom door and threatened Bert. Later, Bert heard footsteps running away from his room followed by yelling and several loud bangs. Richter then opened the door to Bert's room. Bert said her wrists were bound with pantyhose. Bert then followed his mother, who had a gun in each hand. Bert said Wehde, who was lying on the floor, started to move. Bert said he then heard his mother warn Wehde not to move followed by a couple shots. On cross-examination, Bert agreed that his interview with police on the night of the shooting was his most accurate recall of the incident.

In the police interview, which occurred within hours of the shooting, Bert said nothing about Richter being pulled away from his room, about hearing banging and kicking noises in the hallway, or about hearing choking noises. Nor did Bert say in the interview that he saw Wehde moving or trying to get up, and he did not say he heard Richter telling Wehde to stay down.

The jury convicted Richter of first-degree murder, and she was sentenced to prison for life.

*State v. Richter*, No. 11-2124, 2013 WL 118357, at *1-3, 828 N.W.2d 326 (Iowa Ct. App. 2013) (table) [footnote omitted].[4]

## IV. FINDINGS OF FACT

Based on the evidence presented, I find the facts relevant[5] to plaintiffs' motion to be as follows:

### A. The Ripoff Report

Xcentric, with its managing member Magedson, operates the Ripoff Report – a website that provides a forum for complaints about businesses and government officials. Once a complaint is posted, the author and others (including the target of the complaint) may append responses, updates and rebuttals. For the most part, Ripoff Report does not remove any postings from its site. However, a target who contends that information posted on Ripoff Report is defamatory may apply to have that information deleted. The application process requires payment of a non-refundable $2,000 fee. The applicant must then submit evidence establishing that the challenged information is false while the party posting the information may submit evidence that the information is true. Ripoff Report then makes arrangements to have the evidence reviewed by a neutral arbitrator, whose decision is final. Ripoff Report will remove information found to be false.

---

[4] Richter has commenced post-conviction relief proceedings.

[5] The record contains a massive array of facts, including detailed information about the business and personal relationships among various individuals. I will describe only those facts that I find to be relevant to plaintiffs' pending motion.

8

## B.    Events Pre-Dating the Wehde Shooting

Richter was previously married to Dr. John Pitman (Pitman).  They had one child, a son.  The marriage ended after a protracted divorce battle.  Among other things, Richter accused Pitman of molesting their son.  Pitman contended that the allegation was false and also contended that Richter had forged Pitman's signature on a life insurance application.  Pitman also alleged that Richter had tried to kill him.  The divorce concluded with Richter and Pitman being awarded joint legal custody, with Richter being the primary caregiver and Pitman having visitation rights.

Richter married Michael Robert (Roberts) in 1996.  Roberts, an Australian citizen, moved to the United States after the marriage.  The couple had two children during the marriage.  In 1998, Richter and Roberts and the children (including the son previously born to Richter and Pitman) moved to Early, Iowa.  In 2000, Richter accused Pitman of molesting their son.  Pitman denied the allegation and asked that the court modify the custodial arrangement to award full custody to him.

## C.    The Shooting and its Aftermath

On December 13, 2001, shortly before the custody modification hearing was scheduled to begin, Richter shot Wehde in the home occupied by Richter, Roberts and the children.  Wehde was 20 years old at the time of his death.  Roberts was not present but Richter's three children were in the home.  As more-fully described by the Iowa Court of Appeals, above, Richter claimed that Wehde and another person invaded the home and that she shot Wehde in self-defense.  Evidence indicated that Richter used two different guns and fired eleven shots, with nine of those shots hitting Wehde, including three in the back of his head.  An expert later testified that one of those three shots had been fired about fifteen minutes after the first two.

9

After the shooting, Richter told a friend that law enforcement discovered a notebook in Wehde's vehicle that proved Pitman was responsible for the home invasion and that Pitman would be arrested soon. Richter asked law enforcement to investigate Pitman and provided reasons why she believed he was responsible. Pitman was never charged or arrested in connection with the incident.

Meanwhile, as part of the investigation into the Wehde shooting, law enforcement asked Roberts to submit to a polygraph examination. He agreed and the examination was conducted on February 13, 2002. Roberts was asked questions as to whether he was responsible for Wehde's presence inside the family home on the day of the shooting. According to the examiner, the results revealed "consistent specific responses indicative of emotional distress" while Roberts answered the relevant questions. The examiner concluded that Roberts' "truthfulness could not be verified and he could not be cleared in this matter." Doc. No. 37 at 77 (Ex. 17). Like Pitman, Roberts has never been charged or arrested in connection with the incident.

Roberts filed for divorce from Richter in 2004. Richter then made allegations that Roberts committed acts of domestic abuse and child abuse. Richter also began suggesting to law enforcement and others that Roberts may have been involved in the home invasion. Ultimately, Richter was awarded full custody of the children and Roberts was awarded visitation rights. Like Pitman, Roberts has contended that Richter has tried to kill him.

In 2010, in separate cases, Richter was convicted of felony fraud (in Nebraska) and perjury (in Iowa). However, no charges were filed against anyone in connection with Wehde's death for nearly ten years.

### D.    Smith Charges Richter

Smith was elected to serve as Sac County Attorney in November 2010.   Soon after he took office, a law enforcement officer told him about the Wehde shooting and suggested that he look into it.   Smith testified that two things jumped out at him when he examined the case: (1) the nature of the shooting, as Richter fired eleven shots from two weapons, with three shots hitting Wehde in the back of his head, and (2) the fact that Richter made seemingly-inconsistent statements about various events after the shooting. Smith testified that he tried to enlist the assistance of the Iowa Attorney General's Office in re-examining the case but his requests were met with little enthusiasm.   Ultimately, Smith made the decision on his own to charge Richter with first degree murder.   Once he filed the case against Richter, the Iowa Attorney General's Office agreed to assist and assigned Assistant Attorney General Doug Hammerand to prosecute the case with Smith.

Richter was arrested July 27, 2011.   Roberts immediately took custody of their two children and moved them to California.   Richter's trial began in October 2011. Witnesses who testified against Richter included Pitman, Mary Higgins, Mona Wehde, Ashley Wehde, Raymond Friedman, Marie Friedman and Jeremy Collins.[6]   On November 7, 2011, the jury returned a verdict finding Richter guilty of first degree murder.   On December 5, 2011, she was sentenced to life in prison without the possibility of parole.

### E.    Ripoff Report Postings

After Richter was convicted, posts about her case began appearing on Ripoff Report.   Many were authored by Darren Meade, an individual who has a long and, eventually, adverse history with Roberts.   Others were submitted anonymously.   One

---

[6] Roberts was listed as a witness in the trial information but was not called as a witness at trial.

unique, and somewhat bizarre, feature of Ripoff Report postings is the fact that the titles of complaints sometimes consist of seemingly-disconnected words and phrases. For example, Ripoff Report complaint number 1049232 includes the following title:

> Tracey Richter falsely convicted. Ben Smith Sac County Iowa Michael Roberts Rexxfield Exposed Audio recording proves Prosecutor's friend Michael Roberts motive and opportunity, confesses he claimed Dr. John Pitman baby raper. Sydney Morning Herald disgrace Sac City Iowa

Ex. 41. The evidence indicates that this style, along with search engine optimization (SEO) techniques employed by Ripoff Report, causes Ripoff Report pages to appear at or near the top of internet search engine results. For example, a Google search for "Dr. John Pitman" may show various Ripoff Report postings first, including the above-listed title that contains the adjoining phrases "Dr. John Pitman" and "baby raper."

On September 11, 2012, a post by Meade appeared on Ripoff Report as complaint number 938843. The post described findings Meade claimed to have made as a result of his own investigation into the case. Smith testified that this compliant, along with its various replies, updates and rebuttals, falsely accused various witnesses who testified against Richter of committing murder, theft, perjury and child molestation, in addition to having sexually transmitted diseases. For some reason, however, Smith did not offer the complaint, updates, rebuttals, etc., into evidence. In any event, it appears to be undisputed that this complaint was selected by Ripoff Report as a "featured" complaint, meaning it was advertised on each of Ripoff Report's other complaint pages. According to Smith, this means the complaint was referenced on approximately 1.8 million web pages.

On February 5, 2013, Meade posted Ripoff Report complaint number 1009000, which contained the following title:

> Mile2 Michael Roberts Rexxfield Raymond Friedman Writes Mile2 Michael Roberts Rexxfield Raymond Friedman Marie Friedman Graphic

12

<u>Depictions Of Child Molestation, Child Torture</u>, Exact Recipes Of Liquid Explosives, Type Bombs Illicit Recordings, Internet.

Ex. 1 at 63 [emphasis added]. Thus, the names of two witnesses who testified against Richter are listed immediately before the phrase "Graphic Depictions Of Child Molestation, Child Torture, Exact Recipes Of Liquid Explosives, Type Bombs Illicit Recordings."

According to Smith, some of the State's witnesses against Richter have advised him that their reputations have been damaged by the Ripoff Report postings. Smith stated as follows in an affidavit in support of a state court search warrant application:

> Dr. John Pitman stated his medical practice has lost an estimated $600,000 since these defamatory / derogatory articles about him first appeared on RIPOFF REPORT. Similarly, State's witness Raymond Friedman and Michael Roberts also informed SCA Smith that their respective businesses had suffered greatly as a result of DARREN MEADE's RIPOFF REPORT complaints / articles.

Ex. 1 at 97. Other than his own testimony, however, Smith has presented no evidence to substantiate any alleged harm suffered by the State's witnesses.[7]

Smith, too, has been the subject of various reports, replies, updates and rebuttals. He testified that his own photo appears on approximately two million pages on the Ripoff Report website and many statements have been published about him and his family. Among other things, Smith alleges that he has been accused on Ripoff Report of having sexual relationships with witnesses and abusing methamphetamine. Again, however, Smith did not present evidence of any Ripoff Report pages containing such accusations. He did, however, acknowledge that he has been "irritated" by the allegations.

---

[7] Testimony from Pitman, for example, would have been especially relevant. Even if Pitman was not available to testify in person, Smith could have presented his testimony by telephone (which is how Magedson testified) or, at least, could have sought to take his deposition before the hearing.

Plaintiffs do not dispute that information about certain witnesses has been posted on Ripoff Report. However, they deny having any control over, or responsibility for, the content of any such posts. Moreover, Adam Kunz – an in-house attorney for Xcentric – testified that Ripoff Report asked Smith to identify specific, defamatory statements so Ripoff Report could investigate them. Kunz further testified that Ripoff Report offered to waive its usual fee ($2,000) for the arbitration process under which determinations could be made as to whether specific statements should be removed as defamatory. Smith identified no specific statements and did not follow up on Ripoff Report's offer to waive the arbitration fee.

## F.     *Smith's Investigation*

In the spring of 2012, about five months after Richter was convicted, Meade contacted Smith and told him that he had evidence that Richter was innocent. Meade further claimed that he had attempted to present the evidence to law enforcement before the trial but no one returned his messages or followed up on his information. Smith was dubious, as he had previously learned that Richter attempted to solicit a prisoner to come forward with false testimony on Richter's behalf. Smith suspected that Meade was working with Richter's family to advance potentially-false information in an effort to free Richter. According to Smith, he looked into Meade's allegations and found them to be false. Smith then issued a county attorney subpoena for Meade's telephone records and, based on those records, learned that Meade was in regular contact with Richter's family.

After postings about the case began to appear on Ripoff Report, Pitman advised Smith that he had been contacted by an employee of Ripoff Report with an offer to remove all derogatory content about Pitman for a fee of $10,000, along with a monthly maintenance fee. According to Smith, he grew concerned about the fact that certain witnesses against Richter were being targeted with defamatory statements on Ripoff

14

Report and decided to investigate whether Richter and her family were responsible. He obtained recordings of Richter's prison telephone conversations and discovered that they often correlated to Ripoff Report postings and updates. That is, information about a witness, such as Pitman, would be discussed by telephone and would soon thereafter appear on Ripoff Report.

In listening to the recorded telephone conversations, Smith noted that the participants sometimes mentioned continuing the discussions "in person." As such, he made arrangements to record conversations between Richter and her prison visitors. Smith testified that he then listened to numerous visits between Richter and her mother, Anna Richter. According to Smith, Anna Richter indicated during those discussions that she was in communication with Magedson and that he was making various requests or suggestions. For example, Anna Richter stated that Magedson wanted Richter's attorney to obtain information about Pitman through the discovery process that Magedson could then use. Smith testified that Anna Richter also made statements indicating that Meade and Magedson were working together. Smith considered this alleged working relationship to be significant based on his understanding that the host of a website is not liable for content posted by third-parties *unless* the host actively participated in the creation of the content. Smith believed that if Magedson, as Ripoff Report's owner, was directing Meade to publish false and harassing information about the State's witnesses on Ripoff Report, then Magedson and Ripoff Report could be legally responsible for the content.

Smith did not offer any of the recorded conversations, or their transcripts, into evidence. Thus, the record contains only his testimony about their contents.[8] Smith

---

[8] In response to a hearsay objection, Smith's counsel indicated that Smith's testimony about the statements made during the recorded conversations was not being offered to prove the truth of those statements. As such, I will not consider Smith's testimony for that purpose.

ultimately issued over 100 county attorney investigatory subpoenas to obtain records and documents concerning the possible connection between Meade, Magedson and the Richter family. The records Smith obtained included privileged communications between Xcentric and its counsel. Smith did not return those communications to Xcentric or advise Xcentric that he had received them. Smith also obtained financial records and copies of checks issued by Xcentric.

On July 7, 2014, Smith applied for a search warrant authorizing a search of Anna Richter's home in Urbandale, Iowa, and the seizure of computers, smart phones, digital storage devices and similar items. Ex. 1. The application was supported by Smith's 119-page, single-spaced affidavit. *Id.* Smith admits that some of the information contained in the affidavit came from Roberts and others, including avowed enemies of Ripoff Report.

The search warrant was issued the same day. Smith then filed the application, affidavit and warrant with the Iowa District Court for Sac County on July 9, 2014. Smith testified that he made a deliberate decision not to file the application under seal even though it is his usual practice to do so. He stated that he made this decision, at least in part, for strategic reasons. Specifically, he contends that he wanted Magedson to be aware of the application and affidavit so Smith could later obtain evidence (e.g., email messages) as to how Magedson reacted.

In addition to making the search warrant application public, Smith directly or indirectly caused the disclosure of (a) privileged communications between Xcentric and its lawyers and (b) information concerning Xcentric's bank accounts. Smith shared this information with certain individuals who were assisting him with the search warrant application. At least some of these individuals are vocal enemies of Ripoff Report. Smith did not require any of these individuals to enter into written nondisclosure

agreements before sharing privileged and confidential information with them. Some of the shared information has since been leaked to the public.

### G.    *Smith Charges Meade (and Later Un-Charges Him)*

Smith eventually brought criminal proceedings against Meade in the Iowa District Court for Sac County.   A Trial Information filed September 2, 2014, alleged one count of ongoing criminal conduct, eight counts of witness tampering and one count of obstructing prosecution.   Ex. 12.   The case was pending as of the date of the preliminary injunction hearing.   However, on May 27, 2015, Smith filed a motion to dismiss the criminal charges against Meade with prejudice.   Ex. 42.   Smith cited this lawsuit, among other events, as "devouring [Smith's] limited resources and the court's time."   *Id.* at 3.   Smith also alleged that he had offered absolute prosecutorial immunity to Meade in exchange for testimony against Ripoff Report but Meade had rejected the offer.   *Id.*   The Iowa District Court granted the motion the same day, thus ending the case.   Ex. 43.

### H.    *The Connection Between Magedson and Meade*

It is undisputed that a financial relationship existed during the relevant period of time between Magedson and Meade.   Smith testified that he obtained, through various subpoenas, bank records showing regular payments from Xcentric to Meade.   Smith stated that the payments averaged about $7000 per month between December 2011 and May 2013, meaning that the total exceeded $100,000.   Smith also testified that he obtained phone records documenting extensive communications between Magedson and Meade.   Based on those records, Smith estimated that they talked by telephone approximately 25 to 30 hours per month during the relevant period of time.

17

Plaintiffs acknowledge that Xcentric's payments to Meade have at least some connection to the Richter case. Kunz testified that Meade convinced Magedson of Richter's innocence and that Magedson hopes to raise awareness of the issue and correct the alleged injustice. Kunz acknowledged that the payments from Xcentric to Meade were made, in part, to support Meade's efforts to free Richter. However, both Kunz and Magedson testified that there were other reasons for the payments, as well. For example, Kunz testified that Meade alerted Ripoff Report about a particular hack to its website that allowed the hackers (who allegedly included Roberts) to remove complaints from Ripoff Report. The hackers would then approach individuals who were the subject of particular complaints and offer to remove the complaints for a price. Meade became aware of the scheme, notified Ripoff Report and provided information to law enforcement. Kunz testified that some of Xcentric's payments to Meade were made in gratitude for Meade's assistance.

In addition, Magedson testified that Xcentric made payments to Meade because Magedson wanted to help Meade. He stated that when Meade traveled to Arizona to meet with law enforcement and provide information about the hack of Ripoff Report's website, he was facing eviction and had health issues. Magedson testified that he provided money to Meade for rent and a medical procedure and also offered him an opportunity to sell Xcentric's corporate advocacy program. According to Magedson, at some later time Meade convinced Magedson of Richter's innocence, thus creating a "common cause" between the two of them. Magedson testified that he has had conversations with Anna Richter and was aware that she was providing information to Meade about the case. Magedson acknowledged that one purpose for making payments to Meade was to assist the efforts to free Richter.

Magedson denies, however, that he has had any role in creating, or even encouraging, Meade's various Ripoff Report posts about the Richter case. Indeed, he

18

testified that he only recently became aware of Meade's posts that accuse certain witnesses against Richter of committing illegal activities. Magedson stated that he was generally aware of the fact that Meade was posting complaints about the case on Ripoff Report, but does not recall having specific conversations with Meade about what the substance of Meade's complaints.

Additional findings of fact will be discussed, as necessary, in the course of addressing the parties' arguments.

## V. APPLICABLE LEGAL STANDARDS

### A. *Preliminary Injunctions*

A preliminary injunction is an extraordinary remedy and the burden of establishing the propriety of an injunction is on the movant. *Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). A request for preliminary injunction is analyzed under the four factors set forth by the Eighth Circuit Court of Appeals in *Dataphase Systems, Inc. v. CL Systems, Inc.*, 640 F.2d 109 (8th Cir. 1981). Those factors are "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Id*. at 114. Of these factors, success on the merits has been referred to as the most important factor. *Roudachevski v. All–American Care Centers, Inc.*, 648 F.3d 701, 706 (8th Cir. 2011) (citing *Kai v. Ross*, 336 F.3d 650, 653 (8th Cir. 2003)). Indeed, "[w]hen a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Elli v. City of Ellisville, Mo.*, 997 F. Supp. 2d 980, 983 (E.D. Mo. 2014) (citing *Minnesota Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012)).

Ultimately, the decision of whether to grant a preliminary injunction is committed to the "broad discretion" of the district court and "will be reversed only for clearly erroneous factual determinations, an error of law, or an abuse of its discretion." *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 893 (8th Cir. 2013) (quoting *Aaron v. Target Corp.*, 357 F.3d 768, 773–74 (8th Cir. 2004)).

## B.  *The Communications Decency Act of 1996*

Section 230 of the Communications Decency Act of 1996 (CDA) provides as follows in relevant part:

> **(c)  Protection for "Good Samaritan" blocking and screening of offensive material**
>
> **(1)  Treatment of publisher or speaker**
>
> No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.
>
> **(2)  Civil liability**
>
> No provider or user of an interactive computer service shall be held liable on account of—
>
>> (A)  any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or
>>
>> (B)  any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).
>
> *       *       *

20

**(e)    Effect on other laws**

*        *        *

**(3)    State law**

Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

47 U.S.C. § 230(c) and (e)(3).   The CDA includes the following definitions:

**(2)    Interactive computer service**

The term "interactive computer service" means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

**(3)    Information content provider**

The term "information content provider" means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service.

47 U.S.C. § 230(f)(2) and (f)(3).   The Sixth Circuit Court of Appeals has summarized the purpose of Section 230 as follows:

By barring publisher-liability and notice-liability defamation claims lodged against interactive computer service providers, § 230 serves three main purposes. First, it "maintain[s] the robust nature of Internet communication and, accordingly, ... keep[s] government interference in the medium to a minimum." [*Zeran v. AOL*, 129 F.3d 327, 330 (4th Cir. 1997)]; *see also* 47 U.S.C. § 230(b)(2) ("It is the policy of the United States ... to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation."). Second, the immunity provided by § 230 protects against

21

the "heckler's veto" that would chill free speech. Without § 230, persons who perceive themselves as the objects of unwelcome speech on the internet could threaten litigation against interactive computer service providers, who would then face a choice: remove the content or face litigation costs and potential liability. *See Zeran*, 129 F.3d at 331 ("The specter of tort liability in an area of such prolific speech would have an obvious chilling effect."). Immunity shields service providers from this choice. *See Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009) ("[I]mmunity is an immunity from suit rather than a mere defense to liability and … is effectively lost if a case is erroneously permitted to go to trial." (internal quotation marks omitted)). Third, § 230 encourages interactive computer service providers to self-regulate. An early internet case, *Stratton Oakmont* [*Inc. v. Prodigy Servs. Co.,* 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995)], held that at common law the provider of an electronic message-board service was potentially liable for its user's defamatory message because it had engaged in voluntary self-policing of the third-party content made available through its service. 1995 WL 323710, at *4. Section 230 set out to abrogate this precedent. *See* S. Rep. No. 104–230, at 194 (1996) ("One of the specific purposes of [§ 230] is to overrule *Stratton Oakmont v. Prodigy* and any other similar decisions…."); *see also, e.g., Zeran*, 129 F.3d at 331 ("Another important purpose of § 230 was to encourage service providers to self-regulate the dissemination of offensive material over their services. In this respect, § 230 responded to [*Stratton Oakmont*].").

*Jones v. Dirty World Entertainment Recordings, LLC*, 755 F.3d 398, 407-08 (6th Cir. 2014).

The Eighth Circuit Court of Appeals has discussed the CDA in two decisions. In the first, *Johnson v. Arden*, 614 F.3d 785 (8th Cir. 2010), the plaintiffs sued the owner of an internet message board, InMotion, for certain statements posted on that board by others. *Id.* at 787-88. The district court granted summary judgment for InMotion, finding that it was immune under the CDA. *Id.* at 787. On appeal, the Eighth Circuit started its analysis of the CDA as follows:

Read together, these provisions [paragraphs (c) and (e)(3)] bar plaintiffs from holding ISPs legally responsible for information that third parties

22

created and developed. . . "Congress thus established a general rule that providers of interactive computer services are liable only for speech that is properly attributable to them."

*Id.* at 791 (quoting *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009). The court then stated:

> It is undisputed that InMotion did not originate the material that the Johnsons deem damaging. InMotion is not a "publisher or speaker" as § 230(c)(1) uses those terms, therefore, the district court held that InMotion cannot be liable under any state-law theory to the persons harmed by the allegedly defamatory material.

*Id.* After discussing decisions from other circuits, the court explained:

> The record contains no evidence that InMotion designed its website to be a portal for defamatory material or do anything to induce defamatory postings. We conclude that the CDA provides ISPs like InMotion with federal immunity against state tort defamation actions that would make service providers liable for information originating with third-party users of the service such as the other defendants in this case.

*Id.* at 792. The court concluded that dismissal was proper "[b]ecause InMotion was merely an ISP host and not an information content provider." *Id.*

The Eighth Circuit's other CDA-related decision is *S.J.W. ex rel. Wilson v. Lee's Summit R–7 Sch. Dist.*, 696 F.3d 771 (8th Cir. 2012). In that case, two high school students created an internet blog to discuss and "vent" about events at their school. *Id.* at 773. Over a four-day period in December 2011, they added posts containing racist comments along with sexually explicit and degrading comments about certain female classmates. *Id.* A third student then added another racist post. *Id.* The parties disputed whether the students used computers at the high school to create and upload the posts. Either way, the posts allegedly caused substantial disruption at the school. *Id.* at 774. The two students were suspended as a result of their actions. *Id.* They then

23

filed suit seeking to enjoin the suspensions and the district court ultimately granted their motion for preliminary injunction. *Id.* at 774-75.

On appeal, one of the arguments advanced by the plaintiffs involved the CDA. Specifically, they urged that any disruption was caused by the racist comments posted by the third student, not by their own posts. *Id.* at 779. Based on this assertion, they argued that they were immune from responsibility under the CDA because they simply provided an interactive computer service – the blog. *Id.* This argument failed in light of the district court's finding that the plaintiffs' own posts caused at least some of the disruption. *Id.* at 779-80. In other words, the plaintiffs did more than simply host a website – they created some of the content at issue. *Id.*

These cases illustrate the two ends of the CDA spectrum. At one end are the providers of interactive computer services. These are website hosts who provide online forums for content created by others. At the other end are the information content providers who create and upload content to websites. When actionable content appears on a website, the CDA generally protects the website host from liability and directs that liability to the content provider. When the parties' respective roles are clearly defined, this framework is not hard to apply. The situation becomes more complicated, however, as the line between website host and content provider begins to blur. The Act makes it clear that a website host will lose immunity if it is also "an information content provider," which is "any person or entity *that is responsible, in whole or in part, for the creation or development* of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3) [emphasis added]. Several federal courts have addressed the issue of whether website hosts' actions with regard to the creation or development of content caused those hosts to lose CDA immunity.

In *F.T.C. v. Accusearch Inc.*, 570 F.3d 1187, 1200 (10th Cir. 2009), the defendant (Accusearch) operated a website that allowed users to search various databases, including

24

certain telephone records. *Id.* at 1191-92. Accusearch utilized third-party researchers, who were required to assure Accusearch that they would perform their work in accordance with applicable law. *Id.* at 1191. Accusearch's website promised that it could provide detailed information such as the date, time and duration of calls made from telephone numbers. *Id.* at 1191-92. The Federal Trade Commission (FTC) filed suit, alleging that the disclosure of such details, without the customer's consent, violated federal law. *Id.* at 1192. The district court entered summary judgment in favor of the FTC. *Id.* at 1193.

On appeal, Accusearch argued that it was immune from liability under the CDA. *Id.* at 1195-96. The Tenth Circuit Court of Appeals noted, however, that the immunity applies only with regard to "information provided by another information content provider." *Id.* at 1197 (quoting 47 U.S.C. § 230(c)(1)). By contrast, "an interactive computer service that is also an 'information content provider' of certain content is not immune from liability arising from publication of that content." *Id.* (citing *Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157, 1168 (9th Cir. 2008), and *Ben Ezra, Weinstein, & Co., Inc. v. Am. Online Inc.*, 206 F.3d 980, 985 n. 4 (10th Cir. 2000)). The court then analyzed the statutory definition of "information content provider" to determine whether Accusearch crossed the line from service provider to content provider. *Id.* at 1197-1200.

The court first addressed the CDA's use of the word "development" and found that the act of making information available or usable, which had not previously been available or usable, qualified. *Id.* at 1198. The court then addressed the word "responsible" and concluded that a service provider is "responsible" for the development of content if it is "more than a neutral conduit for that content" and, instead, "in some way specifically encourages development of what is offensive about the content." *Id.*

25

at 1199.    Based on these interpretations, the court found that Accusearch was not entitled to immunity:

> As explained above, Accusearch solicited requests for confidential information protected by law, paid researchers to find it, knew that the researchers were likely to use improper methods, and charged customers who wished the information to be disclosed. Accusearch's actions were not "neutral" with respect to generating offensive content; on the contrary, its actions were intended to generate such content. Accusearch is not entitled to immunity under the CDA.

*Id.* at 1201.

Another district court in this circuit applied the *Accusearch* court's statutory interpretation to address tort claims against the operator of the "Backpage" website. *M.A. ex rel. P.K. v. Vill. Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041 (E.D. Mo. 2011).    The plaintiff, a victim of child sex trafficking, alleged that Latasha Jewell McFarland, an adult who eventually pleaded guilty to criminal charges, used Backpage to advertise the plaintiff's availability as an escort for sexual services.    *Id.* at 1043-44. Plaintiff alleged that McFarland paid Backpage to place advertising on its website, including ads containing explicit nude photographs of the plaintiff.    *Id.* at 1044.    She further alleged that Backpage knew that the postings on its website were solicitations for prostitution and that minors were included in those postings.    *Id.*    She contended that by allowing McFarland to post explicit nude photos of her, Backpage facilitated child sex trafficking and aided and abetted McFarland's violation of various laws.    *Id.* at 1044-45.

The district court, relying on the CDA, granted a Rule 12(b)(6) motion to dismiss for failure to state a claim.    *Id.* at 1058-59.    The court framed the dispute as follows:

> Backpage is a website operator. . . .    As such, it "'can be both a service provider and a content provider: If it passively displays content that is created entirely by third parties, then it is only a service provider with respect to that content. But as to content that it creates itself, or is

26

responsible in whole or in part for creating or developing, the website is also a content provider.'"

*Id.* at 1048 (quoting *Stayart v. Yahoo! Inc.,* 651 F. Supp. 2d 873, 886 (E.D. Wis. 2009), in turn quoting *Roommates*, 521 F.3d at 1167). The court then explained the plaintiff's arguments as follows:

> M.A. argues that Backpage is not a service provider for purposes of § 230's immunity because, in part, (a) its website has a search engine for adult categories that allows searches of postings by keywords; (b) it "developed the value of the posted ads by working to create a highly viewed website"; (c) its website is claimed to be a "highly tuned marketing site"; (d) the website has instructions, for a fee, on how to increase the impact of the posted ads; and (e) it "offers special ad placement and re-posting for a fee."

*Id.* The court concluded that "[n]one of these characteristics distinguish Backpage from other ISPs that courts have found to be within the reach of § 230 immunity." *Id.* Indeed, the court held that even if Backpage knew that the content posted on its website was facilitating illegal conduct, it enjoyed immunity under Section 230 so long as it played no role in the creation or development of that content. *Id.* at 1050-51.

In finding that Backpage was entitled to immunity, the court distinguished the en banc decision of Ninth Circuit Court of Appeals in *Roommates*. *Id.* at 1051-52. In that case, the Ninth Circuit held that a website designed to match tenants with landlords was an "information content provider" as to the profiles of its users because the website host had developed "at least 'in part'" the information in those profiles. *Roommates*, 521 F.3d at 1164-65. Specifically, users were required to create profiles that included discriminatory criteria, causing alleged violations of fair housing laws. *Id.* at 1161–62, 1166-67. In considering the scope of Section 230 immunity, the Ninth Circuit stated:

> It's true that the broadest sense of the term "develop" could include the functions of an ordinary search engine—indeed, just about any function performed by a website. But to read the term so broadly would defeat the purposes of section 230 by swallowing up every bit of the immunity that

the section otherwise provides. At the same time, reading the exception for co-developers as applying only to content that originates entirely with the website … ignores the words "development … in part" in the statutory passage "creation or *development* in whole or *in part*." 47 U.S.C. § 230(f)(3) (emphasis added). We believe that both the immunity for passive conduits and the exception for co-developers must be given their proper scope and, to that end, we interpret the term "development" as referring not merely to augmenting the content generally, but to materially contributing to its alleged unlawfulness. <u>In other words, a website helps to develop unlawful content, and thus falls within the exception to section 230, if it contributes materially to the alleged illegality of the conduct</u>.

*Id*. at 1167-68 [emphasis added]. In finding that the defendant developed the offensive content, the court explained:

Roommate both elicits the allegedly illegal content and makes aggressive use of it in conducting its business. Roommate does not merely provide a framework that could be utilized for proper or improper purposes; rather, Roommate's work in developing the discriminatory questions, discriminatory answers and discriminatory search mechanism is directly related to the alleged illegality of the site. . . . Roommate is directly involved with developing and enforcing a system that subjects subscribers to allegedly discriminatory housing practices.

*Id*. at 1172.

The Sixth Circuit analyzed *Roommates*, *Accusearch* and other CDA immunity cases in *Jones*. In that case, the plaintiff, who was a cheerleader for a professional football team, sued an online tabloid ("The Dirty") that allowed internet users to submit their own stories. *Id.* at 402-03. The website's staff reviewed the various submissions and selected some for publication on the site. *Id.* at 403. The only changes made to the chosen submissions were the removal of "nudity, obscenity, threats of violence, profanity, and racial slurs." *Id.* Upon posting a submission, however, the website's manager often added his own commentary about the subject of that submission. *Id.*

28

The plaintiff was the subject of several allegedly-defamatory submissions published by The Dirty. *Id.* at 403-04. After her requests to remove the stories were rejected, she filed suit against the website and its owners, asserting claims that included defamation and intentional infliction of emotional distress. *Id.* at 404-05. The district court denied the defendants' motion for summary judgment, holding that they were not entitled to CDA immunity. *Id.* at 405. A jury then awarded actual and punitive damages to the plaintiff. *Id.* at 406.

On appeal, the Sixth Circuit reversed the judgment, holding that the defendants were entitled to immunity under the CDA. *Id.* at 417. After reviewing prior decisions from various jurisdictions, the court concluded that the district court had construed the holdings of *Roommates.com* and *Accusearch* too broadly in crafting an "encouragement" test for the depravation of CDA immunity. *Id.* at 414. The court explained the lack of CDA immunity in *Roomates.com* and *Accusearch* as follows:

> In *Roommates*, the website was responsible for the alleged discrimination by requiring users to submit protected characteristics and hiding listings based on those submissions. . . . . In *Accusearch*, the website was responsible for the illegal purchase and resale of confidential telephone records.

*Id.* [citations omitted]. The court then noted that in various cases recognizing CDA immunity, "the website operators provided a forum for user posts, did not require users to violate the law as a condition of posting, did not compensate for the posting of actionable speech, did not post actionable content themselves, and therefore were not responsible for the actionable speech that was displayed on their websites." *Id.*

In criticizing the district court's "encouragement" test, the court stated:

> [A]n encouragement test would inflate the meaning of "development" to the point of eclipsing the immunity from publisher-liability that Congress established. Many websites not only allow but also actively invite and encourage users to post particular types of content. Some of this content will be unwelcome to others—e.g., unfavorable reviews of consumer

29

products and services, allegations of price gouging, complaints of fraud on consumers, reports of bed bugs, collections of cease-and-desist notices relating to online speech. And much of this content is commented upon by the website operators who make the forum available. Indeed, much of it is "adopted" by website operators, gathered into reports, and republished online. Under an encouragement test of development, these websites would lose the immunity under the CDA and be subject to hecklers' suits aimed at the publisher. Moreover, under the district court's rule, courts would then have to decide what constitutes "encouragement" in order to determine immunity under the CDA—a concept that is certainly more difficult to define and apply than the Ninth Circuit's material contribution test. . . . Congress envisioned an uninhibited, robust, and wide-open internet, see § 230(a)(1)-(5), but the muddiness of an encouragement rule would cloud that vision.

*Id.* at 414-15 [citations omitted].    The court adopted a material contribution test for determining whether a website host was responsible, in whole or in part, for the development of allegedly-unlawful content.    *Id.* at 410-11, 413.    The court explained:

> A material contribution to the alleged illegality of the content does not mean merely taking action that is necessary to the display of allegedly illegal content. Rather, it means being responsible for what makes the displayed content allegedly unlawful.

*Id.* at 410.    Applying this test, the court held that the defendants were not responsible for the development of the allegedly-defamatory statements because:

1.    they selected the statements for publication but did not author them;

2.    they "did not require users to post illegal or actionable conduct as a condition of use;"

3.    they did not compensate users for the submission of the objectionable statements;

4.    the comments they posted about the objectionable statements "did not materially contribute to the defamatory content of the statements;"

30

*Id.* at 416.

Having carefully reviewed the Eighth Circuit's decisions in *Johnson* and *S.J.W.*, and the myriad of cases from other jurisdictions applying the CDA, I predict that the Eighth Circuit will adopt the material-contribution test described and applied in *Jones*. I find that this test embodies the purposes of the CDA by construing the exception to immunity narrowly, depriving website hosts of immunity only when they bear factual responsibility for the allegedly-unlawful characteristics of content posted on their websites.

## C. Iowa Code Section 720.4

According to Smith, the actions on his part that the plaintiffs complain about in this case involve his investigation into possible violations of this Iowa statute:

**720.4. Tampering with witnesses or jurors**

A person who offers any bribe to any person who the offeror believes has been or may be summoned as a witness or juror in any judicial or arbitration proceeding, or any legislative hearing, or who makes any threats toward such person or who forcibly or fraudulently detains or restrains such person, with the intent to improperly influence such witness or juror with respect to the witness' or juror's testimony or decision in such case, or to prevent such person from testifying or serving in such case, or who, in retaliation for anything lawfully done by any witness or juror in any case, harasses such witness or juror, commits an aggravated misdemeanor.

Iowa Code § 720.4. The Iowa Supreme Court has explained that the statute describes three separate forms of a tampering offense: "(1) offering a bribe, (2) making threats or forcibly or fraudulently detaining or restraining, or (3) harassing in retaliation." *State v. LaPointe*, 418 N.W.2d 49, 51 (Iowa 1988). Here, the third form is at issue. Smith contends that Richter and her family, along with Meade, Magedson, Xcentric and others, have used Ripoff Report to harass certain witnesses in retaliation for their testimony

31

against Richter. The Iowa Supreme Court has described the elements of the "harassing in retaliation" charge as follows:

> Under section 720.4, the criminality of one's conduct turns on whether the defendant acts (1) without legitimate purpose, (2) with an intent to intimidate, annoy, or alarm the [witness or] juror, and (3) in retaliation for the [witness's or] juror's performance of his or her civic duty as a [witness or] juror on a case.

*State v. Baker*, 688 N.W.2d 250, 253-54 (Iowa 2004). In *Baker*, the Court held that even if the conduct at issue includes speech, that conduct is not protected by the First Amendment if these elements are established. *Id.* at 254 (citing cases). The Court also held that Section 720.4 is not unconstitutionally vague. *Id.* at 255-56.

Plaintiffs point out that Roberts did not actually testify at Richter's trial, even though he had been listed as a potential witness. They argue that because he did not testify, any alleged harassment of him cannot form the basis of a charge under Section 720.4. While the statute does not define the word "witness," the Iowa Supreme Court addressed its meaning in *LaPointe,* reversing a conviction under a "harassment" theory because the alleged harassment occurred after the victim gave a statement but before she actually testified. 418 N.W.2d at 53. The court stated: "[T]he term 'witness … in any case' used in the harassment portion of section 720.4 indicates involvement in some type of official proceeding. We conclude that the term 'witness … in any case' does not include a person who merely reports an incident to the police or makes a statement." *Id.* Because Roberts did not testify at Richter's trial, any alleged harassment of him does not fall within Section 720.4.

## VI. ANALYSIS

In seeking a preliminary injunction, plaintiffs rely on their claim that they are entitled to relief pursuant to 42 U.S.C. § 1983 because Smith, while acting under color

32

of state law, is violating their rights under the First, Fourth, Sixth and Fourteenth Amendments. *See* Doc. No. 44. To establish a right to relief under Section 1983, a plaintiff must show both (a) that he or she was deprived of a right secured by the Constitution and the laws of the United States and (b) that the defendant acted under color of state law. *Lind v. Midland Funding, L.L.C.*, 688 F.3d 402, 405 (8th Cir. 2012) (citing *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155 (1978)). Here, there is no dispute about the second element, as the actions plaintiffs complain about are actions Smith has taken in his role as the elected county attorney for Sac County, Iowa.

As noted above, when a plaintiff claims a violation of First Amendment rights, the likelihood of success on the merits is the most critical of the *Dataphase* factors. *See, e.g., Minnesota Citizens Concerned for Life,* 692 F.3d at 870. For that reason, I will address that factor first.

## A.    *Likelihood of Success on the Merits*

### 1.    *First Amendment*

In arguing that they are likely to succeed on the merits of their First Amendment claim, plaintiffs contend (a) there is no basis for Smith to investigate possible criminal charges against them because they are immune from liability under the CDA and (b) that Smith is acting against them in retaliation for statements posted on Ripoff Report that are critical of him. I will address these arguments separately.

### a.    *CDA Immunity*

Plaintiffs argue that they are entitled to immunity under the CDA because – despite their financial relationship with Meade – they were not information content providers with regard to any of the allegedly-unlawful posts about the state's witnesses. At this stage of the case, however, they have failed to demonstrate a likelihood of success on

33

their claim that the CDA protects them from criminal liability for any potential violation of Iowa Code Section 720.4. This is because there is substantial evidence suggesting that the plaintiffs materially contributed to the alleged illegality of the information at issue.

As noted above, there is an undisputed connection between Magedson and Meade concerning the Richter case, as they have participated in a "common cause" to free Richter. Xcentric made substantial payments to Meade during the period of time Meade was gathering information and posting complaints about the case, including complaints with titles that associate certain state's witnesses with illegal and/or embarrassing conduct. Smith testified that he has gathered evidence of ongoing, systematic communications between Magedson and Meade during this period of time. He also claims that various recorded conversations between Richter and her mother establish that Meade was acting at Magedson's directions. Smith's testimony, along with the affidavit (Ex. 1) he submitted in support of the search warrant application, suggest direct ties between Anna Richter, Meade and Magedson concerning the content of Ripoff Report postings.

Magedson acknowledged that he was aware that Meade was posting information about Richter's case on Ripoff Report but denied having any advance involvement with the content of Meade's posts. I am not fully convinced of Magedson's credibility on this issue. Xcentric paid Meade a large amount of money and Magedson has strong feelings about Richter's case. I simply do not believe that he was blissfully unaware of what Meade was planning to post.

Based on the current record, I predict it is more likely than not that at trial, the plaintiffs will be found to have been "more than a neutral conduit" for the allegedly-harassing content about the state's witnesses posted on Ripoff Report, *Accusearch,* 570 F.3d at 1199, and instead will be found to have materially contributed to the alleged

34

illegality of the statements at issue. *Jones*, 755 F.3d at 410-11. Thus, I find that the plaintiffs have failed to show that they are likely to succeed on the merits of their argument that the CDA immunizes them from any possible liability for those statements.

Of course, this is not a final decision as to the plaintiffs' immunity under the CDA. Both sides will have the opportunity to conduct significant discovery on this issue between now and the time of trial. At this time, however, for the purpose of determining whether injunctive relief is appropriate, I cannot find that the plaintiffs are likely to succeed on the merits of their immunity argument.

### b. Retaliatory Motive

My conclusion as to the lack of CDA immunity does not end the analysis. With or without that immunity, plaintiffs can prevail on the merits at trial by establishing that Smith has retaliated against them for the exercise of their First Amendment rights. The Eighth Circuit Court of Appeals has stated:

> "[C]riticism of public officials lies at the very core of speech protected by the First Amendment." *Colson v. Grohman*, 174 F.3d 498, 507 (5th Cir. 1999) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 269–70, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)). Retaliation by a government actor in response to such an exercise of First Amendment rights forms a basis for § 1983 liability. *Pendleton v. St. Louis County*, 178 F.3d 1007, 1011 (8th Cir. 1999).

*Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir. 2002). To establish such a claim, a plaintiff must prove (1) he or she engaged in a protected activity, (2) the defendant responded with adverse action that would "chill a person of ordinary firmness" from continuing in the activity, and (3) that "the adverse action was motivated at least in part by the exercise of the protected activity." *L.L. Nelson Enters., Inc. v. County of St. Louis, Mo.*, 673 F.3d 799, 807–08 (8th Cir. 2012) (quoting *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004)). I will address each element separately.

35

### i.    *Protected activity*

It is undisputed that Ripoff Report has published statements that are sharply critical of Smith and that those statements are protected by the First Amendment.[9]    The Supreme Court has stressed the importance of protecting speech that is critical of elected prosecutors.    *Gentile v. State Bar of Nevada,* 501 U.S. 1030, 1035-36 (1991).    Smith acknowledged this during his testimony, agreeing that the First Amendment permits others to criticize or insult him as they see fit.

Plaintiffs are entitled to First Amendment protection regardless of whether they were content providers with regard to any statements about Smith that have been published on Ripoff Report.    If they were content providers, then statements were their own speech.    If not, the acts of publishing the speech of others, and exercising editorial discretion about which complaints to include on Ripoff Report, are also protected by the First Amendment.    *See, e.g., see Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 258 (1974) (owner of publication has First Amendment right to determine its contents); *Phelps v. Wichita Eagle-Beacon*, 886 F.2d 1262, 1271 (10th Cir. 1989) ("the act of publication and the exercise of editorial discretion concerning what to publish are protected by the First Amendment").    Smith does not argue otherwise.    At this stage of the case, at least, there is little doubt that the plaintiffs have engaged in activity protected by the First Amendment.

---

[9] By focusing on statements critical of Smith, I do not mean to suggest that statements published on Ripoff Report about the State's witnesses are not worthy of First Amendment protections. Those statements, too, may very well be protected.    It is unnecessary to decide that issue at this time because it is undisputed that Ripoff Report published comments about Smith that are protected by the First Amendment.

## ii. Adverse Action

I must next consider whether Smith took adverse action against plaintiffs that would "chill a person of ordinary firmness" from continuing in the protected activity. The adverse action itself need not be a constitutional violation, as the violation occurs when an official acts in retaliation for "the exercise of a constitutionally protected right." *Spencer v. Jackson County, Mo.*, 738 F.3d 907, 911 (8th Cir. 2013) (citing *Cody v. Weber*, 256 F.3d 764, 771 (8th Cir. 2001)). Here, after complaints about Smith (and others involved in the Richter case) appeared on Ripoff Report, Smith commenced an extensive investigation of Xcentric, Magedson and others. Among other things, he (a) issued more than a hundred subpoenas and, as a result, obtained email messages, detailed financial information and copies of checks issued by Xcentric, (b) filed a search warrant application and lengthy supporting affidavit as unsealed documents, contrary to his usual practice, thus exposing the contents of those documents to the public, (c) obtained privileged email communications between Xcentric and its lawyers without returning those privileged communications or, at least, advising Xcentric that he was in possession of them, (d) shared privileged information from those communications with individuals who are adverse to Ripoff Report, (e) shared checks and bank statements relating to Xcentric's accounts with individuals who are adverse to Ripoff Report and (f) obtained no written non-disclosure assurances from any individual before disclosing privileged and/or confidential information.

Moreover, Smith has made no secret of his desire to file criminal charges against Xcentric and Magedson. He confirmed this during his testimony. In addition, he commenced a prosecution of Meade based, at least in part, on Meade's Ripoff Report postings and then acknowledged in a public filing (Ex. 42) that he offered absolute immunity to Meade in exchange for testimony against Xcentric and Magedson. He

37

ultimately dismissed all charges against Meade but has done nothing to suggest that he will not prosecute plaintiffs.

In short, the plaintiffs have had their confidential records and privileged communications seized and disclosed and have been threatened with criminal prosecution as a result of statements posted on Ripoff Report. I have no difficulty concluding that these consequences would "chill a person of ordinary firmness" from continuing to engage in protected First Amendment activity.

### iii.    Motivation

The final question is whether Smith's "adverse action was motivated at least in part by the exercise of the protected activity." *L.L. Nelson Enters., Inc.*, 673 F.3d at 808. While retaliation need not have been the defendant's sole motivation, it must have been a substantial factor in the defendant's decision to act. *Baribeau v. City of Minneapolis*, 596 F.3d 465, 481 (8th Cir. 2010). In addition, the plaintiff "must show that the retaliatory motive was a but-for cause of the harm; that is, that the plaintiff was 'singled out' for adverse treatment because of his exercise of constitutional rights. *Kilpatrick v. King*, 499 F.3d 759, 767 (8th Cir. 2007) (citing *Osborne v. Grussing*, 477 F.3d 1002, 1006 (8th Cir. 2007)).

At this stage of the case, I conclude that the plaintiffs have met their burden of demonstrating a likelihood of success on this element. While Smith contends he is acting solely for the benefit of various witnesses who have been targeted on Ripoff Report, I find that he has acted, at least in part, for retaliatory reasons. For starters, I am amazed that Smith offered no direct evidence, such as copies, of any Ripoff Report posts that have allegedly harassed or defamed any witnesses who testified against Richter. Instead, he chose to provide only his own characterizations of the statements at issue.

38

In one instance, counsel for plaintiffs offered a Ripoff Report complaint (Ex. 41) into evidence to challenge Smith's testimony about that complaint. As noted above, the allegedly-harassing aspect of this complaint seems to be the fact that the words "Dr. John Pitman" are adjacent to the words "baby raper." Ex. 41 at 1. In context, the heading simply alleges that Michael Roberts "confesses he claimed Dr. John Pitman baby raper." *Id.* While Smith testified about other statements on Ripoff Report concerning the state's witnesses, he did not offer them into evidence. If Smith's investigatory tactics have truly been motivated by a desire to protect the State's witnesses from harassing or defamatory posts on Ripoff Report, it would have been a fine idea for him to offer those statements into evidence.

Instead, there is substantial evidence that Smith's actions have been motivated, in large part, by statements made about him on Ripoff Report. Smith admits that he has worked over a thousand hours and has issued over one hundred subpoenas during his investigation into Ripoff Report. Smith presented no evidence that in his role of Sac County Attorney, he has devoted similar time and resources into other investigations of potential misdemeanor offenses. The finder of fact could easily determine that Smith is treating this investigation differently, and indeed obsessively, because he is angry and embarrassed by Ripoff Report posts that have criticized and ridiculed him.[10]

The evidence also reveals other ways that Smith has gone above and beyond normal investigatory tactics. He wrote a 119-page, singled-spaced affidavit in support of an application to obtain a search warrant, relying on avowed enemies of Ripoff Report for substantial portions of its contents. He then filed the application as public record, rather than sealing it as is his usual practice. This allowed him, in effect, to publicly air his allegations about the plaintiffs before filing any charges.

---

[10] As noted earlier, Smith admits that he has been "irritated" by complaints about him posted on Ripoff Report. I find this to be an understatement.

More troubling, and what I find to be most persuasive, is what Smith did with privileged and confidential information after obtaining it by his myriad of subpoenas. Upon obtaining communications that clearly appear to be between Xcentric and its own counsel (*e.g.*, Ex. 8), Smith did nothing to advise Xcentric of this fact. Nor did Smith do anything to preserve their confidentiality. Instead, he put at least one such communication (Ex. 8) into evidence in a proceeding and provided other presumably-privileged communications to third-parties, including various enemies of Ripoff Report. He also disclosed Xcentric's financial and banking information to third-parties, thus allowing that information to become public. While disclosing privileged and confidential information to others, Smith did not require those individuals to enter into non-disclosure agreements. He has provided no legal justification for this. At this stage of the case, it is very difficult to consider this over-the-top behavior as being anything other than retaliatory.[11]

For these reasons, I find that the record supports plaintiffs' contention that the Ripoff Report postings critical of Smith were, at least, a substantial factor in his decision to take adverse actions against plaintiffs. Indeed, at this stage of the case it appears that the plaintiffs have been singled out for adverse treatment because of their exercise of constitutional rights. Thus, I find that they have demonstrated a likelihood of success on the merits of their claim that Smith has improperly retaliated against them for their exercise of rights protected by the First Amendment.

As with my finding concerning CDA immunity, this is not a final determination that Smith has violated plaintiffs' constitutional rights. His failure to submit relevant evidence at the injunction hearing, while puzzling, does not mean that such evidence does

---

[11] Plaintiffs contend that Smith violated Iowa law by disclosing information obtained by subpoena. Doc. No. 49 at 10 (citing *Chidester v. Needles*, 353 N.W.2d 849, 852-53 (Iowa 1984)).

not exist.   Once the parties have full opportunity to conduct discovery, Smith's motivations for acting may prove to be less offensive than they currently appear.   At this point, however, it is very easy to infer a retaliatory motive.

### 2.    *Fourth Amendment*

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons ... and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause."   U.S. Const. amend. IV.   It is applicable to state actors by virtue of the Fourteenth Amendment.   *United States v. Hallam*, 407 F.3d 942, 945 (8th Cir. 2005).   Here, plaintiffs contend that Smith violated their rights under the Fourth Amendment.   According to their briefs, this argument is based on Smith's application for, and execution of, a search warrant.   *See, e.g.,* Doc. No. 44 at 10-12; Doc. No. 49 at 21-22.   The only evidence of record concerning a search warrant is the application and warrant (Ex. 1) concerning Anna Richter's home.   Plaintiffs complain that Smith's affidavit in support of that warrant was flawed in various ways, including the alleged omission of material facts.   *Id.*

Even if the plaintiffs had strong arguments on the substantive merits of this claim (and I am hardly convinced that they do), they did not address the crucial issue of standing.   Fourth Amendment rights are personal and cannot be asserted vicariously. *See, e.g., United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994).   In order to have standing to complain about an allegedly-unreasonable search, a party must have a reasonable expectation of privacy in the area searched.   *Id.*   The relevant factors include:

> ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case.

*Id.*   Plaintiffs have made no effort to show that they had a reasonable expectation of privacy with regard to Anna Richter's home or any of the items seized from that home. Thus, even if the search warrant was flawed, plaintiffs have made no showing that their own, personal Fourth Amendment rights were violated.   At this stage of the case, then, plaintiffs have failed to demonstrate a likelihood of success on the merits of their claims under the Fourth Amendment.[12]

### 3.     Sixth Amendment

Plaintiffs also make an (abbreviated) argument that Smith has violated their rights under the Sixth Amendment, which – among other things – provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . have the assistance of counsel for his defense."   U.S. Const. amend. VI.   The Sixth Amendment also applies to the states through the Fourteenth Amendment.   *Pointer v. Texas*, 380 U.S. 400, 403 (1965). Citing no authority, plaintiffs contend Smith violated their Sixth Amendment rights by obtaining and reviewing communications subject to the attorney-client privilege and by filing an ethics complaint against their counsel.   Doc. No. 44 at 12.

Plaintiffs' failure to reference supporting authority is a major clue about the merits of this claim.   I have not, through independent research, located any case law that might support the claim, as currently framed.   Among other things, it is undisputed that Smith has not yet charged plaintiffs with any offense.   *But see Texas v. Cobb*, 532 U.S. 162, 172 (2001) (Sixth Amendment right to counsel attaches only to charged offenses). Perhaps there is a non-frivolous Sixth Amendment argument to be made, but plaintiffs

---

[12] Plaintiffs may also contend in this case that Smith violated their rights under the Fourth and Fourteenth Amendments by using subpoenas to obtain various documents, including email messages and bank records.   They did not brief that argument.

42

have not taken the trouble to make it. At this stage of the case, they have certainly not demonstrated anything close to a likelihood of success on the merits.

## B.    *The Other <u>Dataphase</u> Factors*

Because the plaintiffs have demonstrated a likelihood of success on the merits with regard to their First Amendment retaliation claim, "the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Elli*, 997 F. Supp. 2d at 983. Nonetheless, I will briefly address those other factors.

### 1.    *Irreparable Harm*

A party seeking a preliminary injunction typically must establish that it will suffer irreparable harm absent such relief. *See, e.g., Dataphase*, 640 F.2d at 114. However, such harm is presumed with regard to First Amendment violations, as "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Lowry ex rel. Crow v. Watson Chapel Sch. Dist.*, 540 F.3d 752, 762 (8th Cir. 2008) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality)). Even without this presumption, I find that irreparable harm would continue to occur if Smith is not enjoined from continuing with his seemingly-retaliatory conduct. In particular, the continued receipt, review and disclosure by Smith of privileged communications and confidential financial information would likely cause harm that could not be cured or remedied by a mere award of money damages. Based on the legal presumption of irreparable harm and the evidentiary record, I find that this factor weighs in favor of injunctive relief.

43

## 2.    Balance of Harms

The next factor is the state of balance between the harm to the plaintiffs if an injunction does not issue and the harm to Smith if it does.    *Dataphase*, 640 F.2d at 114. Even if this factor was not already deemed to weigh in plaintiffs' favor based on the strength of their First Amendment retaliation claim, I would find that it does.    As plaintiffs point out, Smith is the only defendant and an injunction would apply only to him.    The injunction would not prevent the Attorney General of Iowa, or a special prosecutor, from investigating potential criminal charges against plaintiffs.[13]    Instead, it would simply prevent Smith from continuing to engage in behavior that appears to be motivated, at least in substantial part, by speech about him that is protected by the First Amendment.

Other prosecutors, who have not yet been savaged on Ripoff Report, would be far less likely to be susceptible to such retaliatory motives.    Smith, meanwhile, would be free to perform his obligations as an elected prosecutor in every other respect.    In short, the balance of harms weighs in favor of injunction relief.

## 3.    The Public Interest

"[I]njunctions protecting First Amendment freedoms are always in the public interest." *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 298 (5th Cir. 2012) (quoting *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006); *accord Ingebretsen ex rel. Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996) (holding that where a law violates the First Amendment "the public interest was not disserved by an injunction preventing its implementation").    I find that to be

---

[13]  The Iowa Code provides for the appointment of the Attorney General or any other attorney as special prosecutor if the county attorney is disqualified from a particular proceeding.    Iowa Code § 331.754(2).

true here.   Smith has undertaken a massive investigation into alleged misdemeanor offenses that, if charged, would be based entirely on speech.   Whether he has been motivated by speech about trial witnesses, speech about himself or some combination of the two, there is no doubt that the investigation arises from statements made on a public internet forum.   Smith has done virtually nothing to show that allowing him to continue his investigation into the Ripoff Report would advance the public interest.

This is especially true because, as noted above, an injunction would apply only to Smith.   If there is a strong case to be made that the plaintiffs violated Iowa Code § 720.4, other prosecutors would remain free to make that case.   An injunction would simply remove Smith, whose motives are (at best) unclear, from continuing a pattern of conduct affecting plaintiffs' First Amendment rights.

Smith argues, however, that the abstention doctrine established by *Younger v. Harris*, 401 U.S. 37 (1971), not only demonstrates that an injunction is contrary to the public interest, but also deprives this court of jurisdiction to issue an injunction.   As the Eighth Circuit has explained:

> In *Younger*, the Supreme Court held that federal courts as a rule should abstain from exercising jurisdiction when asked to enjoin <u>pending</u> state criminal proceedings.   *Id*. at 56, 91 S. Ct. at 757.   The *Younger* abstention doctrine is a reflection of the public policy that disfavors federal court interference with state judicial proceedings.   The doctrine is based on comity and federalism. *See Ronwin v. Dunham*, 818 F.2d 675, 677 (8th Cir. 1987) (citing *Younger*, 401 U.S. at 44, 91 S. Ct. at 750).

*Lewellen v. Raff*, 843 F.2d 1103, 1109 (8th Cir. 1988) [emphasis added; footnote omitted].   *Younger* abstention is appropriate when "(1) there is an ongoing state proceeding, (2) which implicates important state interests, and (3) there is an adequate opportunity to raise any relevant federal questions in the state proceeding." *Plouffe v. Ligon*, 606 F.3d 890, 892 (8th Cir. 2010) (citing *Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982).

45

According to Smith, issuing an injunction would violate *Younger*. There are at least three problems with this contention. First, no state court criminal proceedings are "pending" against plaintiffs.[14] Smith cites no case applying *Younger* to a prosecutor's investigatory actions before the commencement of judicial proceedings. Because no proceedings against the plaintiffs are currently pending in any Iowa state court, *Younger* does not apply.

Second, and as noted above, the requested injunction would not prohibit the commencement and prosecution of state criminal charges by anyone other than Smith. Another prosecutor, including the Attorney General of Iowa, would be free to investigate plaintiffs and commence any criminal proceedings that may be appropriate.

Third, *Younger* abstention is not absolute. Indeed, "[a] showing that a prosecution was brought in retaliation for or to discourage the exercise of constitutional rights 'will justify an injunction regardless of whether valid convictions conceivably could be obtained.'" *Lewellen*, 843 F.2d at 1109-10 (quoting *Fitzgerald v. Peek*, 636 F.2d 943, 945 (5th Cir. 1981)). This is because no state has a legitimate interest in pursuing such a prosecution. *Id.* at 1110. Here, I have already found a likelihood of success that plaintiffs will succeed on the merits of their First Amendment retaliation claim at trial.

In short, Smith's reliance on *Younger* is misplaced. I find that the public interest, like all of the other *Dataphase* factors, weighs in favor of injunctive relief.[15] As such,

---

[14] Smith's post-hearing brief, filed May 29, 2015, appears to invoke the criminal action against Meade as satisfying the "pending proceedings" requirement. Doc. No. 45 at 20-22. Even if that argument otherwise might have had merit, it was ill-timed. All charges against Meade were dismissed with prejudice, at Smith's request, two days before Smith filed his brief. Exs. 42, 43. Thus, there is no evidence that any criminal proceedings relating to the plaintiffs are currently pending in the Iowa state court.

[15] Smith has raised an affirmative defense of qualified immunity. Doc. No. 11 at 6. The doctrine of qualified immunity, even if applicable, does not bar injunctive relief. *Mead v.*

46

I will recommend the issuance of a preliminary injunction. The remaining matters to address are (1) the appropriate scope of the injunction and (2) the amount of the bond, if any.

### C.  *The Recommended Injunction*

As I noted at the beginning, plaintiffs request that Smith be enjoined from the following:

A.  Bringing criminal charges against Xcentric or Magedson related to any postings related to criticisms of the State or its evidence presented in *State v. Richter*.

B.  Continuing the investigation of Xcentric and Magedson such as sending search warrants or subpoenas to their banks, email providers and other service providers.

C.  Reading Xcentric's privileged attorney-client communications.

D.  Disclosing Xcentric's attorney-client privileged communications to others.

E.  Disclosing Xcentric's financial and banking records to others.

F.  Disclosing Magedson's personal and private communications to others.

G.  Disclosing any communications or information obtained through investigation of Xcentric or Magedson.

H.  Wrongfully instituting civil proceedings on behalf of the State.

I.  Threatening, intimidating, accusing or otherwise stating that plaintiffs' lawyers are violating any laws in representing plaintiffs.

---

*Palmer*, 2015 WL 4488665, at *5, ___ F.3d ___ (8th Cir. July 24, 2015); *see also Burnham v. Ianni*, 119 F.3d 668, 673 n. 7 (8th Cir. 1997) (en banc); *Grantham v. Trickey*, 21 F.3d 289, 295 (8th Cir. 1994).

Doc. No. 44 at 23. In addition, plaintiffs request that Smith be ordered to "obtain certifications, under oath, from his agents, including Michael Roberts, John Brewington and Tina Church, that they have destroyed, and will not further distribute, plaintiffs' emails and financial records that were provided to these third parties by Smith." *Id.* at 24.

An injunction should be no broader than necessary to remedy the underlying wrong. *Coca-Cola Co. v. Purdy,* 382 F.3d 774, 790 (8th Cir. 2004) (citing *EEOC v. HBE Corp.*, 135 F.3d 543, 557 (8th Cir. 1998)). In addition, an injunction "must provide a person of ordinary intelligence a reasonable opportunity to understand what is prohibited." *Id.* Applying these principles, I find items A through G on plaintiffs' injunction wish list to be appropriate, with one caveat. Because the injunction will not prevent the Attorney General of Iowa, or another specially-appointed prosecutor, from investigating plaintiffs, I find that Smith should be permitted – without violating the injunction – to provide copies of materials he has gathered in the course of his investigation to other prosecutorial officers upon their written request.

I further find that plaintiffs' proposed item H (enjoining Smith from "[w]rongfully instituting civil proceedings on behalf of the State") is vague, ambiguous and cumulative. Among other things, it does not answer the question: "Against whom?" Nor does it describe the concept of what it means to "wrongfully" institute civil proceedings. Smith is already subject to the Iowa Rules of Professional Conduct which, among other things, provide as follows:

> A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification, or reversal of existing law.

Iowa Rule of Professional Conduct 32:3.1.   This ethical requirement, when combined with the injunction that I will recommend, is sufficient to protect plaintiffs from further harm.

I also find plaintiffs' proposed item I (enjoining Smith from "[t]hreatening, intimidating, accusing or otherwise stating that plaintiffs' lawyers are violating any laws in representing plaintiffs") to be inappropriate and sadly ironic.   After loudly championing the importance of First Amendment freedoms in this case, plaintiffs have proposed a gag order that would restrain Smith's speech.   Moreover, this item is expressly designed for the benefit of plaintiffs' attorneys – none of whom are parties to this case.   Item I is overly broad and unnecessary.

Finally, I reject plaintiffs' request for an affirmative injunction compelling Smith to "obtain certifications, under oath" from various non-parties that they have taken certain actions.   The purpose of a preliminary injunction is "to preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the lawsuit's merits." *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994) (citing *Dataphase*, 640 F.2d at 113 & n. 5).   The requested affirmative injunction would go far beyond simply preserving the status quo.   Moreover, because the third-parties at issue are not parties to this case, they have no obligation to comply with this court's directives.   Thus, the proposed order would be all but unenforceable.[16]

For these reasons, I will recommend entry of a preliminary injunction consistent with items A through G of plaintiffs' request, but not the remaining items.

---

[16] The requested order is also overly broad, as it is not limited to privileged and confidential information, or information that Smith may have been prohibited by law from disclosing.

*D.* **Bond**

"The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "The amount of the bond rests within the sound discretion of the trial court and will not be disturbed on appeal in the absence of an abuse of that discretion." *Stockslager v. Carroll Elec. Co-op. Corp.*, 528 F.2d 949, 951 (8th Cir. 1976) [citation omitted].

Here, there is no risk that Smith will suffer monetary loss if a preliminary injunction against him is later dissolved. Moreover, I find it to be inappropriate to require plaintiffs to post security as a condition of enjoining potential violations of their constitutional rights. *See, e.g., Incubus Invs., L.L.C. v. City of Garland*, No. CIV.A. 303CV2039-K, 2003 WL 23095680, at *4 (N.D. Tex. Dec. 17, 2003) (requiring a bond for a constitutional challenge "would have a negative impact on [the plaintiff's] constitutional rights, as well as the constitutional rights of the members of the public."). As such, I recommend that no security be required as a condition of issuing a preliminary injunction.

## VII. CONCLUSION

For the reasons set forth herein, I RESPECTFULLY RECOMMEND that plaintiffs' motion (Doc. No. 7) for preliminary injunction be **granted** and that a preliminary injunction issue, without payment of security, enjoining defendant Ben Smith from engaging in the following conduct while this action is pending:

A.   Bringing criminal charges against Xcentric or Magedson related to any postings related to criticisms of the State or its evidence presented in *State v. Richter*.

50

B.     Continuing the investigation of Xcentric and Magedson such as sending search warrants or subpoenas to their banks, email providers and other service providers.

C.     Reading Xcentric's privileged attorney-client communications.

D.     Disclosing Xcentric's attorney-client privileged communications to others.

E.     Disclosing Xcentric's financial and banking records to others.

F.     Disclosing Magedson's personal and private communications to others.

G.     Disclosing any communications or information obtained through investigation of Xcentric or Magedson.

I further recommend that the injunction include a limited exception as to items D, E, F and G, that would permit Smith, upon written request, to disclose information gathered in the course of his investigation of Xcentric and Magedson to the Attorney General of Iowa or any other special prosecutor who may be appointed to investigate alleged criminal conduct on the part of Xcentric or Magedson.

Objections to this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72. Failure to object waives the right to de novo review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**IT IS SO ORDERED.**

**DATED** this 19th day of August, 2015.

 

 

_____
LEONARD T. STRAND
UNITED STATES MAGISTRATE JUDGE